UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

VALERIE PLAME WILSON et al.,    :
   :
          Plaintiffs,    :
   :    07 Civ. 4595 (BSJ)
      v.    :
   :
J. MICHAEL MCCONNELL et al.,    :
   :
          Defendants.    :

-------------------------------------------------------- x

## ADMINISTRATIVE RECORD
## (UNCLASSIFIED)

# WILSON, ET AL. V. MCCONNELL, ET AL.

# UNCLASSIFIED ADMINISTRATIVE RECORD

# TABLE OF CONTENTS
## FOR THE
## UNCLASSIFIED ADMINISTRATIVE RECORD

| DOCUMENT | TAB | DATE |
|---|---|---|
| Redacted letter to Valerie Wilson from the Chief, Retirement & Insurance Services, dated 10 February 2006 | 1 | 10 February 2006 |
| Letter to Valerie Wilson from R. Puhl, dated 31 May 2006 | 2 | 31 May 2006 |
| Letter to Valerie Wilson from R. Puhl, dated 9 June 2006 | 3 | 9 June 2006 |
| Letter to R. Puhl from Valerie Wilson, dated 14 June 2006 | 4 | 14 June 2006 |
| E-mail to the CIA Publication Review Board from Valerie Wilson, dated 7 July 2006 | 5 | 7 July 2006 |
| E-mail string including the following e-mails: to R. Puhl from Valerie Wilson, dated 5 August 2006; to Valerie Wilson from R. Puhl, dated 4 August 2006; to R. Puhl from Valerie Wilson, dated 30 July 2006; to Valerie Wilson from R. Puhl, dated 10 July 2006 | 6 | 5 August 2006 |
| E-mail string including the following e-mails: to Valerie Wilson from R. Puhl, dated 21 August 2006; to R. Puhl from Valerie Wilson, dated 10 August 2006 | 7 | 21 August 2006 |
| E-mail string including the following e-mails: to Valerie Wilson from R. Puhl, dated 8 September 2006; to R. Puhl from Valerie Wilson, dated 7 September 2006 | 8 | 8 September 2006 |
| E-mail string including the following e-mails: to Valerie Wilson from Joyce H., dated 3 October 2006; to Jane B. Fraser from Valerie Wilson, dated 3 October 2006; to R. Puhl from Valerie Wilson, dated 14 September 2006; to Valerie Wilson from Jane B. Fraser, dated 14 September 2006 | 9 | 3 October 2006 |
| E-mail string including the following e-mails: to Joyce H. from Valerie Wilson, dated 27 November 2006; to Joyce H. from Valerie Wilson, dated 20 November 2007; to Valerie Wilson from R. Puhl, dated 16 November 2006 | 10 | 27 November 2006 |
| Letter to Valerie Wilson from R. Puhl, dated 21 November 2006, including portion of redacted manuscript (filed under seal) | 11 | 21 November 2006 |
| Letter to Valerie Wilson from R. Puhl, dated 22 December 2006 (with fax cover sheet transmitting this letter to David B. Smallman dated 3 January 2007) | 13 | 22 December 2006 |

| | | |
|---|---|---|
| E-mail string including the following e-mails: to Joyce H. from Valerie Wilson, dated 25 December 2006; to Joyce H. from Valerie Wilson, dated 14 December 2006 | 14 | 25 December 2006 |
| Letter to Ginger A. Wright from David B. Smallman, dated 9 January 2007 | 15 | 9 January 2007 |
| Attachment of spreadsheet to the 9 January 2007 letter | 15 A | 9 January 2007 Attachment |
| E-mail to R. Puhl from Valerie Wilson, dated 11 January 2007 | 16 | 11 January 2007 |
| E-mail to R. Puhl from Valerie Wilson, dated 12 January 2007 | 17 | 12 January 2007 |
| Letter to Valerie Wilson from CIA, dated 19 January 2007 (with fax cover sheet transmitting this letter to David B. Smallman dated 22 January 2007) | 18 | 19 January 2007 |
| Letter to The Honorable Karen Haas from Christopher J. Walker, dated 23 January 2007 | 19 | 23 January 2007 |
| Letter to Ginger A. Wright from David B. Smallman, dated 31 January 2007 | 20 | 31 January 2007 |
| Letter to David B. Smallman from Ginger A. Wright, dated 9 February 2007 | 21 | 9 February 2007 |
| Letter to Ginger A. Wright from David B. Smallman, dated 16 February 2007 | 22 | 16 February 2007 |
| Letter to David B. Smallman from Ginger A. Wright, dated 23 February 2007 (with fax cover sheet transmitting this letter and tab 24 w/o attachment to David B. Smallman, dated 23 February 2007) | 23 | 23 February 2007 |
| Letter to Valerie Wilson from R. Puhl, dated 23 February 2007, including portion of redacted manuscript (filed under seal) | 24 | 23 February 2007 |
| E-mail string including the following e-mails: to Joyce H. from Valerie Wilson, dated 2 April 2007; to R. Puhl from Valerie Wilson, dated 1 April 2007 | 25 | 2 April 2007 |
| E-mail string including the following e-mails: to Joyce H. from Valerie Wilson, dated 9 April 2007; to Joyce H. from Valerie Wilson, dated 9 April 2007 | 26 | 9 April 2007 |
| Letter to John A. Rizzo from David B. Smallman, dated 17 April 2007 | 27 | 17 April 2007 |

| | | |
|---|---|---|
| Letter to Valerie Wilson from R. Puhl, dated 23 February 2007 | 27 A | 17 April 2007 Attachment |
| Letter to David B. Smallman from Ginger A. Wright, dated 23 February 2007 | 27 B | 17 April 2007 Attachment |
| Letter to Valerie Wilson from the Chief, Retirement & Insurance Services, dated 10 February 2006 (filed in classified record) | 27 C | 17 April 2007 Attachment |
| E-mail to Valerie Wilson from Brian Bonlender, dated 16 January 2007, attaching the Valerie Plame Wilson Compensation Act | 27 D | 17 April 2007 Attachment |
| Introduction of the 16 January 2007 Valerie Plame Wilson Compensation Act (2 versions) and the 16 January 2007 Congressional Record (filed in classified record) | 27 E | 17 April 2007 Attachments |
| Letter to Valerie Wilson from R. Puhl, dated 19 April 2007 | 28 | 19 April 2007 |
| Letter to David B. Smallman from John A. Rizzo, dated 24 April 2007 | 29 | 24 April 2007 |
| Letter to Valerie Wilson from R. Puhl, dated 19 April 2007 | 29 A | 24 April 2007 Attachment |
| Redacted letter to Valerie Wilson from the Chief, Retirement & Insurance Services, dated 10 February 2006 | 29 B | 24 April 2007 Attachment |
| E-mail string including the following e-mails: to Joyce H. from Valerie Wilson, dated 25 April 2007; to Joyce H. from Valerie Wilson, dated 23 April 2007 | 30 | 25 April 2007 |
| Letter to John A. Rizzo from David B. Smallman, dated 27 April 2007 | 31 | 27 April 2007 |
| Letter to J. Michael McConnell from David B. Smallman, dated 27 April 2007 | 31 A | 27 April 2007 Attachment |
| Letter to Benjamin A. Powell from David B. Smallman, dated 2 May 2007 | 32 | 2 May 2007 |
| Letter to David B. Smallman from Tricia S. Wellman, dated 4 May 2007 | 33 | 4 May 2007 |
| Letter to Tricia S. Wellman from David B. Smallman, dated 4 May 2007 | 34 | 4 May 2007 |

| | | |
|---|---|---|
| Letter to Tricia S. Wellman from David B. Smallman, dated 11 May 2007 | 35 | 11 May 2007 |
| Letter to David B. Smallman from John A. Rizzo, dated 17 May 2007 | 36 | 17 May 2007 |
| Letter to Tricia S. Wellman from David B. Smallman, dated 17 May 2007 | 37 | 17 May 2007 |
| Letter to David B. Smallman from Benjamin A. Powell, dated 18 May 2007 | 38 | 18 May 2007 |
| Redacted Agency Regulation – Prepublication Review of Certain Material Prepared for Public Dissemination, dated 22 July 2005 | 39 | 22 July 2005 |
| Agency Regulation – Declassification Authorities, effective 3 June 1997 | 40 | 3 June 1997 |
| Redacted Secrecy Agreement signed by Valerie Plame | 41 | (Redacted) |

**Tab 1**

SECRET//20320110



Central Intelligence Agency



Washington, D.C. 20505

February 10, 2006

APPROVED FOR RELEASE
DATE:  APR 2007

Mrs. Valerie Wilson
4612 Charleston Terrace, NW
Washington, DC 20007

Dear Mrs. Wilson,

    This letter is in response to your recent telephone conversation with [redacted] regarding when you would be eligible to receive your deferred annuity. Per federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA).

SECRET//20320110

SECRET//20320110

| | Dates of Service | Years/Months/Days |
|---|---|---|
| CIA (P/T 40) | 01/01/2002 - 12/31/2002 | 01 year, 00 months, 00 days |
| CIA (P/T 40) | 01/01/2003 - 12/31/2003 | 01 year, 00 months, 00 days |
| CIA (P/T 40) | 01/01/2004 - 08/07/2004 | 00 years, 07 months, 07 days |
| CIA (LWOP) | 08/08/2004 - 12/31/2004 | 00 years, 04 months, 23 days (no excess) |
| CIA | 01/01/2005 – 01/09/2006 | 01 years, 00 months, 09 days |

The above figures are estimates for your planning purposes. The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts. Please let me know if I can be of any further assistance.

Sincerely,

Chief, Retirement & Insurance Services

SECRET//20320110

**Tab 2**




Central Intelligence Agency

Washington, D.C. 20505

**Publications Review Board**
**1H11 IP Building**
**Washington, D.C. 20505**

Telephone: 703.613.3070
Facsimile: 703.613.3004
E-mail: prb@ucia.gov

31 May 2006

Ms. Valerie E. Wilson
4612 Charleston Terrace, NW
Washington, DC 20007

Dear Ms. Wilson: *Valerie*

Media reports concerning the publication of your proposed memoir have come to the attention of the Central Intelligence Agency's Publications Review Board. Upon your departure from the Agency in January 2006, the Board took the opportunity to ensure that you were fully briefed on your prepublication review obligation. This obligation is based upon provisions of the legally binding secrecy agreement you signed with the Agency.

Let me take this opportunity to remind you that pursuant to this secrecy agreement, you are obligated to submit for prepublication review:

> [A]ny written, oral, electronic, or other presentation
> intended for publication or public dissemination,
> whether personal or official, that mentions CIA or
> intelligence data or activities or material on any subject
> about which the author has had access to classified
> information in the course of his employment or other
> contact with the Agency.

Also, your eventual manuscript and corresponding contacts with publishers and the media must take into account your specific career status with the Agency during the periods in question.

Please note that we make every effort to accommodate reasonable publishing deadlines and that permission to publish will not be denied solely because information may be embarrassing to or critical of the Agency.

Our contact information is as follows:

(U.S. Postal Service Delivery)

CIA Publications Review Board
1H11 IP Building
Washington DC 20505

(Overnight Delivery)

CIA Gate 5
Publications Review Board
1H11 IP Building
1000 Colonial Farm Road
McLean VA 22101

Manuscripts may be sent as a standard Word attachment to e-mail address: prb@ucia.gov.

Please do not hesitate to contact me if you have any questions or if we can be of further assistance.

Sincerely yours,

R. Puhl

R. Puhl
Chairman, Publications Review Board

**Tab 3**

Central Intelligence Agency



Washington, D.C. 20505

Publications Review Board
1H11 IP Building
Washington, D.C. 20505

Telephone: 703.613.3070
Facsimile: 703.613.3004
E-mail: prb@ucia.gov

9 June 2006

Ms. Valerie E. Wilson
4612 Charleston Terrace, NW
Washington, DC 20007

Dear Ms. Wilson:

I received your recent voicemail message in response to my letter of 31 May 2006. This letter confirms your assurance that in accordance with your secrecy agreement and CIA regulations, you will submit your manuscript to the Publications Review Board ("PRB") prior to publication.

Your obligation under your secrecy agreement and CIA regulations, however, is not limited to submitting a final manuscript for approval before publication. Under Agency regulations, *publication* of covered information (as defined by regulation, but which includes information related to the CIA, intelligence data or activities, or material on any subject about which you had access to classified information) includes any communication by you of such information to any other person. Accordingly, before communicating (whether in writing or orally) any information related to the CIA, intelligence data or activities, or material on any subject about which you had access to classified information to any person (including but not limited to a co-writer, editor, publisher, etc.), you must request and secure *prior written approval* from the PRB. Thus, you must secure PRB approval of any outline, draft, notes or other writing, or any proposed oral communication, containing covered information before submitting such writing to any person or imparting such information orally to any person.

According to recent press reporting, including an article dated 6 May 2006 in the New York Times (entitled "Book Deal for Ex-C.I.A. Officer"), you have submitted a detailed proposal with outlines and sample matter to Crown Publishing. If true, such conduct would be a clear violation of your secrecy agreement and Agency regulations.

The PRB stands ready to assist you in fully complying with your legal obligation to ensure the safeguarding of classified information through the prepublication review process.

Certainly, if you have any further questions, do not hesitate to contact me.

Sincerely yours,

R. Puhl

R. Puhl
Chairman, Publications Review Board

**Tab 4**

Valerie E. Wilson
4612 Charleston Terrace, NW
Washington, DC 20007

14 June 2006

Mr. R. Puhl
Chairman, Publications Review Board
Central Intelligence Agency
1H11 1P Building
Washington, D.C. 20505

Dear Mr. Puhl:

Thank you for your letters of 31 May 2006 and 9 June 2006 which provided me with additional and new information about the PRB review process as well as my obligations under Agency regulations. I greatly appreciate the offer from you and the PRB to provide assistance in complying with the review process.

As you know from our ongoing contacts, I take seriously my obligation to safeguard classified information through the prepublication review process. At our personal meeting in January of this year, and in several subsequent telephone calls, I requested copies of unclassified versions of any applicable regulations that bear upon my secrecy agreement. Although I have not yet received those unclassified regulations, PRB's offer of guidance on existing regulations will be helpful to me as I move forward with the process of preparing materials for eventual submission to my publisher. I welcome the Agency's recommendations regarding compliance to avoid any inadvertent disclosure of classified information.

I look forward to working with you and the PRB and offer my complete cooperation with respect to the submission of any materials that fall within the scope of the PRB review. In that regard, because I am not a professional writer and will be working with an editor, and because PRB has stated that it will make every effort to accommodate reasonable publishing deadlines, I propose to submit draft chapters from my book on a rolling basis to PRB. I anticipate sending you four such chapters of about one hundred pages by 27 June. I look forward to talking to you on the 26th of June.

Sincerely,

*Valerie Wilson*

Valerie Wilson

**Tab 5**

**Subject:** Manuscript Submission
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Fri, 07 Jul 2006 16:23:15 +0000
**To:** prb@ucia.gov

To the CIA Publication Review Board,

In my 28 June 2006 telephone conversation with Richard Puhl, it

was agreed that I could submit my manuscript to PRB in "chunks" on
a rolling basis.  In accordance with that agreement, attached please

find Chapters 1-5 of approximately 100 pages of my book manuscript
for
PRB review.      I understand that the PRB will review the material
in a
timely manner and will undertake a subsequent timely review upon my
submission of the entire work.

In order to comply with any confidentiality issues,
I have changed the names of all individuals associated with the
Agency
who appear in these pages, with the exception of truly public
figures,
such as George Tenet.For the same reasons, I have also sought to
obscure any
identifying details of persons, operations, and places.

Please advise once you have received this email and its
attachments.  I look forward to working with the PRB to remain in
complete compliance with Agency publication regulations.

Sincerely,    Valerie Wilson

# Tab 6

**Subject:** Re: Manuscript Submission
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Sat, 05 Aug 2006 21:03:12 +0000
**To:** richajp@ucia.gov, MartyEdelman@paulhastings.com

here's what i sent on 30 july

Richard,

     I received your 10 July email (below), which touches upon the
required "formal" review of the completed manuscript (required for
the reasons indicated in your email), as distinguished from the
"informal" review of chapters submitted on a rolling basis also
agreed to in our telephone conversation on 28 June.

     As you know, our agreement had two parts:  that the PRB will
undertake an informal "quick review" of chapters submitted on a
rolling basis -- in "chunks" -- so that PRB reviewed chapters can be
quickly submitted to my editor for line editing. This was requested
and agreed to because I am not a professional writer, and it permits
a reasonable time for line editing, which I relied upon in entering
into my publishing agreement.     Secondly, PRB will not give complete
approval/no objection (including any final comments) until it sees
the entire manuscript (that is, all of the line edited chapters).

     While I appreciate your recent offer to allow me to delay
submission until I have finished a first draft of the entire work
and PRB has compiled all of those chapters for "formal" review, I
believe our existing agreement -- which provides for the PRB to
undertake a relatively quick i.e., first-cut "informal" review of
chapters submitted on a rolling basis -- is the best approach.  This
will ensure that any "covered information" is identified and not
communicated during the line editing process.   (We did not discuss
previously whether PRB would permit line editing of unreviewed
chapters by an approved person, but that could have been another
possible approach.)  Of course, the existing approach, as we agreed,
also makes it unnecessary for PRB to have to "re-review portions of
the text that have been modified" (as noted in your email) until
after it receives a complete line-edited manuscript and performs its
"formal" review.

     This accurately summarizes what we discussed and agreed to on 28
June concerning my submissions.  I look forward to receiving back
from PRB, with its comments, the first five chapters that were
submitted on 6 July so that I may promptly forward them to my line
editor.  I would be disappointed and concerned if the filing of a
civil suit by my husband and me earlier this month against certain
current and former government officials had anything to do with a
change in position by the PRB regarding our 28 June agreement about
prepublication review of my book.  To the extent that is an issue,

or if there are any questions about PRB honoring our agreement, it
would be helpful for us to schedule a meeting in person at a
mutually convenient time during the week beginning 14 or 21 August.


Sincerely, Valerie Wilson


From: richajp@ucia.gov
To: Joseph Wilson <thewilsonswdc@hotmail.com>
CC: PRB@ucia.gov
Subject: Re: Manuscript Submission
Date: Mon, 10 Jul 2006 13:00:31 -0400

Valerie -
We have received the first section of your manuscript.  Thanks.

Just to make clear what we discussed concerning your
submissions: although we are pleased to get portions of your
manuscript submitted as you complete them, we cannot provide any
formal response or approval until we have a complete manuscript with
which to work.  As you might expect, certain references in later
submissions might impact directly or indirectly on earlier passages
and could affect our review.  Additionally, as you are continuing to
write your first draft, you may find it necessary to include changes
to the text of previously-submitted sections.  In order that we will
not have to re-review portions of the text that have been modified,
we will wait for your final submission before formally starting the
review process.  Certainly, if you prefer to delay submission until
you have completed the entire work, that is fine.  Otherwise, we
will compile the sections of your manuscript as you send them in and
will then be ready to undertake our formal review once your draft
manuscript is complete.

Certainly, if you have any questions or concerns, feel free to
let us know.

Joseph Wilson wrote:
To the CIA Publication Review Board,


In my 28 June 2006 telephone conversation with Richard Puhl,
it
was agreed that I could submit my manuscript to PRB in "chunks" on

a rolling basis.  In accordance with that agreement, attached
please
find Chapters 1-5 of approximately 100 pages of my book manuscript
for
PRB review.     I understand that the PRB will review the material
in a
timely manner and will undertake a subsequent timely review upon

my
submission of the entire work.

    In order to comply with any confidentiality issues,
I have changed the names of all individuals associated with the
Agency
who appear in these pages, with the exception of truly public
figures,
such as George Tenet.For the same reasons, I have also sought to
obscure any
identifying details of persons, operations, and places.

    Please advise once you have received this email and its
attachments.  I look forward to working with the PRB to remain in
complete compliance with Agency publication regulations.

    Sincerely,    Valerie Wilson

**Subject:** Re: Manuscript Submission
**From:** richajp@ucia.gov
**Date:** Fri, 04 Aug 2006 07:15:40 -0400
**To:** Joseph Wilson <thewilsonswdc@hotmail.com>

Valerie -
I appreciate your note and hope that I can better communicate what I
believed to be our original understanding.
The PRB, as a matter of procedure and practice, has rarely (and
certainly not recently) approved individual parts of a more complete

submission for the reasons I outlined previously -- mainly that
earlier-submitted text in a segmented, staggered submission may actually
contain classified information when read in the context of
subsequently-supplied additional information. We need to ensure that
the entire document contains no classified information and that can best
be done when we have the entire work in front of us. Even if workable,
if you were to force the PRB to decide as to whether or not classified
information was contained within a portion of a manuscript, we would by
necessity have to err on the conservative side and require deletions

where the discussion could later go into classified material.
Since this practice has been the norm for the PRB for some time, I am
not exactly sure how I may have miscommunicated, or you perhaps
misinterpreted, our earlier discussion. It is possible that when we

were talking about "notes" that you might prepare and wish to share with
your editor/co-author, the PRB would review those individually before
you shared them. But a completed chapter or group of chapters is
different. If the PRB moved to review sections of the completed work
and then later identified, in the context of the whole manuscript,
objectionable material that had already be shared with others, were we
to require additional deletions, your editor/co-author would now know
exactly what information was considered classified and sensitive.
Let me be clear, if I gave you the wrong impression, I had no intent to
do so. Let me further say that my earlier note, clarifying what I

believed to be our understanding, was in no way a reflection of any
court or legal actions you have taken thus far.  I have, and will
continue to be, interested in only one thing in this pre-publication

review process, that information damaging to national security is
not
divulged.  The PRB stands ready to work with you to that end and
will
continue to provide you with professional support and guidance in
that
regard.
     I will certainly meet with you at your convenience.  I am out
for most
of the week of the 21st, but you can meet with other members of my
staff
that week or we can arrange to meet the week of the 14th or at
another time.

     Richard

Joseph Wilson wrote:
  Richard,

          I received your 10 July email (below), which touches upon the
  required "formal" review of the completed manuscript (required for
  the reasons indicated in your email), as distinguished from the
  "informal" review of chapters submitted on a rolling basis also
  agreed to in our telephone conversation on 28 June.

          As you know, our agreement had two parts:  that the PRB will
  undertake an informal "quick review" of chapters submitted on a
  rolling basis -- in "chunks" -- so that PRB reviewed chapters can
  be quickly submitted to my editor for line editing. This was
  requested and agreed to because I am not a professional writer,
  and it permits a reasonable time for line editing, which I relied
  upon in entering into my publishing agreement.    Secondly, PRB
  will not give complete approval/no objection (including any final
  comments) until it sees the entire manuscript (that is, all of the
  line edited chapters).

          While I appreciate your recent offer to allow me to delay
  submission until I have finished a first draft of the entire work
  and PRB has compiled all of those chapters for "formal" review, I
  believe our existing agreement -- which provides for the PRB to
  undertake a relatively quick i.e., first-cut "informal" review of
  chapters submitted on a rolling basis -- is the best approach.
  This will ensure that any "covered information" is identified and
  not communicated during the line editing process.  (We did not
  discuss previously whether PRB would permit line editing of
  unreviewed chapters by an approved person, but that could have
  been another possible approach.)  Of course, the existing
  approach, as we agreed, also makes it unnecessary for PRB to have
  to "re-review portions of the text that have been modified" (as

noted in your email) until after it receives a complete
line-edited manuscript and performs its "formal" review.

This accurately summarizes what we discussed and agreed to on
28 June concerning my submissions. I look forward to receiving
back from PRB, with its comments, the first five chapters that
were submitted on 6 July so that I may promptly forward them to my
line editor. I would be disappointed and concerned if the filing
of a civil suit by my husband and me earlier this month against
certain current and former government officials had anything to do
with a change in position by the PRB regarding our 28 June
agreement about prepublication review of my book. To the extent
that is an issue, or if there are any questions about PRB honoring
our agreement, it would be helpful for us to schedule a meeting in
person at a mutually convenient time during the week beginning 14
or 21 August.


Sincerely, Valerie Wilson



From: richajp@ucia.gov
To: Joseph Wilson <thewilsonswdc@hotmail.com>
CC: PRB@ucia.gov
Subject: Re: Manuscript Submission
Date: Mon, 10 Jul 2006 13:00:31 -0400

Valerie -
We have received the first section of your manuscript.
Thanks.

Just to make clear what we discussed concerning your
submissions: although we are pleased to get portions of your
manuscript submitted as you complete them, we cannot provide any
formal response or approval until we have a complete manuscript
with which to work. As you might expect, certain references in
later submissions might impact directly or indirectly on earlier
passages and could affect our review. Additionally, as you are
continuing to write your first draft, you may find it necessary to
include changes to the text of previously-submitted sections. In
order that we will not have to re-review portions of the text that
have been modified, we will wait for your final submission before
formally starting the review process. Certainly, if you prefer to
delay submission until you have completed the entire work, that is
fine. Otherwise, we will compile the sections of your manuscript
as you send them in and will then be ready to undertake our formal
review once your draft manuscript is complete.

Certainly, if you have any questions or concerns, feel free to
let us know.

Joseph Wilson wrote:

To the CIA Publication Review Board,


    In my 28 June 2006 telephone conversation with Richard Puhl, it
was agreed that I could submit my manuscript to PRB in "chunks" on
a rolling basis. In accordance with that agreement, attached please
find Chapters 1-5 of approximately 100 pages of my book manuscript for
PRB review.    I understand that the PRB will review the material in a
timely manner and will undertake a subsequent timely review upon my
submission of the entire work.

    In order to comply with any confidentiality issues,
I have changed the names of all individuals associated with the Agency
who appear in these pages, with the exception of truly public figures,
such as George Tenet.For the same reasons, I have also sought to obscure any
identifying details of persons, operations, and places.

    Please advise once you have received this email and its
attachments.  I look forward to working with the PRB to remain in
complete compliance with Agency publication regulations.

Sincerely,   Valerie Wilson

**Subject:** Re: Manuscript Submission
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Sun, 30 Jul 2006 11:33:14 +0000
**To:** richajp@ucia.gov

Richard,

    I received your 10 July email (below), which touches upon the required "formal" review of the completed manuscript (required for the reasons indicated in your email), as distinguished from the "informal" review of chapters submitted on a rolling basis also agreed to in our telephone conversation on 28 June.

    As you know, our agreement had two parts: that the PRB will undertake an informal "quick review" of chapters submitted on a rolling basis -- in "chunks" -- so that PRB reviewed chapters can be quickly submitted to my editor for line editing. This was requested and agreed to because I am not a professional writer, and it permits a reasonable time for line editing, which I relied upon in entering into my publishing agreement.  Secondly, PRB will not give complete approval/no objection (including any final comments) until it sees the entire manuscript (that is, all of the line edited chapters).

    While I appreciate your recent offer to allow me to delay submission until I have finished a first draft of the entire work and PRB has compiled all of those chapters for "formal" review, I believe our existing agreement -- which provides for the PRB to undertake a relatively quick i.e., first-cut "informal" review of chapters submitted on a rolling basis -- is the best approach.  This will ensure that any "covered information" is identified and not communicated during the line editing process.  (We did not discuss previously whether PRB would permit line editing of unreviewed chapters by an approved person, but that could have been another possible approach.)  Of course, the existing approach, as we agreed, also makes it unnecessary for PRB to have to "re-review portions of the text that have been modified" (as noted in your email) until after it receives a complete line-edited manuscript and performs its "formal" review.

    This accurately summarizes what we discussed and agreed to on 28 June concerning my submissions.  I look forward to receiving back from PRB, with its comments, the first five chapters that were submitted on 6 July so that I may promptly forward them to my line editor.  I would be disappointed and concerned if the filing of a civil suit by my husband and me earlier this month against certain current and former government officials had anything to do with a change in position by the PRB regarding our 28 June agreement about prepublication review of my book.  To the extent that is an issue, or if there are any questions about PRB honoring our agreement, it would be helpful for us to schedule a meeting in person at a

mutually convenient time during the week beginning 14 or 21 August.


Sincerely, Valerie Wilson


From: richajp@ucia.gov
To: Joseph Wilson <thewilsonswdc@hotmail.com>
CC: PRB@ucia.gov
Subject: Re: Manuscript Submission
Date: Mon, 10 Jul 2006 13:00:31 -0400

Valerie -
We have received the first section of your manuscript.  Thanks.

Just to make clear what we discussed concerning your
submissions: although we are pleased to get portions of your
manuscript submitted as you complete them, we cannot provide any
formal response or approval until we have a complete manuscript with
which to work.  As you might expect, certain references in later
submissions might impact directly or indirectly on earlier passages
and could affect our review. Additionally, as you are continuing to
write your first draft, you may find it necessary to include changes
to the text of previously-submitted sections.  In order that we will
not have to re-review portions of the text that have been modified,
we will wait for your final submission before formally starting the
review process.  Certainly, if you prefer to delay submission until
you have completed the entire work, that is fine.  Otherwise, we
will compile the sections of your manuscript as you send them in and
will then be ready to undertake our formal review once your draft
manuscript is complete.

Certainly, if you have any questions or concerns, feel free to
let us know.

Joseph Wilson wrote:
To the CIA Publication Review Board,


In my 28 June 2006 telephone conversation with Richard Puhl,
it
was agreed that I could submit my manuscript to PRB in "chunks" on

a rolling basis.  In accordance with that agreement, attached
please
find Chapters 1-5 of approximately 100 pages of my book manuscript
for
PRB review.    I understand that the PRB will review the material
in a
timely manner and will undertake a subsequent timely review upon
my
submission of the entire work.

In order to comply with any confidentiality issues,
I have changed the names of all individuals associated with the Agency
who appear in these pages, with the exception of truly public figures,
such as George Tenet.For the same reasons, I have also sought to obscure any
identifying details of persons, operations, and places.

Please advise once you have received this email and its
attachments.   I look forward to working with the PRB to remain in
complete compliance with Agency publication regulations.

Sincerely,   Valerie Wilson

**Subject:** Re: Manuscript Submission
**From:** richajp@ucia.gov
**Date:** Mon, 10 Jul 2006 13:00:31 -0400
**To:** Joseph Wilson <thewilsonswdc@hotmail.com>
**CC:** PRB@ucia.gov

> Valerie -
> We have received the first section of your manuscript.  Thanks.
>
> Just to make clear what we discussed concerning your
> submissions: although we are pleased to get portions of your
> manuscript submitted as you complete them, we cannot provide any
> formal response or approval until we have a complete manuscript with
> which to work.  As you might expect, certain references in later
> submissions might impact directly or indirectly on earlier passages
> and could affect our review. Additionally, as you are continuing to
> write your first draft, you may find it necessary to include changes
> to the text of previously-submitted sections.  In order that we will
> not have to re-review portions of the text that have been modified,
> we will wait for your final submission before formally starting the
> review process.  Certainly, if you prefer to delay submission until
> you have completed the entire work, that is fine.  Otherwise, we
> will compile the sections of your manuscript as you send them in and
> will then be ready to undertake our formal review once your draft
> manuscript is complete.
>
> Certainly, if you have any questions or concerns, feel free to
> let us know.

Joseph Wilson wrote:
> To the CIA Publication Review Board,
>
>
>      In my 28 June 2006 telephone conversation with Richard Puhl,
> it
> was agreed that I could submit my manuscript to PRB in "chunks" on
>
> a rolling basis.  In accordance with that agreement, attached
> please
> find Chapters 1-5 of approximately 100 pages of my book manuscript
> for
> PRB review.     I understand that the PRB will review the material
> in a
> timely manner and will undertake a subsequent timely review upon
> my
> submission of the entire work.
>
>
>      In order to comply with any confidentiality issues,
> I have changed the names of all individuals associated with the
> Agency

who appear in these pages, with the exception of truly public
figures,
such as George Tenet.For the same reasons, I have also sought to
obscure any
identifying details of persons, operations, and places.

   Please advise once you have received this email and its
attachments.  I look forward to working with the PRB to remain in
complete compliance with Agency publication regulations.

   Sincerely,   Valerie Wilson

**Tab 7**

**Subject:** Re: Meeting
**From:** richajp@ucia.gov
**Date:** Mon, 21 Aug 2006 12:21:02 -0400
**To:** Joseph Wilson <thewilsonswdc@hotmail.com>
**CC:** PRb@ucia.gov, janebf@ucia.gov

Valerie -
    Thank you for your note.  I, too, am generally available the
week of the 28th (though I am on vacation through the 28th).  Please
offer two or three preferable days and times to meet and I am sure
we can arrange a mutually convenient meeting date and time.
    I don't know exactly what you would like to discuss, but I would
recommend that for this initial meeting we leave the attorneys out
of the picture.  If you want to discuss any of the potentially
classified aspects of your manuscript obviously they will not be
able to participate.  However, if there are specific legal issues
that they would like to raise, then I can put them in contact with
the PRB's legal adviser.
    If you agree, we can arrange a meeting room within my office
area.  We are located in Herndon (I will provide the address and
other contact information once we have agreed to a meeting time.
    I look forward to our meeting.

    Richard

P.S.  Please cc: <u>PRB@ucia.gov</u> on any e-mail correspondence to ensure
someone will respond or take action in the event I am not
available.  By the way, during my upcoming absence, Jane Fraser
(<u>janebf@ucia.gov</u>, 703/613.1212) can be contacted if you need
immediate assistance.


Joseph Wilson wrote:
  Richard,

  Thank you for your email of 4 August and your willingness to meet
  with
  me and make sure that the Agency's publication review process
  regarding
  the publication of my memoir goes as smoothly as possible.

  Per your suggestion, I think the most productive next step is to
  arrange
  a meeting and I suggest the week of 28 August.  I believe it will
  be
  helpful for David Smallman and Lisa Davis of the Frankfurt Kurnit
  Klein
  & Selz law firm in New York, who are advising me on the book, also
  to
  attend our meeting.  I am free all of that week except the 29th.

Mornings are generally better.    I have cc'd David and Lisa on this note
so we can all coordinate our schedules to find the best mutual time.

I look forward to meeting in person shortly.

Sincerely, Valerie Wilson

**Subject:** Meeting

**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>

**Date:** Thu, 10 Aug 2006 15:31:22 +0000

**To:** richajp@ucia.gov

**CC:** dsmallman@fkks.com, ldavis@fkks.com

Richard,

Thank you for your email of 4 August and your willingness to meet with
me and make sure that the Agency's publication review process regarding
the publication of my memoir goes as smoothly as possible.

Per your suggestion, I think the most productive next step is to arrange
a meeting and I suggest the week of 28 August.  I believe it will be

helpful for David Smallman and Lisa Davis of the Frankfurt Kurnit Klein
& Selz law firm in New York, who are advising me on the book, also to
attend our meeting.  I am free all of that week except the 29th.
Mornings are generally better.  I have cc'd David and Lisa on this note
so we can all coordinate our schedules to find the best mutual time.


I look forward to meeting in person shortly.

Sincerely, Valerie Wilson

**Tab 8**

**Subject:** Re: First Draft of Manuscript from Valerie Wilson
**From:** richajp@ucia.gov
**Date:** Fri, 08 Sep 2006 12:24:42 -0400
**To:** Joseph Wilson <thewilsonswdc@hotmail.com>

```
    Valerie -
    Manuscript received.  Thanks.
    Right now the middle of the week of the 16th is fairly open, so
please choose a date/time or two and we will finalize the meeting
arrangements.
    I will pass along your wish that the PRB's legal adviser contact
your attorneys.  (If she has any trouble finding a contact number,
we will be back in touch.)

    Richard

P.S.  Please include prb@ucia.gov in the e-mail address to ensure
any correspondence is answered quickly (in the event that I am
unable to read my e-mail in a timely manner).

Joseph Wilson wrote:

  Richard,

        I am forwarding to you today a complete first draft of my
  manuscript
  and will look forward to receiving PRB's response within the
  reasonable time
  period we have discussed. To follow up on your email of 21 August,
  I would
  like to arrange a mutually convenient date and time for us to have
  our
  initial meeting this coming October. Please let me know your
  availability
  during the week beginning October 16 and I can then propose
  preferable days
  and times. In the meantime, as you suggested, I would also
  appreciate it if
  you would put PRB's legal adviser in contact with my publishing
  counsel in
  New York, Lisa Davis and David Smallman.

        Thank you, and I will look forward to meeting with you in
  October.

  Sincerely,

  Valerie Wilson
```

**Subject:** First Draft of Manuscript from Valerie Wilson
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Thu, 07 Sep 2006 20:58:58 +0000
**To:** richajp@ucia.gov

Richard,

I am forwarding to you today a complete first draft of my manuscript
and will look forward to receiving PRB's response within the reasonable time
period we have discussed. To follow up on your email of 21 August, I would
like to arrange a mutually convenient date and time for us to have our
initial meeting this coming October. Please let me know your availability
during the week beginning October 16 and I can then propose preferable days
and times. In the meantime, as you suggested, I would also appreciate it if
you would put PRB's legal adviser in contact with my publishing counsel in
New York, Lisa Davis and David Smallman.

Thank you, and I will look forward to meeting with you in October.

Sincerely,

Valerie Wilson

**Tab 9**

**Subject:** Re: Meeting to Discuss Manuscript
**From:** joyceah@ucia.gov
**Date:** Tue, 03 Oct 2006 13:02:48 -0400
**To:** Joseph Wilson <thewilsonswdc@hotmail.com>
**CC:** janebf@ucia.gov, richajp@ucia.gov, prb@ucia.gov

Valerie,

I was going to call you in the next couple of days.  Here is the
basic info:

19 October, 9-12am (if needed).

Address:  13651 McLearen Road, Herndon

Directions:  Take 495 to the Dulles Toll Road.  Follow the Toll Road
to
Exit 10, Chantilly/Herndon.  Turn left on Old Centerville Road,
Route
657.  Go 2.6 miles to McLearen Road and take a right onto McLearen
(Gas
Station on the corner).  International Point is located on the left
side
of the road.

Tell the guard at the gate that you are visiting and they will
advise
where to park.  You will enter the front of the building and get a
visitor's badge; I will meet you to escort you to the meeting.

At your earliest convenience, please give me a call on (703)
613-1802
rpt 613-1802.  Some information concerning the review of your book
as
come up in the past few days and we would like to discuss it with
you
prior to the meeting.

Look forward to meeting you, Joyce/PRB Staff

Joseph Wilson wrote:

  good morning.

  shall i assume that our meeting is still on for thursday, the

19th?  have you been able to identify a time to meet?  also,
please tell me where your offices are located.

thank you, valerie wilson


From: janebf@ucia.gov
To: Joseph Wilson <thewilsonswdc@hotmail.com>
CC: richajp@ucia.gov, prb@ucia.gov
Subject: Re: Meeting to Discuss Manuscript
Date: Thu, 14 Sep 2006 14:25:02 -0400

Valerie,

     Richard is out of the office for the remainder of this week --
I am a colleague and spoke with him earlier today.  We'd like to
schedule the meeting with you the morning of 19 October.  We'll
get back to you on Monday when Richard returns to identify a
specific time.  Many thanks. jane/prb staff

Joseph Wilson wrote:

Richard,

I'm glad you received my draft manuscript.  I am available on
October 16,17, and 19th.  Mornings are generally better. Please
let me know which date and a time that works best for you.

Per your last email, David Smallman and Lisa Davis can best be
reached at:
212.826.5580.

Sincerely, Valerie Wilson

**Subject:** Re: Meeting to Discuss Manuscript
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Tue, 03 Oct 2006 13:00:04 +0000
**To:** janebf@ucia.gov
**CC:** richajp@ucia.gov, prb@ucia.gov

good morning.

shall i assume that our meeting is still on for thursday, the 19th?
have you been able to identify a time to meet?  also, please tell me
where your offices are located.

thank you, valerie wilson


From: janebf@ucia.gov
To: Joseph Wilson <thewilsonswdc@hotmail.com>
CC: richajp@ucia.gov, prb@ucia.gov
Subject: Re: Meeting to Discuss Manuscript
Date: Thu, 14 Sep 2006 14:25:02 -0400

Valerie,

    Richard is out of the office for the remainder of this week -- I
am a colleague and spoke with him earlier today.  We'd like to
schedule the meeting with you the morning of 19 October.  We'll get
back to you on Monday when Richard returns to identify a specific
time.  Many thanks. jane/prb staff

Joseph Wilson wrote:
  Richard,

  I'm glad you received my draft manuscript.  I am available on
  October 16,17, and 19th.  Mornings are generally better. Please
  let me know which date and a time that works best for you.

  Per your last email, David Smallman and Lisa Davis can best be
  reached at:
  212.826.5580.

  Sincerely, Valerie Wilson

**Subject:** Meeting to Discuss Manuscript
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Thu, 14 Sep 2006 16:09:58 +0000
**To:** richajp@ucia.gov
**CC:** prb@ucia.gov

Richard,

I'm glad you received my draft manuscript.  I am available on
October 16,17, and 19th.  Mornings are generally better. Please let
me know which date and a time that works best for you.

Per your last email, David Smallman and Lisa Davis can best be
reached at:
212.826.5580.

Sincerely, Valerie Wilson

**Subject:** Re: Meeting to Discuss Manuscript
**From:** janebf@ucia.gov
**Date:** Thu, 14 Sep 2006 14:25:02 -0400
**To:** Joseph Wilson <thewilsonswdc@hotmail.com>
**CC:** richajp@ucia.gov, prb@ucia.gov

```
Valerie,

     Richard is out of the office for the remainder of this week -- I
am a colleague and spoke with him earlier today.  We'd like to
schedule the meeting with you the morning of 19 October.  We'll get
back to you on Monday when Richard returns to identify a specific
time.  Many thanks. jane/prb staff

Joseph Wilson wrote:
  Richard,

  I'm glad you received my draft manuscript.  I am available on
  October 16,17, and 19th.  Mornings are generally better. Please
  let me know which date and a time that works best for you.

  Per your last email, David Smallman and Lisa Davis can best be
  reached at:
  212.826.5580.

  Sincerely, Valerie Wilson
```

**Tab 10**

**Subject:** Re: from valerie wilson
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Mon, 27 Nov 2006 14:40:53 +0000
**To:** joyceah@ucia.gov

joyce -

i hope your thanksgiving holiday was a relaxing one and your husband
had no complications with his surgery.

received the letter last week and as you may know, my lawyers will
be speaking with the gc tomorrow afternoon.   let's be in touch after
that meeting regarding the manuscript.

thank you, valerie


From: joyceah@ucia.gov
To: Joseph Wilson <thewilsonswdc@hotmail.com>
CC: richajp@ucia.gov
Subject: Re: from valerie wilson
Date: Mon, 20 Nov 2006 15:35:48 -0500

Valerie,

Others are still reviewing the letter---consequently, it will not be
ready today.  I'll be in touch tomorrow with an update.   Joyce.

Joseph Wilson wrote:
  good morning.

  just to follow up on our conversation of thursday (i think)... can
  i expect to have a letter from you by close of business today and
  is there still the possibility of coming into your offices to
  review whatever can be salvaged?

  thanks for all your good work on this.

  best, valerie

**Subject:** from valerie wilson
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Mon, 20 Nov 2006 16:30:17 +0000
**To:** joyceah@ucia.gov

good morning.

just to follow up on our conversation of thursday (i think)... can i
expect to have a letter from you by close of business today and is
there still the possibility of coming into your offices to review
whatever can be salvaged?

thanks for all your good work on this.

best, valerie

**Subject:** Re: Formal Letter from the PRB
**From:** richajp@ucia.gov
**Date:** Thu, 16 Nov 2006 08:22:14 -0500
**To:** Joseph Wilson <thewilsonswdc@hotmail.com>
**CC:** PRb@ucia.gov

```
        Valerie -
        We are still on track to provide our formal response by
tomorrow.  If that changes, we will contact you immediately (both by
telephone and e-mail).  We will let you know when we are ready to
send the letter and can work out the specific details (e-mail, fax,
delivery, etc.) at that time.
```

Joseph Wilson wrote:

```
 Greetings, Richard.


 To follow up on our telephone conversation of 9 November and
 subsequent to our personal meeting on 1 November, you noted that a
 formal letter of the Agency's decision regarding my manuscript
 would be available by Friday, 17 November.  Please let me know if
 this is still on track.  Also, I would be most appreciative if you
 could email or fax me the letter as soon as it is prepared so that
 I may have it as promptly as possible.

 Thank you,

 Valerie Wilson
```

**Tab 11**

Central Intelligence Agency



Washington, D.C. 20505

**Publications Review Board**
**1H11 IP Building**
**Washington, D.C. 20505**

**Telephone: 703-613-3070**
**Facsimile: 703-613-3004**
**E-mail: prb@ucia.gov**

21 November 2006

Ms. Valerie E. Wilson
4612 Charleston Terrace, NW
Washington, DC 20007

Dear Ms. Wilson:

The Central Intelligence Agency has reviewed for classification certain information that is contained in your manuscript, and has determined that this information remains currently and properly classified. Thus, your manuscript is disapproved for publication as it is currently written.

Your manuscript would reveal classified information because of the context in which it appears, the timeframes associated with the material, or the nature of the information on its face. Problematic material relating to context and timeframe is found primarily in pages 1 through 124 of your manuscript. Problematic material involving information that is classified on its face is found primarily in pages 125 through the end of your manuscript.

We would welcome the opportunity to meet with you to discuss the problematic portions of your manuscript and the deletions needed, or the changes that could be made to the context or the timeframe of this material, that would render your manuscript unclassified. Since pages 125 through the end of your manuscript require significantly fewer and less complex changes than pages 1 through 124, we have enclosed a list of the changes that would render that portion of the manuscript unclassified.

{Pages 1 – 124 – Please see above.}

**Page 124**
Lines 1 - 3
    Delete the first word in line 1 through the first word in line 3.
Line 6
    Delete the seventh word in the line.
Lines 9 - 10
    Delete the twelfth word in line 9 through the third word in line 10.

Line 12

Delete the fifth word in the line.

**Page 125**

Line 3

Delete the first three words in the line.

Lines 5 - 6

Delete the second word in line 5 through the third word in line 6.

Line 8

Delete the first word in the line.

Line 17

Delete the thirteenth word. This designation should be deleted throughout the manuscript.

Line 18

Delete the thirteenth word in the line.

Line 22

Delete the thirteenth word in the line.

**Page 126**

Line 1

Delete the fourth word in the line.

Lines 12 - 13

Delete the thirteenth word in line 12 through the tenth word in line 13.

**Page 127**

Line 6

Delete the eleventh word in the line.

**Page 129**

Line 7

Delete the sixth word.

**Page 130**

Line 19

Delete the seventh through eleventh word in the line.

Line 23

Delete the first through eleventh word in the line.

**Page 131**

Lines 5 - 6

Delete the second word in line 5 through the fourth word in line 6.

Line 14

Delete the ninth word in the line.

Line 17

Delete the thirteenth and fourteenth words in the line.

**Page 132**
Line 10
Delete the eighth word in the line.
Line 18
Delete the ninth word in the line.

**Page 133**
Line 6
Delete the first word through the ninth word in the line.
Line 17
Delete the second word in the line.

**Page 134**
Line 1
Delete the eleventh word in the line.
Lines 2 - 4
Delete the thirteenth word in line 2 through the twelfth word in line 4.
Line 6
Delete the third word through the sixth word in the line.
Line 15
Delete the eight and ninth words in the line.
Lines 18 - 19
Delete the twelfth word in line 18 through the third word in line 19.

**Page 135**
Line 2
Delete the first word in the line.
Line 5
Delete the second through the ninth word in the line.
Lines 6 - 7
Delete the thirteenth word in line 6 through the second word in line 7.
Also delete the fifth word through the eighth word in line 7.

**Page 136**
Line 23
Delete the eleventh and twelfth words in the line.

**Page 137**
Line 4
Delete the sixth through the eighth word in the line.
Lines 5 - 6
Delete the seventh word in line 5 through the second word in line 6.
Lines 11 - 19
Delete the fourteenth word in line 11 through the fourth word in line 19.

Lines 22 - 23

Delete the first word in line 22 through the sixteenth word in 23.

## Page 138

Lines 3 - 6

Delete the tenth word in line 3 through the fourth word in line 6.

Line 14

Delete the sixth and seventh words in the line.

## Page 139

Lines 3 - 13

Delete the tenth word in line 3 through the last word of line 13.

Lines 15 - 23

Delete the sixth word in line 15 through the fifteenth word in line 23.

## Page 140

Lines 1 - 14

Delete the first word of line 1 through the sixth word in line 14.

Line 20

Delete the eighth word in the line.

Lines 20 - 21

Delete the twelfth word in line 20 through thirteenth word in line 21.

## Page 141

Line 19

Delete the second word.

## Page 142

Line 1

Delete the first word.

## Pages 144 - 148

Delete these pages in their entirety.

## Page 149

Lines 1 - 10

Delete the first word in line 1 through the eleventh word in line 10.

## Page 150

Line 14

Delete the first word.

## Page 151

Lines 17 - 22

Delete the second word in line 17 through the fourth word in line 22.

**Page 152**
Line 9
>   Delete the eighth and ninth words in the line.

**Page 153**
Line 1
>   Delete the sixth through the ninth word in the line.
Lines 7 - 8
>   Delete the sixth word in line 7 through the sixth word in line 8.
Lines 8 - 9
>   Delete the thirteenth word in line 8 through the fifth word in line 9.
Lines 11 - 12
>   Delete the eighteenth word in line 11 through the second word in line 12.

**Page 154**
Line 21
>   Delete the third and fourth words in the line.

**Page 160**
Lines 6 - 7
>   Delete the fourteenth word in line 6 through the first word in line 7.
Line 9
>   Delete the sixth through tenth word in the line.

**Page 161**
Line 10
>   Delete the first through the eleventh word in the line.
Lines 20 - 21
>   Delete the ninth word in line 20 through the twelfth word in line 21.

**Page 163**
Lines 15 - 16
>   Delete the fourteenth word in line 15 through the second word of line 16.
Line 18
>   Delete the fifth and sixth words in the line.

**Page 164**
Line 4
>   Delete the seventh word in the line.
Lines 21 - 22
>   Delete the first word in line 21 through the thirteenth word in line 22.

**Page 165**
Line 1
    Delete the fifteenth word in the line.
Line 2
    Delete the ninth and tenth words in the line.
Lines 3 - 19
    Delete the fifth word in line 3 through the eighth word in line 19.
Lines 21 - 23
    Delete the tenth word in line 21 through the seventeenth word in line 23.

**Page 166**
Lines 1 - 2
    Delete the first word in line 1 through the fifth word in line 2.
Lines 3 - 4
    Delete the second word in line 3 through the tenth word in line 4.
Lines 7 - 9
    Delete the thirteenth word in line 7 through the tenth word in line 9.
Lines 17 - 19
    Delete the tenth word in line 17 through the fourteenth word in line 19.

**Page 169**
Line 19
    Delete the thirteenth word in the line.
Line 20
    Delete the first through the third word in the line.

**Page 170**
Line 9
    Delete the first through third word in the line.
Line 23
    Delete the fourth through the seventh word in the line.

**Page 172**
Line 7
    Delete the last two words in the line.
Line 8
    Delete the first four words in the line as well as the last four.
Line 9
    Delete the first two words in the line.
Line 10
    Delete the fourth and twelfth words in the line.
Line 14
    Delete the third word in the line.
Line 16
    Delete the twelfth word in the line.

Line 19

      Delete the first word in the line.

**Page 173**

Lines 20 - 23

      Delete the seventh word in line 20 through the twelfth word in line 23.

**Page 174**

Line 1

      Delete the first word in the line.

**Page 177**

Lines 1 - 2

      Delete the twelfth word in line 1 through the first word in line 2.

Line 14

      Delete the third word in the line.

Line 16

      Delete the third word in the line.

**Page 180**

Line 21

      Delete the seventh and eighth words in the line.

**Page 188**

Line 18

      Delete the second word in the line.

Lines 18 - 19

      Delete the thirteenth word in line 18 through the first word in line 19.

Line 21

      Delete the fourth word in the line.

Line 22

      Delete the first word in the line.

Lines 22 - 23

      Delete the sixteenth word in line 22 through the seventeenth word in line 23.

**Page 189**

Lines 1 - 22

      Delete the first word in line 1 through the second word in line 22.

**Page 190**

Line 3

      Delete the first word in the line.

Line 19

      Delete the fourth and fifth words in the line.

**Page 191**

Line 13

    Delete the eleventh word in the line.

**Page 192**

Lines 16 - 17

    Delete the fifteenth word in line 16 through the second word in line 17.

Line 19

    Delete the first word in line 19.

**Page 193**

Lines 8 - 10

    Delete the first word in line 8 through the ninth word in line 10.

**Page 196**

Line 3

    Delete the third word in the line.

**Page 198**

Lines 16 - 19

    Delete the twelfth word in line 16 through the first word of line 19.

**Page 206**

Line 15

    Delete the ninth through the fourteenth word in the line.

Lines 17 - 19

    Delete the fifteenth word in line 17 through the sixth word in line 19.

**Page 207**

Line 1

    Delete the second word in the line.

Line 8

    Delete the fourth through the sixth word in the line.

Line 9

    Delete the eleventh word in the line.

Line 13

    Delete the first two words in the line.

Lines 20 - 21

    Delete the fifth word in line 20 through the fourth word in line 21.

**Page 237**

Line 13

Delete the third through the sixth word in the line.

**Page 238**

Lines 6 - 7

Delete the nineteenth word in line 6 through the sixth word in line 7.

**Page 239**

Line 1

Delete the first word in the line.

Line 9

Delete the sixth and seventh words in the line.

A copy of the edited pages is enclosed for your records.

I remind you that until your manuscript is approved for publication in writing, you may not disclose the classified manuscript to any publisher, editor, literary agent, co-author, ghost writer, reviewer, attorney, or any other member of the public.

We look forward to hearing from you in the near future regarding how you wish to proceed. Please do not hesitate to contact me if you have any questions or if we can be of further assistance.

Sincerely yours,

R. Puhl

Chairman, Publications Review Board

Manuscript filed under seal

**Tab 12**

00253

**Subject:** Re: from valerie wilson
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Thu, 30 Nov 2006 18:22:02 +0000
**To:** joyceah@ucia.gov

good afternoon.

unless i hear from you otherwise, i will plan to be at your building
tomorrow, friday at 10am.

thanks, valerie


From: joyceah@ucia.gov
To: Joseph Wilson <thewilsonswdc@hotmail.com>
Subject: Re: from valerie wilson
Date: Mon, 27 Nov 2006 15:03:56 -0500

Valerie - Thanks for your note.  I'll be here.  J

Joseph Wilson wrote:
  joyce -

  i hope your thanksgiving holiday was a relaxing one and your
  husband had no complications with his surgery.

  received the letter last week and as you may know, my lawyers will
  be speaking with the gc tomorrow afternoon.  let's be in touch
  after that meeting regarding the manuscript.

  thank you, valerie


  From: joyceah@ucia.gov
  To: Joseph Wilson <thewilsonswdc@hotmail.com>
  CC: richajp@ucia.gov
  Subject: Re: from valerie wilson
  Date: Mon, 20 Nov 2006 15:35:48 -0500

  Valerie,

  Others are still reviewing the letter---consequently, it will not
  be ready today.  I'll be in touch tomorrow with an update.  Joyce.


  Joseph Wilson wrote:

    good morning.

    just to follow up on our conversation of thursday (i think)...

00253

can i expect to have a letter from you by close of business
today and is there still the possibility of coming into your
offices to review whatever can be salvaged?

thanks for all your good work on this.

best, valerie

06251

**Subject:** Re: from valerie wilson
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Mon, 27 Nov 2006 14:40:53 +0000
**To:** joyceah@ucia.gov

joyce -

i hope your thanksgiving holiday was a relaxing one and your husband
had no complications with his surgery.

received the letter last week and as you may know, my lawyers will
be speaking with the gc tomorrow afternoon.  let's be in touch after
that meeting regarding the manuscript.

thank you, valerie


From: joyceah@ucia.gov
To: Joseph Wilson <thewilsonswdc@hotmail.com>
CC: richajp@ucia.gov
Subject: Re: from valerie wilson
Date: Mon, 20 Nov 2006 15:35:48 -0500

Valerie,

Others are still reviewing the letter---consequently, it will not be
ready today.  I'll be in touch tomorrow with an update.  Joyce.

Joseph Wilson wrote:
  good morning.

  just to follow up on our conversation of thursday (i think)... can
  i expect to have a letter from you by close of business today and
  is there still the possibility of coming into your offices to
  review whatever can be salvaged?

  thanks for all your good work on this.

  best, valerie

**Tab 13**

COMMUNICATION RESULT REPORT ( JAN.3.2007 10:01AM ) P. 3

```
                                                              FAX HEADER:   IP 1J17

FILE MODE          OPTION              ADDRESS (GROUP)          RESULT        PAGE
----------------------------------------------------------------------------------
721   MEMORY TX                        91—3474382123             OK         P. 3/3
```

```
---------------------------------------------------------------------------------
REASON FOR ERROR
         E-1) HANG UP OR LINE FAIL            E-2) BUSY
         E-3) NO ANSWER                       E-4) NO FACSIMILE CONNECTION
```

## FAX COVER SHEET

Number of Pages
(including cover):        3

To:                       **David Smallman**
Telephone:                (212) 826-5580
Fax Number:               (347) 438-2123

From:                     **Ginger A. Wright**
Telephone:                (703) 613-3029
Fax Number:               (703) 613-3003

Date:                     3 January 2007

Subject:                  22 December 2006 Letter to Valerie Wilson

# FAX COVER SHEET

Number of Pages
(including cover):      3

To:                **David Smallman**
Telephone:         (212) 826-5580
Fax Number:        (347) 438-2123

From:              **Ginger A. Wright**
Telephone:         (703) 613-3029
Fax Number:        (703) 613-3003

Date:              3 January 2007

Subject:           22 December 2006 Letter to Valerie Wilson



Washington, D.C. 20505

Publications Review Board
IHl l IP Building
Washington, D.C. 20505

Telephone: 703-613-3070
Facsimile: 703-613-3004
E-mail: prb@ucia.gov

22 December 2006

Valerie E. Wilson
c/o Diane Plame
5117 Polaris Ct.
Atlantic Beach, FL 32233

Dear Ms. Wilson:

As we explained in our letter of 21 November 2006 and as we discussed during our recent meeting, pages 1 through 124 of your manuscript, as currently drafted, would reveal classified information primarily because of the context in which the information appears and the timeframes associated with the material. At our recent meeting, you asked us to provide you with line-in/line-out edits to this part of the manuscript. We are committed to working with you and to providing you with constructive assistance in identifying changes that could be made to your manuscript to render it unclassified. However, we are unable to provide you with line-in/line-out edits in an unclassified correspondence.

The first 124 pages of your manuscript are replete with statements that may be unclassified standing alone, but they become classified when they are linked with a specific time, such as an event in your personal life, or are included in another context that would reveal classified information. A detailed description of this information along with how the timeframes and contexts are problematic would be classified. We are available to meet at your convenience to discuss these issues in person. However, we are not able to communicate this information to you in an unclassified correspondence.

Additionally, there is more than one approach to revising the material in the first 124 pages of your manuscript in order to render it unclassified. For example, one approach to revising these portions of your manuscript to make them unclassified might be to separate certain statements and vignettes from the timeframes in which they currently appear in your manuscript and incorporate them into other parts of the manuscript. Another approach might be to remove the references to the times and events in your personal life.

We recognize that these options might not be feasible in some instances and that the only way to avoid revealing classified information in those cases would be to recast that information or fictionalize it. The approach that you prefer to take to revising the material in your manuscript would significantly affect the line-in/line-out changes that would be required to render it unclassified.

We look forward to hearing from you in the near future regarding how you wish to proceed. Please do not hesitate to contact me if you have any questions or if we can be of further assistance.

Sincerely,

John R. Puhl
Chairman, Publications Review Board

**Tab 14**

06251

**Subject:** Re: Address for Redacted Manuscript
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Mon, 25 Dec 2006 14:49:08 +0000
**To:** joyceah@ucia.gov

joyce,

i hope your holiday was peaceful.

i am leaving my parents' home tomorrow, the 26th, and will be skiing
for a few days.  could you please let me know the status of the
first portion of the manuscript and if/where you have sent it?  i
will be available via cell phone and email.

thanks, valerie

From: joyceah@ucia.gov
To: Joseph Wilson <thewilsonswdc@hotmail.com>, prb@ucia.gov
Subject: Re: Address for Redacted Manuscript
Date: Thu, 14 Dec 2006 14:11:59 -0500

Valerie - Just to confirm receipt of your note.  I will give you an
update prior to the Christmas holiday.    Joyce

Joseph Wilson wrote:
  Please send a manuscript to the following addresses (and kindly
  let me know when you are sending it):


  Valerie Wilson
  c/o Diane Plame
  5117 Polaris Ct.
  Atlantic Beach, FL 32233

  David Rosenthal
  c/o Simon & Schuster
  1230 Avenue of the Americas, 12fl
  NY, NY, 10020
  212-698-7549


  Lisa E. Davis
  Frankfurt Kurnit Klein & Selz, PC
  488 Madison Avenue
  New York, New York 10022
  Tele: (212) 826-5530

**Subject:** Address for Redacted Manuscript
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Thu, 14 Dec 2006 15:40:48 +0000
**To:** joyceah@ucia.gov

```
Please send a manuscript to the following addresses (and kindly let
me know when you are sending it):

Valerie Wilson
c/o Diane Plame
5117 Polaris Ct.
Atlantic Beach, FL 32233

David Rosenthal
c/o Simon & Schuster
1230 Avenue of the Americas, 12fl
NY, NY, 10020
212-698-7549


Lisa E. Davis
Frankfurt Kurnit Klein & Selz, PC
488 Madison Avenue
New York, New York 10022
Tele: (212) 826-5530
```

**Tab 15**

# Frankfurt Kurnit Klein & Selz, PC

Attorneys at Law
488 Madison Avenue
New York, New York 10022

Phone: (212) 980-0120
Fax: (212) 593-9175

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| Deliver To: | Fax Number: |
| Ginger Wright, Esq. | 1-703-613-3003/ 3020 |
| | Telephone Number: |
| | 1-703-613-3029 |
| From: | Direct Dial Number: |
| David B. Smallman, Esq. | 1-212-826-5580 |
| Subject: | Client/Matter Number: |
| Wilson | 99995-3183 |
| Date: | Total Number of Pages (including cover): |
| January 9, 2007 | 26 |

Comments:

If you do not receive all of the pages, or if you have difficulty with the transmission, please call the direct dial number shown above or (212) 980-0120 and ask for the mailroom at extension 6605.

**PRIVILEGED AND CONFIDENTIAL**

This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

# FRANKFURT KURNIT KLEIN & SELZ PC

488 Madison Avenue
New York, New York 10022
Telephone: (212) 980-0120
Facsimile: (212) 593-9175

David B. Smallman
Direct dial: (212) 826-5580
e-mail: dsmallman@fkks.com

January 9, 2007

VIA FAX
(703) 613-3003

Ginger A. Wright, Esq.
Assistant General Counsel
Office of General Counsel
Central Intelligence Agency
Washington, D.C. 20505

Dear Ms. Wright:

I am writing in connection with my receipt of a copy of a letter dated December 22, 2006 from Richard Puhl to Valerie Wilson and our telephone conversations on December 29, 2006, and January 5, 2007 in which we discussed the Agency's position regarding the review of Ms. Wilson's memoir and the impact of its position on the ongoing editorial process in New York with her publisher, Simon & Schuster.

There has never been any question whatsoever that Ms. Wilson, having dedicated much of her life and career to serving her country, understood her duties and sought to comply in every way with preserving and protecting national security information. She duly submitted her manuscript to the Agency's Publication Review Board ("PRB") more than four months ago and has cooperated fully with the publication review process.

From the outset, Ms. Wilson has endeavored to reach a reasonable resolution with the Agency of any possible national security issues arising from her memoir and, in doing so, to balance fairly all of the equitable and legal issues at stake. Ms. Wilson is not seeking *carte blanche* to discuss her entire government service or to reveal any classified information. Rather, because of newsworthy events concerning her government service, a fundamental public interest "lies in a proper accommodation that will preserve the intelligence mission of the Agency while not abridging the free flow of unclassified information." *Snepp v. United States*, 444 U.S. 507, 520 (1980) (Stevens, J., dissenting). In that regard, Ms. Wilson has a First Amendment right to publish unclassified information about her life and a corresponding interest in ensuring that the Agency's pre-

# FRANKFURT KURNIT KLEIN & SELZ ᴘᴄ

Ginger A. Wright, Esq.
January 9, 2007
Page 2 of 6

publication review process is reasonably structured to prevent publication only of
*properly* classified material.

When we spoke on December 29th, I expressed my concern that the recent
reversal of the PRB's December 13th determination to provide Ms. Wilson with a
redacted version of the first half of her manuscript would frustrate efforts to find a
reasonable resolution of mutual concerns regarding Ms. Wilson's right to disclose in her
memoir certain non-controversial public domain information regarding her employment
status prior to 2002. The dates of Ms. Wilson's federal service and her government
employment affiliation during specific time periods were disclosed officially by the
Agency in an unclassified letter to her in February 2006. That disclosure of Ms. Wilson's
federal service information conforms to other open source, public domain information set
forth in a chart previously provided to the Agency ("Public Domain Chart") (copy
attached).[1] Viewed against this factual and legal background, the Agency's decision to
renege on its agreement to release the redacted first half of Ms. Wilson's manuscript is
another example of the inconsistent positions taken by the Agency throughout the review
process and the Agency's apparent disregard for the effect of its decisions on the ability
of a loyal former officer, Valerie Wilson, to earn a living now that her career with the
Agency has been prematurely ended by forces beyond her control.

As you are aware, Ms. Wilson has been engaged in the PRB process since June
2006. In initial conversations with Ms. Wilson, the PRB agreed to review her memoir on
a rolling basis in order to facilitate editing of her manuscript by Simon & Schuster, her
New York-based publisher. Then, without warning or suitable explanation, the PRB
abruptly reversed course during the summer and informed Ms. Wilson that it would only
consider the manuscript in its entirety. Faced with the prospect of unanticipated delay
after relying upon the Agency's prior representation, Ms. Wilson submitted the complete
manuscript to the PRB for its review in early September, 2006 and requested a meeting in
mid-October to discuss any required redactions. Two days prior to the scheduled
October meeting, Ms. Wilson received a request from the PRB seeking to postpone the

---

[1] *See, e.g.,* Public Domain Chart at 1, Timothy M. Phelps and Knut Royce, "Columnist Blows CIA Agent's
Cover," *Newsday,* July 22, 2003 ("Intelligence officials confirmed to Newsday [on July 21, 2003] that
Valerie Plame, wife of retired Ambassador Joseph Wilson, works at the agency . . . in an undercover
capacity . . . ."); James Gordon Meek and Kenneth R. Bazinet, "She's the Perfect Spy," *New York Daily
News,* Oct. 2, 2003 ("Two former senior intelligence officials confirmed that Valerie Plame, 40, is an
operations officer in the spy agency's directorate of operations – the clandestine service. Plame 'ran
intelligence operations overseas,' said Vincent Cannistraro, former CIA counterterrorism operations chief
. . . . Cannistraro called Plame's outing a 'dirty trick'"; "[A] former senior intelligence officer . . . [said] of
Plame: 'She was working undercover.'"); Public Domain Chart at 10-11, Joseph C. Wilson, IV, *The
Politics of Truth* 240-43 (Agency approved text of book by Ms. Wilson's husband, Ambassador Joseph
Wilson, which discloses Ms. Wilson's affiliation with the Agency dating back to 1997).

**FRANKFURT KURNIT KLEIN & SELZ** pc

Ginger A. Wright, Esq.
January 9, 2007
Page 3 of 6

meeting by one week. PRB then subsequently requested yet another week's
postponement. From that conversation, Ms. Wilson learned for the first time that there
was an internal Agency debate about the propriety of rolling back her cover prior to 2002
and therefore potentially foreclosing the possibility of a memoir referring to time periods
prior to 2002. During her first in-person meeting with PRB officials on November 1st,
they themselves indicated that it was *their* view that prohibiting Ms. Wilson from
disclosing her CIA affiliation prior to 2002 would lead to an "absurd" and "ludicrous"
result. On November 8th, we were informed that a decision had been made by "the
Seventh Floor," *i.e.,* senior Agency management, not to permit her to disclose her
Agency affiliation prior to 2002. Subsequently, in mid-December 2006, Ms. Wilson was
again informed by the Agency of its belated concerns about disclosure *by her* of open
source information regarding her long government service. By any reasonable measure,
PRB's asserted position remains at odds with the indisputable public record concerning
Ms. Wilson's Agency affiliation and is inconsistent with the Agency's prior conduct.

Despite apparent disagreement internally at the Agency concerning an absurd
result that would be unfair to Ms. Wilson, PRB's chairman indicated that his hands were
tied because Agency management had intervened and the final decision rested with the
Office of the Director, rather than with the individuals directly involved in the review
process and therefore most knowledgeable about the specific aspects of information
subject to nondisclosure for national security purposes.

From the outset of Ms. Wilson's communications with the PRB, she made it clear
that she planned to write and publish a memoir. At no point during the five months of
correspondence and conversations with the PRB did anyone there indicate that she would
be effectively prevented from publishing a memoir. Even after learning of the Agency's
ostensible position regarding rollback of her cover, our client remained committed to
trying to work with the Agency to arrive at a common sense solution that would address
every legitimate national security issue without unfairly foreclosing any possibility of
publishing a memoir that included open source information but did not reveal classified
information, as other former Agency officers have done in the past.

When my partner, Lisa Davis, and I met with you and the Agency's Acting
General Counsel, John Rizzo, at the end of last November, we sought to keep an open
channel for pursuing an amicable resolution of any issues in connection with review of
Ms. Wilson's memoir.

Although as Ms. Wilson's publishing counsel we have understood that senior
management at the Agency had certain issues regarding rollback of Ms. Wilson's cover,
it was not until our recent telephone conversation that I understood that a decision had

**FRANKFURT KURNIT KLEIN & SELZ** ᴘᴄ

Ginger A. Wright, Esq.
January 9, 2007
Page 4 of 6

been made by General Hayden himself, as Agency director, to create and enforce a
bright-line rule that would have the practical effect of preventing Ms. Wilson from
publishing her memoir as submitted. For obvious reasons, however, an illogical result
that belies common sense does not serve either the interests of the Agency or its
government customers. Nor does such an outcome benefit the Agency's broader
constituencies, including, ultimately, the American public. While the Agency has
suggested options for avoiding any inclusion of public domain facts about her
government service, the Agency has not and cannot, under the applicable facts and law,
justify disallowing Ms. Wilson from referring to unclassified open source information
about her life, which, in and of itself, presents no threat to national security.

As a general matter, it is our understanding that the PRB has essentially
acknowledged that most of the material in the book is by itself innocuous and poses no
actual threat to disclosure of any confidential information. More specifically, the
December 22, 2006 letter from PRB, to the extent it purports to offer a coherent
expression of certain relevant considerations, does not attempt to provide a cognizable
justification for restraining publication of material that is irrelevant to confirming the
accuracy of open source information at issue here. Certainly, even apart from a
demonstrable failure to meet its own criteria for disallowing publication of open source
information, the Agency cannot arbitrarily classify public domain information that falls
outside the scope of Section 1.1 of Executive Order 12958 (as amended), nor does it have
any discretion to restrain without appropriate basis publication of unclassified
information, particularly when the Agency has itself not treated such information as
classified. Moreover, the Agency's own regulations contemplate disclosure of public
domain information under the circumstances in this case and provide sufficient protection
through the use of required disclaimers upon publication in which the Agency neither
confirms nor denies the validity of any information published by former employees. In
contrast, an overbroad approach that characterizes information neither "owned by,
produced by or for, or under the control of the United States government" as somehow
classified leads to a nonsensical outcome, to wit, virtually anyone in the world can write
about non-secret, publicly known aspects of Ms. Wilson's life – *except for her*. This
extreme position would extend the so-called "mosaic theory" to an illogical extreme that
far exceeds any permissible Agency discretion in such matters and triggers serious
Constitutional concerns.

Now that an apparent impasse poses a substantial risk of derailing the review
process for Ms. Wilson's memoir, efforts are underway for our respective clients
(Agency management and Ms. Wilson) and other concerned government parties to meet
to address and hopefully resolve mutual concerns and differences. Insofar as lawyers
sensitive to the overall process can have a positive influence on reaching a reasonable

**FR^NKFURT KURNIT KLEIN & SELZ** rc

Ginger A. Wright, Esq.
January 9, 2007
Page 5 of 6

accord, Ms. Davis and I would look forward to additional direct communications with
you and Mr. Rizzo in conjunction with proposed upcoming discussions involving senior
Agency management. Accordingly, we respectfully offer the following four points for
prompt reappraisal of the Agency's current position.

First, it behooves the Agency to take a common sense approach that allows Ms.
Wilson to acknowledge publicly disclosed information about her life, without disclosing
information that remains secret or which could in any way harm national security. As
noted above, Ms. Wilson is plainly not seeking *carte blanche* to discuss her entire
government service or to reveal any classified information.

Second, it is both wrong from a legal standpoint and detrimental to public
confidence in the Agency if the Executive Branch promotes a bizarre position about
publication of unclassified information in Ms. Wilson's memoir, especially when, as
here, a First Amendment confrontation could easily be prevented by a more narrowly
tailored approach that takes into account the accuracy of established historical or
biographical facts concerning Ms. Wilson's life and government service without
triggering concerns about disclosure of otherwise classified information.

Third, as a practical matter, publication of unclassified public domain information
about Ms. Wilson's government service cannot reasonably be expected to cause any
damage – let alone serious damage – to national security. Everyone now knows from
indisputable open source information or authorized government disclosures that
Ms. Wilson worked for the Agency. No one, of course, disputes the vital importance of
protecting legitimately classified information and the key role of the Agency in that
process. However, even under the Agency's recent declaration regarding publication
review, which it admits to be "more art than science," the national interest is not served
by an *Alice in Wonderland* approach that denies known facts and defies logical reasoning.

Fourth, Ms. Wilson's memoir could have a genuine public benefit by showing
that it is possible for women to have successful careers in what is now known as the
National Clandestine Service, as published reports indicate Ms. Wilson did for many
years. This is especially true at a time when the next generation of talented Americans
are being sought to aid their country and the Agency has embarked on a massive
advertising campaign at taxpayer expense to recruit talented women and men for such
government service. A very different and, indeed, counterproductive message would be
sent by prohibiting Ms. Wilson from publishing a memoir after having been a victim of
an apparent leak about her employment status. As matters now stand, Ms. Wilson,
although a veteran officer with decades of service, faces a dismal financial reality that
would give anyone pause who embarks on a similar career path: as a forty-three year old

# FRANKFURT KURNIT KLEIN & SELZ pc

Ginger A. Wright, Esq.
January 9, 2007
Page 6 of 6

mother of two young children, her annuity will consist of merely $21,000 annually, and she cannot even collect that for another 13 years until she reaches the age of 56.

There is good reason, therefore, for revisiting the application of a bright-line rule under the circumstances presented, especially when tailoring a more narrowly drawn response could avoid (i) an unnecessary public dispute regarding the outer boundaries – or absence – of the Agency's discretion under applicable Executive Orders and Agency regulations, (ii) invocation of crucial First Amendment considerations, and (iii) application of the oversight authority of the Director of National Intelligence "to ensure compliance with the Constitution and laws of the United States by the Central Intelligence Agency . . . ." *Intelligence Reform and Terrorism Prevention Act of 2004* § 1011, 50 U.S.C. § 403-1(f)(4).

While Ms. Wilson fully reserves all of her rights and remedies, I would appreciate hearing back from you at your earliest convenience – but kindly no later than close of business this Friday, January 12 – about reconsideration of the Agency's current stance and logistics for coordinating and scheduling further in-person discussions among counsel and Agency management.

Sincerely,

David B. Smallman

Attachment

# Tab 15 A

# Frankfurt Kurnit Klein & Selz, PC

Attorneys at Law
488 Madison Avenue
New York, New York 10022

Phone: (212) 980-0120
Fax: (212) 593-9175

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| Deliver To: | Fax Number: |
| Ginger Wright, Esq. | 1-703-613-3003/ 3020 |
| | Telephone Number: |
| | 1-703-613-3029 |
| From: | Direct Dial Number: |
| David B. Smallman, Esq. | 1-212-826-5580 |
| Subject: | Client/Matter Number: |
| Wilson | 99995-3183 |
| Date: | Total Number of Pages (including cover): |
| December 6, 2006 | 19 |

Comments:

If you do not receive all of the pages, or if you have difficulty with the transmission, please call the direct dial number shown above or (212) 980-0120 and ask for the mailroom at extension 6605.

### PRIVILEGED AND CONFIDENTIAL

This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| *Overview* 1985 - 2005 | Valerie Plame Wilson's employment status as Central Intelligence Agency officer during twenty year period beginning in 1985 and ending in 2005, publicly disclosed through leaks by U.S. government officials and becomes widely known throughout the world. | • James Gordon Meek and Kenneth R. Bazinet, "She's the Perfect Spy," *New York Daily News*, Oct. 2, 2003 ("Two former senior intelligence officials confirmed that Valerie Plame, 40, is an operations officer in the spy agency's directorate of operations – the clandestine service. Plame 'ran intelligence operations overseas," said Vincent Cannistraro, former CIA counterterrorism operations chief. Her specialty in the agency's nonproliferation center was biological, chemical and nuclear weapons and 'recruiting agents, sending them to areas where they could access information about proliferation matters, weapons of mass destruction,' Cannistraro said."; "Plame is the wife of former Ambassador Joseph Wilson, who has charged that his wife's cover was blown in retaliation for his comments contradicting the Bush Administration's claim that deposed Iraqi dictator Saddam Hussein had tried to buy nuclear weapons material in Africa. Cannistraro called Plame's outing a 'dirty trick.'"; "[A] former senior intelligence officer . . . [said] of Plame: 'She was working undercover'.")

• Scott Shane, "Private Spy and Public Spouse Live at Center of Leak Case," *New York Times*, July 5, 2005 ("For nearly two years, the investigation into the leak of a covert C.I.A. officer's name has unfolded clamorously in the nation's capital, with partisan brawling on talk shows, prosecutors interviewing President Bush and top White House officials, and the imminent prospect that reporters could go to jail for contempt of court. But the woman at the center of it all, Valerie E. Wilson, has kept her silence, showing the discipline and discretion that colleagues say made her a good spy. As her husband, Joseph C. Wilson IV, has become a highly visible critic of the administration and promoted his memoirs, Ms. Wilson has ferried their 5-year-old twins to doctors' appointments, looked after their billion house in the upscale Palisades neighborhood of Washington and counseled women with postpartum depression. On June 1, after a year's unpaid leave, Ms. Wilson, now known to the country by her maiden name, Valerie Plame, returned to a new job at the Central Intelligence Agency, determined to get her career back on track, her husband said. Neither the agency nor Mr. Wilson would describe her position, except to make what might seem an obvious point: she will no longer be working under cover, as she did successfully for almost 20 years.")

• Timothy M. Phelps and Knut Royce, "Columnist Blows CIA Agent's Cover," *Newsday*, July 22, 2003 ("The identity of an undercover CIA officer whose husband started the Iraq uranium intelligence controversy has been publicly revealed by a conservative Washington columnist citing 'two senior administration officials.' Intelligence officials confirmed to Newsday yesterday that Valerie Plame, wife of retired Ambassador Joseph Wilson, works at the agency on weapons of mass destruction issues in an undercover capacity – at least she was undercover until last week when she was named by columnist Robert Novak.")

• Timothy M. Phelps, "My Plame Problem -- And Yours," *Columbia Journalism Review* |

1

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|------|-----------|----------------------|
| | | (Jan./Feb. 2006)( "Our story [July 22, 2003] was the first to establish that Plame was undercover. In fact not only was she working for the secret "D. O." or Directorate of Operations at agency headquarters in Langley, Virginia, but she was also still in transition from an even deeper underground mission as a "NOC" for NonofTicial Cover, posing as a businesswoman during agency-sponsored trips to Europe. The day after our story there were calls for an investigation by Democrats, and White House press secretary Scott McClellan vigorously asserted that "That is not the way this White House operates.") |
| | • | "Bush Welcomes Probe of CIA Leak", *CNN.com*, Feb. 11, 2004 ("Sources told CNN that Plame works in the CIA's Directorate of Operations -- the part of the agency in charge of spying -- and worked in the field for many years as an undercover officer. "If she were only an analyst, not an operative, we would not have filed a crimes report" with the Justice Department, a senior intelligence official said.") |
| | • | "Spies, A Feeling of Betrayal," *ABC News Nightline*, Oct. 3, 2003 (JIM MARCINKOWSKI: Intelligence should not be political. This government, this country should take every effort to make sure it insulates the intelligence community from politics. But the real issue here really is not - politics. It's what happened. Politics goes on, there's fights all the time. But they crossed the line in this case because they exposed a CIA asset. CHRIS BURY: (Off Camera) Do CIA analysts or operatives, do they have a right to write a check to a political candidate during a presidential election year? JIM MARCINKOWSKI: The fact that you walk in the front door of the CIA doesn't mean you lose your political rights in this country. The point is, it shouldn't be an issue for anyone. In the case of an operative overseas, when you're looking at what exactly - has been exposed, when you are living in covered capacity overseas, you have plausible deniability, you can always say, I'm not a CIA person. When the government steps in and confirms that the fact, that's the line that's been crossed. That has never been done before. This is similar to the hundreds of police investigations, undercover investigations that go on, that I've been a witness to, been involved in over the years. This is like an undercover officer doing a drug buy and the sellers of the drug call up the police station to figure whether this guy's trying to do the buy is an undercover police officer and they saying, yes. That's the line that's been crossed here, that's the danger, that's the damage. It has nothing to do with politics.") |
| | • | "Was Valerie Plame *Really* A Covert Agent?" *FoxNews.com*, July 18, 2005 (FRED RUSTMANN: Former CIA Operations Officer: "Valerie went through the — came in as a career trainee into the agency and then went through the training program down at the Farm. And I was her first supervisor when she actually had a real job at headquarters. And she worked for me there for about a year. She was super. She was great. . . . [S]he came in mid site was undercover, yes, as all of the new CT's do when they come into the agency. And it was probably — well, it was definitely an official cover status which she retained and then worked at the |

PKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|------|-----------|---------------------|
| | *1985-1987: Joining the Agency and training at "the Farm" under official State Department cover* | |
| 1985 | "Valerie Plame entered the CIA, recruited straight out of Penn State and placed in the program that trained the agency's best prospect.. She was 22 years old." | • Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Identi Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 ("At 22, Plame had joined the Central Intelligence Agency and traveled the world on undercover missions.")

• Richard Leiby, "Valerie Plame, the Spy Who Got Shoved Out Into the Cold", *Washington Post*, Oct. 29, 2005("Plame, the daughter of an Air Force colonel and an elementary school teacher, was recruited by the CIA at 22, shortly after graduation from Pennsylvania State University.")

• "The Exposure Of Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994753.shtml) ("In the late 1980's, [Jim Marcinkowski] was a covert CIA agent spying in Central America. Like all recruits, he was sent to the agency's top-secret training facility in Virginia known simply as 'the farm.' That's where he first met a 22-year-old graduate of Penn State University named Valerie.")

• David Corn, "What Valerie Plame Really Did at the CIA", *Nation Online*, Sept. 6, 2006 (http://www.thenation.com/doc/20060918/corn) ("Valerie Plame was recruited into the CIA in 1985, straight out of Pennsylvania State University.")

• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)

• Vicky Ward, "Double Exposure *Vanity Fair* Magazine, Jan. 17, 2004 (http://www.janegilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) (After Valerie graduated from Penn State, she moved to Washington, D.C., and married her college boyfriend Todd Sesler. She worked at a clothing store, biding her time, waiting for her acceptance from the C.I.A. She may have mentioned, says Augsnder, that she was going to interview with the C.I.A., but 'nobody ever heard about it ever again.' Plame and Sesler were both accepted at the agency. But, according to a friend of the couple's, his heart wasn't in it. "When she talks about something, you suddenly want to do what she's doing, because it's so infectious," says this friend, who adds, "I think that's what happened in this case." According to Sesler, it was Plame who ended the marriage. (Sesler did not respond to calls for comment).")

• Michael Isikoff and David Corn, *Hubris: The Inside Story of Spin, Scandal and the Selling of the Iraq War* ("*Hubris*"), at 280 (2006). |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|------|-----------|----------------------|
| September 1985 | Coming of age; post-college graduation training and employment affiliation of "Val P." at the Agency | • Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003<br><br>• Richard Leiby, "Valerie Plame, the Spy Who Got Shoved Out into the Cold", *Washington Post*, Oct. 29, 2005 ("She was in the 1985-86 class of CIA officers trained at "The Farm" near Williamsburg, where the curriculum included learning to drive under fire, blowing up cars and handling an AK-47")<br><br>• Larry C. Johnson, "The Real Outrage in the Rove Plame Affair", *Noquater.typepad.com* (personal blog), July 12, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/the_real_outrage.html) ("Valerie Plame was a classmate of mine from the day she started with the CIA. I entered on duty at the CIA in September 1985.")<br><br>• Larry C. Johnson, "Correcting the Record on Valerie Plame", *Noquater.typepad.com* (personal blog), July 22, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/correcting_the_.html) ("I entered on duty at the CIA in September 1985 as a member of the Career Trainee Program. Senator Orin Hatch had written a letter of recommendation on my behalf and I believe that helped open the doors to me at the CIA. From the first day all members of my training class were undercover. In other words, we had to lie to our family and friends about where we worked. We could only tell those who had an absolute need to know where we worked. In my case, I told my wife. Most of us were given official cover, which means that on paper we worked for some other U.S. Government Agency. People with official cover enjoy the benefits of an official passport, usually a black passport—i.e., a diplomatic passport. If we were caught overseas engaged in espionage activity the black passport was a get out of jail free card. It accords the bearer the protections of the Geneva Convention.")<br><br>■ Valerie Plame was a classmate of mine from the day she started with the CIA. At the time I only knew her as Valerie P. Even though all of us in the training class held Top Secret Clearances, we were asked to limit our knowledge of our other classmates to the first initial of their last name. So, Larry J. knew Val P. rather than Valerie Plame. Her name did not become a part of my consciousness until her cover was betrayed by the Government officials who gave columnist Robert Novak her true name."; )<br><br>■ "The Exposure Of Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994753.shtml) ("Marcinkowski says he knew her simply as Val P., since recruits went by the initial of their last name. And he says she was a natural.")<br><br>• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br><br>• Larry C. Johnson, "The Big Lie About Valerie Plame", Oct. 13, 2005 |

4

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|------|-----------|---------------------|
| November 1985 | "After the initial orientation, members of the class were assigned internships with various parts of the C.I.A. Then they headed to the Farm, the C.I.A.'s paramilitary training facility near Williamsburg, Virginia. Because of her young age, Plame did extra internships and headed to the Farm later." | • (http://www.tpmcafe.com/story/2005/7/13/04720/9340) David Corn, "What Valerie Plame Really Did at the CIA", *Nation Online*, September 6, 2006 (http://www.thenation.com/doc/20060918/corn) |
| | | • Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimgilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php)("It was, Valerie P., as she was known to her classmates at the Farm, in Camp Peary, Virginia, the C.I.A.'s training facility, where former C.I.A. agent Jim Marcinkowski noticed-as he later told *Time* magazine-that she showed considerable prowess wielding an AK-47 machine gun") |
| | | • *Hubris*, at 281-82. ("And in September 1985. Plame found herself in a conference room in the CIA with about forty-five other new trainees.  'The class included trainees who would be heading toward various careers in the agency: analysts, logistics managers, technicians, operatives.  Plame was in a case officer slot; she had been lined to be an undercover CIA employee who would run agents and operations overseas.  She was the youngest in the class.") |
| | | • *Hubris*, at 282. ("During a ten-week course, Plame and her classmates were taught the basics of the CIA. . . .During one class, a CIA official who had been stationed overseas stalked about life as a case officer working under non official cover (or NOC), the most perilous of agency positions. . . .'He told us,' Brent Caven, a classmate of Plame, said, 'that you have to think about this.  This is not a life for someone with a family.  He had a fantastic salary with this company but he didn't get to keep it--and he had to work two jobs.  We heard lots of stuff like that.  Valerie took it to heart.' |
| | | Plame, according to one member of her class, was 'the kid sister in the group.' She came across, Cavan said, as a young but 'plucky,' determined, ambitious, and personable.  'She was physically stunning, with platinum blond hair,' a fellow trainee later said.  'During our first four to five minutes together, I could tell she was more of a listener than a talker.  That's why she was going into the DO.'  The trainees didn't know each other by their full names.  To her fellow trainees, she was Val. P.") |
| | | • Richard Leiby and Dana Priest, "The Spy Next Door:  Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 |
| | | • Richard Leiby, "Valerie Plame, the Spy Who Got Shoved Out into the Cold", *Washington Post*, Oct. 29, 2005 ("She was in the 1985-86 class of CIA officers trained at 'The Farm' near Williamsburg, where the curriculum included learning to drive under fire, blowing up cars and handling an AK-47") |
| | Valerie Plame trains at the Farm.  As part of her courses, she was taught hostage and taught how to reduce messages to microdots.  She became expert at firing an AK-47.  She learned how to blow up cars and drive under | |

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | lie. | • "The Exposure Of Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994753.shtml) ("In the late 1980's, [Jim Marcinkowski] was a covert CIA agent spying in Central America. Like all recruits, he was sent to the agency's top-secret training facility in Virginia known simply as 'the farm.' That's where he first met a 22-year-old graduate of Penn State University named Valerie. Marcinkowski says he knew her simply as Val P., since recruits went by the initial of their last name. And he says site was a natural 'Did all of you have firearms training?' Bradley asked. 'Yes,' he replied. Marcinkowski says she was good. 'Some people had never fired weapons before, and some of us had. And it's always interesting when someone that has never fired a weapon kind of beats everybody else that did.") <br>• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame) <br>• Larry C. Johnson, The Big Lie About Valerie Plame, Oct. 13, 2005 (http://www.tpmcafe.com/story/2005/13/104720/9340) <br>• David Corn, "What Valerie Plame Really Did at the CIA", *Nation Online*, Sept. 6, 2006 (http://www.thenation.com/doc/20060918/corn) <br>• Vicky Ward, "Double Exposure", *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimmilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.html) ("It was, Valerie P., as she was known to her classmates at the Farm, in Camp Peary, Virginia, the C.I.A.'s training facility, where former C.I.A. agent Jim Marcinkowski noticed-as he later told Time magazine-that she showed considerable prowess wielding an AK-47 machine gun") |
| Fall 1986 | • "Plame graduated from the Farm in Fall 1986." | • *Halevis*, at 283 |
| Spring 1987 | • "The following spring, [Valerie Plame] took a course in operations for trainees destined to be case officers, the elite corps of the Directorate of Operation. This covered the essence of espionage: how to recruit an agent—a foreign national who would be willing to hand over valuable information about his government, his military, his company. (In CIA lingo, agency officers are not 'agents'; that word applies to foreigners persuaded by case officers to become spies.) Plame learned the basics: how to | *Halevis*, at 283 |

FRUS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| Post-training | assess a potential agent, how to make contact, how to make a pitch." | |
| | "After her CIA education was complete, Plame was assigned to the Cyprus/Greece/Turkey desk in the European Division of the DO. She was a junior case officer, basically doing work that supported officers in the field. She studied Greek. The branch's main focus at the time was counterterrorism. The CIA's Cyprus station was a field headquarters for much of the agency's counterterror operations related to the Middle East. The branch's number one target was the 17 November leftist terrorism group working out of Greece. The agency had an intense interest in these terrorists for good reason: the 17 November group had claimed responsibility for the 1975 assassination of Richard Welch, the CIA station chief in Athens. (The Group had targeted the CIA for working with the repressive military junta that ruled Greece from 1967 to 1974.) More than a decade later, the Cyprus/Greece/Turkey desk was still looking to find Welch's killers." | *Hubris*, at 284. See also: • David Corn, "What Valerie Plame Really Did at the CIA", *Nation Online* Sept. 6, 2006 (http://www.thenation.com/doc/20060918/corn) (". . . she served a stint on the Greece desk. . . ") |
| 1989 | | *1989-1992: Under Official Diplomatic Cover, US Embassy Athens, Greece* |
| | "In 1989, Plame was posted to the CIA station in Athens as a case officer. She served under official cover as a State Department officer, working in the US Embassy there. She carried a diplomatic passport. Her task was to spot and recruit agents for the CIA." | *Hubris*, at 284. See also: • David Corn, "What Valerie Plame Really Did at the CIA", September 6, 2006 (http://www.thenation.com/doc/20060918/corn) • Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame) • Michael Duffy and Timothy J. Burger, "NOC, NOC, Who's There? A Special Kind of Agent", *Time Magazine*, Oct. 19, 2003 |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|------|-----------|---------------------|
| 1990s | "After that first tour, [Valerie Plame] obtained a master's degree at the London School of Economics . . . ." | Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimgillison.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) ("Meanwhile, Plame learned Greek-she can also speak French and German-and was sent to Athens. There she had what is known as "State Department cover." The only tie Plame had to tell her friends then was that the State Department was her only boss.") |
| | | *1993-1995: Under "student cover" while studying at the London School of Economics and the College d' Europe* |
| | | *Hubris*, at 284. |
| | | See also: |
| | | ■ Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 ("She later earned two master's degrees, one from the London School of Economics. . . .") |
| | | ■ "The Exposure Of Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994753.shtml) ("As the investigation into who leaked her name got underway in Washington, more details about Valerie Plame's life emerged. She spent her early years in the CIA in Europe, where she received advanced degrees from the London School of Economics and the College of Europe, in Bruges, Belgium.") |
| | | ■ Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame) |
| | | ■ Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimgillison.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) ("After the Gulf War she was sent to the London School of Economics. . . .") |
| 1990s | " . . . and [Valerie Plame obtained] a Master's in European Studies at the College d' Europe in Bruges, Belgium. | *1996-1997: Under non-official cover* |
| | | *Hubris*, at 284. |
| | | See also: |
| | | ■ Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 (". . . one from the College of Europe in Bruges, Belgium") |
| | | ■ "The Exposure Of Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994753.shtml) ("As the investigation into who leaked her name got underway in Washington, more details about Valerie Plame's life emerged. She spent her early years in the CIA in Europe, where she received advanced degrees from the London School of Economics and the College of Europe, in Bruges, Belgium.") |
| | | ■ Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame) |
| | | ■ Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimgillison.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) (". . . and from there to the College of Europe, an international-relations school in Bruges") |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| 1990s | "In the early 1990's Plame became a NOC, that most covert of covert officers. She was looking to work more on her own and to avoid what she could of usual bureaucratic nonsense that afflicted even the government's spy services. It was uncommon for a case officer who had official cover to turn into a NOC. Plame had already established a trail as a U.S. government officer. (This meant she would not be the purest of NOCs.) She 'resigned' from her cover job at the State Department and began working out of Belgium, telling those who asked that she was in the Energy field. . . . Her main mission, though, remained the same as before: to gather agents for the CIA." | *Hubris*, at 284<br><br>See also:<br><br>■ David Corn, "What Valerie Plame Really Did at the CIA", *Nation Online* (http://www.thenation.com/doc/20060913/corn) ("In the early 1990s, she became what's known as a nonofficial cover officer. NOCs are the most clandestine of the CIA's frontline officers. . . She told people she was with an energy firm. Her main mission remained the same: to gather agents for the CIA.")<br><br>■ Larry C. Johnson, "The Real Outrage in the Rove Plame Affair", *Noquarter.typepad.com* (personal blog), July 12, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/the_real_outrag.html) ("A few of my classmates, and Valerie was one of these, became a non-official cover officer. That meant she agreed to operate overseas without the protection of a diplomatic passport. If caught in that status she would have been executed.")<br><br>■ Larry C. Johnson, "Correcting the Record on Valerie Plame", *Noquarter.typepad.com* (personal blog), July 22, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/correcting_the_.html)("Although Val started off with official cover, she later joined a select group of intelligence officers a few years later when she became a NOC, i.e. a Non-Official Cover officer. That meant site agreed to operate overseas without the protection of a diplomatic passport. She was using cover, which we now know because of the leak to Robert Novak, of the consulting firm Brewster-Jennings. When she traveled overseas she did not use or have an official passport. If she had been caught engaged in espionage activities while traveling overseas without the black passport she could have been executed.")<br><br>■ Elisabeth Bumiller, "Debating a Leak: The Director CIA Chief is Caught in Middle By Leak Inquiry", *New York Times*, Oct. 5, 2003 ("Ms. Plame, a specialist in nonconventional weapons who worked overseas, had "nonofficial cover," and was what in C.I.A. parlance is called a Noc, the most difficult kind of false identity for the agency to create. While most undercover agency officers disguise their real profession by pretending to be American embassy diplomats or other United States government employees, Ms. Plame passed herself off as a private energy expert. Intelligence experts said that Nocs have especially dangerous jobs.")<br><br>■ Vicky Ward, "Double Exposure", *Vanity Fair Magazine*, Jan 17, 2004 (http://www.tineilham.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plame.php) ("Plame was an "undercover officer." In fact, she had noc status, that is, nonofficial cover. nocs are not ordinarily deskbound intelligence analysts who work inside C.I.A. headquarters. Mostly they operate abroad, frequently using fake job descriptions and sometimes fake names."; "She slaved on in Brussels, telling friends she was working for an energy |

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | | consulting firm, Brewster-Jennings (now defunct). Angstadt, who is a lawyer for the Archipelago Exchange in Chicago, says it never crossed her mind to doubt her friend's stories. "I think she trained us not to ask questions," Angstadt says. |
| 1997 | "In 1997 [Valerie Plame] returned to CIA headquarters. Back at Langley, Plame had to choose a new career path within the agency. She figured that with the end of the Cold War, the two growth industries in the intelligence field were counterterrorism and counterproliferation. She picked counterproliferation. She requested an assignment in the DO's new Counterproliferation Division, a unit Congress had pushed the CIA to create to address concerns about weapons of mass destruction." | *1997-1999: Under non-official cover with Brewster-Jennings located in Boston, MA*<br><br>*Hubris*, at 284-85.<br><br>See also:<br><br>■ David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online* (http://www.thenation.com/doc/20060619/corn) ("In 1997 she returned to CIA headquarters and joined the Counterproliferation Division.")<br><br>■ Mark Mazzenar "CIA Outing May Fall Short of Crime", *USA Today*, July 14, 2005<br><br>■ "USA Today Relied on Unsupported Reading of 'Law' in Report Suggesting that Outing Plame Was Likely Not a Crime", *Media Matters for America*, July 15, 2005 ("... while actually serving as a weapons proliferation analyst for the CIA. . . .")<br><br>■ Larry C. Johnson, "Flannegate Update", *Nquonter.typepad.com* (personal blog), Oct. 5, 2005 (http://nquonter.typepad.com/no_wchlog/2005/10/planegate_upda.html) ("Valerie Plame Wilson was a non-official cover officer (aka NOC) in the Directorate of Operations Counter Proliferation Division (CPD). She worked in a branch with other undercover officers. She reported to a Chief, who in turn reported to the Chief of the CPD.")<br><br>■ Vicky Ward, "Double Exposure", *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimagilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) ("In 1997, Plame moved back to the Washington area, partly because (as was recently reported in The New York Times) the C.I.A., suspected that her name may have been on a list reported in The New York Times) the C.I.A., suspected that her name may have been on a list given to the Russians by the double agent Aldrich Ames in 1994.") |
| June 1997 | "[Joe Wilson] had first met [Valerie Plame] several months [before his move back to Washington D. C.] at a reception in Washington [Wilson] was attending with General Jim Jamerson at the residence of the Turkish ambassador. [Wilson and Jamerson] were there to accept an award from the American Turkish Council, on behalf of the American troops of the European Command who were working in close collaboration with their Turkish | ■ Joseph C. Wilson, IV, *The Politics of Truth: Inside the Lies that Led to War and Betrayed My Wife's CIA Identity* (*"The Politics of Truth"*) at 240-41.<br><br>See also:<br><br>■ *Hubris*, at 285.<br><br>■ Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br><br>■ Christopher Goffard, "Valerie Plame: Smart, Private, 'Waltons' Fan", *St. Petersburg Times*, August 7, 2005 ("In February 1997, she met diplomat Joseph Wilson, who was soon to be divorced, at the Washington, D.C., home of the Turkish ambassador, where she reminded Wilson of a young Grace Kelly and left him 'hopelessly smitten.'")<br><br>■ Vicky Ward, "Double Exposure", *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimagilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam |

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| Nov. 1997 | counterparts in Iraq and Bosnia. . . . [Valerie Plame] described herself as an energy executive living in Brussels. . . ." <br><br> Valerie Plame takes Joe Wilson "into her confidence. It was important to her, if we were going to move to another stage in our relationship, that she be honest about what she did. She told me what was permissible, under the circumstances, since I had the requisite clearances." | e.php) ("He had met Plame in February 1997 at a reception at the Washington home of the Turkish ambassador.") <br><br> • *The Politics of Truth*, at 242–43. <br><br> See also: <br><br> ■ Vicky Ward, "Double Exposure" *Vanity Fair: Magazine*, Jan. 17, 2004 (http://www.jimellinnn.com/2004/01/vanity_fair_profile_on_joseph_wilson_and_valerie_plam e.php) ("On the third or fourth date, he says, they were in the middle of a "heavy make-out" session when she said she had something to tell him. She was very conflicted and very nervous, thinking of everything that had gone into getting her to that point, such as money and training. She was, she explained, undercover in the C.I.A. "It did nothing to dampen my ardor," he says. "My only question was: Is your name really Valerie?" |
| Winter 1997 | "Soon after [their] return to Washington, [Plame and Wilson] decided to move in together in an apartment in the Watergate building. She went to work at her headquarters and [Wilson] to the ornate, Napoleon III-style Old Executive Office Building (OEOB) right next to the West Wing of the White House." | • *The Politics of Truth*, at 243. <br><br> See also: <br><br> • *Hidiris*, at 285. |
| 1997 | Turkey/U.S. | ■ Mike Mejia, "Ex-FBI [translator's] case may reveal Plame's Crucial CIA role," *Online Journal*, Dec 16, 2005. (http://www.onlinejournal.com/artman/publish/article_340.shtml) ("According to Deliso's two sources, the Turkish newspaper *Hurriyet* and former FBI translator Sibel Edmonds, the outing of Valerie Plame may have severely damaged a CIA operation to monitor a nuclear black market facilitated by the shadowy but well-connected Washington lobby group, the *American Turkish Council (ATC)*. (Those familiar with the Sibel Edmonds case will know the ATC is the very same organization that the former FBI translator heard on wiretaps in connection with various alleged illegal activities, some connected to 9/11.) From Edmonds, Deliso obtained the following admission: "Plame's undercover job involved the organizations [the FBI had been investigating], the ATC (American-Turkish Association) . . . the Brewster Jennings network was very active in Turkey and with the Turkish community in the U.S. during the late 1990s, 2000, and 2001 . . . in places like Chicago, Boston, and Paterson, N.J." |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | | Such a stunning statement by the former FBI contract linguist could be dismissed by those not familiar with the whistleblower's well-established credibility were it not for the fact that Edmonds is, at least in part, corroborated by Ambassador Joseph Wilson himself. In his book the *Politics of Truth*, Wilson recounts on page 240 that he first met Valerie Plame in 1997, at a reception at the home of the Turkish ambassador which Wilson attended to receive an award from -- you guessed it -- the *American Turkish Council*. Wilson, of course, never explains in his book what brought Valerie Plame to attend this ATC-sponsored event, but since it is public information that Plame was an undercover CIA operative at the time, the simplest explanation is the most likely one: she was there as part of her Brewster Jennings & Associates cover. Although U.S. law prohibits the CIA from conducting espionage operations against U.S. citizens on American soil, nothing would have prohibited Plame from attending such an event in Washington. |
| April 3, 1998 | Valerie Plame and Wilson marry. | These revelations about Plame's surveillance of the American Turkish Council are significant because the ATC is connected to powerful neocons like Richard Perle and Douglas Feith (and, to be fair, to powerful anti-Iraq War activists like Brent Scowcroft and Joe Wilson.) And Edmonds implies that at least some on the ATC neocon side of this scandal are heavily involved in the nuclear black market: Feith and Perle, along with former Ambassador to Turkey Marc Grossman, are fingered by Edmonds as figures of interest.") <br><br> ▪ *Hubris*, at 286. <br> ▪ Richard Leiby, "Valerie Plame, the Spy Who Got Showed Out into the Cold", *Washington Post*, Oct. 29, 2005 <br> ▪ Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame) <br> ▪ Christopher Goffard, "Valerie Plame: Smart, Private, 'Wallous' Fan, *St. Petersburg Times*, August 7, 2005 ("she married Wilson in April 1998 at Washington's City Hall, with her parents as the witnesses.") <br> ▪ *The Politics of Truth*, at 276. |
| May 1998 | Valerie Plame and Wilson buy a house in DC together. | ▪ *The Politics of Truth*, at 276-77. |
| 1999 | Valerie Wilson worked for a Boston front company named Brewster-Jennings & Associates. | ▪ Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 ("I included a Boston front company named Brewster-Jennings & Associates") <br> ▪ "The Exposure Of Valerie Plame", *CBS News*, Oct. 10, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994733.shtml) (In recent years, she told |

PKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|------|-----------|---------------------|
| 1999 | "In 1999, after Valerie Wilson mentioned to her supervisors that her husband was planning a business trip to Niger, the CPD asked if [Joe] Wilson would be willing, while he was in Niger, to ask his contacts there about A.Q. Khan, the Pakistani nuclear scientist who was running a secret international proliferation network. The CIA had picked up intelligence indicating a possible Niger connection involving Khan. Wilson agreed to do so but returned with no fresh information on the subject." | people she worked at an energy consulting firm called "Brewster-Jennings & Associates." Robert Novak, the columnist who first printed her name, revealed that, too. "And she listed herself as an employee of Brewster-Jennings & Associates. There is no such firm, I'm convinced," Novak said on CNN. He was right. Even though the business directory Dun & Bradstreet had a listing for the firm in a Boston office building, Brewster-Jennings & Associates was a CIA fiction, created to provide cover for agents like Valerie Plame."); • Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame) • Russ Kerbor and Bryan Bender, "Apparent CIA Front Didn't Offer Much Cover", *Boston Globe*, Oct. 10, 2003. • Larry Johnson, "Is Max Boot Using Oxycontin?" *Noquarter.typepad.com* (personal blog), Nov. 2, 2005 (http://noquarter.typepad.com/my_weblog/2005/11/is_max_boot_usi.html) ("In the case of Valerie Wilson, energy consultant for Brewster-Jennings, she traveled overseas in 2003, 2002, and 2001, as part of her cover job. She met with folks who worked in the nuclear industry, cultivated sources, and managed spies. She was a national security asset until exposed by Karl Rove and Scooter Libby.") *1999-2003: Under official State Department Cover* • *Hubris*, at 93 |
| January 2000 | "[Valerie Plame and Joe Wilson] married in April 1998 and she took his last name. Less than two years later, Valerie Wilson gave birth to twins, a boy and a girl .... After the twins were born, Valerie Wilson was struck by post | • *Hubris*, at 285 See also: • Richard Leiby and Dana Priest, "Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 • Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame) • *The Politics of Truth*, at 277-78. |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | partum depression. It lasted for months. But with the help of medication she recovered and later became executive director of a local post partum support group. After maternity leave, Valerie Wilson returned to the CIA's Counterproliferation Division in the spring of 2001." | • Larry C. Johnson, "The Betrayal of Valerie Plame, "truthout.com Feb. 7, 2006 (http://www.truthout.org/cgi-bin/artman/exec/view.cgi/48/17531); Alternet.org (http://www.alternet.org/story/31881/)("Vice President Cheney (old Scooter Libby) that Valerie Plame worked at the CIA's Counter Proliferation Division in mid-June 2003") |
| Spring 2001 | "After maternity leave, Valerie Wilson returned to the CIA's Counterproliferation Division in the spring of 2001. She was given a choice: she could work on North Korea or Iraq. She selected Iraq and became one of the two operations officers working for the CPD's rather modest Iraq branch. But within months, it would expand into the Joint Task Force on Iraq and assume one of the agency's most important missions: the search for intelligence on Iraq's WMDs. (She also assisted on operations related to Iran)" | • Hubris, at 285.
See also:
• David Corn, "What Valerie Plame Really Did at the CIA", The Nation Online, (http://www.thenation.com/doc/20060918/corn)
• Larry C. Johnson, "The Betrayal of Valerie Plame," truthout.com Feb. 7, 2006 (http://www.truthout.org/cgi-bin/artman/exec/view.cgi/48/17531); Alternet.org (http://www.alternet.org/story/31881/) ("Valerie was working on projects to identify terrorists and criminals who were trying to procure weapons of mass destruction. Part of this information was the basis for the referral to the Justice Department in September 2003 to investigate this as a violation of the Intelligence Identities Protection Act") |
| ? | "Plame Wilson, who worked on the clandestine side of the CIA in the Directorate of Operations as a non-official cover (NOC) officer, was part of an operation tracking distribution and acquisition of weapons of mass destruction technology to and from Iran. Speaking under strict confidentiality, intelligence officials revealed heretofore unreported elements of Plame's work. Their accounts suggest that Plame's | • Michael Isikoff, "The CIA Leak: Plame Was Still Covert", Newsweek, Feb. 13, 2006 (http://www.msnbc.msn.com/id/11197196/site/newsweek/)(Story Continued) ("But special prosecutor Patrick Fitzgerald found that Plame had indeed done "covert work overseas" on counterproliferation matters in the past five years, and the CIA "was making specific efforts to conceal" her identity, according to newly released portions of a judge's opinion. (A CIA spokesman at the time is quoted as saying Plame was "unlikely" to take further trips overseas, though.")
• Larisa Alexandrovna, "Outed CIA officer was working on Iran, intelligence sources say", Raw Story, Feb.13, 2006 (http://rawstory.com/admin/dsecops/printstory.php?story=1851)
See also:
• Hubris, at 285. ("She also assisted on operations related to Iran.")
• "MSNBC update: Cheney's office knew Plame's work was sensitive" Raw Story; May 2, 2006 (http://www.rawstory.com/news/2006/MSNBC_Cheneys_office_knew_Plames_work_0502.htm l) ("As MSNBC first reported yesterday, Wilson was not just undercover... but was, according to intelligence sources, part of an effort three years ago to monitor the proliferation of nuclear weapons material into Iran. And the sources allege that when Mrs. Wilson's cover was blown, part of the administration's ability to track Iran's nuclear ambitions was damaged as well.")
• "MSNBC confirms: Outed CIA agent was working on Iran", Raw Story, May 1, 2006 |

14

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | outing was more serious than has previously been reported and carries grave implications for U.S. national security and its ability to monitor Iran's burgeoning nuclear program.<br><br>While many have speculated that Plame was involved in monitoring the nuclear proliferation black market, specifically the proliferation activities of Pakistan's nuclear "father," A.Q. Khan, intelligence sources say that her team provided only minimal support in that area, focusing almost entirely on Iran." | (http://www.rawstory.com/news/2006/MSNBC_confirms_Raw_Story_report_Outed_0501.html)<br>; (http://www.crooksandliars.com/2006/03/01.html#a8126) ; Larry C. Johnson, "Republican Chutzpah on Iran", *NoQuarter.typepad.com* (personal blog), (http://noquarter.typepad.com/my_weblog/2006/08/republican_chut.html#more) ("Reports Sluster in this rush transcript: 'Intelligence sources say Valerie Wilson was part of an operation three years ago tracking the proliferation of nuclear weapons material into Iran and the sources allege that when Mrs. Wilson's cover was blown, the administration's ability to track Iran's nuclear ambitions was damaged as well.")<br><br>• James Gordon Meek and Kenneth R. Bazinet, "She's the perfect spy", *New York Daily News*, Oct. 2, 2003 ("Two former senior intelligence officials confirmed that Valerie Plame, 40, is an operations officer in the spy agency's directorate of operations – the clandestine service. Plame 'ran intelligence operations overseas,' said Vincent Cannistraro, former CIA counterterrorism operations chief. Her specialty in the agency's nonproliferation center was biological, chemical and nuclear weapons and 'recruiting agents, sending them to areas where they could access information about proliferation matters, weapons of mass destruction,' Cannistraro said.") |
| January 1, 2002 | Began post as Classified CIA Officer | • Transcript of Special Counsel Fitzgerald's Press Conference, *Washington Post* Oct. 28, 2005<br>• Larry C. Johnson, "Planegate Update", *Noquater.typepad.com* (personal blog), Oct. 5, 2005 (http://noquarter.typepad.com/my_weblog/2005/10/planegate_updat.html) ("Although Valerie had been based in the United States for several years, her cover was intact until compromised by White House officials. She had conducted several overseas missions as part of her cover job. Although she was in the process of moving from non-official cover to official cover status, she was still undercover.")<br>• Larry C. Johnson, "Correcting the Record on Valerie Plame", *Noquater.typepad.com* (personal blog), July 22, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/correcting_the_.html) ("Val only told those with a need to know about her status in order to safeguard her cover, not compromise it. Val has never been a flamboyant, insecure person who felt the need to tell people what her 'real' job was. She was content with being known as an energy consultant married to Joe Wilson and the mother of twins. Despite the repeated claims of representatives for the Republican National Committee, the Wilson's neighbors did not know where Valerie really worked until Novak's op-ed appeared.") |
| Beginning of 2002 | "When Valerie Wilson's colleague inquired in 2002 if Wilson could help on | • *Hubris* at 93 |

FKSS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| February 19, 2002 | the latest Niger matter; this mother of two-year-old twins was not especially eager to have her husband trek to Niger (for no pay). Just see if he'll come talk to us, her fellow CPD officer asked. Valerie Wilson would later tell a friend, "My supervisor said, 'Why don't we set up a meeting and have Joe come in?' My job was to go home and say, 'Honey, will you come into the office next week?'"

"On February 19, 2002, Joseph Wilson made the ten-minute drive from the Wilsons' Washington town house across the Potomac to Langley to discuss Niger and uranium with assorted analysts. Valerie Wilson introduces her husband to CIA office Valerie met him at the front entrance of CIA headquarters and escorted him to a basement meeting room. . . . Later—once this session had become a matter of controversy— Valerie Wilson told friends that she had merely introduced her husband to the assembled analysts and officers and then left." | • *Hubris*, at 94
See also:
• Larry C. Johnson, "Plamegate Update", *Noquater.typepad.com* (personal blog), Oct. 5, 2005 (http://noquater.typepad.com/my_weblog/2005/10/plamegate_updat.html) ("According to the CIA, Valerie Wilson did not make the decision to send her husband to Niger. . . . The Office Chief, the Division Chief, and the Branch Chief are the only decision makers at the CIA outside of the DCI himself who can make a decision to send someone on a trip overseas. CPD convened a meeting of intelligence community analysts on 19 February to meet with Ambassador Joe Wilson. Ambassador Wilson's wife introduced her husband and then left the meeting. She had neither the authority or the means to hire her husband. This was a decision made by her supervisors.")
• Larry Johnson, "Is Max Boot Using Oxycontin" *Noquater.typepad.com* (personal blog), Nov. 2, 2005 (http://noquater.typepad.com/my_weblog/2005/11/is_max_boot_usi.html) ("CIA officials in July 2003 and in July 2005 have said on the record that Valerie Wilson played no role in the decision to send Joe Wilson to Niger. Although in the Senate Intelligence Committee report from July of 2004 tried to insinuate otherwise, Valerie's bosses asked her to write a memo outlining her husband's qualifications for a mission to Niger and she introduced her husband at a meeting (and then left). She was an undercover case officer, not a manager with the authority to make such a decision."). |
| March 5, 2002 | "On March 5, two CIA officers debriefed Wilson at his home. Valerie Wilson didn't take part in the session." | • *Hubris*, at 97 |
| May 2002 | Valerie Wilson is Chief of Operations of the Joint Task Force on Iraq which was charged with digging up information on | • *Hubris*, at 11
• David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online*, (http://www.thenation.com/doc/20060918/corn) |

16

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | Iraq's WMD programs. | |
| Spring 2002 | "By the spring of 2002, the JTFI, including [Valerie] Wilson, was under intense pressure to get more solid intelligence on Iraq's weapon's program. . . . Valerie Wilson and the operations officers of JTFI sought out Iraqi graduate students studying abroad who had previously studied under Iraqi scientists of interest to the CIA. . . . At the same time, Valerie Wilson's operations unit was overwhelmed with walk-ins." | • *Hubris*, at 13-14 <br> See also: <br> • David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online*, (http://www.thenation.com/doc/20060918/corn) <br> • "The Exposure Of Valerie Plame", CBS News, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994753.shtml) ("[Melissa]Mahle says Valerie was working on important national security issues, like keeping tabs on nuclear material and the world's top nuclear scientists. 'She is an expert on weapons of mass destruction. These are the kind of people that don't grow on trees.' 'What do agents in that division do?' 'They're trying to figure out, really, the hard questions of who has the capability obtaining and deploying a biological weapon. Or a chemical weapon. Who's doing it? What are those networks? What are the financial banks?' says Mahle.") |
| | | • *Nightline*, ABC News, Oct. 3, 2003 ("JANE DOE: 'Well, like Jim just said, just a few months ago, this Administration went out of its way to tell us how important human intelligence is. We cannot find Saddam Hussein because we have no human intelligence. And here you are, you have a case officer who is gathering human intelligence, who is running agents, and here you're exposing her and everyone that she came in contact with." |
| Spring 2002 | "As the cases piled up, Valerie Wilson traveled overseas under assumed names to monitor walk-in operations and other activities. Members of the unit were putting in long hours. But the results were frustrating. None of the JTFI's operations was generating evidence that Saddam had biological or chemical weapons or a revived nuclear weapons program". | • *Hubris*, at 15 <br> See also: <br> • David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online*, (http://www.thenation.com/doc/20060918/corn) |
| | "She also went to Jordan to work with Jordanian intelligence officials who had intercepted a shipment of aluminum tubes leading to Iraq that CIA analysts were claiming--wrongly--were for a nuclear weapons program. (The analysts rolled over the government's top nuclear | • David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online*, (http://www.thenation.com/doc/20060918/corn) |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|------|-----------|---------------------|
| | experts, who had concluded the tubes were not destined for a nuclear program)." | |
| Spring 2003 | "[I]n the spring, Plame was in the process of moving from noc status to State Department cover." | ■ Vicky Ward, **"Double Exposure"** *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.vanityfair.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plame) |
| July 2003 | July 6 opinion piece in the New York Times and in an interview with The Washington Post, J. Wilson cited a secret mission he conducted in February 2002 for the CIA, when he determined there was no evidence that Iraq was seeking uranium for a nuclear weapons program in the African nation of Niger. Valerie Wilson is identified as NOC by media | ■ Robert Novak, "Mission to Niger, *Washington Post*, July 14, 2003.<br>■ Elisabeth Bumiller, "Debating a Leak: The Director CIA Chief is Caught in Middle By Leak Inquiry", *New York Times*, Oct. 5, 2003.<br>■ Michael Duffy and Timothy Burger, "NOC, NOC, Who's There? A Special Kind of Agent, *Time Magazine*, Oct. 19, 2003.<br>■ Walter Pincus and Jim VandeHei, "Plame's Identity Marked As Secret, Memo Central to Probe Of Leak Was Written By State Dept. Analyst", *Washington Post*, July 21, 2005.<br>■ Lincoln Caplan, "Law and Politics", *Legal Affairs*, Jan.-Feb. 2006 ("The case began in 2003 with the leak that Valerie Wilson, a covert operator in the CIA, worked at the agency. The leak came after her husband, the career foreign service officer Joseph Wilson, conducted an investigation for the CIA in Africa and went public with his conclusion that the Bush Administration had muted the world about a key justification for the war in Iraq; that Iraq had obtained from Niger yellow-cake, a processed form of uranium ore that can be used in making nuclear bombs.") |

18

**Tab 16**

**Subject:** From Valerie Plame Wilson
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Thu, 11 Jan 2007 16:47:30 +0000
**To:** richajp@ucia.gov
**CC:** D_Grannis@ssci.senate.gov

Richard,

I just spoke on the telephone with David Grannis of Senator
Feinstein's office.  He informed me of the meeting between himself,
PRB and OGC representatives, and a senior Agency manager on 9
January.  I request that you forward David, at your earliest
convenience,  a copy of my entire manuscript so that he may review
the chapters in question.  It is our understanding that the Agency
would do this with my approval.

Thank you for your help on this.

Valerie Wilson

**Tab 17**

**Subject:** From Valerie Wilson
**From:** "Joseph Wilson" <thewilsonswdc@hotmail.com>
**Date:** Fri, 12 Jan 2007 18:28:33 +0000
**To:** richajp@ucia.gov

Richard,

I wanted to confirm that you received me email request of yesterday,
11 January, to send my manuscript to David Grannis of Senator
Feinstein's office.

Looking forward to hearing from you.

Thank you,

Valerie Wilson

**Tab 18**

Central Intelligence Agency



Washington, D.C. 20505

19 January 2007

Mrs. Valerie Wilson
4612 Charleston Terrace, NW
Washington, D.C.    20007

Dear Mrs. Wilson:

    I am writing with regard to CIA's February 10, 2006
letter to you concerning your creditable federal service
and deferred annuity.  The letter was not properly marked
to indicate its national security classification.    The
absence of a national security classification marking was
an administrative error and information contained therein
remains classified.  Please return the letter and any
copies in your possession to me as soon as possible so that
it may be properly marked and secured.  Please contact me
at (703) 613-8624 to make arrangements to return the
letter.

                        Sincerely,

                        Karen F. Tumolo
                        Karen F. Tumolo
            Chief, Retirement & Insurance Services

# FAX COVER SHEET

Number of Pages
(including cover):        2

To:                  **David Smallman**
Telephone:           (212) 826-5580
Fax Number:          (212) 593-9175

From:                **Ginger A. Wright**
Telephone:           (703) 613-3029
Fax Number:          (703) 613-3003

Date:                22 January 2007

Subject:             19 January 2007 Letter to Valerie Wilson

David, I just received a copy of this today. I had called you earlier to
give you a heads-up about this but since we were not able to touch
base, I wanted to get this to you sooner rather than later. Please call
me at your earliest convenience. Thanks, Ginger

**Tab 19**

Central Intelligence Agency



Washington, D.C. 20505

January 23, 2007

The Honorable Karen Haas
Clerk
U.S. House of Representatives
H-154, The Capitol
Washington, D.C.  20515

Dear Ms. Haas:

In am writing regarding a February 10, 2006 letter from
the Central Intelligence Agency included on page E119 of the
January 12, 2007 Congressional Record (Extension of
Remarks). Please be advised that the letter contains
classified information that was not properly marked to
reflect its national security classification.

Sincerely,

Christopher J. Walker
Director of Congressional Affairs

**Tab 20**

# Frankfurt Kurnit Klein & Selz, PC



Attorneys at Law
488 Madison Avenue
New York, New York 10022

Phone: (212) 980-0120
Fax: (212) 593-9175

## FACSIMILE TRANSMITTAL SHEET

| Deliver To: | Fax Number: |
|---|---|
| Ginger Wright, Esq. | 1-703-613-3003/ |
|  | 3020 |
|  | Telephone Number: |
|  | 1-703-613-3029 |
| From: | Direct Dial Number: |
| David B. Smallman, Esq. | 1-212-826-5580 |
| Subject: | Client/Matter Number: |
| Wilson | 16100-0200 |
| Date: | Total Number of Pages (including cover): |
| January 31, 2007 | 44 |

Comments:

If you do not receive all of the pages, or if you have difficulty with the transmission, please call the direct dial number shown above or (212) 980-0120 and ask for the mailroom at extension 6605.

### PRIVILEGED AND CONFIDENTIAL

This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

# FRANKFURT KURNIT KLEIN & SELZ PC

488 Madison Avenue
New York, New York 10122
Telephone: (212) 980-0 20
Facsimile: (212) 593-9 75

David B. Smallman
Direct dial: (212) 826-5380
e-mail: dsmallman@fkks.com

January 31, 2007

VIA FAX
(703) 613-3003

Ginger A. Wright, Esq.
Assistant General Counsel
Office of General Counsel
Central Intelligence Agency
Washington, D.C. 20505

Dear Ms. Wright:

I am writing in response to a fax received from you on January 22, 2007 forwarding a copy of a letter dated January 19, 2007 from Karen F. Turnolo, Chief, Retirement & Insurance Services, Central Intelligence Agency, to Valerie Wilson ("January 19, 2007 Letter") (copy attached). I am also following up on our recent telephone communications regarding the scheduling of a second meeting with the Agency to discuss resolving unwarranted delays now approaching *six months* in the review process for Ms. Wilson's memoir. In connection with this response, my letter references the Introduction of "the Valerie Plame Wilson Compensation Act," H.R. 501, ("VPW Compensation Act Introduction"), the text of H.R. 501 ("H.R. 501"), and a previously authorized, unclassified February 10, 2006 letter to Mrs. Valerie Wilson from Central Intelligence Agency as published in the Congressional Record on January 16, 2007 ("Published February 10, 2006 Letter").[1]

---

[1] Copies of the VPW Compensation Act Introduction, H.R. 501, and the Published February 10, 2006 Letter – published by Congress prior to the January 19, 2007 request from the Agency requesting return of the February 10, 2006 letter due to a purported "administrative error" – are attached hereto in the specific form currently available from the Library of Congress THOMAS website. *See* http://thomas.loc.gov/cgi-bin/query/D?c110:1:./temp/~c110pplmK5:: While more complete information may be obtainable directly from Congress, the genesis of this legislation apparently dates back to November 2005. The Agency letter officially acknowledging and disclosing in unclassified form Ms. Wilson's dates of federal service was published in the extension of remarks regarding the proposed legislation for the apparent purpose of demonstrating that Ms. Wilson had satisfied the duration of government service required and showing the accrual date upon which an accelerated government annuity

FRANKFURT KURNIT KLEIN & SELZ pc

Ginger A. Wright, Esq.
January 31, 2007
Page 2 of 7

The Published February 10, 2006 Letter from CIA, which was an authorized and
unclassified communication delivered by regular mail, officially acknowledged and
disclosed information regarding Ms. Wilson's eligibility to receive a deferred annuity
under the Federal Employees Retirement System (FERS) Special Category at the
conclusion of her government service in January 2006. The following unclassified
information was included in that authorized letter from the Agency: (1) Valerie Wilson
(a/k/a Valerie Plame) commenced her service with CIA on "11/9/1985" (2) dates of Ms.
Wilson's CIA service were from "11/9/1985 to 1/9/2006—total 20 years, 7 days"; (3)
Ms. Wilson "acquired 6 years, 1 month and 29 days of overseas service" with CIA.
(Published February 10, 2006 Letter, available at http://thomas.loc.gov/cgi-
bin/query/D?c110:1:./temp/~c110pplmK5::)

As more fully set forth in my letter to you dated January 9, 2007 ("January 9,
2007 Letter") (copy attached), senior management at the Agency, including its Director,
have ostensibly sought to preclude Ms. Wilson from referring to her pre-2002 federal
government employment affiliation through application of a so-called "bright-line"
determination not to roll back her "cover" prior to 2002, even though Ms. Wilson's
Agency affiliation has, since 2003, been a matter of indisputable public record. As a
result, the Agency has refused to date to approve for publication the first 125 pages of
Ms. Wilson's memoir primarily because it acknowledges – as the entire world knows –
otherwise non-confidential aspects of her employment affiliation for approximately the
last two decades.

However, for a period of almost a year, an unclassified letter to Ms. Wilson from
the Agency already officially disclosed the inception and duration of Ms. Wilson's
specific federal employment affiliation. And although the Agency had actual knowledge
of the existence of its own officially acknowledged disclosure[2] from at least February 10,

---

would be conditioned. Congress redacted the name of the Agency employee who sent the letter and also
redacted the year-by-year summary information regarding Ms. Wilson's overseas service.

[2] Numerous courts have held that to be "officially acknowledged" by an agency, information must
meet three criteria: (1) the information at issue must be as specific as the information previously released;
(2) the information to be disclosed must be as specific as the information previously released; (3) the
information for which publication approval is sought must already have been made public through an
official and documented disclosure. *See, e.g., Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990); *Wolf
v. CIA*, Nos. 05-5394, 06-5072, 2007 WL 92693 *5-8 (D.C. Cir. Jan. 16, 2007) (reversing district court and
remanding issue of waiver based upon "official acknowledgment" criteria); *see also Rubin v. CIA*, No. 01
Civ. 2274, 2001 WL 1537706 *4 (S.D.N.Y. Dec. 3, 2001) (citing *Afshar*). It is indisputable under the
circumstances presented by the pending Agency review of Ms. Wilson's memoir that the Published
February 10, 2006 Letter satisfies each of these criteria and constitutes an official documented disclosure of
substantially the same information – indeed the precise information – regarding Ms. Wilson's CIA

FRANKFURT KURNIT KLEIN & SELZ pc

Ginger A. Wright, Esq.
January 31, 2007
Page 3 of 7

2006 to January 19, 2007, it took no steps whatsoever to reclassify information in the
February 10, 2006 letter, to indicate any national security classification of the contents of
the letter through proper marking and redelivery of the letter, to retrieve the original
letter, or to restrict in any way dissemination of the letter or any information contained
therein. To the contrary, for approximately a full year, none of the measures set forth in
Executive Order 12958, as amended by Executive Order No. 13292, 68 Fed. Reg. 15315
("E.O. 12958") applicable to the handling of "Classified National Security Information"
were undertaken by the Agency with respect to information about Ms. Wilson's federal
service contained in the February 10, 2006 letter. Given the controversy surrounding the
outing of Ms. Wilson as an Agency employee in 2003 and her resulting notoriety, and
given the Agency's presumed expertise in the handling of national security information,
it strains credulity for the Agency to assert at this late date that its official disclosure in
February 2006 of Ms. Wilson's dates of "creditable federal service" with the CIA "from
11/9/1985 to 1/9/2006" can be ascribed to "administrative error." *See* Published
February 10, 2006 Letter; *cf.* January 19, 2007 Letter.

The official acknowledgement and disclosure by the Agency of Ms. Wilson's
employment affiliation with CIA in an unclassified letter delivered after her resignation
from the Agency in January 2006, together with the publication and broad public
dissemination of that specific official Agency disclosure by Congress in the
Congressional Record prior to any communication from the Agency that the information
was somehow restricted "National Security Information," provides strong legal support
for the position that Ms. Wilson's employment affiliation with the Agency has now
irretrievably entered the public domain. U.S. Supreme Court precedent and related
authority indicates that this would be true even if prior to that time the identical
information had not been officially disclosed by the Agency itself, insofar as an official
acknowledgment by CIA of the specific information occurred during February 2006 and
became public, through Congress, in early 2007.[3] Accordingly, there appears to be no

---

affiliation that the Agency has inconsistently, inexplicably, and mistakenly asserted should not be disclosed
in her memoir.

[3] *See Snepp v. United States*, 444 U.S. 507, 511 (1980) ("Government does not deny – as a general
principle – [former CIA employee's] right to publish unclassified information."); *id;* 444 U.S. at 521 n.11
(Stevens, J., dissenting) ("It is noteworthy that the Court does not disagree with the Fourth Circuit's view in
*Marchetti*, reiterated in *Snepp*, that a CIA employee has a First Amendment right to publish unclassified
information.") (citing *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972) ("by accepting
employment with the CIA and by signing a secrecy agreement [CIA employee] does not surrender [her]
First amendment right of free speech"), *cert. denied*, 409 U.S. 1063. In *Marchetti*, the court expressly
stated that it "would decline enforcement of the secrecy oath signed when [Marchetti] left the employment
of the CIA to the extent that it purports to prevent disclosure of unclassified information. for, to that extent,
the oath would in contravention of his First Amendment rights." 466 F.2d at 1316. The court further

**FRANKFURT KURNIT KLEIN & SELZ** PC

Ginger A. Wright, Esq.
January 31, 2007
Page 4 of 7

legal support for the continued assertion of a "bright-line" rule precluding Ms. Wilson from referencing her employment affiliation with the Agency in her memoir. Nor does there appear to be any reasonable basis for further delay by the Agency in completing immediately its review of Ms. Wilson's manuscript, which she submitted for approval *nearly six months ago,* and rescinding any further general objections to its publication. If there are other parts of the Executive Branch, including, for example, the Office of Vice President of the United States, that are in any way involved in the publication review process by the Agency for Ms. Wilson's manuscript and thereby seeking to censor or otherwise restrain publication of her memoir in possible violation of the Constitution and the laws of the United States, *see, e.g.,* Intelligence Reform and Terrorism Prevention Act of 2004, § 1011, 50 U.S.C. § 403-1(f)(4), please let us know so that we take up this issue

---

observed that "Marchetti retains the right to speak and write about the CIA . . . but he may not disclose *classified information* obtained by him during the course of his employment *which is not already in the public domain." Id.* (emphasis added.) *See also Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 891 F.2d 414, 421 (2d Cir. 1989) (government may not invoke exemptions under FOIA pertaining to properly classified information to prevent public disclosure "when the government has *officially* disclosed the *specific* information being sought" and "the information sought has previously been made public through official disclosures") (citing *Afshar v. Department of State,* 702 F.2d 1125, 1130-33 (D.C. Cir. 1983) (plaintiff bears burden of showing specific information in the public domain that duplicates the information withheld)); *Fitzgibbon v. Central Intelligence Agency,* 578 F. Supp. 704, 715 (D.D.C. 1983) (plaintiff must show that information in public domain is as specific as that which is being sought, relates to the same time period, and has been the result of an official disclosure); *National Lawyers Guild v. Attorney General,* 96 F.R.D. 390, 402 (S.D.N.Y. 1982 (prior disclosure of similar, as opposed to specific, information to that being sought does not waive the state secrets privilege). *Cf. American Civil Liberties Union v. Department of Defense,* 389 F.Supp.2d 547, 564-65 (S.D.N.Y. 2005) (referring to public disclosures and observing that position of government agency raises concern that purpose of response "is less to protect intelligence activities, sources or methods than to conceal possible 'violations of law' . . . 'inefficiency' or 'embarrassment' of the CIA"); *Compare* 50 U.S.C.A. § 403-3(c)(7) (West 2003) (protecting intelligence sources and methods), *and* E.O. 12958 § 1.4 (same; permissible subjects of classification), *with* E.O. 12958 § 1.7 (criteria that forbid classification, including "administrative error"). With respect to Ms. Wilson's government employment affiliation, that information, having been disclosed by the Agency in an unclassified letter, clearly falls within the public domain exception set forth in *Marchetti* and followed in *Snepp.* The CIA's indisputable official disclosure of specific information about Ms. Wilson's government service dates is clearly no longer "under the control of the United States." E.O. 12958, § 1.1(2), (4). Nor did the Agency, as the original classification authority, identify, mark, or describe any aspect of that disclosure that "reasonably could be expected to result in damage to national security" in 2006. E.O. §1.6 (5)(c). The Published February 10, 2006 Letter was therefore not classified information at the time of its official disclosure in February 2006, and the Agency is expressly prohibited from reclassifying the information merely due to purported "administrative error." *Id.,* §1.7(a)(1). Moreover, reclassification can only occur if "the information may be reasonably recovered," *id,* § 1.7(4)(c)(2), and that cannot occur here because the specific information has been published in the Congressional Record and made available worldwide on the internet via the Library of Congress THOMAS website. *Cf. Students Against Genocide v. Department of State,* 257 F.3d 828, 836 (D.C. Cir. 2001) ("For the public domain doctrine to apply, the specific information sought must have already been "disclosed and preserved in a permanent public record.") (quoting *Cottone v. Reno,* 193 F.3d 550, 555 (D.C. Cir. 1999)).

**FRANKFURT KURNIT KLEIN & SELZ** *rc*

Ginger A. Wright, Esq.
January 31, 2007
Page 5 of 7

with them directly or refer that conduct for investigation by an appropriate government
authority.

Notwithstanding the Agency's official disclosure of Ms. Wilson's government
service record on February 10, 2006 and the publication of that official disclosure by
Congress in the Congressional Record, (*See* http://thomas.loc.gov/cgi-
bin/query/D?c110:1:./temp/~c110pplmK5::), the Agency's January 19, 2007 Letter
requests that Ms. Wilson "contact [Karen F. Tumolo, Chief, Retirement & Insurance
Services] . . . to make arrangements to return the [February 10, 2006] letter." As an
initial matter, please be assured that Ms. Wilson and her counsel intend to comply fully
with all applicable obligations regarding "Classified National Security Information"
pursuant to E.O. 12958, and any other applicable law, and, while fully reserving her
rights and without prejudice to or otherwise waiving any rights she may have, Ms.
Wilson will provide a copy of the February 10, 2006 letter to Ms. Tumolo. In order to
comply with any such obligations, to respond appropriately to the January 19, 2007
Letter, and to preserve all applicable rights of the parties in interest to this matter, certain
additional information is need to ensure appropriate compliance with the law.[4]

First, while the January 19, 2007 Letter asserts that "[t]he absence of a national
security classification marking [on the February 10, 2006 letter] was an administrative
error and information contained therein remains classified," this argument appears to be
inconsistent with and contradicted on its face by the Published February 10, 2006 Letter.
E.O. 12958, § 1.6(a) requires that

> [a]t the time of original classification the following *shall appear on the face of
> each classified document,* or shall be applied to other classified media in an
> appropriate manner:
>
> > (1) one of the three classification levels defined in section 1.2 [of E.O.
> > 12958];
> > (2) the identity, by name or personal identifier and position, of the original
> > classification authority;
> > (3) the agency and office of origin, if not otherwise evident;
> > (4) declassification instructions, as prescribed in section 1.5(a) or section
> > 1.5(c);

---

[4] Please note that any requests by the Agency regarding the Published February 10, 2006 Letter
must also be directed to Congress as Ms. Wilson obviously cannot respond on behalf of the Legislative
Branch of the United States Government and also cannot reasonably be requested to recover information
publicly released by Congress. *See* E.O 12598 § 1.7(4)(2).

**FRANKFURT KURNIT KLEIN & SELZ** pc

Ginger A. Wright, Esq.
January 31, 2007
Page 6 of 7

> (A) the date or event for declassification, as prescribed in section 1.5(a) or
>     section 1.5(c);
> (B) the date that is 10 years from the date of original classification, as
>     prescribed in section 1.5(b); or
> (C) the date that is up to 25 years from the date of original classification,
>     as prescribed in section 1.5(b); and
> (5) a concise reason for classification that, at a minimum, cites the
>     applicable classification categories in section 1.4 of this order.

(emphasis added.) Despite this mandatory requirement for original classification, the
Published February 10, 2006 Letter contains no such identification and markings.
Moreover, E.O. 12958 § (5)(c), states, in relevant part, that "[w]ith respect to each
classified document, the agency originating the document *shall*, by marking or other
means, indicate which portions are classified, with the applicable classification level, and
which portions are unclassified." (emphasis added.) Here again, the Published February
10, 2006 Letter does not contain the mandatory information required at the time of
original classification or any indicia of an intent to undertake such classification. This
would appear to demonstrate, conclusively, that the information contained in the
February 10, 2006 letter contains no currently classified information and that the
standards applicable to original classification of that information as of February 2006
were not and could not be met. Accordingly, if the Agency's position differs, please send
to me as soon as possible a revised and remarked version of the February 10, 2006 letter[5]
that complies in good faith with any applicable provisions of E.O. 12958 § 1.6.

    Second, to the extent that the Agency is now seeking to reclassify the Published
February 10, 2006 Letter or any portion thereof, the Agency is required to comply with
E.O. 12958 § 1.7. Accordingly, please provide to me at your earliest convenience the
Agency's legal basis for seeking reclassification of the Published February 10, 2006
Letter and confirmation that all required actions have been undertaken by the Agency in
connection with seeking reclassification, including, but not limited to, that the
reclassification action "is taken under the personal authority of the Agency head or
Deputy Agency head," and that the Agency head or Deputy Agency head has determined
"in writing that the reclassification of the information is necessary in the interest of
national security." E.O. 12958, § 1.7(c)(1). *Cf. Alfred A. Knopf, Inc. v. Colby*, 509 F.2d
1362, 1367 (4th Cir. 1975) (setting forth *de novo* standard of review for classification
decision; "the deletion items should be suppressed only if they are found to be both
classified and classifiable under the Executive Order"), *cert denied*, 421 U.S. 992.

---

[5] Because the Agency is in possession of a copy of the original February 10, 2006 letter and the
Published February 10, 2006 Letter, there would appear to be no reasonable basis for delay in providing a
revised version of the letter that reflects the Agency's actual determinations pursuant to E.O. § 1.6.

# FRANKFURT KURNIT KLEIN & SELZ pc

Ginger A. Wright, Esq.
January 31, 2007
Page 7 of 7

Third, I requested in my January 9, 2007 Letter that we schedule a second meeting with the Agency's acting General Counsel to discuss the issues raised in that letter. In our telephone communications, you stated the Agency would be interested in scheduling such a meeting and suggested that my partner, Lisa Davis, and I travel to the Agency's headquarters. While we appreciate the invitation to visit the Agency's headquarters for a second time, Ms. Davis and I do not have the requisite security clearance to discuss any applicable classified national security information, nor is it our understanding that any such classified national security information would be discussed at our meeting. Accordingly, because of the stringent security requirements necessary to gain access to the Agency's headquarters, and because the editing of Ms. Wilson's book is taking place in New York, I would propose that our meeting occur at my firm's office in New York or, alternately, at another convenient New York location, for example, the office of Ms. Wilson's publisher, Simon & Schuster, if they are amenable. Please let me know at your earliest convenience whether it will be possible for you and Mr. Rizzo to meet with us in New York and, if so, when it would be possible to schedule that meeting.

In closing, I again reiterate that Ms. Wilson has endeavored to reach a reasonable resolution with the Agency of any possible national security issues arising from her memoir and, in doing so, to balance fairly all of the equitable and legal issues at stake. Ms. Wilson is not seeking *carte blanche* to discuss her entire government service or to reveal any classified information. Rather, because of newsworthy events concerning her government service, a fundamental public interest "lies in a proper accommodation that will preserve the intelligence mission of the Agency while not abridging the free flow of unclassified information." *Snepp v. United States*, 444 U.S. 507, 520 (1980) (Stevens, J., dissenting). In that regard, Ms. Wilson has a First Amendment right to publish unclassified information about her life and a corresponding interest in ensuring that the Agency's pre-publication review process is reasonably structured to prevent publication only of *properly* classified material.

I will look forward to hearing back from you at your earliest convenience regarding the matters addressed herein.

Sincerely,

David B. Smallman /MB

David B. Smallman

Attachments

The following documents were attached to this letter [AR (Unclassified) Tab 20]:

- [AR (Unclassified) Tab 18] January 22, 2007 fax from Ginger Wright to David B. Smallman (of January 19, 2007 letter from Karen Tumolo to Valerie Wilson)

- [AR (Classified) Tabs 6, 7, 8] Library of Congress printout — Inslee bill and remarks, Congressional Record

- [AR (Unclassified) Tab 15] January 9, 2007 fax from David B. Smallman to Ginger Wright (of January 9, 2007 letter from David B. Smallman to Ginger Wright and Fact/Event chart)