# Exhibit G

# Frankfurt Kurnit Klein & Selz, PC

Attorneys at Law
488 Madison Avenue
New York, New York 10022

Phone:  (212) 980-0120
Fax:  (212) 593-9175

---

## FACSIMILE TRANSMITTAL SHEET

| Deliver To: | Fax Number: |
|---|---|
| Ginger Wright, Esq. | 1-703-613-3003/ 3020 |
| | Telephone Number: |
| | 1-703-613-3029 |
| From: | Direct Dial Number: |
| David B. Smallman, Esq. | 1-212-826-5580 |
| Subject: | Client/Matter Number: |
| Wilson | 16100-0200 |
| Date: | Total Number of Pages (including cover): |
| January 31, 2007 | 44 |

Comments:

If you do not receive all of the pages, or if you have difficulty with the transmission, please call the direct dial number shown above or (212) 980-0120 and ask for the mailroom at extension 6605.

### PRIVILEGED AND CONFIDENTIAL

This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

FRANKFURT KURNIT KLEIN & SELZ PC

488 Madison Avenue
New York, New York 10022
Telephone: (212) 980-0120
Facsimile: (212) 593-9175

David B. Smallman
Direct dial: (212) 826-5580
e-mail: dsmallman@fkks.com

January 31, 2007

<u>VIA FAX</u>
(703) 613-3003

Ginger A. Wright, Esq.
Assistant General Counsel
Office of General Counsel
Central Intelligence Agency
Washington, D.C.  20505

Dear Ms. Wright:

        I am writing in response to a fax received from you on January 22, 2007
forwarding a copy of a letter dated January 19, 2007 from Karen F. Tumolo, Chief,
Retirement & Insurance Services, Central Intelligence Agency, to Valerie Wilson
("January 19, 2007 Letter") (copy attached).  I am also following up on our recent
telephone communications regarding the scheduling of a second meeting with the
Agency to discuss resolving unwarranted delays now approaching *six months* in the
review process for Ms. Wilson's memoir.  In connection with this response, my letter
references the Introduction of "the Valerie Plame Wilson Compensation Act," H.R. 501,
("VPW Compensation Act Introduction"), the text of H.R. 501 ("H.R. 501"), and a
previously authorized, unclassified February 10, 2006 letter to Mrs. Valerie Wilson from
Central Intelligence Agency as published in the Congressional Record on January 16,
2007  ("Published February 10, 2006 Letter").[1]

---

        [1] Copies of the VPW Compensation Act Introduction, H.R. 501, and the Published February 10,
2006 Letter – published by Congress prior to the January 19, 2007 request from the Agency requesting
return of the February 10, 2006 letter due to a purported "administrative error" – are attached hereto in the
specific form currently available from the Library of Congress THOMAS website.  *See*
http://thomas.loc.gov/cgi-bin/query/D?c110:1:./temp/~c110pplmK5::  While more complete information
may be obtainable directly from Congress, the genesis of this legislation apparently dates back to
November 2005.  The Agency letter officially acknowledging and disclosing in unclassified form Ms.
Wilson's dates of federal service was published in the extension of remarks regarding the proposed
legislation for the apparent purpose of demonstrating that Ms. Wilson had satisfied the duration of
government service required and showing the accrual date upon which an accelerated government annuity

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 2 of 7

The Published February 10, 2006 Letter from CIA, which was an authorized and unclassified communication delivered by regular mail, officially acknowledged and disclosed information regarding Ms. Wilson's eligibility to receive a deferred annuity under the Federal Employees Retirement System (FERS) Special Category at the conclusion of her government service in January 2006. The following unclassified information was included in that authorized letter from the Agency: (1) Valerie Wilson (a/k/a Valerie Plame) commenced her service with CIA on "11/9/1985" (2) dates of Ms. Wilson's CIA service were from "11/9/1985 to 1/9/2006—total 20 years, 7 days"; (3) Ms. Wilson "acquired 6 years, 1 month and 29 days of overseas service" with CIA. (Published February 10, 2006 Letter, available at http://thomas.loc.gov/cgi-bin/query/D?c110:1:./temp/~c110pplmK5::)

As more fully set forth in my letter to you dated January 9, 2007 ("January 9, 2007 Letter") (copy attached), senior management at the Agency, including its Director, have ostensibly sought to preclude Ms. Wilson from referring to her pre-2002 federal government employment affiliation through application of a so-called "bright-line" determination not to roll back her "cover" prior to 2002, even though Ms. Wilson's Agency affiliation has, since 2003, been a matter of indisputable public record. As a result, the Agency has refused to date to approve for publication the first 125 pages of Ms. Wilson's memoir primarily because it acknowledges – as the entire world knows – otherwise non-confidential aspects of her employment affiliation for approximately the last two decades.

However, for a period of almost a year, an unclassified letter to Ms. Wilson from the Agency already officially disclosed the inception and duration of Ms. Wilson's specific federal employment affiliation. And although the Agency had actual knowledge of the existence of its own officially acknowledged disclosure[2] from at least February 10,

---

would be conditioned. Congress redacted the name of the Agency employee who sent the letter and also redacted the year-by-year summary information regarding Ms. Wilson's overseas service.

[2] Numerous courts have held that to be "officially acknowledged" by an agency, information must meet three criteria: (1) the information at issue must be as specific as the information previously released; (2) the information to be disclosed must be as specific as the information previously released; (3) the information for which publication approval is sought must already have been made public through an official and documented disclosure. See, e.g., Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990); Wolf v. CIA, Nos. 05-5394, 06-5072, 2007 WL 92693 *5-8 (D.C. Cir. Jan. 16, 2007) (reversing district court and remanding issue of waiver based upon "official acknowledgment" criteria); see also Rubin v. CIA, No. 01 Civ. 2274, 2001 WL 1537706 *4 (S.D.N.Y. Dec. 3, 2001) (citing Afshar). It is indisputable under the circumstances presented by the pending Agency review of Ms. Wilson's memoir that the Published February 10, 2006 Letter satisfies each of these criteria and constitutes an official documented disclosure of substantially the same information – indeed the precise information – regarding Ms. Wilson's CIA

**FRANKFURT KURNIT KLEIN & SELZ** PC

Ginger A. Wright, Esq.
January 31, 2007
Page 3 of 7

2006 to January 19, 2007, it took no steps whatsoever to reclassify information in the February 10, 2006 letter, to indicate any national security classification of the contents of the letter through proper marking and redelivery of the letter, to retrieve the original letter, or to restrict in any way dissemination of the letter or any information contained therein.  To the contrary, for approximately a full year, none of the measures set forth in Executive Order 12958, as amended by Executive Order No. 13292, 68 Fed. Reg. 15315 ("E.O. 12958") applicable to the handling of "Classified National Security Information" were undertaken by the Agency with respect to information about Ms. Wilson's federal service contained in the February 10, 2006 letter.  Given the controversy surrounding the outing of Ms. Wilson as an Agency employee in 2003 and her resulting notoriety, and given the Agency's presumed expertise in the handling of national security information, it strains credulity for the Agency to assert at this late date that its official disclosure in February 2006 of Ms. Wilson's dates of "creditable federal service" with the CIA "from 11/9/1985 to 1/9/2006" can be ascribed to "administrative error."  *See* Published February 10, 2006 Letter; *cf.* January 19, 2007 Letter.

        The official acknowledgement and disclosure by the Agency of Ms. Wilson's employment affiliation with CIA in an unclassified letter delivered after her resignation from the Agency in January 2006, together with the publication and broad public dissemination of that specific official Agency disclosure by Congress in the Congressional Record prior to any communication from the Agency that the information was somehow restricted "National Security Information," provides strong legal support for the position that Ms. Wilson's employment affiliation with the Agency has now irretrievably entered the public domain.  U.S. Supreme Court precedent and related authority indicates that this would be true even if prior to that time the identical information had not been officially disclosed by the Agency itself, insofar as an official acknowledgment by CIA of the specific information occurred during February 2006 and became public, through Congress, in early 2007.[3]  Accordingly, there appears to be no

---

affiliation that the Agency has inconsistently, inexplicably, and mistakenly asserted should not be disclosed in her memoir.

        [3] *See Snepp v. United States*, 444 U.S. 507, 511 (1980) ("Government does not deny – as a general principle – [former CIA employee's] right to publish unclassified information."); *id;* 444 U.S. at 521 n.11 (Stevens, J., dissenting) ("It is noteworthy that the Court does not disagree with the Fourth Circuit's view in *Marchetti*, reiterated in *Snepp*, that a CIA employee has a First Amendment right to publish unclassified information.") (citing *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972) ("by accepting employment with the CIA and by signing a secrecy agreement [CIA employee] does not surrender [her] First amendment right of free speech"), *cert. denied*, 409 U.S. 1063.  In *Marchetti*, the court expressly stated that it "would decline enforcement of the secrecy oath signed when [Marchetti] left the employment of the CIA to the extent that it purports to prevent disclosure of unclassified information, for, to that extent, the oath would in contravention of his First Amendment rights." 466 F.2d at 1316.  The court further

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 4 of 7

legal support for the continued assertion of a "bright-line" rule precluding Ms. Wilson from referencing her employment affiliation with the Agency in her memoir. Nor does there appear to be any reasonable basis for further delay by the Agency in completing immediately its review of Ms. Wilson's manuscript, which she submitted for approval *nearly six months ago,* and rescinding any further general objections to its publication. If there are other parts of the Executive Branch, including, for example, the Office of Vice President of the United States, that are in any way involved in the publication review process by the Agency for Ms. Wilson's manuscript and thereby seeking to censor or otherwise restrain publication of her memoir in possible violation of the Constitution and the laws of the United States, *see, e.g.,* Intelligence Reform and Terrorism Prevention Act of 2004, § 1011, 50 U.S.C. § 403-1(f)(4), please let us know so that we take up this issue

---

observed that "Marchetti retains the right to speak and write about the CIA . . . but he may not disclose *classified information* obtained by him during the course of his employment *which is not already in the public domain.*" *Id.* (emphasis added.) *See also Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 891 F.2d 414, 421 (2d Cir. 1989) (government may not invoke exemptions under FOIA pertaining to properly classified information to prevent public disclosure "when the government has *officially* disclosed the *specific* information being sought" and "the information sought has previously been made public through official disclosures") (citing *Afshar v. Department of State,* 702 F.2d 1125, 1130-33 (D.C. Cir. 1983) (plaintiff bears burden of showing specific information in the public domain that duplicates the information withheld)); *Fitzgibbon v. Central Intelligence Agency,* 578 F. Supp. 704, 715 (D.D.C. 1983) (plaintiff must show that information in public domain is as specific as that which is being sought, relates to the same time period, and has been the result of an official disclosure); *National Lawyers Guild v. Attorney General,* 96 F.R.D. 390, 402 (S.D.N.Y. 1982) (prior disclosure of similar, as opposed to specific, information to that being sought does not waive the state secrets privilege). *Cf. American Civil Liberties Union v. Department of Defense,* 389 F.Supp.2d 547, 564-65 (S.D.N.Y. 2005) (referring to public disclosures and observing that position of government agency raises concern that purpose of response "is less to protect intelligence activities, sources or methods than to conceal possible 'violations of law' . . . 'inefficiency' or 'embarrassment' of the CIA"); *Compare* 50 U.S.C.A. § 403-3(c)(7) (West 2003) (protecting intelligence sources and methods), *and* E.O. 12958 § 1.4 (same; permissible subjects of classification), *with* E.O. 12958 § 1.7 (criteria that forbid classification, including "administrative error"). With respect to Ms. Wilson's government employment affiliation, that information, having been disclosed by the Agency in an unclassified letter, clearly falls within the public domain exception set forth in *Marchetti* and followed in *Snepp.* The CIA's indisputable official disclosure of specific information about Ms. Wilson's government service dates is clearly no longer "under the control of the United States." E.O. 12958, § 1.1(2), (4). Nor did the Agency, as the original classification authority, identify, mark, or describe any aspect of that disclosure that "reasonably could be expected to result in damage to national security" in 2006. E.O. §1.6 (5)(c). The Published February 10, 2006 Letter was therefore not classified information at the time of its official disclosure in February 2006, and the Agency is expressly prohibited from reclassifying the information merely due to purported "administrative error." *Id.,* §1.7(a)(1). Moreover, reclassification can only occur if "the information may be reasonably recovered," *id,* § 1.7(4)(c)(2), and that cannot occur here because the specific information has been published in the Congressional Record and made available worldwide on the internet via the Library of Congress THOMAS website. *Cf. Students Against Genocide v. Department of State,* 257 F.3d 828, 836 (D.C. Cir. 2001) ("For the public domain doctrine to apply, the specific information sought must have already been "disclosed and preserved in a permanent public record.") (quoting *Cottone v. Reno,* 193 F.3d 550, 555 (D.C. Cir. 1999)).

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 5 of 7

with them directly or refer that conduct for investigation by an appropriate government authority.

Notwithstanding the Agency's official disclosure of Ms. Wilson's government service record on February 10, 2006 and the publication of that official disclosure by Congress in the Congressional Record, (See http://thomas.loc.gov/cgi-bin/query/D?c110:1:./temp/~c110pplmK5::), the Agency's January 19, 2007 Letter requests that Ms. Wilson "contact [Karen F. Tumolo, Chief, Retirement & Insurance Services] . . . to make arrangements to return the [February 10, 2006] letter." As an initial matter, please be assured that Ms. Wilson and her counsel intend to comply fully with all applicable obligations regarding "Classified National Security Information" pursuant to E.O. 12958, and any other applicable law, and, while fully reserving her rights and without prejudice to or otherwise waiving any rights she may have, Ms. Wilson will provide a copy of the February 10, 2006 letter to Ms. Tumolo. In order to comply with any such obligations, to respond appropriately to the January 19, 2007 Letter, and to preserve all applicable rights of the parties in interest to this matter, certain additional information is need to ensure appropriate compliance with the law.[4]

First, while the January 19, 2007 Letter asserts that "[t]he absence of a national security classification marking [on the February 10, 2006 letter] was an administrative error and information contained therein remains classified," this argument appears to be inconsistent with and contradicted on its face by the Published February 10, 2006 Letter. E.O. 12958, § 1.6(a) requires that

> [a]t the time of original classification the following *shall appear on the face of each classified document*, or shall be applied to other classified media in an appropriate manner:
>
> > (1) one of the three classification levels defined in section 1.2 [of E.O. 12958];
> > (2) the identity, by name or personal identifier and position, of the original classification authority;
> > (3) the agency and office of origin, if not otherwise evident;
> > (4) declassification instructions, as prescribed in section 1.5(a) or section 1.5(c);

---

[4] Please note that any requests by the Agency regarding the Published February 10, 2006 Letter must also be directed to Congress as Ms. Wilson obviously cannot respond on behalf of the Legislative Branch of the United States Government and also cannot reasonably be requested to recover information publicly released by Congress. See E.O 12598 § 1.7(4)(2).

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 6 of 7

> (A) the date or event for declassification, as prescribed in section 1.5(a) or
> section 1.5(c);
> (B) the date that is 10 years from the date of original classification, as
> prescribed in section 1.5(b); or
> (C) the date that is up to 25 years from the date of original classification,
> as prescribed in section 1.5(b); and
> (5) a concise reason for classification that, at a minimum, cites the
> applicable classification categories in section 1.4 of this order.

(emphasis added.) Despite this mandatory requirement for original classification, the Published February 10, 2006 Letter contains no such identification and markings. Moreover, E.O. 12958 § (5)(c), states, in relevant part, that "[w]ith respect to each classified document, the agency originating the document *shall*, by marking or other means, indicate which portions are classified, with the applicable classification level, and which portions are unclassified." (emphasis added.) Here again, the Published February 10, 2006 Letter does not contain the mandatory information required at the time of original classification or any indicia of an intent to undertake such classification. This would appear to demonstrate, conclusively, that the information contained in the February 10, 2006 letter contains no currently classified information and that the standards applicable to original classification of that information as of February 2006 were not and could not be met. Accordingly, if the Agency's position differs, please send to me as soon as possible a revised and remarked version of the February 10, 2006 letter[5] that complies in good faith with any applicable provisions of E.O. 12958 § 1.6.

Second, to the extent that the Agency is now seeking to reclassify the Published February 10, 2006 Letter or any portion thereof, the Agency is required to comply with E.O. 12958 § 1.7. Accordingly, please provide to me at your earliest convenience the Agency's legal basis for seeking reclassification of the Published February 10, 2006 Letter and confirmation that all required actions have been undertaken by the Agency in connection with seeking reclassification, including, but not limited to, that the reclassification action "is taken under the personal authority of the Agency head or Deputy Agency head," and that the Agency head or Deputy Agency head has determined "in writing that the reclassification of the information is necessary in the interest of national security." E.O. 12958, § 1.7(c)(1). *Cf. Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1367 (4th Cir. 1975) (setting forth *de novo* standard of review for classification decision; "the deletion items should be suppressed only if they are found to be both classified and classifiable under the Executive Order"), *cert denied*, 421 U.S. 992.

---

[5] Because the Agency is in possession of a copy of the original February 10, 2006 letter and the Published February 10, 2006 Letter, there would appear to be no reasonable basis for delay in providing a revised version of the letter that reflects the Agency's actual determinations pursuant to E.O. § 1.6.

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 7 of 7

Third, I requested in my January 9, 2007 Letter that we schedule a second meeting with the Agency's acting General Counsel to discuss the issues raised in that letter. In our telephone communications, you stated the Agency would be interested in scheduling such a meeting and suggested that my partner, Lisa Davis, and I travel to the Agency's headquarters. While we appreciate the invitation to visit the Agency's headquarters, for a second time, Ms. Davis and I do not have the requisite security clearance to discuss any applicable classified national security information, nor is it our understanding that any such classified national security information would be discussed at our meeting. Accordingly, because of the stringent security requirements necessary to gain access to the Agency's headquarters, and because the editing of Ms. Wilson's book is taking place in New York, I would propose that our meeting occur at my firm's office in New York or, alternately, at another convenient New York location, for example, the office of Ms. Wilson's publisher, Simon & Schuster, if they are amenable. Please let me know at your earliest convenience whether it will be possible for you and Mr. Rizzo to meet with us in New York and, if so, when it would be possible to schedule that meeting.

In closing, I again reiterate that Ms. Wilson has endeavored to reach a reasonable resolution with the Agency of any possible national security issues arising from her memoir and, in doing so, to balance fairly all of the equitable and legal issues at stake. Ms. Wilson is not seeking *carte blanche* to discuss her entire government service or to reveal any classified information. Rather, because of newsworthy events concerning her government service, a fundamental public interest "lies in a proper accommodation that will preserve the intelligence mission of the Agency while not abridging the free flow of unclassified information." *Snepp v. United States*, 444 U.S. 507, 520 (1980) (Stevens, J., dissenting). In that regard, Ms. Wilson has a First Amendment right to publish unclassified information about her life and a corresponding interest in ensuring that the Agency's pre-publication review process is reasonably structured to prevent publication only of *properly* classified material.

I will look forward to hearing back from you at your earliest convenience regarding the matters addressed herein.

Sincerely,

David B. Smallman /MB

David B. Smallman

Attachments

# FAX COVER SHEET

Number of Pages
(including cover):          2

To:                    **David Smallman**
Telephone:             (212) 826-5580
Fax Number:            (212) 593-9175

From:                  **Ginger A. Wright**
Telephone:             (703) 613-3029
Fax Number:            (703) 613-3003

Date:                  22 January 2007

Subject:               19 January 2007 Letter to Valerie Wilson

David, I just received a copy of this today. I had called you earlier to
give you a heads-up about this but since we were not able to touch
base, I wanted to get this to you sooner rather than later. Please call
me at your earliest convenience. Thanks, Ginger



Central Intelligence Agency

Washington, D.C. 20505

19 January 2007

Mrs. Valerie Wilson
4612 Charleston Terrace, NW
Washington, D.C.  20007

Dear Mrs. Wilson:

I am writing with regard to CIA's February 10, 2006
letter to you concerning your creditable federal service
and deferred annuity.  The letter was not properly marked
to indicate its national security classification.  The
absence of a national security classification marking was
an administrative error and information contained therein
remains classified.  Please return the letter and any
copies in your possession to me as soon as possible so that
it may be properly marked and secured.  Please contact me
at (703) 613-8624 to make arrangements to return the
letter.

Sincerely,

Karen F. Tumolo
Karen F. Tumolo
Chief, Retirement & Insurance Services

## NEW SEARCH | HOME | HELP

**H.R.501**
**Title:** For the relief of Valerie Plame Wilson.
**Sponsor:** Rep Inslee, Jay [WA-1] (introduced 1/16/2007)    Cosponsors (None) Private bill
**Latest Major Action:** 1/16/2007 Referred to House committee. Status: Referred to the House Committee on Intelligence (Permanent Select).

Jump to: Summary, Major Actions, All Actions, Titles, Cosponsors, Committees, Related Bill Details, Amendments

**SUMMARY AS OF:**
1/16/2007--Introduced.

Valerie Plame Wilson Compensation Act - Provides for the relief of Valerie Plame Wilson.

**MAJOR ACTIONS:**

***NONE***

**ALL ACTIONS:**

**1/16/2007:**
    Introductory remarks on measure. (CR E118-119)
**1/16/2007:**
    Referred to the House Committee on Intelligence (Permanent Select).

**TITLE(S):**  (*italics indicate a title for a portion of a bill*)

***NONE***

**COSPONSOR(S):**

***NONE***

**COMMITTEE(S):**

**Committee/Subcommittee: Activity:**

House Intelligence
(Permanent Select)                Referral

**RELATED BILL DETAILS:**

    ***NONE***

**AMENDMENT(S):**

***NONE***

The Library of Congress > THOMAS Home > Congressional Record > Search Results

| THIS SEARCH | THIS DOCUMENT | THIS CR ISSUE | GO TO |
|---|---|---|---|
| Next Hit | Forward | Next Document | New CR Search |
| Prev Hit | Back | Prev Document | HomePage |
| Hit List | Best Sections | Daily Digest | Help |
| | Contents Display | | |

# Page E119

**1 .** INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT -- (Extensions of Remarks - January 16, 2007)
**2 .** TRIBUTE TO THE REVEREND JAMES D. PETERS -- (Extensions of Remarks - January 16, 2007)
**3 .** OPPORTUNITY KNOCKS IN TURKMENISTAN: IS ANYONE LISTENING? -- (Extensions of Remarks - January 16, 2007)

THOMAS Home | Contact | Accessibility | Legal | FirstGov

| THIS SEARCH | THIS DOCUMENT | THIS CR ISSUE | GO TO |
|---|---|---|---|
| Next Hit | Forward | Next Document | New CR Search |
| Prev Hit | Back | Prev Document | HomePage |
| Hit List | Best Sections | Daily Digest | Help |
| | Contents Display | | |

| Congressional Record article 1 of 3 | Printer Friendly Display - 5,504 bytes.[Help] |
|---|---|

## INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT -- (Extensions of Remarks - January 16, 2007)

[Page: E118]  *GPO's PDF*

---

SPEECH OF☐
**HON. JAY INSLEE**
OF WASHINGTON
IN THE HOUSE OF REPRESENTATIVES
TUESDAY, JANUARY 16, 2007

- Mr. INSLEE. Madam Speaker, I rise today to bring to the attention of Congress one of the human impacts caused by the indiscretion of government officials regarding the covert identity of Central Intelligence Agency operative Valerie Plame Wilson.

- As nearly every American knows, and as most of the world has heard, the covert CIA identity of Valerie Plame Wilson was exposed to the public as part of an Administration response to a critical op-ed published in the New York Times by Mrs. Plame Wilson's husband, Joe Wilson.

- The national security ramifications for this act have been discussed thoroughly on this floor, in the news media, and I am quite certain behind CIA's closed doors. Today I intend to call my colleagues' attention to the human toll that this ``outing'' has had on one, often overlooked, individual. That person is Valerie Plame Wilson.

- While the media, Congress, and the judiciary have gone to great lengths to discuss the impact of this unfortunate act on politicians, bureaucrats, agents in the field, and the suspected perpetrators of the outing, few have looked at the impact that the outing has had on Mrs. Plame Wilson and her family.

- On July 14, 2003, Mrs. Plame Wilson's professional life was forever altered, and her CIA career irrevocably ruined by the syndicated publication of a column, which revealed Mrs. Plame Wilson's identity as a covert CIA officer. Since this time, numerous reports on Mrs. Plame Wilson's personal history have surfaced

[Page: E119]   *GPO's PDF*

in the press, official government documents, and by government officials.

- Following the initial outing in the media, Mrs. Plame Wilson's future as a covert CIA operative ceased to exist and her career of two decades was destroyed. On January 9, 2006, Mrs. Plame Wilson resigned from the CIA, recognizing that any future with the Agency would not include any work for which she had been highly trained. For these reasons, and under these distressing conditions, Mrs. Plame Wilson voluntarily resigned from the Agency.

- Despite Mrs. Plame Wilson's 20 years of federal service, she does not meet the minimum age requirement to receive her retirement annuity. She has been left without a career.

- I am introducing legislation to allow Mrs. Plame Wilson to qualify for her annuity, as one who has served her country for two decades, and waive the age requirement for collecting it. To best demonstrate the annuity for which Mrs. Plame Wilson may qualify if this legislation were to pass, I am submitting for the record a document sent to Mrs. Plame Wilson by the CIA. It outlines her deferred annuity and testifies to 20 years of service. The document bears no indications of classified material as required by CIA procedures, and was sent via regular postal mail after Mrs. Plame Wilson was no longer in the employ of the CIA. Legal experts have assured me that this is not a classified document.

- I believe that this is one small measure to help send a message that we must stand up for public service officers, such as Mrs. Plame Wilson, who have been treated wrongly despite their loyalty and sacrifice to country. For those who have been, for all practicable purposes, pushed out of public service for reasons unrelated to performance, but instead seeded in politics, we should not turn our backs.

Central Intelligence Agency,

Washington, DC, February 10, 2006.

Mrs. **VALERIE WILSON**

**DEAR MRS. WILSON,** This letter is in response to your recent telephone conversation with regarding when you would be eligible to receive your deferred annuity. Per federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA). Your MRA is age 56, at which time you'll be eligible to receive a deferred annuity.

Your deferred annuity will be based on the regular FERS computation rate, one percent for every year of service vice the FERS Special rate of 1.7% for every year of service. You will receive 1.7% for each year of overseas service, prorated on a monthly basis, after January 1, 1987 in the calculation of your annuity. Our records show that since January 1, 1987, you have acquired 6 years, 1 month and 29 days

of overseas service.

Following is a list of your federal service:

Dates of Service: CIA, CIA (LWOP), CIA Ð(P/T 40), from 11/9/1985 to 1/9/2006--total 20 years, 7 days.

Based on the above service and your resignation on January 9, 2006, your estimated deferred annuity is $21,541.00 per year, or $1795 per month, beginning at age 56.

The above figures are estimates for your planning purposes. The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts. Please let me know if I can be of any further assistance.

Sincerely,

------.

---

| *THIS SEARCH* | *THIS DOCUMENT* | *THIS CR ISSUE* | *GO TO* |
|---|---|---|---|
| Next Hit | Forward | Next Document | New CR Search |
| Prev Hit | Back | Prev Document | HomePage |
| Hit List | Best Sections | Daily Digest | Help |
| | Contents Display | | |

---

THOMAS Home | Contact | Accessibility | Legal | FirstGov

will do nothing, just as previous Congresses have done nothing, Nancy Pelosi promises to "build a better future for all of America's children." If she were serious, she would back cuts in Social Security and Medicare. President Bush calls "entitlement spending" the central budget problem. If he were serious, he, too, would propose cuts in Social Security and Medicare.

They are not serious, because few Americans—particularly prospective baby-boom retirees—want them to be. There is a consensus against candor, because there is no constituency for it. It's no secret that the 65-and-over population will double by 2030 (to almost 72 million, or 20 percent of the total population); but hardly anyone wants to face the implications:

By comparison, other budget issues, including the notorious earmarks, are trivial. In 2005, Social Security, Medicare and Medicaid (the main programs for the elderly) cost \$1.034 trillion, twice the amount of defense spending and more than two-fifths of the total federal budget. These programs are projected to equal about three-quarters of the budget by 2030, if it remains constant as a share of national income.

Preserving present retirement benefits automatically imposes huge costs on the young—costs that are economically unsound and socially unjust. The tax increases required by 2030 could hit 50 percent, if other spending is maintained as a share of national income. Or much of the rest of government (from defense to national parks) would have to be shut down or crippled. Or budget deficits would balloon to quadruple today's level.

Social Security and Medicare benefits must be cut to keep down overall costs. Yes, some taxes will be raised and some other spending cut. But much of the adjustment should come from increasing eligibility ages (ultimately to 70) and curbing payments to wealthier retirees. Americans live longer and are healthier. They can work longer and save more for retirement.

Because I've written all this before, I can anticipate some of the furious responses from prospective retirees. First will be the "social compact" argument: We paid to support today's retirees; tomorrow's workers must pay to support us. Well, of course they will pay; the question is how much. The alleged compact is entirely artificial, acknowledged only by those who benefit from it. My three children (ages 16 to 21) didn't endorse it. Judging from the e-mail I receive, neither did many 20- or 30-somethings.

Next I'll hear that the Social Security and Medicare trust funds, intended to cover future benefits, have been "plundered." This is pure fiction.

Social Security, Medicare and Medicaid are pay-as-you-go programs. Present taxes pay present benefits. In 2005, 86 percent of Social Security payroll taxes went to pay current retiree benefits. True, excess taxes had created a "surplus" in the Social Security trust fund (it hasn't been "plundered") of \$1.66 trillion in 2005; but that equaled less than four years' worth of present benefits. More important, Medicare and Medicaid represent three-quarters of the projected spending increase for retirees by 2030.

All the misinformation bespeaks political evasion. With his rhetorical skills, Clinton might have raised public understanding. Instead, he lowered it by falsely denouncing the Republicans for attempting to "destroy" Medicare. The first refuge of good Democrats is to accuse the Republicans of conspiring against old folks by trying to dismantle Social Security and Medicare. And Bush's credibility is shot, because he made the problem worse. His Medicare drug benefit increases spending and, though it could have been justified as part of a grand bargain that reduced older benefits, its isolated enactment was a political giveaway.

The failure to communicate also implicates many pundits and think tanks, liberal and conservative. Pundits usually speak in bland generalities. They support "fiscal responsibility" and "entitlement reform" and oppose big budget deficits. Less often do they say plainly that people need to work longer and that retirees need to lose some benefits. Think tanks endlessly publish technical reports on Social Security and Medicare, but most avoid the big issues. Are present benefits justified? How big can government become before the resulting taxes or deficits harm the economy?

Opportunities for gradual change have been squandered. These public failings are also mirrored privately. I know many bright, politically engaged boomers who can summon vast concern or outrage about global warming, corporate corruption, foreign policy, budget deficits and much more—but, somehow, their own Social Security and Medicare benefits rarely come up for discussion or criticism. Older boomers (say, those born by 1955) are the most cynical, hoping their benefits will be grandfathered in when inevitable cuts occur in the future.

Our children will not be so blind to this hypocrisy. We have managed to take successful programs—Social Security and Medicare—and turn them into huge problems by our self-centered inattention. Baby boomers seem eager to "reinvent retirement" in all ways except those that might threaten their pocketbooks.

[From The Dallas Morning News, June 8, 2006]

DEEP IN THE BUDGET HOLE—BIPARTISAN PANEL COULD HELP COUNTRY DIG OUT

When you're almost \$10 trillion in the hole, you've got to call somebody, right?

Fortunately, GOP Rep. Frank Wolf has a suggestion to deliver us from the gates of budget hell. The Virginia legislator introduced legislation yesterday that would establish a bipartisan commission charged with presenting the choices required to balance the budget.

The panel would function like the commission that former Texas GOP Rep. Dick Armey launched to close down unnecessary military bases. An independent group would give Congress a budget package, which legislators would vote up or down on unless the House and Senate come up with better solutions.

President Bush approves of this approach earlier this year when he called for a bipartisan commission to recommend how Washington can control runaway spending on Social Security, Medicare and other big guaranteed programs.

But Mr. Wolf understands that the budget challenges are not all about spending. They also involve taxes and how much revenue the Treasury needs to pay for the services Americans demand.

In an encouraging sign, White House economic adviser Allen Hubbard recently acknowledged that any bipartisan panel probably would look at taxes.

He wasn't saying the White House is backing off its fondness for tax cuts, but it was a Washington way of saying, "Let's look at the whole range of choices."

We encourage North Texas representatives to line up as sponsors of Mr. Wolf's legislation and help get it through the House this summer. (The delegation's chief deficit fighter, GOP Rep. Jeb Hensarling of Dallas, told us last week that he wants to look at the proposal.)

It's time Washington reaches out for help. By the numbers: \$9.6 trillion: The amount of debt Congress recently authorized the Treasury to borrow (the limit was \$8.4 trillion four summers ago); \$2.8 trillion: The likely 2007 federal budget; \$399 billion: Next year's interest expense on the federal debt; \$27,000: What every man, woman and child would owe to eliminate the federal debt; 37.4 percent: How much of the gross domestic product the federal debt consumes.

[From the Orlando Sentinel, June 12, 2006]

GET ON WITH IT

Our position: A panel on Medicare and other issues would get needed talks started.

Finally, someone in Congress has taken up President Bush's call for a bipartisan commission on the looming financial crisis if no changes are made to Medicare, Medicaid and Social Security.

Unchecked growth in the cost of these programs in coming decades will consume the economy by forcing some combination of huge tax increases, drastic spending cuts or massive borrowing.

This past week, Republican Rep. Frank Wolf of Virginia proposed a panel aptly named SAFE, to secure America's future economy. Its bipartisan experts would deliver a package of recommendations to Congress for an up-or-down vote.

Mr. Wolf says he is open to suggestions on his proposal. Members unwilling to support it have a moral obligation to come forward with something they deem better.

---

INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT

---

## HON. JAY INSLEE
### OF WASHINGTON
### IN THE HOUSE OF REPRESENTATIVES

*Tuesday, January 16, 2007*

Mr. INSLEE, Madam Speaker, I rise today to bring to the attention of Congress one of the human impacts caused by the indiscretion of government officials regarding the covert identity of Central Intelligence Agency operative Valerie Plame Wilson.

As nearly every American knows, and as most of the world has heard, the covert CIA identity of Valerie Plame Wilson was exposed to the public as part of an Administration response to a critical op-ed published in the New York Times by Mrs. Plame Wilson's husband, Joe Wilson.

The national security ramifications for this act have been discussed thoroughly on this floor, in the news media, and I am quite certain behind CIA's closed-doors. Today I intend to call my colleagues' attention to the human toll that this "outing" has had on one, often overlooked, individual. That person is Valerie Plame Wilson.

While the media, Congress, and the judiciary have gone to great lengths to discuss the impact of this unfortunate act on politicians, bureaucrats, agents in the field, and the suspected perpetrators of the outing, few have looked at the impact that the outing has had on Mrs. Plame Wilson and her family.

On July 14, 2003, Mrs. Plame Wilson's professional life was forever altered, and her CIA career irrevocably ruined by the syndicated publication of a column, which revealed Mrs. Plame Wilson's identity as a covert CIA officer. Since this time, numerous reports on Mrs. Plame Wilson's personal history have surfaced

in the press, official government documents, and by government officials.

Following the initial outing in the media, Mrs. Plame Wilson's future as a covert CIA operative ceased to exist and her career of two decades was destroyed. On January 9, 2006, Mrs. Plame Wilson resigned from the CIA, recognizing that any future with the Agency would not include any work for which she had been highly trained. For these reasons, and under these distressing conditions, Mrs. Plame Wilson voluntarily resigned from the Agency.

Despite Mrs. Plame Wilson's 20 years of federal service, she does not meet the minimum age requirement to receive her retirement annuity. She has been left without a career.

I am introducing legislation to allow Mrs. Plame Wilson to qualify for her annuity, as one who has served her country for two decades, and waive the age requirement for collecting it. To best demonstrate the annuity for which Mrs. Plame Wilson may qualify if this legislation were to pass, I am submitting for the record a document sent to Mrs. Plame Wilson by the CIA. It outlines her deferred annuity and testifies to 20 years of service. The document bears no indications of classified material as required by CIA procedures, and was sent via regular postal mail after Mrs. Plame Wilson was no longer in the employ of the CIA. Legal experts have assured me that this is not a classified document.

I believe that this is one small measure to help send a message that we must stand up for public service officers, such as Mrs. Plame Wilson, who have been treated wrongly despite their loyalty and sacrifice to country. For those who have been, for all practicable purposes, pushed out of public service for reasons unrelated to performance, but instead seeded in politics, we should not turn our backs.

CENTRAL INTELLIGENCE AGENCY,
*Washington, DC, February 10, 2006.*
Mrs. VALERIE WILSON.

DEAR MRS. WILSON, This letter is in response to your recent telephone conversation with regarding when you would be eligible to receive your deferred annuity. Per federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA). Your MRA is age 56, at which time you'll be eligible to receive a deferred annuity.

Your deferred annuity will be based on the regular FERS computation rate, one percent for every year of service vice the FERS Special rate of 1.7% for every year of service. You will receive 1.7% for each year of overseas service, prorated on a monthly basis, after January 1, 1987 in the calculation of your annuity. Our records show that since January 1, 1987, you have acquired 6 years, 1 month and 29 days of overseas service.

Following is a list of your federal service: Dates of Service: CIA, CIA (LWOP), CIA (P/T 40), from 1/9/1985 to 1/9/2006—total 20 years, 7 days.

Based on the above service and your resignation on January 9, 2006, your estimated deferred annuity is $21,541.00 per year, or $1795 per month, beginning at age 56.

The above figures are estimates for your planning purposes. The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts.

Please let me know if I can be of any further assistance.

Sincerely,

---

## TRIBUTE TO THE REVEREND JAMES D. PETERS

## HON. DIANA DeGETTE

OF COLORADO

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, January 16, 2007*

Mr. DEGETTE. Madam Speaker, I rise to honor the extraordinary life and exceptional accomplishments of the Reverend James D. Peters, Pastor of New Hope Baptist Church. This remarkable gentleman merits both our recognition and esteem as his spiritual leadership, service and lifelong devotion to civil rights have done much to advance the lives of our people.

While many have made notable contributions to our community, few have left a legacy of progress as has Reverend Peters. He is a powerful champion of social justice and has led with those who fought for civil liberty and whose deeds changed the very fabric of our nation. Reverend Peters has touched countless lives and he has built a ministry that joins faith with equality. He is a dynamic pastor whose teaching and counsel is infused with a spiritual fervor that constantly edifies us and moves us to do what is right.

Reverend Peters' journey began in Washington D.C., the son of a baseball player. He grew up poor but he grew up in church. He was a gifted student and grew to recite Longfellow, Keats and Kipling. He worked full time at the Navy Annex near the Pentagon and struggled to get an education, attending night school for ten years. Reverend Peters recently noted that "I couldn't eat in restaurants, I couldn't sleep at a hotel or go to the movies. I could never go to school with white children. All the way through high school, I never sat in a classroom with white people, not until I went to college." Many of us in this country forget how far we've come. Although civil liberties have deep roots in our republic, there was a time when fundamental decency and equality for all people were not a part of our shared experience. The courage and the work of Reverend Peters during the dark days of the Civil Rights Movement helped make fairness and equal rights part of our shared values. Reverend Peters was at the founding meeting of the Southern Christian Leadership Conference and he worked directly with Dr. Martin Luther King, Jr. He faced guns and dogs during the marches and civil rights demonstrations in Albany, Georgia, in Selma and in Birmingham, Alabama. He was part of the March on Washington that led to the steps of the Lincoln Memorial where Dr. King gave his unparalleled "I Have a Dream" speech.

Reverend Peters' work ethic and his service to the Civil Rights Movement molded a life of enduring accomplishment and a vocation that included ministering to congregations in Connecticut and Virginia. He became pastor of Denver's New Hope Baptist Church in February of 1979 and during his twenty-eight year tenure, he led his congregation through construction of a new church home and the expansion of services for an ever growing congregation. As a spiritual leader, he has burnished a reputation as a powerful advocate for inclusion and expanding opportunity for all people. He served as a volunteer member of the Denver Housing Advisory Board for approximately ten years assisting the twenty-two thousand public housing residents in changing the quality and image of public housing.

He served as a member of the Colorado Civil Rights Commission for nine years, serving as its Chairman from 1987 to 1989, during which time he traveled throughout Colorado and held countless civil rights hearings to secure justice and equality for all citizens.

Reverend Peters has received service recognitions from numerous organizations including the Southern Christian Leadership Conference, Martin Luther King, Jr., the Anti-Defamation League, the Denver Post and the NAACP. He is also the recipient of the Carle Whitehead Award, the highest award given by the American Civil Liberties Union.

Reverend James Peters is an unrelenting advocate for the causes that elevate the human condition and his immeasurable contributions to the spiritual life of our community merit our gratitude. He has led in the struggle for freedom, justice and equality for all people. But Reverend Peters' leadership goes to the heart of what he means to be a leader. "Nathalia Young, a pastor at New Hope Baptist Church. . . remembers how he helped homeless people himself, not delegating it to a deacon. (He) would get into his own car, and use his own money to get someone a hotel room. And then there was a Christmas season one year, when a woman and her children were suddenly homeless. 'He didn't just get her connected with housing but also supplied her with gifts and food.'" Reverend Peters leads by example.

In a recent Denver Post article, Reverend Peters expressed "concern that young people don't understand what it was like before the Civil Rights Act and that some believe King's message is now irrelevant." At some level, I think we all share his concern. But I would submit that Reverend Peters' legacy provides a powerful example that not only affirms Dr. King's undertaking, but inspires all of us to remember the struggle and keep faith with those who have gone before.

Reverend Peters' tenure as pastor of New Hope Baptist Church is quickly drawing to a close. His leadership has been exemplary and his contributions are rich in consequence. On behalf of the citizens of the 1st Congressional District of Colorado, I wish to express our gratitude and look forward to his continued involvement in the life of our community.

Please join me in paying tribute to Reverend James D. Peters, a distinguished spiritual and civic leader. The values, leadership and commitment he exhibits set the mark and compel us to continue the work that distinguishes us as Americans.

---

## OPPORTUNITY KNOCKS IN TURKMENISTAN: IS ANYONE LISTENING?

## HON. JANICE D. SCHAKOWSKY

OF ILLINOIS

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, January 16, 2007*

Ms. SCHAKOWSKY. Madam Speaker, the Administration's crusade to spread democracy

# Frankfurt Kurnit Klein & Selz, PC

Attorneys at Law
488 Madison Avenue
New York, New York 10022

Phone: (212) 980-0120
Fax: (212) 593-9175

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| Deliver To: | Fax Number: |
| Ginger Wright, Esq. | 1-703-613-3003/ 3020 |
| | Telephone Number: |
| | 1-703-613-3029 |
| From: | Direct Dial Number: |
| David B. Smallman, Esq. | 1-212-826-5580 |
| Subject: | Client/Matter Number: |
| Wilson | 99995-3183 |
| Date: | Total Number of Pages (including cover): |
| January 9, 2007 | 26 |

Comments:

If you do not receive all of the pages, or if you have difficulty with the transmission, please call the direct dial number shown above or (212) 980-0120 and ask for the mailroom at extension 6605.

### PRIVILEGED AND CONFIDENTIAL

This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

# FRANKFURT KURNIT KLEIN & SELZ PC

488 Madison Avenue
New York, New York 10022
Telephone: (212) 980-0120
Facsimile: (212) 593-9175

David B. Smallman
Direct dial: (212) 826-5580
e-mail: dsmallman@fkks.com

January 9, 2007

VIA FAX
(703) 613-3003

Ginger A. Wright, Esq.
Assistant General Counsel
Office of General Counsel
Central Intelligence Agency
Washington, D.C. 20505

Dear Ms. Wright:

I am writing in connection with my receipt of a copy of a letter dated December 22, 2006 from Richard Puhl to Valerie Wilson and our telephone conversations on December 29, 2006, and January 5, 2007 in which we discussed the Agency's position regarding the review of Ms. Wilson's memoir and the impact of its position on the ongoing editorial process in New York with her publisher, Simon & Schuster.

There has never been any question whatsoever that Ms. Wilson, having dedicated much of her life and career to serving her country, understood her duties and sought to comply in every way with preserving and protecting national security information. She duly submitted her manuscript to the Agency's Publication Review Board ("PRB") more than four months ago and has cooperated fully with the publication review process.

From the outset, Ms. Wilson has endeavored to reach a reasonable resolution with the Agency of any possible national security issues arising from her memoir and, in doing so, to balance fairly all of the equitable and legal issues at stake. Ms. Wilson is not seeking *carte blanche* to discuss her entire government service or to reveal any classified information. Rather, because of newsworthy events concerning her government service, a fundamental public interest "lies in a proper accommodation that will preserve the intelligence mission of the Agency while not abridging the free flow of unclassified information." *Snepp v. United States*, 444 U.S. 507, 520 (1980) (Stevens, J., dissenting). In that regard, Ms. Wilson has a First Amendment right to publish unclassified information about her life and a corresponding interest in ensuring that the Agency's pre-

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 9, 2007
Page 2 of 6

publication review process is reasonably structured to prevent publication only of *properly* classified material.

When we spoke on December 29th, I expressed my concern that the recent reversal of the PRB's December 13th determination to provide Ms. Wilson with a redacted version of the first half of her manuscript would frustrate efforts to find a reasonable resolution of mutual concerns regarding Ms. Wilson's right to disclose in her memoir certain non-controversial public domain information regarding her employment status prior to 2002. The dates of Ms. Wilson's federal service and her government employment affiliation during specific time periods were disclosed officially by the Agency in an unclassified letter to her in February 2006. That disclosure of Ms. Wilson's federal service information conforms to other open source, public domain information set forth in a chart previously provided to the Agency ("Public Domain Chart") (copy attached).[1] Viewed against this factual and legal background, the Agency's decision to renege on its agreement to release the redacted first half of Ms. Wilson's manuscript is another example of the inconsistent positions taken by the Agency throughout the review process and the Agency's apparent disregard for the effect of its decisions on the ability of a loyal former officer, Valerie Wilson, to earn a living now that her career with the Agency has been prematurely ended by forces beyond her control.

As you are aware, Ms. Wilson has been engaged in the PRB process since June 2006. In initial conversations with Ms. Wilson, the PRB agreed to review her memoir on a rolling basis in order to facilitate editing of her manuscript by Simon & Schuster, her New York-based publisher. Then, without warning or suitable explanation, the PRB abruptly reversed course during the summer and informed Ms. Wilson that it would only consider the manuscript in its entirety. Faced with the prospect of unanticipated delay after relying upon the Agency's prior representation, Ms. Wilson submitted the complete manuscript to the PRB for its review in early September, 2006 and requested a meeting in mid-October to discuss any required redactions. Two days prior to the scheduled October meeting, Ms. Wilson received a request from the PRB seeking to postpone the

---

[1] *See, e.g.*, Public Domain Chart at 1, Timothy M. Phelps and Knut Royce, "Columnist Blows CIA Agent's Cover," *Newsday*, July 22, 2003 ("Intelligence officials confirmed to Newsday [on July 21, 2003] that Valerie Plame, wife of retired Ambassador Joseph Wilson, works at the agency . . . in an undercover capacity . . . ."); James Gordon Meek and Kenneth R. Bazinet, "She's the Perfect Spy," *New York Daily News*, Oct. 2, 2003 ("Two former senior intelligence officials confirmed that Valerie Plame, 40, is an operations officer in the spy agency's directorate of operations – the clandestine service. Plame 'ran intelligence operations overseas,' said Vincent Cannistraro, former CIA counterterrorism operations chief . . . . Cannistraro called Plame's outing a 'dirty trick'"; "[A] former senior intelligence officer . . . [said] of Plame: 'She was working undercover.'"); Public Domain Chart at 10-11, Joseph C. Wilson, IV, *The Politics of Truth* 240-43 (Agency approved text of book by Ms. Wilson's husband, Ambassador Joseph Wilson, which discloses Ms. Wilson's affiliation with the Agency dating back to 1997).

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 9, 2007
Page 3 of 6

meeting by one week. PRB then subsequently requested yet another week's postponement. From that conversation, Ms. Wilson learned for the first time that there was an internal Agency debate about the propriety of rolling back her cover prior to 2002 and therefore potentially foreclosing the possibility of a memoir referring to time periods prior to 2002. During her first in-person meeting with PRB officials on November 1st, they themselves indicated that it was *their* view that prohibiting Ms. Wilson from disclosing her CIA affiliation prior to 2002 would lead to an "absurd" and "ludicrous" result. On November 8th, we were informed that a decision had been made by "the Seventh Floor," *i.e.*, senior Agency management, not to permit her to disclose her Agency affiliation prior to 2002. Subsequently, in mid-December 2006, Ms. Wilson was again informed by the Agency of its belated concerns about disclosure *by her* of open source information regarding her long government service. By any reasonable measure, PRB's asserted position remains at odds with the indisputable public record concerning Ms. Wilson's Agency affiliation and is inconsistent with the Agency's prior conduct.

Despite apparent disagreement internally at the Agency concerning an absurd result that would be unfair to Ms. Wilson, PRB's chairman indicated that his hands were tied because Agency management had intervened and the final decision rested with the Office of the Director, rather than with the individuals directly involved in the review process and therefore most knowledgeable about the specific aspects of information subject to nondisclosure for national security purposes.

From the outset of Ms. Wilson's communications with the PRB, she made it clear that she planned to write and publish a memoir. At no point during the five months of correspondence and conversations with the PRB did anyone there indicate that she would be effectively prevented from publishing a memoir. Even after learning of the Agency's ostensible position regarding rollback of her cover, our client remained committed to trying to work with the Agency to arrive at a common sense solution that would address every legitimate national security issue without unfairly foreclosing any possibility of publishing a memoir that included open source information but did not reveal classified information, as other former Agency officers have done in the past.

When my partner, Lisa Davis, and I met with you and the Agency's Acting General Counsel, John Rizzo, at the end of last November, we sought to keep an open channel for pursuing an amicable resolution of any issues in connection with review of Ms. Wilson's memoir.

Although as Ms. Wilson's publishing counsel we have understood that senior management at the Agency had certain issues regarding rollback of Ms. Wilson's cover, it was not until our recent telephone conversation that I understood that a decision had

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 9, 2007
Page 4 of 6

been made by General Hayden himself, as Agency director, to create and enforce a
bright-line rule that would have the practical effect of preventing Ms. Wilson from
publishing her memoir as submitted. For obvious reasons, however, an illogical result
that belies common sense does not serve either the interests of the Agency or its
government customers. Nor does such an outcome benefit the Agency's broader
constituencies, including, ultimately, the American public. While the Agency has
suggested options for avoiding any inclusion of public domain facts about her
government service, the Agency has not and cannot, under the applicable facts and law,
justify disallowing Ms. Wilson from referring to unclassified open source information
about her life, which, in and of itself, presents no threat to national security.

   As a general matter, it is our understanding that the PRB has essentially
acknowledged that most of the material in the book is by itself innocuous and poses no
actual threat to disclosure of any confidential information. More specifically, the
December 22, 2006 letter from PRB, to the extent it purports to offer a coherent
expression of certain relevant considerations, does not attempt to provide a cognizable
justification for restraining publication of material that is irrelevant to confirming the
accuracy of open source information at issue here. Certainly, even apart from a
demonstrable failure to meet its own criteria for disallowing publication of open source
information, the Agency cannot arbitrarily classify public domain information that falls
outside the scope of Section 1.1 of Executive Order 12958 (as amended), nor does it have
any discretion to restrain without appropriate basis publication of unclassified
information, particularly when the Agency has itself not treated such information as
classified. Moreover, the Agency's own regulations contemplate disclosure of public
domain information under the circumstances in this case and provide sufficient protection
through the use of required disclaimers upon publication in which the Agency neither
confirms nor denies the validity of any information published by former employees. In
contrast, an overbroad approach that characterizes information neither "owned by,
produced by or for, or under the control of the United States government" as somehow
classified leads to a nonsensical outcome, to wit, virtually anyone in the world can write
about non-secret, publicly known aspects of Ms. Wilson's life – *except for her*. This
extreme position would extend the so-called "mosaic theory" to an illogical extreme that
far exceeds any permissible Agency discretion in such matters and triggers serious
Constitutional concerns.

   Now that an apparent impasse poses a substantial risk of derailing the review
process for Ms. Wilson's memoir, efforts are underway for our respective clients
(Agency management and Ms. Wilson) and other concerned government parties to meet
to address and hopefully resolve mutual concerns and differences. Insofar as lawyers
sensitive to the overall process can have a positive influence on reaching a reasonable

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 9, 2007
Page 5 of 6

accord, Ms. Davis and I would look forward to additional direct communications with
you and Mr. Rizzo in conjunction with proposed upcoming discussions involving senior
Agency management.  Accordingly, we respectfully offer the following four points for
prompt reappraisal of the Agency's current position.

First, it behooves the Agency to take a common sense approach that allows Ms.
Wilson to acknowledge publicly disclosed information about her life, without disclosing
information that remains secret or which could in any way harm national security.  As
noted above, Ms. Wilson is plainly not seeking *carte blanche* to discuss her entire
government service or to reveal any classified information.

Second, it is both wrong from a legal standpoint and detrimental to public
confidence in the Agency if the Executive Branch promotes a bizarre position about
publication of unclassified information in Ms. Wilson's memoir, especially when, as
here, a First Amendment confrontation could easily be prevented by a more narrowly
tailored approach that takes into account the accuracy of established historical or
biographical facts concerning Ms. Wilson's life and government service without
triggering concerns about disclosure of otherwise classified information.

Third, as a practical matter, publication of unclassified public domain information
about Ms. Wilson's government service cannot reasonably be expected to cause any
damage – let alone serious damage – to national security.  Everyone now knows from
indisputable open source information or authorized government disclosures that
Ms. Wilson worked for the Agency.  No one, of course, disputes the vital importance of
protecting legitimately classified information and the key role of the Agency in that
process.  However, even under the Agency's recent declaration regarding publication
review, which it admits to be "more art than science," the national interest is not served
by an *Alice in Wonderland* approach that denies known facts and defies logical reasoning.

Fourth, Ms. Wilson's memoir could have a genuine public benefit by showing
that it is possible for women to have successful careers in what is now known as the
National Clandestine Service, as published reports indicate Ms. Wilson did for many
years.  This is especially true at a time when the next generation of talented Americans
are being sought to aid their country and the Agency has embarked on a massive
advertising campaign at taxpayer expense to recruit talented women and men for such
government service.  A very different and, indeed, counterproductive message would be
sent by prohibiting Ms. Wilson from publishing a memoir after having been a victim of
an apparent leak about her employment status.  As matters now stand, Ms. Wilson,
although a veteran officer with decades of service, faces a dismal financial reality that
would give anyone pause who embarks on a similar career path: as a forty-three year old

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 9, 2007
Page 6 of 6

mother of two young children, her annuity will consist of merely $21,000 annually, and she cannot even collect that for another 13 years until she reaches the age of 56.

There is good reason, therefore, for revisiting the application of a bright-line rule under the circumstances presented, especially when tailoring a more narrowly drawn response could avoid (i) an unnecessary public dispute regarding the outer boundaries — or absence — of the Agency's discretion under applicable Executive Orders and Agency regulations, (ii) invocation of crucial First Amendment considerations, and (iii) application of the oversight authority of the Director of National Intelligence "to ensure compliance with the Constitution and laws of the United States by the Central Intelligence Agency . . . ." *Intelligence Reform and Terrorism Prevention Act of 2004* § 1011, 50 U.S.C. § 403-1(f)(4).

While Ms. Wilson fully reserves all of her rights and remedies, I would appreciate hearing back from you at your earliest convenience – but kindly no later than close of business this Friday, January 12 – about reconsideration of the Agency's current stance and logistics for coordinating and scheduling further in-person discussions among counsel and Agency management.

Sincerely,

David B. Smallman

Attachment

# Frankfurt Kurnit Klein & Selz, PC

Attorneys at Law
488 Madison Avenue
New York, New York 10022

Phone: (212) 980-0120
Fax: (212) 593-9175

## FACSIMILE TRANSMITTAL SHEET

| Deliver To: | Fax Number: |
|---|---|
| Ginger Wright, Esq. | 1-703-613-3003/ 3020 |
| | Telephone Number: |
| | 1-703-613-3029 |
| From: | Direct Dial Number: |
| David B. Smallman, Esq. | 1-212-826-5580 |
| Subject: | Client/Matter Number: |
| Wilson | 99995-3183 |
| Date: | Total Number of Pages (including cover): |
| December 6, 2006 | 19 |

Comments:

If you do not receive all of the pages, or if you have difficulty with the transmission, please call the direct dial number shown above or (212) 980-0120 and ask for the mailroom at extension 6605.

### PRIVILEGED AND CONFIDENTIAL

This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| *Overview* 1985 - 2005 | Valerie Plame Wilson's employment status as Central Intelligence Agency officer during twenty year period beginning in 1985 and ending in 2005 publicly disclosed through leaks by U.S. government officials and becomes widely known throughout the world. | • James Gordon Meek and Kenneth R. Bazinet, "She's the Perfect Spy," *New York Daily News*, Oct. 2, 2003 ("Two former senior intelligence officials confirmed that Valerie Plame, 40, is an operations officer in the spy agency's directorate of operations – the clandestine service. Plame 'ran intelligence operations overseas,' said Vincent Cannistraro, former CIA counterterrorism operations chief. Her specialty in the agency's nonproliferation center was biological, chemical and nuclear weapons and 'recruiting agents, sending them to areas where they could access information about proliferation matters, weapons of mass destruction,' Cannistraro said."; "Plame is the wife of former Ambassador Joseph Wilson, who has charged that his wife's cover was blown in retaliation for his comments contradicting the Bush Administration's claim that deposed Iraqi dictator Saddam Hussein had tried to buy nuclear weapons material in Africa. Cannistaro called Plame's outing a 'dirty trick.'"; "[A] former senior intelligence officer. . . [said] of Plame: 'She was working undercover.'") <br><br> • Scott Shane, "Private Spy and Public Spouse Live at Center of Leak Case," *New York Times*, July 5, 2005 ("For nearly two years, the investigation into the leak of a covert C.I.A. officer's name has unfolded clamorously in the nation's capital, with partisan brawling on talk shows, prosecutors interviewing President Bush and top White House officials, and the imminent prospect that reporters could go to jail for contempt of court. But the woman at the center of it all, Valerie E. Wilson, has kept her silence. As her husband, Joseph C. Wilson IV, has become a highly visible critic of the administration and promoted his memoirs, Ms. Wilson has ferried their 5-year-old twins to doctors' appointments, looked after their hilltop house in the upscale Palisades neighborhood of Washington and counseled women with postpartum depression. On June 1, after a year's unpaid leave, Ms. Wilson, now known to the country by her maiden name, Valerie Plame, returned to a new job at the Central Intelligence Agency, determined to get her career back on track, her husband said. Neither the agency nor Mr. Wilson would describe her position, except to make what might seem an obvious point: she will no longer be working under cover, as she did successfully for almost 20 years.") <br><br> • Timothy M. Phelps and Knut Royce, "Columnist Blows CIA Agent's Cover," *Newsday*, July 22, 2003 ("The identity of an undercover CIA officer whose husband started the Iraq uranium intelligence controversy has been publicly revealed by a conservative Washington columnist citing 'two senior administration officials,'" "Intelligence officials confirmed to Newsday yesterday that Valerie Plame, wife of retired Ambassador Joseph Wilson, works at the agency on weapons of mass destruction issues in an undercover capacity - at least she was undercover until last week when she was named by columnist Robert Novak.") <br><br> • Timothy M. Phelps, "My Plame Problem – And Yours," *Columbia Journalism Review* |

1

FKSS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | | (Jan./Feb. 2006)("Our story [July 22, 2003] was the first to establish that Plame was undercover. In fact not only was she working for the secret "D. O." or Directorate of Operations at agency headquarters in Langley, Virginia, but she was also still in transition from an even deeper undergound mission as a "NOC" for Non-official Cover, posing as a businesswoman during agency-sponsored trips to Europe. The day after our story there were calls for an investigation by Democrats, and White House press secretary Scott McClellan vigorously asserted that "That is not the way this White House operates."). |
| | | "Bush Welcomes Probe of CIA Leak", *CNN.com*, Feb. 11, 2004 ("Sources told CNN that Plame works in the CIA's Directorate of Operations -- the part of the agency in charge of spying -- and worked in the field for many years as an undercover officer." "If she were only an analyst, not an operative, we would not have filed a crimes report" with the Justice Department, a senior intelligence official said.") |
| | | "Spies, A Feeling of Betrayal," *ABC News Nightline*, Oct. 3, 2003 (JIM MARCINKOWSKI: Intelligence should not be political. This government, this country should take every effort to make sure it institutes the intelligence community from politics. But the real issue here really is not - politics. It's what happened. Politics goes on, there's fights all the time. But they crossed the line in this case because they exposed a CIA asset. CHRIS BURY: (Off Camera) Do CIA analysts or operatives, do they have a right to write a clock to a political candidate during a presidential election year? JIM MARCINKOWSKI: The fact that you walk in the front door of the CIA doesn't mean you lose your political rights in this country. The point is, it shouldn't be an issue for anyone. In the case of an operative overseas, when you're looking at what exactly - has been exposed, when you are living in covered capacity overseas, you have plausible deniability, you can always say, I'm not a CIA person. When the government steps in and confirms that the fact, that's the line that's been crossed. That has never been done before. This is similar to the hundreds of police investigations, undercover investigations that go on, that I've been a witness to, been involved in over the years. This is like an undercover officer doing a drug buy and the sellers of the drug call up the police station to figure whether this guy trying to do the buy is an undercover police officer and they saying, yes. That's the line that's been crossed here, that's the danger, that's the damage. It has nothing to do with politics.") |
| | | "Was Valerie Plame *Really* A Covert Agent?" *FoxNews.com*, July 18, 2005 (FRED RUSTMANN, Former CIA Operations Officer: "Valerie went through the — came in as a career trainee into the agency and then went through the training program down at the Farm. And I was her first supervisor when she actually had a real job at headquarters. And she worked for me there for about a year. She was super. She was great . . . . [S]he came in and she was undercover, yes, as all of the new CTs do when they come into the agency. And it was probably — well, it was definitely an official cover status which she retained and then worked at the |

2

PKSN

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| 1985 | "Valerie Plame entered the CIA, recruited straight out of Penn State and placed in the program that trained the agency's best prospects. She was 22 years old." | headquarters under that official cover status. And then went overseas with that same status . . . . she had official cover for the first part of her career, when she was overseas in an official capacity. She came back to headquarters for a while, and then they sent her out on a light non-official cover . . . . She was out there. She was collecting information under that cover. She came back to headquarters. They probably then reverted her back to her official cover . . . .") |

*1985-1987: Joining the Agency and training at "the Farm" under official State Department cover*

- Richard Leiby and Dana Priest, "The Spy Next Door," Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 ("At 22, Plame had joined the Central Intelligence Agency and traveled the world on undercover missions.")

- Richard Leiby, "Valerie Plame, the Spy Who Got Shoved Out Into the Cold", *Washington Post*, Oct. 29, 2005 ("Plame, the daughter of an Air Force colonel and an elementary school teacher, was recruited by the CIA at 22, shortly after graduation from Pennsylvania State University.")

- "The Exposure Of Valerie Plame", CBS News, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main947753.shtml) ("In the late 1980's, [Jim Marcinkowski] was a covert CIA agent spying in Central America. Like all recruits, he was sent to the agency's top-secret training facility in Virginia known simply as 'the farm.' That's where he first met a 22-year-old graduate of Penn State University named Valerie.")

- David Corn, "What Valerie Plame Really Did at the CIA", *Nation Online*, Sept. 6, 2006 (http://www.thenation.com/doc/20060918/corn) ("Valerie Plame was recruited into the CIA in 1985, straight out of Pennsylvania State University")

- Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)

- Vicky Ward, "Double Exposure *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimmillburn.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) (After Valerie graduated from Penn State, she moved to Washington, D.C., and married her college boyfriend Todd Sesler. She worked at a clothing store, biding her time, writing for her acceptance from the C.I.A. She may have mentioned, says Angstadt, that she was going to interview with the C.I.A., but 'nobody ever heard about it ever again.' Plame and Sesler were both accepted at the agency. But, according to a friend of the couple's, his heart wasn't in it. "When she talks about something, you suddenly want to do what she's doing, because it's so infectious," says this friend, who adds, "I think that's what happened in this case." According to this person, it was Plame who ended the marriage. (Sesler did not respond to calls for comment.)")

- Michael Isikoff and David Corn, *Hubris: The Inside Story of Spin, Scandal and the Selling of the Iraq War* ("Hubris"), at 289 (2006)

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| September 1985 | Coming of age: post-college graduation training and employment affiliation of "Val P." at the Agency | • Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003<br><br>• Richard Leiby, "Valerie Plame, the Spy Who Got Shoved Out Into the Cold", *Washington Post*, Oct. 29, 2005 ("She was in the 1985-86 class of CIA officers trained at 'The Farm' near Williamsburg, where the curriculum included learning to drive under fire, blowing up cars and handling an AK-47")<br><br>• Larry C. Johnson, "The Real Outrage in the Rove Plame Affair", *Noquater-typepad.com* (personal blog), July 12, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/the_real_outrage.html) ("Valerie Plame was a classmate of mine from the day she started with the CIA. I entered on duty at the CIA in September 1985.")<br><br>• Larry C. Johnson, "Correcting the Record on Valerie Plame", *Noquater.typepad.com* (personal blog), July 22, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/correcting_the_.html) ("I entered on duty at the CIA in September 1985 as a member of the Career Trainee Program. Senator Orin Hatch had written a letter of recommendation on my behalf and I believe that helped open the doors to me at the CIA. From the first day all members of my training class were undercover. In other words, we had to lie to our family and friends about where we worked. We could only tell those who had an absolute need to know where we worked. In my case, I told my wife. Most of us were given official cover, which means that on paper we worked for some other U.S. Government Agency. People will official cover enjoy the benefits of an official passport, usually a black passport—i.e., a diplomatic passport. If we were caught overseas engaged in espionage activity the black passport was a get out of jail free card. It accords the bearer the protections of the Geneva Convention.<br><br>Valerie Plame was a classmate of mine from the day she started with the CIA. At the time I only knew her as Valerie P. Even though all of us in the training class held Top Secret Clearances, we were asked to limit our knowledge of our other classmates to the first initial of their last name. So, Larry J. knew Val P. rather than Valerie Plame. Her name did not become a part of my consciousness until her cover was betrayed by the Government officials who gave columnist Robert Novak her true name.")<br><br>• "The Exposure Of Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994753.shtml) ("Marcinkowski says he knew her simply as Val P., since recruits went by the initial of their last name. And he says she was a natural.")<br><br>• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br><br>Larry C. Johnson, "The Big Lie About Valerie Plame", Oct. 13, 2005 |

4

FKNS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| November 1985 | "After the initial orientation, members of the class were assigned internships with various parts of the CIA. Then they headed to the Farm, the CIA's paramilitary training facility near Williamsburg, Virginia. Because of her young age, Plame did extra internships and flitted to the Farm later."<br><br>Valerie Plame trains at the Farm. As part of her courses, she was taken hostage and taught how to reduce exposure at firing an AK-47. She learned how to blow up cars and drive under | • (http://www.tpmcafe.com/story/2005/7/13/04720/9340) David Corn, "What Valerie Plame Really Did at the CIA," *Nation Online*, September 6, 2006 (http://www.thenation.com/doc/20060918/corn)<br><br>• Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimgilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plame.php) ("It was, Valerie P., as she was known to her classmates at the Farm, in Camp Peary, Virginia, the C.I.A.'s training facility, where former C.I.A. agent Jim Marchinkowski noticed-as he later told *Time* magazine-that she showed considerable prowess wielding an AK-47 machine gun")<br><br>• *Hubris*, at 281-82. ("And in September 1985, Plame found herself in a conference room in the CIA with about forty-five other new trainees. The class included trainees who would be heading toward various careers in the agency: analysts, logistics managers, technicians, operatives. Plame was in a case officer slot; she had been hired to be an undercover CIA employee who would run agents and operations overseas. She was the youngest in the class.")<br><br>• *Hubris*, at 282 ("During a ten-week course, Plame and her classmates were taught the basics of the CIA. . . . During one class, a CIA official who had been stationed overseas stalked about life as a case officer working under non official cover (or NOC), the most perilous of agency positions. . . . 'He told us,' Brent Cavon, a classmate of Plame, said, 'that you have to think about this. This is not a life for someone with a family. He had a fantastic salary with this company but he didn't get to keep it--and he had to work two jobs. We heard lots of stuff like that.' Valerie took it to heart."<br><br>Plame, according to one member of her class, was 'the kid sister in the group.' She came across, Cavon said, as a young but 'plucky,' determined, ambitious, and personable. "She was physically stunning, with platinum blond hair," a fellow trainee later said. "During our first four to five minutes together, I could tell she was more of a listener than a talker. That's why she was going into the DO.' The trainees didn't know each other by their full names. To her fellow trainees, she was 'Val. P.")<br><br>• Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003<br><br>• Richard Leiby, "Valerie Plame, the Spy Who Got Shoved Out into the Cold", *Washington Post*, Oct. 29, 2005 ("She was in the 1985-86 class of CIA officers trained at 'The Farm' near Williamsburg, where the curriculum included learning to drive under fire, blowing up cars and handling an AK-47.") |

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | fire. | • "The Exposure Of Valerie Plame", CBS News, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main1047613.shtml) ("In the late 1980's, [Jim Marcinkowski] was a covert CIA agent spying in Central America. Like all recruits, he was sent to the agency's top-secret training facility in Virginia known simply as 'the farm.' That's where he first met a 22-year-old graduate of Penn State University named Valerie. Marcinkowski says he knew her simply as Val P., since recruits went by the initial of their last name. And he says she was a natural. 'Did all of you have firearms training?' Bradley asked. 'Yes,' he replied. Marcinkowski says she was good. 'Some people had never fired weapons before, and some of us had. And it's always interesting when someone that has never fired a weapon kind of beats everybody else that did.'")<br>• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br>• Larry C. Johnson, The Big Lie About Valerie Plame, Oct. 13, 2005 (http://www.tpmcafe.com/story/2005/7/13/04720/9340)<br>• David Corn, "What Valerie Plame Really Did at the CIA", Nation Online, Sept. 6, 2006 (http://www.thenation.com/doc/20060918/corn)<br>• Vicky Ward, "Double Exposure", Vanity Fair Magazine, Jan. 17, 2004 (http://www.jimettlinen.com/2004/01/vanity_fairs_profile_or_joseph_wilson_and_valerie_plame.php) ("It was Valerie P., as she was known to her classmates at the Farm in Camp Peary, Virginia, the C.I.A.'s training facility, where former C.I.A. agent Jim Marcinkowski noticed—as he later told Time magazine—that she showed considerable prowess wielding an AK-47 machine gun") |
| Fall 1986 | "Plame graduated from the Farm in Fall 1986." | • Hubris, at 283 |
| Spring 1987 | "The following spring, [Valerie Plame] took a course in operations for trainees destined to be case officers, the elite corps of the Directorate of Operations. This covered the essence of espionage: how to recruit an agent—a foreign national who would be willing to hand over valuable information about his government, his military, his company. (In CIA lingo, agency officers are not 'agents'; that word applies to foreigners persuaded by case officers to become spies). Plame learned the basics; how to | • Hubris, at 283 |

FKKS

6

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| Post-training | "After her CIA education was complete, Plame was assigned to the Cyprus/Greece/Turkey desk in the European Division of the DO. She was a junior case officer, basically doing work that supported officers in the field. She studied Greek. The branch's main focus at the time was counterterrorism. The CIA's Cyprus station was a field headquarters for much of the agency's counterterror operations related to the Middle East. The branch's number one target was the 17 November leftist terrorism group working out of Greece. The agency had an intense interest in these terrorists for good reason: the 17 November group had claimed responsibility for the 1975 assassination of Richard Welch, the CIA station chief in Athens. (The Group had targeted the CIA for working with the repressive military junta that ruled Greece from 1967 to 1974.) More than a decade later, the Cyprus/Greece/Turkey desk was still looking to find Welch's killers." | • _Hubris_, at 284.<br>See also:<br>• David Corn, "What Valerie Plame Really Did at the CIA", _Nation Online_ Sept. 6, 2006 (http://www.thenation.com/doc/20060918/corn) (". . . she served a stint on the Greece desk. . . ") |
| 1989 | "In 1989, Plame was posted to the CIA station in Athens as a case officer. She served under official cover as a State Department officer, working in the US Embassy there. She carried a diplomatic passport. Her task was to spot and recruit agents for the CIA." | _1989-1992: Under Official Diplomatic Cover, US Embassy, Athens, Greece_<br><br>• _Hubris_, at 284.<br>See also:<br>• David Corn, "What Valerie Plame Really Did at the CIA", September 6, 2006 (http://www.thenation.com/doc/20060918/corn)<br>• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br>• Michael Duffy and Timothy J. Burger, "NOC, NOC, Who's There? A Special Kind of Agent", _Time Magazine_, Oct. 19, 2003 |

FKNS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | *1993-1995: Under "student cover" while studying at the London School of Economics and the College d'Europe* | • Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimgilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) ("Meanwhile, Plame learned Greek-she can also speak French and German-and was sent to Athens. There she had what is known as 'State Department cover.' The only lie Plame had to tell her friends then was that the State Department was her only boss.")<br><br>*Hubris*, at 284. |
| 1990s | "After that first tour, [Valerie Plame] obtained a master's degree at the London School of Economics . . ." | See also:<br>• Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 ("She later earned two master's degrees, one from the London School of Economics. . . .")<br>• "The Exposure OF Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main94753.shtml) ("As the investigation into who leaked her name got underway in Washington, more details about Valerie Plame's life emerged. She spent her early years in the CIA in Europe, where she received advanced degrees from the London School of Economics and the College of Europe, in Bruges, Belgium.")<br>• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br>• Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan 17, 2004 (http://www.jimgilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) ("After the Gulf War she was sent to the London School of Economics . . .") |
| | *1996-1997: Under non-official cover* | *Hubris*, at 284. |
| 1990s | ". . . and [Valerie Plame obtained] a Master's in European Studies at the College-d'Europe in Bruges, Belgium. | See also:<br>• Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 (". . . one from the College of Europe in Bruges, Belgium")<br>• "The Exposure OF Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main94753.shtml) ("As the investigation into who leaked her name got underway in Washington, more details about Valerie Plame's life emerged. She spent her early years in the CIA in Europe, where she received advanced degrees from the London School of Economics and the College of Europe, in Bruges, Belgium.")<br>• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br>• Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan 17, 2004 (http://www.jimgilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) (". . . and from there to the College of Europe, an international-relations school in Bruges") |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| 1990s | "In the early 1990's Plame became a NOC, that most covert of covert officers. She was looking to work more on her own and to avoid what she could of usual bureaucratic nonsense that afflicted even the government's spy services. It was uncommon for a case officer who had official cover to turn into a NOC. Plame had already established a trail as a U.S. government officer. (This meant she would not be the purest of NOCs.) She 'resigned' from her cover job at the State Department and began working out of Belgium, telling those who asked that she was in the Energy field. . . . Her main mission, though, remained the same as before: to gather agents for the CIA." | *Hubris*, at 284.<br>See also:<br><br>David Corn, "What Valerie Plame Really Did at the CIA", *Nation Online* (http://www.thenation.com/doc/20060918/corn) ("In the early 1990s, she became what's known as a nonofficial cover officer. NOCs are the most clandestine of the CIA's frontline officers. . . She told people she was with an energy firm. Her main mission remained the same: to gather agents for the CIA.")<br><br>Larry C. Johnson, "The Real Outrage in the Rove Plame Affair", *Noquarter.typepad.com* (personal blog), July 12, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/the_real_outrage.html) ("A few of my classmates, and Valerie was one of these, became a non-official cover officer. That meant she agreed to operate overseas without the protection of a diplomatic passport. If caught in that status she would have been executed.")<br><br>Larry C. Johnson, "Correcting the Record on Valerie Plame", *Noquarter.typepad.com* (personal blog), July 22, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/correcting_the_.html)("Although Val started off with official cover, she later joined a select group of intelligence officers a few years later when she became a NOC, i.e. a Non-Official Cover officer. That meant she agreed to operate overseas without the protection of a diplomatic passport. She was using cover, which we now know because of the leak to Robert Novak, of the consulting firm Brewster-Jennings. When she traveled overseas she did not use or have an official passport. If she had been caught engaged in espionage activities while traveling overseas without the black passport she could have been executed.")<br><br>Elisabeth Bumiller, "Debating a Leak: The Director CIA Chief is Caught in Middle By Leak Inquiry", *New York Times*, Oct. 5, 2003 ("Ms. Plame, a specialist in nonconventional weapons who worked overseas, had "nonofficial cover," and was what in C.I.A. parlance is called a Noc, the most difficult kind of false identity for the agency to create. While most undercover agency officers disguise their real profession by pretending to be American embassy diplomats or other United States government employees, Ms. Plame passed herself off as a private energy expert. Intelligence experts said that Nocs have especially dangerous jobs.")<br><br>Vicky Ward, "Double Exposure", *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimcilliano.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plame.html) ("Plame was an "undercover officer." In fact, she had noc status, that is, nonofficial cover. nocs are not ordinarily deskbound intelligence analysts who work inside C.I.A. headquarters. Mostly they operate abroad, frequently using fake job descriptions and sometimes fake names." . . . "She stayed on in Brussels, telling friends she was working for an energy |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | | consulting firm, Brewster-Jennings (now defined). Angstadt, who is a lawyer for the Archipelago Exchange in Chicago, says it never crossed her mind to doubt her friend's stories. "I think she trained us not to ask questions," Angstadt says.) |
| 1997 | "In 1997 [Valerie Plame] returned to CIA headquarters. Back at Langley, Plame had to choose a new career path within the agency. She figured that with the end of the Cold War, the two growth industries in the intelligence field were counterterrorism and counterproliferation. She picked weapons and requested an assignment in the DO's new Counterproliferation Division, a unit Congress had pushed the CIA to create to address concerns about weapons of mass destruction." | *Hubris*, at 284-85. See also: <br><br> • David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online* (http://www.thenation.com/doc/20060918/corn) ("In 1997 she returned to CIA headquarters and joined the Counterproliferation Division.") <br><br> • Mark Memmott "CIA Outing May Fall Short of Crime", *USA Today*, July 14, 2005 "USA Today" Retied on Unsupported Reading of Law in Report Suggesting that Outing Plame Was Likely Not a Crime", *Media Matters for America*, July 15, 2005 (". . . while actually serving as a weapons proliferation analyst for the CIA. . .") <br><br> • Larry C. Johnson, "Plamegate Update", *Noquater.typepad.com* (personal blog), Oct. 5, 2005 (http://noquarter.typepad.com/my_weblog/2005/10/plamegate_updat.html) ("Valerie Plame Wilson was a non-official cover officer (aks NOC) in the Directorate of Operations Counter Proliferation Division (CPD). She worked in a branch with other undercover officers. She reported to a Chief, who in turn reported to the Chief of the CPD.") <br><br> • Vicky Ward, "Double Exposure", *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimgilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam e.php) ("In 1997, Plame moved back to the Washington area, partly because (as was recently reported in The New York Times) the C.I.A. suspected that her name may have been on a list given to the Russians by the double agent Aldrich Ames in 1994.") |
| | 1997-1999: *Under non-official cover with Brewster-Jennings located in Boston, MA* | • Joseph C. Wilson, IV, *The Politics of Truth: Inside the Lies that Led to War and Betrayed My Wife's CIA Identity* ("*The Politics of Truth*") at 240-41. <br><br> See also: <br><br> • *Hubris*, at 285. <br><br> • Wikepedia, Personal History (http://en.wikipedia.org/wiki/Valeric_Plame) <br><br> • Christopher Goffard, "Valerie Plame: Smart. Private. 'Walons' Fan", *St. Petersburg Times*, August 7, 2005 ("In February 1997, the net diplomat Joseph Wilson, who was soon to be divorced, at the Washington, D.C., home of the Turkish ambassador, where she reminded Wilson of a young Grace Kelly and left him 'hopelessly smitten.'") <br><br> • Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan. 17, 2004 (http://www.jimgilliam.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam |
| June 1997 | "[Joe Wilson] had first met [Valerie Plame] several months [before his move back to Washington D. C.] at a reception in Washington [Wilson] was attending with General Jim Jamerson at the residence of the Turkish ambassador. [Wilson and Jamerson] were there to accept an award from the American Turkish Council, on behalf of the American troops of the European Command who were working in close collaboration with their Turkish | |

10

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| Nov. 1997 | counterparts in Iraq and Bosnia. . . . [Valerie Plame] described herself as an energy executive living in Brussels. . . .""<br><br>"Valerie Plame takes Joe Wilson "into her confidence. It was important to her, if we were going to move to another stage in our relationship, that she be honest about what she did. She told me what was permissible, under the circumstances, since I had the requisite clearances."" | ■ e.ub)) ("He had met Plame in February 1997 at a reception at the Washington home of the Turkish ambassador.")<br><br>See also:<br>■ The Politics of Truth, at 242-43.<br>■ Vicky Ward, "Double Exposure" Vanity Fair Magazine, Jan. 17, 2004 (http://www.jimmullian.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plame.ub)) ("On the third or fourth date, he says, they were in the middle of a "heavy make-out" session when she said she had something to tell him. She was very conflicted and very nervous, thinking of everything that had gone into getting her to that point, such as money and training. She says, she explained, undercover in the C.I.A." "It did nothing to dampen my ardor," he says. "My only question was: Is your name really Valerie?" |
| Winter 1997 | "Soon after [their] return to Washington, [Plame and Wilson] decided to move in together in an apartment in the Watergate building. She went to work at her headquarters and [Wilson] to the ornate, Napoleon III-style Old Executive Office Building (OEOB) right next to the West Wing of the White House." | ■ The Politics of Truth, at 243.<br>See also:<br>■ Hubris, at 285. |
| 1997 | Turkey/U.S. | ■ Mike Mejia, "Ex-FBI translator's case may reveal Plame's Crucial CIA role", Online Journal, Dec. 16, 2005. (http://www.onlinejournal.com/artman/publish/article_340.shtml) ("According to Delisio's two sources, the Turkish newspaper Hurriyet and former FBI translator Sibel Edmonds, the outing of Valerie Plame may have severely damaged a CIA operation to monitor a nuclear black market facilitated by the shadowy but well-connected Washington lobby group, the American Turkish Council (ATC). (Those familiar with the Sibel Edmonds case will know the ATC is the very same organization that the former FBI translator heard on wiretaps in connection with various alleged illegal activities, some connected to 9/11.) From Edmonds, Delisio obtained the following admission: "Plame's undercover job involved the organizations [the FBI had been investigating], the ATC (American-Turkish Council) and the ATA (American-Turkish Association) . . . the Brewster Jennings network was very active in Turkey and with the Turkish community in the U.S. during the late 1990s, 2000, and 2001 . . . in places like Chicago, Boston, and Paterson, N.J." |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | | Such a stunning statement by the former FBI contract linguist could be dismissed by those not familiar with the whistleblower's well-established credibility were it not for the fact that Edmonds is, at least in part, corroborated by Ambassador Joseph Wilson himself. In his book the *Politics of Truth*, Wilson recounts on page 240 that the first met Valerie Plame in 1997, at a reception at the home of the Turkish ambassador which Wilson attended to receive an award from -- you guessed it -- the *American Turkish Council*. Wilson, of course, never explains in this book what brought Valerie Plame to attend this ATC-sponsored event, but since it is public information that Plame was an undercover CIA operative at the time, the simplest explanation is the most likely one: she was there as part of her Brewster Jennings & Associates cover. Although U.S. law prohibits the CIA from conducting espionage operations against U.S. citizens on American soil, nothing would have prohibited Plame from attending such an event in Washington. |
| April 3, 1998 | Valerie Plame and Wilson marry. | These revelations about Plame's surveillance of the American Turkish Council are significant, because the ATC is connected to powerful neocons like Richard Perle and Douglas Feith (and, to be fair, to powerful anti-Iraq War activists like Brent Scowcroft and Joe Wilson.) And Edmonds implies that at least some on the ATC neocon side of this scandal are heavily involved in the nuclear black market: Feith and Perle, along with former Ambassador to Turkey Marc Grossman, are fingered by Edmonds as figures of interest.")<br><br>• *Hubris*, at 286.<br>• Richard Leiby, "Valerie Plame, the Spy Who Got Shoved Out Into the Cold", *Washington Post*, Oct. 29, 2005<br>• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br>• Christopher Goffard, "Valerie Plame: Smart, Private, 'Welcons' Fan, *Sr. Petersburg Times*, August 7, 2005 ("She married Wilson in April 1998 at Washington's City Hall, with her parents as the witnesses.")<br>• *The Politics of Truth*, at 276. |
| May 1998 | Valerie Plame and Wilson buy a house in DC together | • *The Politics of Truth*, at 276-77. |
| 1999 | Valerie Wilson worked for a Boston front company named Brewster-Jennings & Associates. | • Richard Leiby and Dana Priest, "The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003 ("It included a Boston front company named Brewster-Jennings & Associates")<br>• "The Exposure Of Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994531.shtml) (In recent years, she told |

12

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | | people she worked at an energy consulting firm called "Brewster-Jennings & Associates." Robert Novak, the columnist who first primed her name, revealed that, too. "And she listed herself is an employee of Brewster-Jennings & Associates. There is no such firm, I'm convinced," Novak said on CNN. He was right. Even though the business directory Dun & Bradstreet had a listing for the firm in a Boston office building, Brewster-Jennings & Associates was a CIA fiction, created to provide cover for agents like Valerie Plame.") Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br><br>• Ross Kerber and Bryan Bender, "Apparent CIA Front Didn't Offer Much Cover", *Boston Globe*, Oct. 10, 2003.<br>• Larry Johnson, "Is Max Boot Using Oxycontin?" *Noquarter.typepad.com* (personal blog), Nov. 2, 2005 (http://noquarter.typepad.com/my_weblog/2005/11/is_max_boot_us.html) ("In the case of Valerie Wilson, energy consultant for Brewster-Jennings, she traveled overseas in 2003, 2002, and 2001, as part of her cover job. She met with folks who worked in the nuclear industry, cultivated sources, and managed spies. She was a national security asset until exposed by Karl Rove and Scooter Libby.") |
| 1999 | "In 1999, after Valerie Wilson mentioned to her supervisors that her husband was planning a business trip to Niger, the CPD asked if [Joe] Wilson would be willing, while he was in Niger, to ask his contacts there about A.Q. Khan, the Pakistani nuclear scientist who was running a secret international proliferation network. The CIA had picked up intelligence indicating a possible Niger connection involving Khan. Wilson agreed to do so but returned with no fresh information on the subject." | *1999-2003: Under official State Department Cover*<br><br>• *Hubris*, at 95 |
| | | • *Hubris*, at 95 |
| January 2000 | "[Valerie Plame and Joe Wilson] married in April 1998 and she took his last name. Less than two years later, Valerie Wilson gave birth to twins, a boy and a girl. . . . After the twins were born, Valerie Wilson was struck by post" | *See also:*<br>• *Hubris*, at 285<br>• Richard Leiby and Dana Priest, "deal Mom Was also the Ideal Cover", *Washington Post*, Oct. 8, 2003<br>• Wikipedia, Personal History (http://en.wikipedia.org/wiki/Valerie_Plame)<br>• *The Politics of Truth*, at 277-78. |

13

FKCS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | partum depression. It lasted for months. But with the help of medication she recovered and later became executive director of a local post partum support group. After maternity leave, Valerie Wilson returned to the CIA's Counterproliferation Division in the spring of 2001." | Larry C. Johnson, "The Betrayal of Valerie Plame," *truthout.com*, Feb. 7, 2006 (http://www.truthout.org/cgi-bin/artman/exec/view.cgi/48/17531); *Alternet.org* (http://www.alternet.org/story/33881/)("Vice President Cheney told Scooter Libby that Valerie Plame worked at the CIA's Counter Proliferation Division in mid-June 2003") |
| Spring 2001 | "After maternity leave, Valerie Wilson returned to the CIA's Counterproliferation Division in the spring of 2001. She was given a choice: she could work on North Korea or Iraq. She selected Iraq and became one of the two operations officers working for the CPD's ruber modest Iraq branch. But within months, it would expand into the Joint Task Force on Iraq and assume one of the agency's most important missions: the search for intelligence on Iraq's WMDs. (She also assisted on operations related to Iran)" | *Hubris,* at 285.<br>See also:<br>• David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online,* (http://www.thenation.com/doc/20060918/corn)<br>• Larry C. Johnson, "The Betrayal of Valerie Plame, *truthout.com* Feb. 7, 2006 (http://www.truthout.org/cgi-bin/artman/exec/view.cgi/48/17531); *Alternet.org* (http://www.alternet.org/story/33881/) ("Valerie was working on projects to identify terrorists and criminals who were trying to procure weapons of mass destruction. Part of this information was the basis for the re-referral to the Justice Department in September 2003 to investigate this as a violation of the Intelligence Identities Protection Act.")<br>• Michael Isikoff, "The CIA Leak: Plame Was Still Covert", *Newsweek,* Feb. 13, 2006 (http://www.msnbc.msn.com/id/11797919/site/newsweek/#storyContinued) ("But special prosecutor Patrick Fitzgerald found that Plame had indeed done "covert work overseas" on counterproliferation matters in the past five years, and the CIA "was making specific efforts to conceal" her identity, according to newly released portions of a judge's opinion. (A CIA spokesman at the time is quoted as saying Plame was "unlikely" to take further trips overseas, though.") |
| ? | "Plame Wilson, who worked on the clandestine side of the CIA in the Directorate of Operations as a non-official cover (NOC) officer, was part of an operation tracking distribution and acquisition of weapons of mass destruction technology to and from Iran. Speaking under strict confidentiality, several intelligence sources revealed heretofore unreported elements of Plame's work. Their accounts suggest that Plame's | • Larissa Alexandrovna, "Outed CIA officer was working on Iran, intelligence sources say", *Raw Story,* Feb.13, 2006 (http://rawstory.com/admin/disorptis/printstory.php?story=1881)<br>See also:<br>• *Hubris,* at 285. ("She also assisted on operations related to Iran.")<br>• "MSNBC update: Cheney's office knew Plame's work was sensitive" *Raw Story,* May 2, 2006 (http://www.rawstory.com/news/2006/MSNBC_Cheneys_office_knew_Plames_work_0502.htm l) ("As MSNBC first reported yesterday, Wilson was not just undercover... but was, according to intelligence sources, part of an effort three years ago to monitor the proliferation of nuclear weapons material into Iran. And the sources allege that when Mrs. Wilson's cover was blown, part of the administration's ability to track Iran's nuclear ambitions was damaged as well.")<br>• "MSNBC confirms: Outed CIA agent was working on Iran", *Raw Story,* May 1, 2006 |

14

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | outing was more serious than has previously been reported and carries grave implications for U.S. national security and its ability to monitor Iran's burgeoning nuclear program.<br><br>While many have speculated that Plame was involved in monitoring the nuclear proliferation black market, specifically the proliferation activities of Pakistan's nuclear "father," A.Q. Khan, intelligence sources say that her team provided only minimal support in that area, focusing almost entirely on Iran." | (http://www.rawstory.com/news/2006/MSNBC_confirms_Raw_Story_report_0501.html) ; (http://www.crooksandliars.com/2006/05/01.html#a8126) ; Larry C. Johnson, "Republican Chutzpah on Iran", *NoQuarter.typepad.com* (personal blog), (http://noquarter.typepad.com/my_weblog/2006/08/republican_chut.html#more) ("Reports Sluster in this rush transcript: "Intelligence sources say Valerie Wilson was part of an operation three years ago tracking the proliferation of nuclear weapons material into Iran and the sources allege that when Mrs. Wilson's cover was blown, the administration's ability to track Iran's nuclear ambitions was damaged as well.")<br><br>• James Gordon Meek and Kenneth R. Bazinez, "She's the perfect spy", *New York Daily News*, Oct. 2, 2003 ("Two former senior intelligence officials confirmed that Valerie Plame, 40, is an operations officer in the spy agency's directorate of operations - the clandestine service. Plame "ran intelligence operations overseas," said Vincent Cannistraro, former CIA counterterrorism operations chief. Her specialty in the agency's nonproliferation center was biological, chemical and nuclear weapons and "recruiting agents, sending them to areas where they could access information about proliferation matters, weapons of mass destruction," Cannistraro said.") |
| January 1, 2002 | Began post as Classified CIA Officer | • Transcript of Special Counsel Fitzgerald's Press Conference, *Washington Post* Oct. 28, 2005<br><br>• Larry C. Johnson, "Plamegate Update", *Noquarter.typepad.com* (personal blog), Oct. 5, 2005 (http://noquarter.typepad.com/my_weblog/2005/10/plamegate_updat.html) ("Although Valerie had been based in the United States for several years, her cover was intact until compromised by White House officials. She had conducted several overseas missions as part of her cover job. Although she was in the process of moving from non-official to official cover status, she was still undercover.")<br><br>• Larry C. Johnson, "Correcting the Record on Valerie Plame", *Noquarter.typepad.com* (personal blog), July 22, 2005 (http://noquarter.typepad.com/my_weblog/2005/07/correcting_the_.html) ("Val only told those with a need to know about her status in order to safeguard her cover, not compromise it. Val has never been a flamboyant, insecure person who felt the need to tell people what her "real" job was. She was content with being known as an energy consultant married to Joe Wilson and the mother of twins. Despite the repeated claims of representatives for the Republican National Committee, the Wilson's neighbors did not know where Valerie really worked until Novak's op-ed appeared.")<br><br>• *Hubris* at 93 |
| Beginning of 2002 | "When Valerie Wilson's colleague inquired in 2002 if Wilson could help on | |

FRKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| February 19, 2002 | the latest Niger matter, this mother of two-year-old twins was not especially eager to have her husband trek to Niger (for no pay). Just see if he'll come talk to us, her fellow CPD officer asked. Valerie Wilson would later tell a friend, "My supervisor said, 'why don't we set up a meeting and have Joe come in?' My job was to go home and say, 'Honey, will you come into the office next week?'"<br><br>"On February 19, 2002, Joseph Wilson made the ten-minute drive from the Wilsons' Washington town house across the Potomac to Langley to discuss Niger and uranium with assorted analysts. Valerie Wilson introduces her husband to CIA office Valerie met him at the front entrance of CIA headquarters and escorted him to a basement meeting room. . . . Later—once this session had become a matter of controversy— Valerie Wilson told friends that she had merely introduced her husband to the assembled analysts and officers and then left." | • *Hubris*, at 94<br>See also:<br>• Larry C. Johnson, "Plamegate Update", *Noquater.typepad.com* (personal blog), Oct. 5, 2005 (http://noquarter.typepad.com/my_weblog/2005/10/plamegate_updat.html) ("According to the CIA, Valerie Wilson did not make the decision to send her husband to Niger. . . . The Office Chief, the Division Chief, and the Branch Chief are the only decision makers at the CIA outside of the DCI himself who can make a decision to send someone on a trip overseas. CPD convened a meeting of intelligence community analysts on 19 February to meet with Ambassador Joe Wilson. Ambassador Wilson's wife introduced her husband and left the meeting. She had neither the authority or the means to hire her husband. This was a decision made by her supervisors.")<br>• Larry Johnson, "Is Max Boot Using Oxycontin?" *Noquater.typepad.com* (personal blog), Nov. 2, 2005 (http://noquarter.typepad.com/my_weblog/2005/11/is_max_boot_usi.html) ("CIA officials in July 2003 and in July 2005 have said on the record that Valerie Wilson played no role in the decision to send Joe Wilson to Niger. Although the Senate Intelligence Committee report from July of 2004 tried to insinuate otherwise, Valerie's bosses asked her to write a memo outlining her husband's qualifications for a mission to Niger and she introduced her husband at a meeting (and then left). She was an undercover case officer, not a manager with the authority to make such a decision.") |
| March 5, 2002 | "On March 5, two CIA officers debriefed Wilson at his home; Valerie Wilson didn't take part in the session." | • *Hubris*, at 97 |
| May 2002 | Valerie Wilson is Chief of Operations of the Joint Task Force on Iraq which was charged with digging up information on | • *Hubris*, at 11<br>• David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online*, (http://www.thenation.com/doc/20060918/corn) |

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| Spring 2002 | Iraq's WMD programs. "By the spring of 2002, the JTFI, including [Valerie] Wilson, was under intense pressure to get more solid intelligence on Iraq's weapons program. . . . Valerie Wilson and the operations officers of JTFI sought out Iraqi graduate students studying abroad who had previously studied under Iraqi scientists of interest to the CIA. . . . At the same time, Valerie Wilson's operations unit was overwhelmed with walk-ins." | ▪ *Hubris*, at 13-14<br>See also:<br>▪ David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online*, (http://www.thenation.com/doc/20060918/corn)<br>▪ "The Exposure Of Valerie Plame", *CBS News*, Oct. 30, 2005 (www.cbsnews.com/stories/2005/10/28/60minutes/main994753.shtml) ("[Melissa]Mahle says Valerie was working on important national security issues, like keeping tabs on nuclear material and the world's top nuclear scientists. 'She is an expert on weapons of mass destruction. These are the kind of people that don't grow on trees.' What do agents in that division do? 'They're trying to figure out, really, the hard questions of who has the capability obtaining and deploying a biological weapon. Or a chemical weapon. Who's doing it? What are those networks? What are the financial trails?' says Mahle.")<br>▪ *Nightline*, ABC News, Oct. 3, 2003 ("JANE DOE: "Well, like Jim just said, just a few months ago, this Administration went out of its way to tell us how important human intelligence is. We cannot find Saddam Hussein because we have no human intelligence. And here you are, you have a case officer who is gathering human intelligence, who is running agents, and here you're exposing her and everyone that she came in contact with." |
| Spring 2002 | "As the cases piled up, Valerie Wilson traveled overseas under assumed names to monitor walk-in operations and other activities. Members of the unit were putting in long hours. But the results were frustrating. None of the JTFI's operations was generating evidence that Saddam had biological or chemical weapons or a revived nuclear weapons program." "She also went to Jordan to work with Jordanian intelligence officials who had intercepted a shipment of aluminum tubes heading to Iraq that CIA analysts were claiming--wrongly--were for a nuclear weapons program. (The analysts rolled over the government's top nuclear | ▪ *Hubris*, at 15<br>See also:<br>▪ David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online*, (http://www.thenation.com/doc/20060918/corn)<br><br>▪ David Corn, "What Valerie Plame Really Did at the CIA", *The Nation Online*, (http://www.thenation.com/doc/20060918/corn) |

17

FKKS

| DATE | FACT/EVENT | OPEN SOURCE CITATION |
|---|---|---|
| | experts, who had concluded the tubes were not destined for a nuclear program)." | • Vicky Ward, "Double Exposure" *Vanity Fair Magazine*, Jan. 17, 2004 (https://www.jangjillian.com/2004/01/vanity_fairs_profile_on_joseph_wilson_and_valerie_plam_e.php) |
| Spring 2003 | "[I]n the spring, Plame was in the process of moving from noc status to State Department cover." | |
| July 2003 | July 6 opinion piece in the New York Times and in an interview with The Washington Post, J. Wilson cited a secret mission he conducted in February 2002 for the CIA, when he determined there was no evidence that Iraq was seeking uranium for a nuclear weapons program in the African nation of Niger.<br><br>Valerie Wilson is identified as NOC by media | • Robert Novak, "Mission to Niger," *Washington Post*, July 14, 2003.<br>• Elisabeth Bumiller, "Debating a Leak: The Director CIA Chief is Caught in Middle By Leak Inquiry", *New York Times*, Oct. 5, 2003.<br>• Michael Duffy and Timothy Burger, "NOC, NOC, Who's There? A Special Kind of Agent, *Time Magazine*, Oct. 19, 2003.<br>• Walter Pincus and Jim VandeHei, "Plame's Identity Marked As Secret, Memo Central to Probe Of Leak Was Written By State Dept. Analyst", *Washington Post*, July 21, 2005.<br>• Lincoln Caplan, "Law and Politics", *Legal Affairs*, Jan.-Feb. 2006 ("The case began in 2003 with the leak that Valerie Wilson, a covert operator in the CIA, worked at the agency. The leak came after her husband, the career foreign service officer Joseph Wilson, conducted an investigation for the CIA in Africa and went public with his conclusion that the Bush Administration had misled the world about a key justification for the war in Iraq: that Iraq had obtained from Niger yellow-cake, a processed form of uranium ore that can be used in making nuclear bombs.") |