# Exhibit I

# WOLLMUTH MAHER & DEUTSCH LLP

---

500 FIFTH AVENUE
12TH FLOOR
NEW YORK, NEW YORK 10110

TELEPHONE: (212) 382-3300
FACSIMILE: (212) 382-0050

FAX TRANSMISSION COVER SHEET

---

| | | | |
|---|---|---|---|
| **Date:** | April 17, 2007 | | |
| **To:** | John Rizzo, Esq. | **Fax:** | 703-613-3003 |
| **Company:** | Central Intelligence Agency | **Phone:** | 703-613-3029 |
| **Subject:** | | | |
| **From:** | David B. Smallman, Esq. | **Direct Dial:** | |

---

YOU SHOULD RECEIVE **25** PAGE(S), INCLUDING THIS COVER SHEET. IF YOU
DO NOT RECEIVE ALL PAGES, PLEASE CALL (212) 382-3300

---

NOTE: THIS CONFIDENTIAL TRANSMISSION IS INTENDED SOLELY FOR ITS ADDRESSEES AND
THEIR AUTHORIZED DISTRIBUTEES. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR,
PLEASE INFORM US IMMEDIATELY BY TELEPHONE AT (212) 382-3300

---

**Message:**   Please see attached.

# WOLLMUTH MAHER & DEUTSCH LLP

500 FIFTH AVENUE

NEW YORK, NEW YORK 10110

TELEPHONE (212) 382-3300
FACSIMILE (212) 382-0050

<u>VIA FAX</u>                                    April 17, 2007
(703) 613-3003

John Rizzo, Esq.
Acting General Counsel
Office of General Counsel
Central Intelligence Agency
Washington, D.C. 20505

Dear Mr. Rizzo:

        I am writing to follow up on our conference call of April 2, 2007 and two letters from the Agency, each dated February 23, 2007 (copies attached). In connection with Ms. Wilson's ongoing cooperation regarding pre-publication review of her memoir, and in order to assist the Agency in complying with its legal obligations to ensure that the pre-publication review process is reasonably structured to prevent publication only of properly classified material, this letter and its attachments respond to the Agency's request for additional information regarding official acknowledgment by CIA in February 2006 of Valerie Wilson's federal service dates. This letter also clarifies the indisputable record of Valerie Wilson's past and present willingness to meet at all relevant times with CIA's Publications Review Board ("PRB").

        With regard to the Agency's official acknowledgment of Ms. Wilson's dates of federal service, the Agency has requested a copy of a letter from CIA to Ms. Wilson dated February 10, 2006 that was previously published in the Congressional Record on January 16, 2007. Mindful of the need to cooperate with the Agency's information request while protecting fully any classified National Security Information, we are forwarding on behalf of Ms. Wilson a copy of the letter in the redacted form received from Congressman Jay Inslee's office, together with the final floor statement in connection with the Valerie Plame Wilson Compensation Act, H.R. 501, the bill as introduced, and pages E118-E119 of the Congressional Record. This response, of course, is subject to and conditioned upon the Agency's prior written acknowledgment that providing a copy to the Agency of the requested letter is without prejudice to our legal position regarding the non-classified status of that letter or any other versions, and Ms. Wilson fully reserves all of her rights and remedies in this matter. This response is further without prejudice to our legal position that the Agency waived any purported

John Rizzo, Esq.
April 17, 2007
Page 2 of 6

basis for seeking to restrict disclosure of the contents of that letter by its actions, including, *inter alia*, prior disclosure by the Agency of the specific information at issue in an official document that is now in the public domain.

The February 10, 2006 letter from CIA was an unclassified communication delivered by regular mail on official CIA letterhead which acknowledged and disclosed information regarding Valerie Wilson's eligibility to receive a deferred annuity under the Federal Employees Retirement System (FERS) Special Category at the conclusion of her government service in January 2006. The deferred annuity letter received by Valerie Wilson contained no indicia whatsoever that the information disclosed by the Agency therein was classified, nor was Valerie Wilson informed at the time of receipt (or for almost a full year thereafter) that this official correspondence was purportedly classified or subject to any restrictions that would prohibit her from providing a copy to Congress in connection with proposed legislation that predated her receipt of the letter.

Thus, while the Agency had actual knowledge of the existence in unclassified form of Valerie Wilson's deferred annuity letter from at least February 10, 2006 through January 19, 2007, it took no steps whatsoever for nearly a year (1) to reclassify any information contained in the February 10, 2006 letter, (2) to indicate any national security classification of the contents of the letter through proper marking and redelivery of the letter, (3) to retrieve the original letter, or (4) to restrict in any way dissemination of the letter or any information contained therein. To the contrary, for approximately a full year, none of the measures set forth in Executive Order 12958, as amended by Executive Order No. 13292, 68 Fed. Reg. 15315 ("E.O. 12958") applicable to the handling of "Classified National Security Information" were undertaken by the Agency with respect to information about Valerie Wilson's federal service as set forth in the February 10, 2006 letter. For example, the Agency, as original classification authority, did not identify, mark, or describe any aspect of that disclosure that "reasonably could be expected to result in damage to national security," as required by E.O. §1.6 (5)(c), and it still has not done so despite my repeated requests. Nor can the Agency seek to classify information to "conceal administrative error," E.O. 12958 §1.7(a)(1), or to "prevent embarrassment to . . . the [A]gency." E.O. 12958 §1.7(a)(2).

In any event, given that the information disclosed in CIA's official correspondence was obviously not in classified form on February 10, 2006, and given that the Agency has no reasonable basis to establish any damage caused to national security arising from the information it disclosed about Ms. Wilson's life as published in the Congressional Record on January 16, 2007, reclassification can only be undertaken if "the information may be reasonably recovered." E.O. 12958 §1.7(4)(c)(2). That simply cannot occur under the circumstances here because the specific information made public through an official and documented disclosure by the Agency is irretrievably in the possession of Congress through the legislative process and hence pursuant to the Speech

John Rizzo, Esq.
April 17, 2007
Page 3 of 6

and Debate Clause of the Constitution. *See* U.S. CONST. art. I, § 6, cl. 1. Moreover, the exact information describing Valerie Wilson's federal service as set forth in the Agency's own official correspondence – which the Agency continues to assert may not be published by Ms. Wilson in her memoir – has been published in the Congressional Record and made available worldwide on the internet via the Library of Congress THOMAS website. *See* http://www.thomas.gov.

Because the Agency began to assert for the first time on January 19, 2007 (three days *after* the January 16, 2007 publication of Ms. Wilson's deferred annuity letter in the Congressional Record) that CIA's disclosure in unclassified form of specific information regarding her dates of federal service was simply an "administrative error," I have requested repeatedly since January 31, 2007 that the Agency provide Ms. Wilson's counsel with a revised and remarked version of the February 10, 2006 letter that complies in good faith with any applicable provisions of E.O. 12958 §1.6. More than two months later, however, the Agency still has not done so. Now that Ms. Wilson and her counsel have complied with the Agency's request to provide it with a copy of the redacted deferred annuity letter already published in the Congressional Record, I am reiterating once again my prior requests. To the extent that the attached redacted version of Ms. Wilson's deferred annuity letter is coterminous with the Agency's determination of a version of the letter that would comply in good faith with any applicable provisions of E.O. 12958 §1.6, or if the Agency has reached and can identify an alternate determination, please advise me immediately so that Ms. Wilson can comply with her legal obligations and respond appropriately to the Agency's January 19, 2007 letter seeking return of the original document.

With regard to the Agency's recent misstatements regarding Ms. Wilson's record of meeting with PRB whenever reasonably requested to do so, I am disappointed that it is again necessary for a second time to point out and correct obviously false and self-serving assertions by the Agency that unfairly distort Ms. Wilson's good faith discussions with PRB.[1] The following chronology demonstrates conclusively, however, that she has

---

[1] Notwithstanding actual facts to the contrary, the February 23, 2007 letter from the Agency's Associate General Counsel, Ginger A. Wright asserts – erroneously – that "Ms. Wilson . . . declined to meet with the PRB staff" to discuss "issues" concerning possible approaches to revision of her manuscript immediately upon receiving a letter to her dated December 22, 2006 (sent three days prior to the Christmas holiday). A letter from R. Puhl, the Chairman of PRB, also dated February 23, 2007, contains a similar inaccurate statement: "Our 22 December 2006 letter included an invitation for you to meet with PRB staff to discuss these issues and to see if you had a preference month the different revision approaches. However, you have declined to meet with us to discuss these issues." It is also my understanding that the Agency's director, General Michael V. Hayden, has repeated the same or similar mischaracterizations to Congress.

John Rizzo, Esq.
April 17, 2007
Page 4 of 6

always been willing to meet with the Agency at mutually convenient times in connection
with the PRB review process and has never declined to meet with PRB to discuss any
issues concerning review of her memoir:

- December 13, 2006:  Ms. Wilson meets with PRB; at that meeting, PRB
  promises to release to her the first 124 pages of her manuscript in redacted
  form.

- December 26, 2006:  A letter from the Agency dated December 22, 2006 is
  delivered to Ms. Wilson's mother's home in Florida.  Ms. Wilson's mother
  reads the letter to Ms. Wilson, who is on vacation with her family in Utah.
  The letter, which completely reverses course on PRB's prior agreement to
  deliver to her a redacted version of the first half of the manuscript, states in
  relevant part, as follows:

  > *The first 124 pages of your manuscript are replete with
  > statements that may be unclassified standing alone, but
  > they become classified when they are linked with a specific
  > time, such as an event in your personal life, or are included
  > in another context that would reveal classified information.
  > A detailed description of this information along with how
  > the timeframes and contexts are problematic would be
  > classified.  We are available to meet at your convenience to
  > discuss these issues in person.  However, we are not able to
  > communicate this information to you in an unclassified
  > correspondence.  Additionally, there is more than one
  > approach to revising the material in the first 124 pages of
  > your manuscript in order to render it unclassified . . . . We
  > recognize that these options might not be feasible in some
  > instances and that the only way to avoid revealing
  > classified information in those cases would be to recast that
  > information or fictionalize it . . . .We look forward to
  > hearing from you in the near future regarding how you
  > wish to proceed.*

- January 5, 2007:  Reflecting concerns about the publication review process for
  Ms. Wilson's manuscript, certain members of the House of Representatives
  and the Senate (and their staffs) inquire into that process and/or communicate
  with the Agency and its director.

John Rizzo, Esq.
April 17, 2007
Page 5 of 6

- January 9, 2007:  Michael David Grannis, a member of Senator Feinstein's staff, meets with the Agency regarding the PRB review process for Ms. Wilson's memoir.  He is informed that the Agency will allow him to review the unredacted manuscript with permission from Ms. Wilson so that a possible compromise approach can be proposed to the Agency.

- January 9, 2007:  Letter to the Agency from Ms. Wilson's counsel regarding Agency's decision to renege on its agreement to release the redacted first half of Ms. Wilson's manuscript and providing the Agency with an open source/public domain chart regarding Ms. Wilson.

- January 11, 2007:  Ms. Wilson emails permission to R. Puhl at PRB to provide Mr. Grannis a copy of the unredacted first half of the manuscript.

- January 16, 2007:  H.R. 501 introduced and related materials published in the Congressional Record.

- January 23, 2007:  Despite email message to R. Puhl twelve days earlier,  Mr. Grannis has still not yet received a copy of the unredacted Wilson manuscript from PRB.

- January 24, 2007:  Ms. Wilson contacts PRB and is informed that Mr. Muhl will be out for "at least the next two weeks."  Ms. Wilson emails the first part of the unredacted manuscript directly to Mr. Grannis.

- January 31, 2007:  Agency provided by Ms. Wilson's counsel with copy of materials published in the Congressional Record on January 16, 2007.  Agency informed that its six month delay in conducting its review of the manuscript appears to be dilatory and improper.

- February 9, 2007:  Agency reverses course again and agrees to provide Ms. Wilson with a redacted version of the first half of her manuscript

Contrary to the Agency's assertion that Ms. Wilson had declined to meet with the Agency, it is clear from the above chronology that Ms. Wilson, with the Agency's consent, had provided Mr. Grannis with the first half of her manuscript.  It was her working assumption that she would meet with PRB *after* Mr. Grannis had completed his review in order to determine whether a compromise approach could be agreed upon. Therefore, any assertions by the Agency that Ms. Wilson "declined to meet with the PRB" staff during the relevant time period to discuss approaches to revising her manuscript are misleading and false.  Rather, Ms. Wilson, with the Agency's knowledge, was considering and actively working on a proposed approach and compromise regarding

John Rizzo, Esq.
April 17, 2007
Page 6 of 6

redactions to the first half of the manuscript. She did not "decline" to meet with anyone, and the Agency should correct its misstatements that suggest otherwise.

As previously discussed with the Agency's lawyers during the many months that Ms. Wilson has worked diligently with PRB to reach a reasonable resolution of any possible national security issues arising from her memoir, Ms. Wilson is a loyal former officer who is not seeking *carte blanche* to discuss her entire government service or to reveal any classified information. Rather, because of newsworthy events concerning her government service, a fundamental public interest "lies in a proper accommodation that will preserve the intelligence mission of the Agency while not abridging the free flow of unclassified information." *Snepp v. United States*, 444 U.S. 507, 520 (1980) (Stevens, J., dissenting). The Agency, therefore, has an obligation to comply with the Constitution and laws of the United States with respect to disclosure of officially acknowledged information, and this extends to its legal duty to ensure that the Agency's pre-publication review process is reasonably structured to prevent publication only of properly classified materials.

Sincerely,

David B. Smallman

Attachments
cc:  Lisa E. Davis, Esq.

Central Intelligence Agency



Washington, D.C. 20505

Publications Review Board
1H11 IP Building
Washington, D.C. 20505

Telephone: 703-613-3070
Facsimile: 703-613-3004
E-mail: prb@ucia.gov

23 February 2007

Ms. Valerie E. Wilson
4612 Charleston Terrace, NW
Washington, DC 20007

Dear Ms. Wilson:

On 21 November 2006, the Central Intelligence Agency's Publications Review Board (PRB or Board) advised you that it had completed a prepublication review of your manuscript for classified information and that it had denied approval for you to publish the manuscript as it is currently written. On 13 December 2006, you requested a list of required revisions to the first 124 pages of your manuscript that would render that portion of your manuscript unclassified. On 22 December 2006, we advised you that the first 124 pages of your manuscript contain statements that may be unclassified standing alone, but they become classified when they are linked with a specific time, such as an event in your personal life, or are included in another context that would reveal classified information. We advised you that there is more than one approach to revising the material in the first 124 pages of your manuscript in order to render it unclassified and that the particular approach taken to revise the material in the manuscript would significantly affect the line-in/line-out changes that would be required to render the manuscript unclassified. Because a detailed discussion of how certain passages are classified because of the context in which they appear would itself be classified, and because we wanted to provide you with as much flexibility as possible, our 22 December 2006 letter included an invitation for you to meet with the PRB staff to discuss these issues and to see if you had a preference among the different revision approaches. However, you have declined to meet with us to discuss these issues.

In light of the concerns regarding the time associated with the prepublication review of your manuscript that Mr. Smallman raised with the Counsel to the PRB and in an effort to be as helpful as possible, we have selected an approach for revising the manuscript and have reviewed the first 124 pages of your manuscript using this approach.

Ms. Valerie E. Wilson

In accordance with the terms of your secrecy agreement, the Board has determined that certain information contained within the first 124 pages of your manuscript cannot be approved for publication because it is currently and properly classified information, the disclosure of which could reasonably be expected to cause harm to national security, and, therefore, must be deleted prior to publication. In some instances, the deleted text is classified because it is linked with a specific time or is included in a particular context that reveals classified information. The PRB staff is available to work with you to discuss ways in which this deleted text could be modified in order to render it unclassified or could be used in other contexts so as to not reveal classified information.

Enclosed is a copy of the most recent version of the manuscript that you provided to the Board for review. Within this copy we have clearly indicated (1) that text (blacked out) that must be deleted from your original version because the information is classified and must be removed before publication, and (2) that text that is formally approved for publication in its current form. You will note that during the course of our review, the original pagination has changed. To ensure we are clearly identifying textual references in any subsequent discussions, we have added new page references so that we are not confusing specific text between versions.

As always, after you have had an opportunity to review these deletions, the PRB staff will be happy to meet with you to discuss any specific concerns and continue our discussion in an effort to assist you in publishing your manuscript while safeguarding classified information. Please keep in mind that if you add material to or change the text the Board has approved for publication, you must submit these additions or changes to us before giving them to your publisher or anyone else. In such a case, please mark or otherwise clearly indicate the new or changed material so we can expedite our review. Additional material that must be submitted includes, but is not limited to, photographs, photograph captions, footnotes, endnotes, illustrations, diagrams, tables, charts, or maps.

Please keep in mind that, because your original manuscript contains classified information, we require that you return to us for destruction any and all earlier, non-approved versions of this work, in whatever form, and remove those items from your hard drive.

Please do not hesitate to contact me if you have any questions or if we can be of further assistance.

Sincerely yours,

R. Puhl

R. Puhl
Chairman, Publications Review Board

Page 2

Central Intelligence Agency



Washington, D.C. 20505

23 February 2007

David B. Smallman, Esq.
Frankfurt, Kurnit, Klein and Selz
488 Madison Avenue
New York, New York 10022

Dear Mr. Smallman:

    I am writing in response to your letter of 16 February 2007
and to our telephone conversation earlier this afternoon.

    We certainly appreciate and accept the commitment of
Ms. Wilson and her counsel to comply fully with all legal
obligations regarding the protection of classified information
while fully reserving any legal rights Ms. Wilson may have.  As
a result of our telephone conversation, I understand that you
have questions regarding what these legal obligations may be
with respect to the Agency's 10 February 2006 letter.  To be
clear, Ms. Wilson has a legal obligation to return the
10 February 2006 letter and any copies that she may have in her
possession.  The 10 February 2006 letter contains currently and
properly classified information.  We disagree with your
characterization of our 10 February 2006 letter as an official
acknowledgment of classified information that would require a
reclassification action to protect.  Please be advised that
reclassification is only required when classified information is
formally declassified by an official with declassification
authority.  Information that is properly classified by the
Executive branch and that is released by administrative error or
by another branch of Government without Executive branch
concurrence continues to retain its classification.  The prompt
return of the 10 February 2006 letter and copies would not
constitute a waiver of Ms. Wilson's ability to challenge, or a
ratification by her of, the Agency's position that the
information included in the letter is currently and properly
classified.  We fully recognize that she would be returning the

David B. Smallman, Esq.

letter and copies in order to comply with her legal obligations
to protect information that the Agency has determined is
classified while at the same time reserving any rights that she
may have to challenge that determination.

   With respect to your letter of 16 February 2007, obviously,
we disagree with your characterization of the contents of our
9 February 2007 letter as false and self-serving.  The Agency's
Publications Review Board (PRB) has acted in good faith in its
discussions with Ms. Wilson at all times and has not engaged in
any dilatory conduct.  As we have indicated to you, Ms. Wilson's
manuscript raises very serious classification issues that have
required careful consideration by the Agency.  The discussions
with Ms. Wilson have been aimed at trying to develop an approach
that would allow Ms. Wilson to tell her story without revealing
classified information.  In such cases, the discussions between
the PRB staff and an author may extend beyond the 30-day
benchmark that the Agency tries to meet.  As we have further
indicated to you, any redactions required in Ms. Wilson's
manuscript would be to delete currently and properly classified
information in accordance with the terms of her secrecy
agreement, not to engage in any improper censorship or restraint
of Ms. Wilson's publication of her manuscript.

   With respect to the record of the PRB's discussions with
Ms. Wilson, as you correctly note the PRB staff met with Ms.
Wilson 6 November 2006 and, on 21 November 2006, advised her
that it had denied approval for her to publish the first half of
her manuscript because the information in that portion of her
manuscript is currently and properly classified and provided her
with a list of required line-in/line-out edits that would render
the second half of her manuscript unclassified.  The PRB staff
met with Ms. Wilson on 1 December 2006 and 13 December 2006 to
discuss these issues.  At the 13 December 2006 meeting, Ms.
Wilson requested that the PRB staff provide her with a list of
line-in/line-out edits that could be made to the first half of
the manuscript in order to render that portion of the manuscript
unclassified.

David B. Smallman, Esq.

On 22 December 2006, the PRB advised Ms. Wilson that the first 124 pages of her manuscript contain statements that may be unclassified standing alone, but they become classified when they are linked with a specific time, such as an event in her personal life, or are included in another context that would reveal classified information.  The PRB also advised Ms. Wilson that there is more than one approach to revising the material in the first 124 pages of her manuscript in order to render it unclassified and that the particular approach taken to revise the material in the manuscript would significantly affect the line-in/line-out changes that would be required to render her manuscript unclassified.  Because a detailed discussion of how certain passages are classified because of the context in which they appear would itself be classified, and because the PRB wanted to provide Ms. Wilson with as much flexibility as possible, the PRB's 22 December 2006 letter to Ms. Wilson invited her to meet with members of the PRB staff to discuss these issues and to see if Ms. Wilson had a preference among the different revision approaches.  However, Ms. Wilson has indeed declined to meet with the PRB staff to discuss these specific issues.

As I explained in my 9 February 2007 letter, in light of the concerns regarding the time associated with the prepublication review of Ms. Wilson's manuscript that you raised in your 31 January 2007 letter and in an effort to be as helpful as possible, the PRB has selected an approach for revising the manuscript and has just completed its review of the first 124 pages of Ms. Wilson's manuscript using this approach.  I understand that the PRB plans to mail Ms. Wilson the deletions required for the first 124 pages of her manuscript in order to render it unclassified by the end of today.

After Ms. Wilson has an opportunity to review the revised unclassified manuscript, the PRB staff will be happy to meet with her to discuss any specific concerns she has.  I am available to discuss any concerns you may have as well.

3

David B. Smallman, Esq.

    If you have any questions, please feel free to contact me at (703) 613-3029.

Sincerely,

Ginger A. Wright
Associate General Counsel

4

From: "Bonlender, Brian" <Brian.Bonlender@mail.house.gov>
To: "'Joseph Wilson (thewilsonswdc@hotmail.com)'"
<thewilsonswdc@hotmail.com>
Date: Tue, 16 Jan 2007 18:59:03 -0500

Attached is the bill we just introduced, the final floor statement, and the
redacted annuity letter submitted into the Congressional Record along with
the floor statement.

We had to name the bill in order to couple the statement with the bill
introduction.  The name of the bill is the Valerie Plame Wilson Compensation
Act.

I'll have somebody get a copy of it when the Congressional Record is
printed.  I'm not sure when that will be.

Thanks for all your patience on this,

Brian

Brian Bonlender
Chief of Staff
Congressman Jay Inslee
 <http://www.house.gov/inslee> www.house.gov/inslee
202-225-6311
202-226-1606 fax

**3 attachments —**

  **annuityletterredacted.pdf**

  **INSLEE_012_xml.pdf**

  **FloorStatementPlamebilljan2007final.doc**

## 3 ATTACHMENTS

Pursuant to the Stipulation and Protective Order
dated June 28, 2007, and subject to the terms and provisions therein,
plaintiffs respectfully refer the Court to the following Tabs of
Defendants' Classified Administrative Record:

- annuityletterredacted.pdf  -  **TAB 3**

- INSLEE_012Xxml.pdf -  **TAB 6**

- FloorStatementPlamebilljan2007final.doc – **TAB 7**

## INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT -- (Extensions of Remarks - January 16, 2007)

[Page: E118]

---

SPEECH OF□
**HON. JAY INSLEE**
OF WASHINGTON
IN THE HOUSE OF REPRESENTATIVES
TUESDAY, JANUARY 16, 2007

- Mr. INSLEE. Madam Speaker, I rise today to bring to the attention of Congress one of the human impacts caused by the indiscretion of government officials regarding the covert identity of Central Intelligence Agency operative Valerie Plame Wilson.

- As nearly every American knows, and as most of the world has heard, the covert CIA identity of Valerie Plame Wilson was exposed to the public as part of an Administration response to a critical op-ed published in the New York Times by Mrs. Plame Wilson's husband, Joe Wilson.

- The national security ramifications for this act have been discussed thoroughly on this floor, in the news media, and I am quite certain behind CIA's closed doors. Today I intend to call my colleagues' attention to the human toll that this ``outing'' has had on one, often overlooked, individual. That person is Valerie Plame Wilson.

- While the media, Congress, and the judiciary have gone to great lengths to discuss the impact of this unfortunate act on politicians, bureaucrats, agents in the field, and the suspected perpetrators of the outing, few have looked at the impact that the outing has had on Mrs. Plame Wilson and her family.

- On July 14, 2003, Mrs. Plame Wilson's professional life was forever altered, and her CIA career irrevocably ruined by the syndicated publication of a column, which revealed Mrs. Plame Wilson's identity as a covert CIA officer. Since this time, numerous reports on Mrs. Plame Wilson's personal history have surfaced

[Page: E119]

in the press, official government documents, and by government officials.

- Following the initial outing in the media, Mrs. Plame Wilson's future as a covert CIA operative ceased to exist and her career of two decades was destroyed. On January 9, 2006, Mrs. Plame Wilson resigned from the CIA, recognizing that any future with the Agency would not include any work for which she had been highly trained. For these reasons, and under these distressing conditions, Mrs. Plame Wilson voluntarily resigned from the Agency.

Search Results - THOMAS (Library of Congress)          http://www.thomas.gov/cgi-bin/query/C?r110:./temp/~r110pLnM9N

- Despite Mrs. Plame Wilson's 20 years of federal service, she does not meet the minimum age requirement to receive her retirement annuity. She has been left without a career.

- I am introducing legislation to allow Mrs. Plame Wilson to qualify for her annuity, as one who has served her country for two decades, and waive the age requirement for collecting it. To best demonstrate the annuity for which Mrs. Plame Wilson may qualify if this legislation were to pass, I am submitting for the record a document sent to Mrs. Plame Wilson by the CIA. It outlines her deferred annuity and testifies to 20 years of service. The document bears no indications of classified material as required by CIA procedures, and was sent via regular postal mail after Mrs. Plame Wilson was no longer in the employ of the CIA. Legal experts have assured me that this is not a classified document.

- I believe that this is one small measure to help send a message that we must stand up for public service officers, such as Mrs. Plame Wilson, who have been treated wrongly despite their loyalty and sacrifice to country. For those who have been, for all practicable purposes, pushed out of public service for reasons unrelated to performance, but instead seeded in politics, we should not turn our backs.

Central Intelligence Agency,

Washington, DC, February 10, 2006.

Mrs. **VALERIE WILSON**

**DEAR MRS. WILSON,** This letter is in response to your recent telephone conversation with regarding when you would be eligible to receive your deferred annuity. Per federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA). Your MRA is age 56, at which time you'll be eligible to receive a deferred annuity.

Your deferred annuity will be based on the regular FERS computation rate, one percent for every year of service vice the FERS Special rate of 1.7% for every year of service. You will receive 1.7% for each year of overseas service, prorated on a monthly basis, after January 1, 1987 in the calculation of your annuity. Our records show that since January 1, 1987, you have acquired 6 years, 1 month and 29 days of overseas service.

Following is a list of your federal service:

Dates of Service: CIA, CIA (LWOP), CIA Đ(P/T 40), from 11/9/1985 to 1/9/2006--total 20 years, 7 days.

Based on the above service and your resignation on January 9, 2006, your estimated deferred annuity is $21,541.00 per year, or $1795 per month, beginning at age 56.

The above figures are estimates for your planning purposes. The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts. Please let me know if I can be of any further assistance.

Sincerely,

------.

*END*

E118                    CONGRESSIONAL RECORD— *Extensions of Remarks*                    *January 16, 2007*

will do nothing, just as previous Congresses have done nothing. Nancy Pelosi promises to "build a better future for all of America's children." If she were serious, she would back cuts in Social Security and Medicare. President Bush calls "entitlement spending" the central budget problem. If he were serious, he, too, would propose cuts in Social Security and Medicare.

They are not serious, because few Americans—particularly prospective baby-boom retirees—want them to be. There is a consensus against candor, because there is no constituency for candor. It's no secret that the 65-and-over population will double by 2030 (to almost 72 million, or 20 percent of the total population), but hardly anyone wants to face the implications:

By comparison, other budget issues, including the notorious earmarks, are trivial. In 2005, Social Security and Medicaid (the main programs for the elderly) cost $1.034 trillion, twice the amount of defense spending and more than two-fifths of the total federal budget. These programs are projected to equal about three-quarters of the budget by 2030, if it remains constant as a share of national income.

Preserving present retirement benefits automatically imposes huge costs on the young—costs that are economically unsound and socially unjust. But much of the adjustment should come from increasing eligibility ages (ultimately to 70) and curbing payments to wealthier retirees. Americans live longer and are healthier. They can work longer and save more for retirement.

Because I've written all this before, I can anticipate some of the furious responses from prospective retirees. First will be the "social compact" argument: We paid to support today's retirees; tomorrow's workers must pay to support us. Well, of course they will pay; the question is how much. The alleged compact is entirely artificial, acknowledged only by those who benefit from it. My three children (ages 16 to 21) didn't endorse it. Judging from the e-mail I receive, neither did many 20- or 30-somethings.

Next I'll hear that the Social Security and Medicare trust funds, intended to cover future benefits, have been "plundered." Blame Congress and the White House—not us. This is pure fiction.

Social Security, Medicare and Medicaid are pay-as-you-go programs. Present taxes pay present benefits. In 2005, $6 percent of Social Security payroll taxes went to pay current retiree benefits. True, excess taxes had created a "surplus" in the Social Security trust fund (it hasn't been "plundered") of $1.66 trillion in 2005; but that equaled less than four years' worth of present benefits. More important, Medicare and Medicaid represent three-quarters of the projected spending increase for retirees by 2030.

All the misinformation bespeaks political evasion. With his rhetorical skills, Clinton might have raised public understanding. Instead, he lowered it by falsely denouncing the Republicans for attempting to "destroy" Medicare. The first refuge of good Democrats is to accuse the Republicans of conspiring against old folks by trying to dismantle Social Security and Medicare. And Bush's credibility is shot, because he made the problem worse. His Medicare drug benefit in-

creases spending, and though it could have been justified as part of a grand bargain that reduced other benefits, its isolated enactment was a political giveaway.

The failure to communicate also implicates many pundits and think tanks, liberal and conservative. Pundits usually speak in bland generalities. They support "fiscal responsibility" and "entitlement reform" and oppose big budget deficits. Less often do they say plainly that people need to work longer and that retirees need to lose some benefits. Think tanks endlessly publish technical reports on Social Security and Medicare, but most avoid the big issues. Are present benefits justified? How big can government become before the resulting taxes or deficits harm the economy?

Opportunities for gradual change have been squandered. These public failings are also mirrored privately. I know many bright, politically engaged boomers who can summon vast concern or outrage about global warming, corporate corruption, foreign policy, budget deficits and much more—but somehow, their own Social Security and Medicare benefits rarely come up for discussion or criticism. Older boomers (say, those born by 1955) are the most cynical, hoping their benefits will be grandfathered in when inevitable cuts occur in the future.

Our children will not be so blind to this hypocrisy. We have managed to take successful programs—Social Security and Medicare—and turn them into huge problems by our self-centered inattention. Baby boomers seem eager to "reinvent retirement" in all ways except those that might threaten their pocketbooks.

[From The Dallas Morning News, June 6, 2005]

DEEP IN THE BUDGET HOLE—BIPARTISAN PANEL COULD HELP COUNTRY DIG OUT

When you're almost $10 trillion in the hole, you've got to call somebody, right?

Fortunately, GOP Rep. Frank Wolf has a suggestion to deliver us from the gates of budget hell. The Virginia legislator introduced legislation yesterday that would establish a bipartisan commission charged with presenting the choices required to balance the budget.

The panel would function like the commission that former Texas GOP Rep. Dick Armey launched to close down unnecessary military bases. An independent group would give Congress a budget package, which legislators would vote up or down on unless the House and Senate come up with better solutions.

President Bush proposed a version of this approach earlier this year when he called for a bipartisan commission to recommend how Washington can control runaway spending on Social Security, Medicare and other big guaranteed programs.

But Mr. Wolf understands that the budget challenges are not all about spending. They also involve taxes and how much revenue the Treasury needs to pay for the services Americans demand.

In an encouraging sign, White House economic adviser Allen Hubbard recently acknowledged that any bipartisan panel probably would look at taxes.

He wasn't saying the White House is backing off its fondness for tax cuts, but it was a Washington way of saying, "Let's look at the whole range of choices."

We encourage North Texas representatives to line up as sponsors of Mr. Wolf's legislation and help get it through the House this summer. (The delegation's chief deficit fighter, GOP Rep. Jeb Hensarling of Dallas, told us last week that he wants to look at the proposal.)

It's time Washington reaches out for help. By the numbers: $9.6 trillion: The amount of debt Congress recently authorized the Treasury to borrow (the limit was $5.4 trillion four summers ago); $2.8 trillion: The likely 2007 federal budget; $389 billion: Next year's interest expense on the federal debt; $27,000: What every man, woman and child would owe to eliminate the federal debt; 37.4 percent: How much of the gross domestic product the federal debt consumes.

[From the Orlando Sentinel, June 12, 2005]

GET ON WITH IT

Our position: A panel on Medicare and other issues would get needed talks started.

Finally, someone in Congress has taken up President Bush's call for a bipartisan commission on the looming financial crisis if no changes are made to Medicare, Medicaid and Social Security.

Unchecked growth in the cost of these programs is forcing decades will devastate the economy by forcing some combination of huge tax increases, drastic spending cuts or massive borrowing.

This past week, Republican Rep. Frank Wolf of Virginia proposed a panel aptly named SAFE, to secure America's future economy. Its bipartisan experts would deliver a package of recommendations to Congress for an up-or-down vote.

Mr. Wolf says he is open to suggestions on his proposal. Members unwilling to support it have a moral obligation to come forward with something they deem better.

## INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT

## HON. JAY INSLEE
### OF WASHINGTON
### IN THE HOUSE OF REPRESENTATIVES

*Tuesday, January 16, 2007*

Mr. INSLEE. Madam Speaker, I rise today to bring to the attention of Congress one of the human impacts caused by the indiscretion of government officials regarding the covert identity of Central Intelligence Agency operative Valerie Plame Wilson.

As nearly every American knows, and as most of the world has heard, the covert CIA identity of Valerie Plame Wilson was exposed to the public as part of an Administration response to a critical op-ed published in the New York Times by Mrs. Plame Wilson's husband, Joe Wilson.

The national security ramifications of this act have been discussed thoroughly on this floor, in the news media, and I quite certain behind CIA's closed doors. Today I intend to call my colleagues' attention to the human toll that this "outing" has had on one, often overlooked, individual. That person is Valerie Plame Wilson.

While the media, Congress, and the judiciary have gone to great lengths to discuss the impact of this unfortunate act on politicians, bureaucrats, agents in the field, and the suspected perpetrators of the outing, few have looked at the impact that the outing has had on Mrs. Plame Wilson and her family.

On July 14, 2003, Mrs. Plame Wilson's professional life was forever altered, and her CIA career irrevocably ruined by the syndicated publication of a column, which revealed Mrs. Plame Wilson's identity as a covert CIA officer. Since this time, numerous reports on Mrs. Plame Wilson's personal history have surfaced

in the press, official government documents, and by government officials.

Following the initial outing in the media, Mrs. Plame Wilson's future as a covert CIA operative ceased to exist and her career of two decades was destroyed. On January 9, 2006, Mrs. Plame Wilson resigned from the CIA, recognizing that any future with the Agency would not include any work for which she had been highly trained. For these reasons, and under these distressing conditions, Mrs. Plame Wilson voluntarily resigned from the Agency.

Despite Mrs. Plame Wilson's 20 years of federal service, she does not meet the minimum age requirement to receive her retirement annuity. She has been left without a career.

I am introducing legislation to allow Mrs. Plame Wilson to qualify for her annuity, as one who has served her country for two decades, and waive the age requirement for collecting it. To best demonstrate the annuity for which Mrs. Plame Wilson may qualify if this legislation were to pass, I am submitting for the record a document sent to Mrs. Plame Wilson by the CIA. It outlines her deferred annuity and testifies to 20 years of service. The document bears no indications of classified material as required by CIA procedures, and was sent via regular postal mail after Mrs. Plame Wilson was no longer in the employ of the CIA. Legal experts have assured me that this is not a classified document.

I believe that this is one small measure to help send a message that we must stand up for public service officers, such as Mrs. Plame Wilson, who have been treated wrongly despite their loyalty and sacrifice to country. For those who have been, for all practicable purposes, pushed out of public service for reasons unrelated to performance, but instead seeded in politics, we should not turn our backs.

CENTRAL INTELLIGENCE AGENCY,
*Washington, DC, February 10, 2006.*
Mrs. VALERIE WILSON.

DEAR MRS. WILSON, This letter is in response to your recent telephone conversation with regarding when you would be eligible to receive your deferred annuity. Per federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA). Your MRA is age 56, at which time you'll be eligible to receive a deferred annuity.

Your deferred annuity will be based on the regular FERS computation rate, one percent for every year of service vice the FERS Special rate of 1.7% for every year of service. You will receive 1.7% for each year of overseas service, prorated on a monthly basis, after January 1, 1987 in the calculation of your annuity. Our records show that since January 1, 1987, you have acquired 6 years, 1 month and 29 days of overseas service.

Following is a list of your federal service: Dates of Service: CIA, CIA (CJWOF), CIA CPT 40), from 11/9/1985 to 1/9/2006—total 20 years, 7 days.

Based on the above service and your resignation on January 9, 2006, your estimated deferred annuity is $21,541.00 per year, or $1795 per month, beginning at age 56.

The above figures are estimates for your planning purposes. The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts.

Please let me know if I can be of any further assistance.

Sincerely,

---

TRIBUTE TO THE REVEREND JAMES D. PETERS

## HON. DIANA DeGETTE
OF COLORADO
IN THE HOUSE OF REPRESENTATIVES
*Tuesday, January 16, 2007*

Mr. DEGETTE. Madam Speaker, I rise to honor the extraordinary life and exceptional accomplishments of the Reverend James D. Peters, Pastor of New Hope Baptist Church. This remarkable gentleman merits both our recognition and esteem as his spiritual leadership, service and lifelong devotion to civil rights have done much to advance the lives of our people.

While many have made notable contributions to our community, few have left a legacy of progress as has Reverend Peters. He is a powerful champion of social justice and has led with those who fought for civil liberty and whose deeds changed the very fabric of our nation. Reverend Peters has touched countless lives and he has built a ministry that joins faith with equality. He is a dynamic pastor whose teaching and counsel is infused with a spiritual fervor that constantly edifies us and moves us to do what is right.

Reverend Peters' journey began in Washington D.C., the son of a baseball player. He grew up poor but he grew up in church. He was a gifted student and grew to recite Longfellow, Keats and Kipling. He worked full time at the Navy Annex near the Pentagon and struggled to get an education, attending night school for ten years. Reverend Peters recently noted that "I couldn't eat in restaurants, I couldn't sleep at a hotel or go to the movies. I could never go to school with white children. All the way through high school, I never sat in a classroom with white people, not until I went to college." Many of us in this country forget how far we've come. Although civil liberties have deep roots in our republic, there was a time when fundamental decency and equality for all people were not a part of our shared experience. The courage and the work of Reverend Peters during the dark days of the Civil Rights Movement helped make fairness and equal rights part of our shared values. Reverend Peters was at the founding meeting of the Southern Christian Leadership Conference and he worked directly with Dr. Martin Luther King, Jr. He faced guns and dogs during the marches and civil rights demonstrations in Albany, Georgia, in Selma and in Birmingham, Alabama. He was part of the March on Washington that led to the steps of the Lincoln Memorial where Dr. King gave his unparalleled "I Have a Dream" speech.

Reverend Peters' work ethic and his service to the Civil Rights Movement molded a life of enduring accomplishment and a vocation that included ministering to congregations in Connecticut and Virginia. He became pastor of Denver's New Hope Baptist Church in February of 1979 and during his twenty-eight year tenure, he led his congregation through construction of a new church home and the expansion of services for an ever growing congregation. As a spiritual leader, he has burnished a reputation as a powerful advocate for inclusion and expanding opportunity for all people. He served as a volunteer member of the Denver Housing Advisory Board for approximately ten years assisting the twenty-two thousand public housing residents in changing the quality and image of public housing.

He served as a member of the Colorado Civil Rights Commission for nine years, serving as its Chairman from 1987 to 1989, during which time he traveled throughout Colorado and held countless civil rights hearings to secure justice and equality for all citizens.

Reverend Peters has received service recognitions from numerous organizations including the Southern Christian Leadership Conference, Martin Luther King, Jr., the Anti-Defamation League, the Denver Post and the NAACP. He is also the recipient of the Carle Whitehead Award, the highest award given by the American Civil Liberties Union.

Reverend James Peters is an unrelenting advocate for the causes that elevate the human condition and his immeasurable contributions to the spiritual life of our community merit our gratitude. He has led in the struggle for freedom, justice and equality for all people. But Reverend Peters' leadership goes to the heart of what he means to be a leader. "Nathalia Young, a pastor at New Hope Baptist Church. . . remembers how he helped homeless people himself, not delegating it to a deacon. (He) would get into his own car, and use his own money to get someone a hotel room. And then there was a Christmas season one year, when a woman and her children were suddenly homeless. 'He didn't just get her connected with housing but also supplied her with gifts and food.'" Reverend Peters leads by example.

In a recent Denver Post article, Reverend Peters expressed "concern that young people don't understand what it was like before the Civil Rights Act and that some believe King's message is now irrelevant." At some level, I think we all share his concern. But I would submit that Reverend Peters' legacy provides a powerful example that not only affirms Dr. King's undertaking, but inspires all of us to remember the struggle and keep faith with those who have gone before.

Reverend Peters' tenure as pastor of New Hope Baptist Church is quickly drawing to a close. His leadership has been exemplary and his contributions are rich in consequence. On behalf of the citizens of the 1st Congressional District of Colorado, I wish to express our gratitude and look forward to his continued involvement in the life of our community.

Please join me in paying tribute to Reverend James D. Peters, a distinguished spiritual and civic leader. The values, leadership and commitment he exhibits set the mark and compel us to continue the work that distinguishes us as Americans.

---

OPPORTUNITY KNOCKS IN TURKMENISTAN: IS ANYONE LISTENING?

## HON. JANICE D. SCHAKOWSKY
OF ILLINOIS
IN THE HOUSE OF REPRESENTATIVES
*Tuesday, January 16, 2007*

Ms. SCHAKOWSKY. Madam Speaker, the Administration's crusade to spread democracy