**3 ATTACHMENTS**

Pursuant to the Stipulation and Protective Order
dated June 28, 2007, and subject to the terms and provisions therein,
plaintiffs respectfully refer the Court to the following Tabs of
Defendants' Classified Administrative Record:

- annuityletterredacted.pdf  -  **TAB 3**

- INSLEE_012Xxml.pdf -  **TAB 6**

- FloorStatementPlamebilljan2007final.doc – **TAB 7**

Search Results - THOMAS (Library of Congress)                    http://www.thomas.gov/cgi-bin/query/C?r110:./temp/~r110pLnM9N

## INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT -- (Extensions of Remarks - January 16, 2007)

[Page: E118]

---

SPEECH OF☐
**HON. JAY INSLEE**
OF WASHINGTON
IN THE HOUSE OF REPRESENTATIVES
TUESDAY, JANUARY 16, 2007

- Mr. INSLEE. Madam Speaker, I rise today to bring to the attention of Congress one of the human impacts caused by the indiscretion of government officials regarding the covert identity of Central Intelligence Agency operative Valerie Plame Wilson.

- As nearly every American knows, and as most of the world has heard, the covert CIA identity of Valerie Plame Wilson was exposed to the public as part of an Administration response to a critical op-ed published in the New York Times by Mrs. Plame Wilson's husband, Joe Wilson.

- The national security ramifications for this act have been discussed thoroughly on this floor, in the news media, and I am quite certain behind CIA's closed doors. Today I intend to call my colleagues' attention to the human toll that this ``outing'' has had on one, often overlooked, individual. That person is Valerie Plame Wilson.

- While the media, Congress, and the judiciary have gone to great lengths to discuss the impact of this unfortunate act on politicians, bureaucrats, agents in the field, and the suspected perpetrators of the outing, few have looked at the impact that the outing has had on Mrs. Plame Wilson and her family.

- On July 14, 2003, Mrs. Plame Wilson's professional life was forever altered, and her CIA career irrevocably ruined by the syndicated publication of a column, which revealed Mrs. Plame Wilson's identity as a covert CIA officer. Since this time, numerous reports on Mrs. Plame Wilson's personal history have surfaced

[Page: E119]

in the press, official government documents, and by government officials.

- Following the initial outing in the media, Mrs. Plame Wilson's future as a covert CIA operative ceased to exist and her career of two decades was destroyed. On January 9, 2006, Mrs. Plame Wilson resigned from the CIA, recognizing that any future with the Agency would not include any work for which she had been highly trained. For these reasons, and under these distressing conditions, Mrs. Plame Wilson voluntarily resigned from the Agency.

- Despite Mrs. Plame Wilson's 20 years of federal service, she does not meet the minimum age requirement to receive her retirement annuity. She has been left without a career.

- I am introducing legislation to allow Mrs. Plame Wilson to qualify for her annuity, as one who has served her country for two decades, and waive the age requirement for collecting it. To best demonstrate the annuity for which Mrs. Plame Wilson may qualify if this legislation were to pass, I am submitting for the record a document sent to Mrs. Plame Wilson by the CIA. It outlines her deferred annuity and testifies to 20 years of service. The document bears no indications of classified material as required by CIA procedures, and was sent via regular postal mail after Mrs. Plame Wilson was no longer in the employ of the CIA. Legal experts have assured me that this is not a classified document.

- I believe that this is one small measure to help send a message that we must stand up for public service officers, such as Mrs. Plame Wilson, who have been treated wrongly despite their loyalty and sacrifice to country. For those who have been, for all practicable purposes, pushed out of public service for reasons unrelated to performance, but instead seeded in politics, we should not turn our backs.

Central Intelligence Agency,

Washington, DC, February 10, 2006.

Mrs. **VALERIE WILSON**

**DEAR MRS. WILSON,** This letter is in response to your recent telephone conversation with regarding when you would be eligible to receive your deferred annuity. Per federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA). Your MRA is age 56, at which time you'll be eligible to receive a deferred annuity.

Your deferred annuity will be based on the regular FERS computation rate, one percent for every year of service vice the FERS Special rate of 1.7% for every year of service. You will receive 1.7% for each year of overseas service, prorated on a monthly basis, after January 1, 1987 in the calculation of your annuity. Our records show that since January 1, 1987, you have acquired 6 years, 1 month and 29 days of overseas service.

Following is a list of your federal service:

Dates of Service: CIA, CIA (LWOP), CIA Ð(P/T 40), from 11/9/1985 to 1/9/2006--total 20 years, 7 days.

Search Results - THOMAS (Library of Congress)                http://www.thomas.gov/cgi-bin/query/C?r110:./temp/~r110pLnM9N

Based on the above service and your resignation on January 9, 2006, your estimated deferred annuity is $21,541.00 per year, or $1795 per month, beginning at age 56.

The above figures are estimates for your planning purposes. The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts. Please let me know if I can be of any further assistance.

Sincerely,

-------.

*END*

THOMAS Home | Contact | Accessibility | Legal | USA.gov

will do nothing, just as previous Congresses have done nothing, Nancy Pelosi promises to "build a better future for all of America's children." If she were serious, she would back cuts in Social Security and Medicare. President Bush calls "entitlement spending" the central budget problem. If he were serious, he, too, would propose cuts in Social Security and Medicare.

They are not serious, because few Americans—particularly prospective baby-boom retirees—want them to be. There is a consensus against candor, because there is no constituency for candor. No secret that the 65-and-over population will double by 2030 (to almost 72 million, or 20 percent of the total population), but hardly anyone wants to face the implications.

By comparison, other budget issues, including the notorious earmarks, are trivial. In 2005, Social Security, Medicare and Medicaid (the main programs for the elderly) cost $1.034 trillion, twice the amount of defense spending and more than two-fifths of the total federal budget. These programs are projected to equal about three-quarters of the budget by 2030, if it remains constant as a share of national income.

Preserving present retirement benefits automatically imposes huge costs on the young—costs that are economically unsound and socially unjust. The tax increases required by 2030 could hit 50 percent, if other spending is maintained as a share of national income. Or much of the rest of government (from defense to national parks) would have to be shut down or crippled. Or budget deficits would balloon to quadruple today's level.

Social Security and Medicare benefits must be cut to keep down overall costs. Yes, some taxes will be raised and some other spending cut. But much of the adjustment should come from increasing eligibility ages (ultimately to 70) and curbing payments to wealthier retirees. Americans live longer and are healthier. They can work longer and save more for retirement.

Because I've written all this before, I can anticipate some of the furious responses from prospective retirees. First will be the "social compact" argument: We paid to support today's retirees; tomorrow's workers must pay to support us. Well, of course they will pay the question is how much. The alleged compact is entirely artificial, acknowledged only by those who benefit from it. My three children (ages 18 to 21) didn't endorse it. Judging from the e-mail I receive, neither did many 20- or 30-somethings.

Next I'll hear that the Social Security and Medicare trust funds, intended to cover future benefits, have been "plundered." Blame Congress and the White House—not us. This is pure fiction.

Social Security, Medicare and Medicaid are pay-as-you-go programs. Present taxes pay present benefits. In 2005, 85 percent of Social Security payroll taxes went to pay current retiree benefits. True, excess taxes had created a "surplus" in the Social Security trust fund (it hasn't been "plundered") of $1.66 trillion in 2005; but that equaled less than four years' worth of present benefits. More important, Medicare and Medicaid represent three-quarters of the projected spending increase for retirees by 2030.

All the misinformation bespeaks political evasion. With his rhetorical skills, Clinton might have raised public understanding. Instead, he bowed it by falsely denouncing the Republicans for attempting to "destroy" Medicare. The first refuge of good Democrats is to accuse the Republicans of conspiring against old folks by trying to dismantle Social Security and Medicare. And Bush's credibility is shot, because he made the problem worse. His Medicare drug benefit in-

creases spending, and though it could have been justified as part of a grand bargain that reduced other benefits, it's isolated enactment was a political giveaway.

The failure to communicate also implicates many pundits and think tanks, liberal and conservative. Pundits usually speak in bland generalities. They support "fiscal responsibility" and "entitlement reform" and oppose big budget deficits. Less often do they say plainly that people need to work longer and that retirees need to lose some benefits. Think tanks endlessly publish technical reports on Social Security and Medicare, but most avoid the big issues. Are present benefits justified? How big can government become before the resulting taxes or deficits harm the economy?

Opportunities for gradual change have been squandered. These public failings are also mirrored privately. I know many bright, politically engaged boomers who are common vast concern or outrage about global warming, corporate corruption, foreign policy, budget deficits and much more—but somehow, their own Social Security and Medicare benefits rarely come up for discussion or criticism. Older boomers (say, those born by 1955) are the most cynical, hoping their benefits will be grandfathered in when inevitable cuts occur in the future.

Our children will not be so blind to this hypocrisy. We have managed to take successful programs—Social Security and Medicare—and turn them into huge problems by our self-centered inattention. Baby boomers seem eager to "reinvent retirement" in all ways except those that might threaten their pocketbooks.

*[From The Dallas Morning News, June 6, 2005.]*

DEEP IN THE BUDGET HOLE—BIPARTISAN PANEL COULD HELP COUNTRY DIG OUT

When you're almost $10 trillion in the hole, you've got to call somebody, right?

Fortunately, GOP Rep. Frank Wolf has a suggestion to deliver us from the gates of budget hell. The Virginia legislator introduced legislation yesterday that would establish a bipartisan commission charged with presenting the choices required to balance the budget.

The panel would function like the commission that former Texas GOP Rep. Dick Armey launched to close down unnecessary military bases. An independent group would give Congress a budget package, which legislators would vote up or down on unless the House and Senate come up with better solutions.

President Bush proposed a version of this approach earlier this year when he called for a bipartisan commission to recommend how Washington can control runaway spending on Social Security, Medicare and other big guaranteed programs.

But Mr. Wolf understands that the budget challenges are not all about spending. They also involve taxes and how much revenue the Treasury needs to pay for the services Americans demand.

In an encouraging sign, White House economic adviser Allen Hubbard recently acknowledged that any bipartisan panel probably would look at taxes.

He wasn't saying the White House is backing off its fondness for tax cuts, but it was a Washington way of saying, "Let's look at the whole range of choices."

We encourage North Texas representatives to line up as sponsors of Mr. Wolf's legislation and help get it through the House this summer. (The delegation's chief deficit fighter, GOP Rep. Jeb Hensarling of Dallas, told us last week that he wants to look at the proposal.)

It's time Washington reaches out for help. By the numbers: $9.6 trillion: The amount of debt Congress recently authorized the Treasury to borrow (the limit was $8.4 trillion four summers ago); $3.6 trillion: The likely 2007 federal budget; $220 billion: Next year's interest expense on the federal debt; $27,000: What every man, woman and child owe Uncle Sam in the federal debt; 37.4 percent: How much of the gross domestic product the federal debt consumes.

*[From the Orlando Sentinel, June 12, 2006.]*

GET ON WITH IT

Our position: A panel on Medicare and other issues would get needed talks started.

Finally, boomers in Congress has taken up President Bush's call for a bipartisan commission on the looming financial crisis if no changes are made to Medicare, Medicaid and Social Security.

Unchecked growth in the cost of these programs in coming decades will devastate the economy by forcing some combination of huge tax increases, drastic spending cuts or massive borrowing.

This past week, Republican Rep. Frank Wolf of Virginia proposed a panel aptly named SAFE, to secure America's future economy. Its bipartisan experts would deliver a package of recommendations to Congress for an up-or-down vote.

Mr. Wolf's plan is an open to suggestions on his proposal. Members unwilling to support it have a moral obligation to come forward with something they deem better.

---

INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT

## HON. JAY INSLEE
OF WASHINGTON
IN THE HOUSE OF REPRESENTATIVES

*Tuesday, January 16, 2007*

Mr. INSLEE. Madam Speaker, I rise today to bring to the attention of Congress one of the human impacts caused by the indiscretion of government officials regarding the covert identity of Central Intelligence Agency operative Valerie Plame Wilson.

As nearly every American knows, and as most of the world has heard, the covert CIA identity of Valerie Plame Wilson was exposed to the public as part of an Administration response to a critical op-ed published in the New York Times by Mrs. Plame Wilson's husband, Joe Wilson.

The national security ramifications for this act have been discussed thoroughly on this floor, in the news media, and I am quite certain behind CIA's closed doors. Today I intend to call my colleagues' attention to the human toll that this "outing" has had on one, often overlooked, individual. That person is Valerie Plame Wilson.

While the media, Congress, and the judiciary have gone to great lengths to discuss the impact of this unfortunate act on politicians, bureaucrats, agents in the field, and the suspected perpetrators of the outing, few have looked at the impact that the outing has had on Mrs. Plame Wilson and her family.

On July 14, 2003, Mrs. Plame Wilson's professional life was forever altered, and her CIA career irrevocably ruined by the syndicated publication of a column, which revealed Mrs. Plame Wilson's identity as a covert CIA officer. Since this time, numerous reports on Mrs. Plame Wilson's personal history have surfaced

in the press, official government documents, and by government officials.

Following the initial outing in the media, Mrs. Plame Wilson's future as a covert CIA operative ceased to exist and her career of two decades was destroyed. On January 9, 2006, Mrs. Plame Wilson resigned from the CIA, recognizing that any future with the Agency would not include any work for which she had been highly trained. For these reasons, and under these distressing conditions, Mrs. Plame Wilson voluntarily resigned from the Agency.

Despite Mrs. Plame Wilson's 20 years of federal service, she does not meet the minimum age requirement to receive her retirement annuity. She has been left without a career.

I am introducing legislation to allow Mrs. Plame Wilson to qualify for her annuity, as one who has served her country for two decades, and waive the age requirement for collecting it. To best demonstrate the annuity for which Mrs. Plame Wilson may qualify if this legislation were to pass, I am submitting for the record a document sent to Mrs. Plame Wilson by the CIA. It outlines her deferred annuity and testifies to 20 years of service. The document bears no indications of classified material as required by CIA procedures, and was sent via regular postal mail after Mrs. Plame Wilson was no longer in the employ of the CIA. Legal experts have assured me that this is not a classified document.

I believe that this is one small measure to help send a message that we must stand up for public service officers, such as Mrs. Plame Wilson, who have been treated wrongly despite their loyalty and sacrifice to country. For those who have been, for all practicable purposes, pushed out of public service for reasons unrelated to performance, but instead seeded in politics, we should not turn our backs.

CENTRAL INTELLIGENCE AGENCY,
*Washington, DC, February 10, 2006.*
Mrs. VALERIE WILSON.

DEAR MRS. WILSON, This letter is in response to your recent telephone conversation with regarding when you would be eligible to receive your deferred annuity. Per federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA). Your MRA is age 56, at which time you'll be eligible to receive a deferred annuity.

Your deferred annuity will be based on the regular FERS computation rule, one percent for every year of service plus the FERS Special rate of 1.7% for every year of overseas service, prorated on a monthly basis, after January 1, 1987 in the calculation of your annuity. Our records show that since January 1, 1987, you have acquired 6 years, 1 month and 29 days of overseas service.

Following is a list of your federal service:

Dates of Service: CIA, CIA (LWOP), CIA (P/T 4D), from 1/28/1985 to 1/9/2006—total 20 years, 7 days.

Based on the above service and your resignation on January 9, 2006, your estimated deferred annuity is $21,649.00 per year, or $1795 per month, beginning at age 56.

The above figures are estimates for your planning purposes. The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts.

Please let me know if I can be of any further assistance.

Sincerely,

## TRIBUTE TO THE REVEREND JAMES D. PETERS

### HON. DIANA DeGETTE
#### OF COLORADO
#### IN THE HOUSE OF REPRESENTATIVES
#### *Tuesday, January 16, 2007*

Mr. DEGETTE. Madam Speaker, I rise to honor the extraordinary life and exceptional accomplishments of the Reverend James D. Peters, Pastor of New Hope Baptist Church. This remarkable gentleman merits both our recognition and esteem as his spiritual leadership, service and lifelong devotion to civil rights have done much to advance the lives of our people.

While many have made notable contributions to our community, few have left a legacy of progress as has Reverend Peters. He is a powerful champion of social justice and has led with those who fought for civil liberty and whose deeds changed the very fabric of our nation. Reverend Peters has touched countless lives and he has built a ministry that joins faith with equality. He is a dynamic pastor whose teaching and counsel is infused with a spiritual fervor that constantly edifies us and moves us to do what is right.

Reverend Peters' journey began in Washington D.C., the son of a baseball player. He grew up poor but he grew up in church. He was a gifted student and grew to recite Longfellow, Keats and Kipling. He worked full time at the Navy Annex near the Pentagon and struggled to get an education, attending night school for ten years. Reverend Peters recently noted that "I couldn't eat in restaurants, I couldn't sleep at a hotel or go to the movies. I could never go to school with white children. All the way through high school, I never sat in a classroom with white people, not until I went to college." Many of us in this country forget how far we've come. Although civil liberties have deep roots in our republic, there was a time when fundamental decency and equality for all people were not a part of our shared experience. The courage and the work of Reverend Peters during the dark days of the Civil Rights Movement helped make fairness and equal rights part of our shared values. Reverend Peters was at the founding meeting of the Southern Christian Leadership Conference and he worked directly with Dr. Martin Luther King, Jr. He faced guns and dogs during the marches and civil rights demonstrations in Albany, Georgia, in Selma and in Birmingham, Alabama. He was part of the March on Washington that led to the steps of the Lincoln Memorial where Dr. King gave his unparalleled "I Have a Dream" speech.

Reverend Peters' work ethic and his service to the Civil Rights Movement molded a life of enduring accomplishment and a vocation that included ministering to congregations in Connecticut and Virginia. He became pastor of Denver's New Hope Baptist Church in February of 1979 and during his twenty-eight year tenure, he led his congregation through construction of a new church home and the expansion of services for an ever growing congregation. As a spiritual leader, he has burnished a reputation as a powerful advocate for inclusion and expanding opportunity for all people. He served as a volunteer member of the Denver Housing Advisory Board for approximately ten years assisting the twenty-two thousand public housing residents in changing the quality and image of public housing.

He served as a member of the Colorado Civil Rights Commission for nine years, serving as its Chairman from 1987 to 1989, during which time he traveled throughout Colorado and held countless civil rights hearings to secure justice and equality for all citizens.

Reverend Peters has received service recognitions from numerous organizations including the Southern Christian Leadership Conference, Martin Luther King, Jr., the Anti-Defamation League, the Denver Post and the NAACP. He is also the recipient of the Carle Whitehead Award, the highest award given by the American Civil Liberties Union.

Reverend James Peters is an unrelenting advocate for the causes that elevate the human condition and his immeasurable contributions to the spiritual life of our community merit our gratitude. He has led in the struggle for freedom, justice and equality for all people. But Reverend Peters' leadership goes to the heart of what he means to be a leader. "Nathalia Young, a pastor at New Hope Baptist Church. . . remembers how he helped homeless people himself, not delegating it to a deacon. (He) would get into his own car, and use his own money to get someone a hotel room. And then there was a Christmas season one year, when a woman and her children were suddenly homeless. 'He didn't just get her connected with housing but also supplied her with gifts and food.'" Reverend Peters leads by example.

In a recent Denver Post article, Reverend Peters expressed "concern that young people don't understand what it was like before the Civil Rights Act and that some believe King's message is now irrelevant." At some level, I think we all share his concern. But I would submit that Reverend Peters' legacy provides a powerful example that not only affirms Dr. King's undertaking, but inspires all of us to remember the struggle and keep faith with those who have gone before.

In a recent profile as pastor of New Hope Baptist Church is quickly drawing to a close. His leadership has been exemplary and his contributions are rich in consequence. On behalf of the citizens of the 1st Congressional District of Colorado, I wish to express our gratitude and look forward to his continued involvement in the life of our community.

Please join me in paying tribute to Reverend James D. Peters, a distinguished spiritual and civic leader. The values, leadership and commitment he exhibits set the mark and compel us to continue the work that distinguishes us as Americans.

## OPPORTUNITY KNOCKS IN TURKMENISTAN: IS ANYONE LISTENING?

### HON. JANICE D. SCHAKOWSKY
#### OF ILLINOIS
#### IN THE HOUSE OF REPRESENTATIVES
#### *Tuesday, January 16, 2007*

Ms. SCHAKOWSKY. Madam Speaker, the Administration's crusade to spread democracy

04/17/2007 20:35 FAX 212 382 3300     WOLLMUTH MAHER DEUTSCH                    ☒001

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              1743
CONNECTION TEL                    17036133003
CONNECTION ID
ST. TIME             04/17 20:29
USAGE T              06'11
PGS. SENT            25
RESULT               OK
```

# WOLLMUTH MAHER & DEUTSCH LLP

500 FIFTH AVENUE
12TH FLOOR
NEW YORK, NEW YORK 10110

TELEPHONE: (212) 382-3300
FACSIMILE: (212) 382-0050

FAX TRANSMISSION COVER SHEET

| | | | |
|---|---|---|---|
| Date: | April 17, 2007 | | |
| To: | John Rizzo, Esq. | Fax: | 703-613-30 )3 |
| Company: | Central Intelligence Agency | Phone: | 703-613-30 )9 |
| Subject: | | | |
| From: | David B. Smallman, Esq. | Direct Dial: | |

YOU SHOULD RECEIVE 25 PAGE(S), INCLUDING THIS COVER SHEET. I  YOU
DO NOT RECEIVE ALL PAGES, PLEASE CALL (212) 382-3300

NOTE: THIS CONFIDENTIAL TRANSMISSION IS INTENDED SOLELY FOR ITS ADDRESSE S AND
THEIR AUTHORIZED DISTRIBUTEES. IF YOU HAVE RECEIVED THIS TRANSMISSION IN  RROR,
PLEASE INFORM US IMMEDIATELY BY TELEPHONE AT (212) 382-3300

Message:   Please see attached.

Letter dated April 24, 2007 from John A. Rizzo,
Esq. to David B. Smallman, Esq.

APR 25 '07  10:52AM CIA/OGC                                                    P.1



Central Intelligence Agency

Office of General Counsel

Washington, DC  20505

*25 April 2007*

|        |                                |
|--------|--------------------------------|
| _To:_      | David B. Smallman, Esq         |
|        | Wollmuth Maher & Deutsch LLP   |
| _Fax:_     | 212-382-0050                   |
| _Subject:_ | Valerie Wilson                 |
| _From:_    | John A. Rizzo                  |
|        | Acting General Counsel         |
| _Phone:_   | 703-482-1953                   |
| _Fax:_     | 703-482-1959                   |

Number of Pages (*Including Cover*)    │  8  │

# CENTRAL INTELLIGENCE AGENCY
### WASHINGTON, D.C. 20505

Office of General Counsel

24 April 2007

David B. Smallman, Esq.
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
12th Floor
New York, New York  10110

Dear Mr. Smallman:

I am responding to your letter of 17 April and also sending you a copy of the Publications Review Board's (PRB) recent letter to your client, Valerie Wilson, confirming the status of the Board's review of her manuscript.

As you know, during our 2 April conference call I reiterated the need for Ms. Wilson to return to CIA the 10 February 2006 letter mistakenly sent to her along with any copies of the letter that she retains. I appreciated that once again you gave your assurances that she intends to comply with her continuing legal obligation to protect classified information. I am also relying on your assurances during that call that Ms. Wilson is prepared to return the original letter and any copies in her possession. To that end, and pursuant to the process we agreed upon, please find enclosed a copy of the 10 February 2006 letter that reflects the proper classification markings and that has been approved for release in redacted form as a result of a declassification review. I trust that now that we have provided it to you as you requested, you will ensure Ms. Wilson fulfills her legal obligation to protect classified information and return to us promptly the original letter and any copies that she may have retained. The PRB is prepared to make arrangements to receive the letter from Ms. Wilson.

Also enclosed is a copy of the PRB Chairman's 19 April 2007 letter to Ms. Wilson confirming the status of the Board's review of her manuscript entitled, *Fair Game*. The Board has clearly summarized the current status of its review of Ms. Wilson's manuscript. It also sets forth various options for Ms. Wilson as she considers how best to move toward publication of her manuscript.

David B. Smallman, Esq.


Finally, I must say I was disappointed to learn that, notwithstanding the progress I thought we made in our conference call, Ms. Wilson subsequently decided not to make any rewrites or any changes to the chronology of significant portions of the first half of the manuscript.  Nevertheless, I continue to strongly encourage Ms. Wilson to work closely with the Board to ensure she takes the appropriate steps to protect classified information, which as a former CIA employee she has a continuing legal obligation to do.

                                        Sincerely,

                                        John A. Rizzo
                                        Acting General Counsel

Enclosures:
   1. Redacted copy of 10 February 2006 letter
   2. PRB Chairman's 19 April 2007 letter

Central Intelligence Agency



Washington, D.C. 20505

Publications Review Board
1H11 IP Building
Washington, D.C. 20505

Telephone: 703-613-3070
Facsimile:  703-613-3004
E-mail:  prb@ucia.gov

19 April 2007

Valerie E. Wilson
123 North Guadalupe St. #549
Santa Fe, New Mexico 87501

Dear Ms. Wilson:

In light of the recent telephone and e-mail conversations you have had with representatives of the Publications Review Board (PRB or Board), I wanted to take this opportunity to confirm the status of the Board's review of your manuscript entitled, *Fair Game*.

The Board had determined that certain information included within your manuscript could not be approved for publication as written because the information was (and is) currently and properly classified, the disclosure of which could reasonably be expected to cause harm to national security and, therefore, must be deleted prior to publication. Our 21 November 2006 and 23 February 2007 letters to you, and the attachment to our 23 February 2007 letter, identified the information that would have to be deleted from your manuscript in order to render your manuscript unclassified so that the Board could approve it for publication.

Our letters also advised you of the Board's availability to discuss with you how you could modify the deleted text or use it in other contexts so as to not reveal classified information, if you wished to explore those options. To this end, we met with you on 1 December 2006 and 13 December 2006 and had a telephone conference call with you on 4 April 2007. During these meetings and the conference call, we discussed your concerns regarding the classification determinations reflected in the Board's review of your manuscript and certain writing techniques (e.g., changing or obscuring the chronological timing of an event, placing text in another part of the manuscript, etc.) that you could use to rewrite some of the deleted material to render it unclassified. This letter memorializes the guidance we provided to you during our conversations that, based on the Board's review of the additional information you provided, we have withdrawn our objections to your publication of the names of individuals that appear throughout both parts of your manuscript.

In your 10 April 2007 telephone conversation with a representative of the PRB staff, you stated that you had decided that you would not rewrite or change the chronology of significant portions of the first half of your manuscript. As it appears that you no longer wish to explore the options regarding how you could modify the majority of the deleted text or use it in other contexts in the manuscript so as to not reveal classified information, please make all of the required deletions to your manuscript that we identified for you in our previous correspondence and forward the entire manuscript to us, with the copies of the modified pages clearly marked. When we confirm that you have made all of the required deletions and that all classified information has been removed from the text, we will approve your manuscript for publication and provide you with the required disclaimer language and information regarding the destruction of the non-approved versions of the manuscript. We also require a final review of the galley proofs so that we can verify that the published version is the approved version. Your responsibility as the author is to ensure that the publisher releases only the Board-approved version. Please note that the Board gives galley reviews high priority because the material has undergone a prior review.

If your plans change and you decide to add material to your manuscript or change the text the Board has approved for publication, you must submit these additions or changes to us before giving them to your publisher or anyone else. In such a case, please mark or otherwise clearly indicate the new material so we can expedite our review. Additional material that must be submitted includes, but is not limited to, photographs, photograph captions, illustrations, diagrams, tables, charts, or maps.

With limited exceptions, the classified information the PRB identified in your manuscript relates to a single issue, of which you are aware, and reflects the classification determination made by the Director of the Agency. Because the Agency has provided you with a level of administrative process that exceeds the requirements of the applicable Agency regulations, you have exhausted your administrative remedies with respect to this classification determination.

With respect to the PRB's required deletions that relate to classified information other than the main issue we have discussed, you may appeal these Board determinations within 30 days of the date of this letter. Appeals must be in writing and must be sent to the Board's Chairman. In accordance with applicable Agency regulations, the Associate Deputy Director of the Agency adjudicates appeals of PRB decisions and will issue the final Agency decision. Appeal documentation must include the material intended for publication and any supporting material you would like the Associate Deputy Director to consider.

As you know, until the Board provides you with written approval to publish your manuscript, you may not disclose your manuscript to any publisher, editor, literary agent, co-author, ghost-writer, reviewer, attorney, or any other member of the public. Disclosure of your manuscript, without the written approval of the Board, would be considered a willful and deliberate breach of your secrecy agreement that may subject you to civil and criminal penalties, to an injunction preventing the publication of any unapproved version of the book, and to the forfeiture of any and all proceeds obtained from publication of the book.

    We look forward to hearing from you in the near future regarding how you wish to proceed.  If you have any questions, please do not hesitate to contact me.

                                    Sincerely,


                                    R. Puhl
                    Chairman, Publications Review Board

SECRET//20520110

Central Intelligence Agency

Washington, D.C. 20501

February 10, 2006

APPROVED FOR RELEASE
DATE:  APR 2007

Mrs. Valerie Wilson
4612 Charleston Terrace, NW
Washington, DC 20007

Dear Mrs. Wilson,

This letter is in response to your recent telephone conversation with [          ] regarding when you would be eligible to receive your deferred annuity. Per Federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA).

SECRET//20520110

SECRET//20320110

|  | Dates of Service | Years/Months/Days |
|---|---|---|
| CIA (P/T 40) | 01/01/2002 - 12/31/2002 | 01 year,  00 months, 00 days |
| CIA (P/T 40) | 01/01/2003 - 12/31/2003 | 01 year,  00 months, 00 days |
| CIA (P/T 40) | 01/01/2004 - 08/07/2004 | 00 years, 07 months, 07 days. |
| CIA (LWOP) | 08/08/2004 - 12/31/2004 | 00 years, 04 months, 23 days (no excess) |
| CIA | 01/01/2005 - 01/09/2006 | 01 years, 00 months, 09 days |

The above figures are estimates for your planning purposes.  The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts.  Please let me know if I can be of any further assistance.

Sincerely,

Chief, Retirement & Insurance Services

SECRET//20320110

**Letter dated January 31, 2007 from David B. Smallman, Esq. to Ginger A. Wright, Esq.**

FRANKFURT KURNIT KLEIN & SELZ PC

488 Madison Avenue
New York, New York 10022
Telephone: (212) 980-0120
Facsimile: (212) 593-9175

David B. Smallman
Direct dial: (212) 826-5580
e-mail: dsmallman@fkks.com

January 31, 2007

VIA FAX
(703) 613-3003

Ginger A. Wright, Esq.
Assistant General Counsel
Office of General Counsel
Central Intelligence Agency
Washington, D.C. 20505

Dear Ms. Wright:

I am writing in response to a fax received from you on January 22, 2007 forwarding a copy of a letter dated January 19, 2007 from Karen E. Tumolo, Chief, Retirement & Insurance Services, Central Intelligence Agency, to Valerie Wilson ("January 19, 2007 Letter") (copy attached). I am also following up on our recent telephone communications regarding the scheduling of a second meeting with the Agency to discuss resolving unwarranted delays now approaching *six months* in the review process for Ms. Wilson's memoir. In connection with this response, my letter references the Introduction of "the Valerie Plame Wilson Compensation Act," H.R. 501, ("VPW Compensation Act Introduction"), the text of H.R. 501 ("H.R. 501"), and a previously authorized, unclassified February 10, 2006 letter to Mrs. Valerie Wilson from Central Intelligence Agency as published in the Congressional Record on January 16, 2007 ("Published February 10, 2006 Letter").[1]

---

[1] Copies of the VPW Compensation Act Introduction, H.R. 501, and the Published February 10, 2006 Letter—published by Congress prior to the January 19, 2007 request from the Agency requesting return of the February 10, 2006 letter due to a purported "administrative error"—are attached hereto in the specific form currently available from the Library of Congress THOMAS website. *See* http://thomas.loc.gov/cgi-bin/query/D?c110:1:./temp/~c110pp1mK5. While more complete information may be obtainable directly from Congress, the genesis of this legislation apparently dates back to November 2005. The Agency letter officially acknowledging and disclosing in unclassified form Ms. Wilson's dates of federal service was published in the extension of remarks regarding the proposed legislation for the apparent purpose of demonstrating that Ms. Wilson had satisfied the duration of government service required and showing the accrual date upon which an accelerated government annuity

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 2 of 7

The Published February 10, 2006 Letter from CIA, which was an authorized and unclassified communication delivered by regular mail, officially acknowledged and disclosed information regarding Ms. Wilson's eligibility to receive a deferred annuity under the Federal Employees Retirement System (FERS) Special Category at the conclusion of her government service in January 2006. The following unclassified information was included in that authorized letter from the Agency: (1) Valerie Wilson (a/k/a Valerie Plame) commenced her service with CIA on "11/9/1985"; (2) dates of Ms. Wilson's CIA service were from "11/9/1985 to 1/9/2006—total 20 years, 7 days"; (3). Ms. Wilson "acquired 6 years, 1 month and 29 days of overseas service" with CIA. (Published February 10, 2006 Letter, available at http://thomas.loc.gov/cgi-bin/query/D?e110:1:./temp/~c110ppInK5::)

As more fully set forth in my letter to you dated January 9, 2007 ("January 9, 2007 Letter") (copy-attached), senior management at the Agency, including its Director, have ostensibly sought to preclude Ms. Wilson from referring to her pre-2002 federal government employment affiliation through application of a so-called "bright-line" determination, not to roll back her "cover" prior to 2002, even though Ms. Wilson's Agency affiliation has, since 2003, been a matter of indisputable public record. As a result, the Agency has refused to date to approve for publication the first 125 pages of Ms. Wilson's memoir primarily because it acknowledges – as the entire world knows – otherwise non-confidential aspects of her employment affiliation for approximately the last two decades.

However, for a period of almost a year, an unclassified letter to Ms. Wilson from the Agency already officially disclosed the inception and duration of Ms. Wilson's specific federal employment affiliation. And although the Agency had actual knowledge of the existence of its own officially acknowledged disclosure[2] from at least February 10,

would be conditioned. Congress redacted the name of the Agency employee who sent the letter and also redacted the year-by-year summary information regarding Ms. Wilson's overseas service.

[2] Numerous courts have held that to be "officially acknowledged" by an agency, information must meet three criteria: (1) the information at issue must be as specific as the information previously released; (2) the information to be disclosed must be as specific as the information previously released; (3) the information for which publication approval is sought must already have been made public through an official and documented disclosure. *See, e.g., Fitzgibbon v. CIA,* 911 F.2d 255, 765 (D.C. Cir. 1990); *Wolf v. CIA,* Nos. 05-5394, 06-5072, 2007 WL 92693 *5-8 (D.C. Cir. Jan. 16, 2007) (reversing district court and remanding issue of waiver based upon "official acknowledgment" criteria); *see also Rubin v. CIA,* No. 01 Civ. 2274, 2001 WL 1537706 *4 (S.D.N.Y. Dec. 3, 2001) (citing *Afshar*). It is indisputable under the circumstances presented by the pending Agency review of Ms. Wilson's memoir that the Published February 10, 2006 Letter satisfies each of these criteria and constitutes an official documented disclosure of substantially the same information – indeed the precise information – regarding Ms. Wilson's CIA

FRANKFURT KURNIT KLEIN & SELZ PC

2006 to January 19, 2007, it took no steps whatsoever to reclassify information in the February 10, 2006 letter, to indicate any national security classification of the contents of the letter through proper marking and redelivery of the letter, to retrieve the original letter, or to restrict in any way dissemination of the letter or any information contained therein. To the contrary, for approximately a full year, none of the measures set forth in Executive Order 12958, as amended by Executive Order No. 13292, 68 Fed. Reg. 15315 ("E.O. 12958") applicable to the handling of "Classified National Security Information" were undertaken by the Agency with respect to information about Ms. Wilson's federal service contained in the February 10, 2006 letter. Given the controversy surrounding the outing of Ms. Wilson as an Agency employee in 2003 and her resulting notoriety, and given the Agency's presumed expertise in the handling of national security information, it strains credulity for the Agency to assert at this late date that its official disclosure in February 2006 of Ms. Wilson's dates of "creditable federal service" with the CIA "from 11/9/1985 to 1/9/2006" can be ascribed to "administrative error." *See* Published February 10, 2006 Letter; *cf.* January 19, 2007 Letter.

The official acknowledgement and disclosure by the Agency of Ms. Wilson's employment affiliation with CIA in an unclassified letter delivered after her resignation from the Agency in January 2006, together with the publication and broad public dissemination of that specific official Agency disclosure by Congress in the Congressional Record prior to any communication from the Agency that the information was somehow restricted "National Security Information," provides strong legal support for the position that Ms. Wilson's employment affiliation with the Agency has now irretrievably entered the public domain. U.S. Supreme Court precedent and related authority indicates that this would be true even if prior to that time the identical information had not been officially disclosed by the Agency itself, insofar as an official acknowledgment by CIA of the specific information occurred during February 2006 and became public, through Congress, in early 2007.[3] Accordingly, there appears to be no

affiliation that the Agency has inconsistently, inexplicably, and mistakenly asserted should not be disclosed in her memoir.

[3] *See Snepp v. United States*, 444 U.S. 507, 511 (1980) ("Government does not deny – as a general principle – [former CIA employee's] right to publish unclassified information."); *id.* 444 U.S. at 521 n.11 (Stevens, J., dissenting) ("It is noteworthy that the Court does not disagree with the Fourth Circuit's view in *Marchetti*, reiterated in *Snepp*, that a CIA employee has a First Amendment right to publish unclassified information.") (citing *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972) ("by accepting employment with the CIA and by signing a secrecy agreement [CIA employee] does not surrender [her] First amendment right of free speech"); *cert. denied*, 409 U.S. 1063. In *Marchetti*, the court expressly stated that it "would decline enforcement of the secrecy oath signed when [Marchetti] left the employment of the CIA to the extent that it purports to prevent disclosure of unclassified information; for, to that extent, the oath would in contravention of his First Amendment rights." 466 F.2d at 1316. The court further

# FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 4 of 7

legal support for the continued assertion of a "bright-line" rule precluding Ms. Wilson from referencing her employment affiliation with the Agency in her memoir. Nor does there appear to be any reasonable basis for further delay by the Agency in completing immediately its review of Ms. Wilson's manuscript, which she submitted for approval *nearly six months ago*, and rescinding any further general objections to its publication. If there are other parts of the Executive Branch, including, for example, the Office of Vice-President of the United States, that are in any way involved in the publication review process by the Agency for Ms. Wilson's manuscript and thereby seeking to censor or otherwise restrain publication of her memoir in possible violation of the Constitution and the laws of the United States, *see, e.g.,* Intelligence Reform and Terrorism Prevention Act of 2004, § 1011, 50 U.S.C. § 403-1(f)(4), please let us know so that we take up this issue

---

observed that "Marchetti retains the right to speak and write about the CIA . . . but he may not disclose *classified information* obtained by him during the course of his employment *which is not already in the public domain.*" *Id.* (emphasis added.) *See also Hudson River Sloop Clearwater, Inc. v. Department of the Navy*, 891 F.2d 414, 421 (2d Cir. 1989) (government may not invoke exemptions under FOIA, pertaining to properly classified information to prevent public disclosure "when the government has *officially* disclosed the *specific* information being sought" and "the information sought has previously been made public through official disclosures") (citing *Afshar v. Department of State*, 702 F.2d 1125, 1130-33 (D.C. Cir. 1983) (plaintiff bears burden of showing specific information in the public domain that duplicates the information withheld); *Fitzgibbon v. Central Intelligence Agency*, 578 F. Supp. 704, 715 (D.D.C. 1983) (plaintiff must show that information is as specific as that which is being sought, relates to the same time period, and has been the result of an official disclosure); *National Lawyers Guild v. Attorney General*, 96 F.R.D. 390, 402 (S.D.N.Y. 1982) (prior disclosure of similar, as opposed to specific, information to that being sought does not waive the state secrets privilege). *Cf. American Civil Liberties Union v. Department of Defense*, 389 F.Supp.2d 547, 564-65 (S.D.N.Y. 2005) (referring to public disclosures and observing that position of government agency raises concern that purpose of response "is less to protect intelligence activities, sources or methods than to conceal possible "violations of law", . . . "inefficiency" or "embarrassment" of the CIA"). *Compare* 50 U.S.C.A. § 403-3(c)(7) (West 2003) (protecting intelligence sources and methods), *and* E.O. 12958 § 1.4 (same; permissible subjects of classification), *with* E.O. 12958 § 1.7 (criteria that forbid classification, including "administrative error"). With respect to Ms. Wilson's government employment affiliation, that information, having been disclosed by the Agency in an unclassified letter, clearly falls within the public domain exception set forth in *Marchetti* and followed in *Snepp*. The CIA's indisputable official disclosure of specific information about Ms. Wilson's government service dates is clearly no longer "under the control of the United States." E.O. 12958, § 1.1(2), (4). Nor did the Agency, as the original classification authority, identify, mark, or describe any aspect of that disclosure that "reasonably could be expected to result in damage to national security" in 2006. E.O. § 1.6 (5)(c). The Published February 10, 2006 Letter was therefore not classified information at the time of its official disclosure in February 2006; and the Agency is expressly prohibited from reclassifying the information merely due to purported "administrative error." *Id.*, §1.7(a)(1). Moreover, reclassification can only occur if "the information may be reasonably recovered," *id,* § 1.7(4)(c)(2); and that cannot occur here because the specific information has been published in the Congressional Record and made available worldwide on the internet via the Library of Congress THOMAS website. *Cf. Students Against Genocide v. Department of State*, 257 F.3d 828, 836 (D.C. Cir. 2001) ("For the public domain doctrine to apply, the specific information sought must have already been "disclosed and preserved in a permanent public record.") (quoting *Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999)).

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 5 of 7

with them directly or refer that conduct for investigation by an appropriate government authority.

Notwithstanding the Agency's official disclosure of Ms. Wilson's government service record on February 10, 2006 and the publication of that official disclosure by Congress in the Congressional Record, (See http://thomas.loc.gov/cgi-bin/query/D?c110:1:./temp/~c110ppJmK5:), the Agency's January 19, 2007 Letter requests that Ms. Wilson "contact [Karen F. Tumolo, Chief, Retirement & Insurance Services] . . . to make arrangements to return the [February 10, 2006] letter." As an initial matter, please be assured that Ms. Wilson and her counsel intend to comply fully with all applicable obligations regarding "Classified National Security Information" pursuant to E.O. 12958, and any other applicable law, and, while fully reserving her rights and without prejudice to or otherwise waiving any rights she may have, Ms. Wilson will provide a copy of the February 10, 2006 letter to Ms. Tumolo. In order to comply with any such obligations, to respond appropriately to the January 19, 2007 Letter, and to preserve all applicable rights of the parties in interest to this matter, certain additional information is need to ensure appropriate compliance with the law.[4]

First, while the January 19, 2007 Letter asserts that "[t]he absence of a national security classification marking [on the February 10, 2006 letter] was an administrative error and information contained therein remains classified," this argument appears to be inconsistent with and contradicted on its face by the Published February 10, 2006 Letter. E.O. 12958, § 1.6(a) requires that

> [a]t the time of original classification the following *shall appear on the face of each classified document*, or shall be applied to other classified media in an appropriate manner:
>
> > (1) one of the three classification levels defined in section 1.2 [of E.O. 12958];
> >
> > (2) the identity, by name or personal identifier and position, of the original classification authority;
> >
> > (3) the agency and office of origin, if not otherwise evident;
> >
> > (4) declassification instructions, as prescribed in section 1.5(a) or section 1.5(e);

---

[4] Please note that any requests by the Agency regarding the Published February 10, 2006 Letter must also be directed to Congress as Ms. Wilson obviously cannot respond on behalf of the Legislative Branch of the United States Government and also cannot reasonably be requested to recover information publicly released by Congress. *See* E.O. 12958, § 1.7(4)(2).

# FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 6 of 7

> (A) the date or event for declassification, as prescribed in section 1.5(a) or section 1.5(c);
>
> (B) the date that is 10 years from the date of original classification, as prescribed in section 1.5(b); or
>
> (C) the date that is up to 25 years from the date of original classification, as prescribed in section 1.5(b); and
>
> (5) a concise reason for classification that, at a minimum, cites the applicable classification categories in section 1.4 of this order.

(emphasis added.) Despite this mandatory requirement for original classification, the Published February 10, 2006 Letter contains no such identification and markings. Moreover, E.O. 12958 § (5)(c), states, in relevant part, that "[w]ith respect to each classified document, the agency originating the document *shall,* by marking or other means, indicate which portions are classified, with the applicable classification level, and which portions are unclassified." (emphasis added.) Here again, the Published February 10, 2006 Letter does not contain the mandatory information required at the time of original classification or any indicia of an intent to undertake such classification. This would appear to demonstrate, conclusively, that the information contained in the February 10, 2006 letter contains no currently classified information and that the standards applicable to original classification of that information as of February 2006 were not and could not be met. Accordingly, if the Agency's position differs, please send to me as soon as possible a revised and remarked version of the February 10, 2006 letter[5] that complies in good faith with any applicable provisions of E.O. 12958 § 1.6.

Second, to the extent that the Agency is now seeking to reclassify the Published February 10, 2006 Letter or any portion thereof, the Agency is required to comply with E.O. 12958 § 1.7. Accordingly, please provide to me at your earliest convenience the Agency's legal basis for seeking reclassification of the Published February 10, 2006 Letter and confirmation that all required actions have been undertaken by the Agency in connection with seeking reclassification, including, but not limited to, that the reclassification action "is taken under the personal authority of the Agency head or Deputy Agency head," and that the Agency head or Deputy Agency head has determined "in writing that the reclassification of the information is necessary in the interest of national security." E.O. 12958, § 1.7(c)(1). *Cf. Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362, 1367 (4th Cir. 1975) (setting forth *de novo* standard of review for classification decision; "the deletion items should be suppressed only if they are found to be both classified and classifiable under the Executive Order"), *cert. denied,* 421 U.S. 992.

---

[5] Because the Agency is in possession of a copy of the original February 10, 2006 letter and the Published February 10, 2006 Letter, there would appear to be no reasonable basis for delay in providing a revised version of the letter that reflects the Agency's actual determinations pursuant to E.O. § 1.6.

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
January 31, 2007
Page 7 of 7

Third, I requested in my January 9, 2007 Letter that we schedule a second meeting with the Agency's acting General Counsel to discuss the issues raised in that letter. In our telephone communications, you stated the Agency would be interested in scheduling such a meeting and suggested that my partner, Lisa Davis, and I travel to the Agency's headquarters. While we appreciate the invitation to visit the Agency's headquarters for a second time, Ms. Davis and I do not have the requisite security clearance to discuss any applicable classified national security information, nor is it our understanding that any such classified national security information would be discussed at our meeting. Accordingly, because of the stringent security requirements necessary to gain access to the Agency's headquarters, and because the editing of Ms. Wilson's book is taking place in New York, I would propose that our meeting occur at my firm's office in New York or, alternately, at another convenient New York location, for example, the office of Ms. Wilson's publisher, Simon & Schuster, if they are amenable. Please let me know at your earliest convenience whether it will be possible for you and Mr. Rizzo to meet with us in New York and, if so, when it would be possible to schedule that meeting.

In closing, I again reiterate that Ms. Wilson has endeavored to reach a reasonable resolution with the Agency of any possible national security issues arising from her memoir and, in doing so, to balance fairly all of the equitable and legal issues at stake. Ms. Wilson is not seeking *carte blanche* to discuss her entire government service or to reveal any classified information. Rather, because of newsworthy events concerning her government service, a fundamental public interest "lies in a proper accommodation that will preserve the intelligence mission of the Agency while not abridging the free flow of unclassified information." *Snepp v. United States*, 444 U.S. 507, 520 (1980) (Stevens, J., dissenting). In that regard, Ms. Wilson has a First Amendment right to publish unclassified information about her life and a corresponding interest in ensuring that the Agency's pre-publication review process is reasonably structured to prevent publication only of *properly* classified material.

I will look forward to hearing back from you at your earliest convenience regarding the matters addressed herein.

Sincerely,

David B. Smallman /MB

David B. Smallman

Attachments

# FAX COVER SHEET

**Number of Pages**
**(including cover):**       2

**To:**                 **David Smallman**
**Telephone:**          (212) 826-5580
**Fax Number:**         (212) 593-9175

**From:**               **Ginger A. Wright**
**Telephone:**          (703) 613-3029
**Fax Number:**         (703) 613-3003

**Date:**               22 January 2007

**Subject:**            19 January 2007 Letter to Valerie Wilson

David,  I just received a copy of this today.  I had called you earlier to
give you a heads-up about this but since we were not able to touch
base, I wanted to get this to you sooner rather than later.  Please call
me at your earliest convenience.  Thanks, Ginger



Central Intelligence Agency

Washington D.C. 20505

19 January 2007

Mrs. Valerie Wilson
4612 Charleston Terrace, NW
Washington, D.C.  20007

Dear Mrs. Wilson:

I am writing with regard to CIA's February 10, 2006 letter to you concerning your creditable federal service and deferred annuity.  The letter was not properly marked to indicate its national security classification.  The absence of a national security classification marking was an administrative error and information contained therein remains classified.  Please return the letter and any copies in your possession to me as soon as possible so that it may be properly marked and secured.  Please contact me at (703) 613-8624 to make arrangements to return the letter.

Sincerely,

Karen F. Tumolo
Chief, Retirement & Insurance Services

The Library of Congress > THOMAS Home > Bills, Resolutions > Search Results

## NEW SEARCH | HOME | HELP

**H.R.501**
**Title:** For the relief of Valerie Plame Wilson.
**Sponsor:** Rep Inslee, Jay [WA-1] (introduced 1/16/2007)     Cosponsors (None) Private bill
**Latest Major Action:** 1/16/2007 Referred to House committee. Status: Referred to the House Committee on Intelligence (Permanent Select).

Jump to: Summary, Major Actions, All Actions, Titles, Cosponsors, Committees, Related Bill Details, Amendments

**SUMMARY AS OF:**
1/16/2007--Introduced.

Valerie Plame Wilson Compensation Act - Provides for the relief of Valerie Plame Wilson.

**MAJOR ACTIONS:**

***NONE***

**ALL ACTIONS:**

1/16/2007:
    Introductory remarks on measure. (CR E118-119)
1/16/2007:
    Referred to the House Committee on Intelligence (Permanent Select).

**TITLE(S):**  (italics indicate a title for a portion of a bill)

***NONE***

**COSPONSOR(S):**

***NONE***

**COMMITTEE(S):**

| Committee/Subcommittee: | Activity: |
| --- | --- |
| House Intelligence (Permanent Select) | Referral |

**RELATED BILL DETAILS:**

    ***NONE***

**AMENDMENT(S):**

***NONE***

THOMAS Home | Contact | Accessibility | Legal | FirstGov

The Library of Congress > THOMAS Home > Congressional Record > Search Results

| THIS SEARCH | THIS DOCUMENT | THIS CR ISSUE | GO TO |
|---|---|---|---|
| Next Hit | Forward | Next Document | New CR Search |
| Prev Hit | Back | Prev Document | HomePage |
| Hit List | Best Sections | Daily Digest | Help |
|  | Contents Display |  |  |

# Page E119

1 . INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT -- (Extensions of Remarks - January 16, 2007)
2 . TRIBUTE TO THE REVEREND JAMES D. PETERS -- (Extensions of Remarks - January 16, 2007)
3 . OPPORTUNITY KNOCKS IN TURKMENISTAN: IS ANYONE LISTENING? -- (Extensions of Remarks - January 16, 2007)

THOMAS Home | Contact | Accessibility | Legal | FirstGov

The Library of Congress > THOMAS Home > Congressional Record > Search Results

| THIS SEARCH | THIS DOCUMENT | THIS CR ISSUE | GO TO |
|---|---|---|---|
| Next Hit | Forward | Next Document | New CR Search |
| Prev Hit | Back | Prev Document | HomePage |
| Hit List | Best Sections | Daily Digest | Help |
| | Contents Display | | |

| Congressional Record article 1 of 3 | Printer Friendly Display - 5,504 bytes.[Help] |
|---|---|

## INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT -- (Extensions of Remarks - January 16, 2007)

[Page: E118]  GPO's PDF

SPEECH OF
**HON. JAY INSLEE**
OF WASHINGTON
IN THE HOUSE OF REPRESENTATIVES
TUESDAY, JANUARY 16, 2007

- Mr. INSLEE. Madam Speaker, I rise today to bring to the attention of Congress one of the human impacts caused by the indiscretion of government officials regarding the covert identity of Central Intelligence Agency operative Valerie Plame Wilson.

- As nearly every American knows, and as most of the world has heard, the covert CIA identity of Valerie Plame Wilson was exposed to the public as part of an Administration response to a critical op-ed published in the New York Times by Mrs. Plame Wilson's husband, Joe Wilson.

- The national security ramifications for this act have been discussed thoroughly on this floor, in the news media, and I am quite certain behind CIA's closed doors. Today I intend to call my colleagues' attention to the human toll that this "outing" has had on one, often overlooked, individual. That person is Valerie Plame Wilson.

- While the media, Congress, and the judiciary have gone to great lengths to discuss the impact of this unfortunate act on politicians, bureaucrats, agents in the field, and the suspected perpetrators of the outing, few have looked at the impact that the outing has had on Mrs. Plame Wilson and her family.

- On July 14, 2003, Mrs. Plame Wilson's professional life was forever altered, and her CIA career irrevocably ruined by the syndicated publication of a column, which revealed Mrs. Plame Wilson's identity as a covert CIA officer. Since this time, numerous reports on Mrs. Plame Wilson's personal history have surfaced

[Page: E119]  GPO's PDF

in the press, official government documents, and by government officials.

* Following the initial outing in the media, Mrs. Plame Wilson's future as a covert CIA operative ceased to exist and her career of two decades was destroyed. On January 9, 2006, Mrs. Plame Wilson resigned from the CIA, recognizing that any future with the Agency would not include any work for which she had been highly trained. For these reasons, and under these distressing conditions, Mrs. Plame Wilson voluntarily resigned from the Agency.

* Despite Mrs. Plame Wilson's 20 years of federal service, she does not meet the minimum age requirement to receive her retirement annuity. She has been left without a career.

* I am introducing legislation to allow Mrs. Plame Wilson to qualify for her annuity, as one who has served her country for two decades, and waive the age requirement for collecting it. To best demonstrate the annuity for which Mrs. Plame Wilson may qualify if this legislation were to pass, I am submitting for the record a document sent to Mrs. Plame Wilson by the CIA. It outlines her deferred annuity and testifies to 20 years of service. The document bears no indications of classified material as required by CIA procedures, and was sent via regular postal mail after Mrs. Plame Wilson was no longer in the employ of the CIA. Legal experts have assured me that this is not a classified document.

* I believe that this is one small measure to help send a message that we must stand up for public service officers, such as Mrs. Plame Wilson, who have been treated wrongly despite their loyalty and sacrifice to country. For those who have been, for all practicable purposes, pushed out of public service for reasons unrelated to performance, but instead seeded in politics, we should not turn our backs.

Central Intelligence Agency,

Washington, DC, February 10, 2006.

**Mrs. VALERIE WILSON**

**DEAR MRS. WILSON,** This letter is in response to your recent telephone conversation with, regarding when you would be eligible to receive your deferred annuity. Per federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA). Your MRA is age 56, at which time you'll be eligible to receive a deferred annuity.

Your deferred annuity will be based on the regular FERS computation rate, one percent for every year of service vice the FERS Special rate of 1.7% for every year of service. You will receive 1.7% for each year of overseas service, prorated on a monthly basis, after January 1, 1987 in the calculation of your annuity. Our records show that since January 1, 1987, you have acquired 6 years, 1 month and 29 days

of overseas service.

Following is a list of your federal service:

Dates of Service: CIA, CIA (LWOP), CIA D(P/T 40), from 11/9/1985 to 1/9/2006--total 20 years, 7 days.

Based on the above service and your resignation on January 9, 2006, your estimated deferred annuity is $21,541.00 per year, or $1795 per month, beginning at age 56.

The above figures are estimates for your planning purposes. The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts. Please let me know if I can be of any further assistance.

Sincerely,

------

---

| _THIS SEARCH_ | _THIS DOCUMENT_ | _THIS CR ISSUE_ | _GO TO_ |
| --- | --- | --- | --- |
| Next Hit | Forward | Next Document | New CR Search |
| Prev Hit | Back | Prev Document | HomePage |
| Hit List | Best Sections | Daily Digest | Help |
| | Contents Display | | |

---

THOMAS Home | Contact | Accessibility | Legal | FirstGov

will do nothing, just as previous Congresses have done nothing. Nancy Pelosi promises to "build a better future for all of America's children." If she were serious, she would back cuts in Social Security and Medicare. President Bush calls "entitlement spending" the central budget problem. If he were serious, he, too, would propose cuts in Social Security and Medicare.

They are not serious, because few Americans—particularly prospective baby-boom retirees—want them to be. There is a consensus against candor, because there is no constituency for candor. It's no secret that the 65-and-over population will double by 2030 (to almost 72 million, or 20 percent of the total population), but hardly anyone wants to face the implications:

By comparison, other budget issues, including the notorious earmarks, are trivial. In 2005, Social Security, Medicare and Medicaid (the main programs for the elderly) cost $1.034 trillion, twice the amount of defense spending and more than two-fifths of the total federal budget. These programs are projected to equal about three-quarters of the budget by 2030, if it remains constant as a share of national income.

Preserving present retirement benefits automatically imposes huge costs on the young—costs that are economically unsound and socially unjust. The tax increases required by 2030 could hit 50 percent, if other spending is maintained as a share of national income. Or much of the rest of government (from defense to national parks) would have to be shut down or crippled. Or budget deficits would balloon to quadruple today's level.

Social Security and Medicare benefits must be cut to keep down overall costs. Yes, some taxes will be raised and some other spending cut. But much of the adjustment should come from increasing eligibility ages (ultimately to 70) and curbing payments to wealthier retirees. Americans live longer and are healthier. They can work longer and save more for retirement.

Because I've written all this before, I can anticipate some of the furious responses from prospective retirees. First will be the "social compact" argument: We paid to support today's retirees; tomorrow's workers must pay to support us. Well, of course they will pay; the question is how much. The alleged compact is entirely artificial, acknowledged only by those who benefit from it. My three children (ages 16 to 21) didn't endorse it. Judging from the e-mail I receive, neither did many 20- or 30-somethings.

Next I'll hear that the Social Security and Medicare trust funds, intended to cover future benefits, have been "plundered." Blame Congress and the White House—not us. This is pure fiction.

Social Security, Medicare and Medicaid are pay-as-you-go programs. Present taxes pay present benefits. True, excess taxes had created a "surplus" in the Social Security trust fund (it hasn't been "plundered") of $1.66 trillion in 2005; but that equaled less than four years' worth of present benefits. More important, Medicare and Medicaid represent three-quarters of the projected spending increase for retirees by 2030.

All the misinformation bespeaks political evasion. With his rhetorical skills, Clinton might have raised public understanding. Instead, he lowered it by falsely denouncing the Republicans for attempting to "destroy" Medicare. The first refuge of good Democrats is to accuse the Republicans of conspiring against old folks by trying to dismantle Social Security and Medicare. And Bush's credibility is shot, because he made the problem worse. His Medicare drug benefit in-

creases spending, and though it could have been justified as part of a grand bargain that reduced other benefits, its isolated enactment was a political giveaway.

The failure to communicate also implicates many pundits and think tanks, liberal and conservative. Pundits usually speak in bland generalities. They support "fiscal responsibility" and "entitlement reform" and oppose big budget deficits. Less often do they say plainly that people need to work longer and that retirees need to lose some benefits. Think tanks endlessly publish technical reports on Social Security and Medicare, but most avoid the big issues. Are present benefits justified? How big can government become before the resulting taxes or deficits harm the economy?

Opportunities for gradual change have been squandered. These public failings are also mirrored privately. I know many bright, politically engaged boomers who can surmount vast concern or outrage about global warming, corporate corruption, foreign policy, budget deficits and much more—but somehow, their own Social Security and Medicare benefits rarely come up for discussion or criticism. Older boomers (say, those born by 1955) are the most cynical, hoping their benefits will be grandfathered in when inevitable cuts occur in the future.

Our children will not be so blind to this hypocrisy. We have managed to take successful programs—Social Security and Medicare—and turn them into huge problems by our self-centered inattention. Baby boomers seem eager to "reinvent retirement" in all ways except those that might threaten their pocketbooks.

[From The Dallas Morning News, June 8, 2006]

DEEP IN THE BUDGET HOLE—BIPARTISAN PANEL COULD HELP COUNTRY DIG OUT

When you're almost $10 trillion in the hole, you've got to call somebody, right?

Fortunately, GOP Rep. Frank Wolf has a suggestion to deliver us from the gates of budget hell. The Virginia legislator introduced legislation yesterday that would establish a bipartisan commission charged with presenting the choices required to balance the budget.

The panel would function like the commission that former Texas GOP Rep. Dick Armey launched to close down unnecessary military bases. An independent group would give Congress a budget package, which legislators would vote up or down on unless the House and Senate come up with better solutions.

President Bush proposed a version of this approach earlier this year when he called for a bipartisan commission to recommend how Washington can control runaway spending on Social Security, Medicare and other big guaranteed programs.

But Mr. Wolf understands that the budget challenges are not all about spending. They also involve taxes and how much revenue the Treasury needs to pay for the services Americans demand.

In an encouraging sign, White House economic adviser Allen Hubbard recently acknowledged that any bipartisan panel probably would look at taxes.

He wasn't saying the White House is backing off its fondness for tax cuts, but it was a Washington way of saying, "Let's look at the whole range of choices."

We encourage North Texas representatives to line up as sponsors of Mr. Wolf's legislation and help get it through the House this summer. (The delegation's chief deficit fighter, GOP Rep. Jeb Hensarling of Dallas, told us last week that he wants to look at the proposal.)

It's time Washington reaches out for help. By the numbers: $3.6 trillion: The amount of debt Congress recently authorized the Treasury to borrow (the limit was $5.4 trillion four summers ago); $2.8 trillion: The likely 2007 federal budget; $399 billion: Next year's interest expense on the federal debt; $27,000: What every man, woman and child would owe to eliminate the federal debt; 37.4 percent: How much of the gross domestic product the federal debt consumes.

[From the Orlando Sentinel, June 12, 2006]

GET ON WITH IT

Our position: A panel on Medicare and other issues would get needed talks started.

Finally, someone in Congress has taken up President Bush's call for a bipartisan commission on the looming financial crisis if no changes are made to Medicare, Medicaid and Social Security.

Unchecked growth in the cost of these programs in coming decades will devastate the economy by forcing some combination of huge tax increases, drastic spending cuts or massive borrowing.

This past week, Republican Rep. Frank Wolf of Virginia proposed a panel aptly named SAFE, to secure America's future economy. Its bipartisan experts would deliver a package of recommendations to Congress for an up-or-down vote.

Mr. Wolf says he is open to suggestions on his proposal. Members unwilling to support it have a moral obligation to come forward with something they deem better.

## INTRODUCTION OF THE VALERIE PLAME WILSON COMPENSATION ACT

## HON. JAY INSLEE

OF WASHINGTON

IN THE HOUSE OF REPRESENTATIVES

Tuesday, January 16, 2007

Mr. INSLEE. Madam Speaker, I rise today to bring to the attention of Congress one of the human impacts caused by the indiscretion of government officials regarding the covert identity of Central Intelligence Agency operative Valerie Plame Wilson.

As nearly every American knows, and as most of the world has heard, the covert CIA identity of Valerie Plame Wilson was exposed to the public as part of an Administration response to a critical op-ed published in the New York Times by Mrs. Plame Wilson's husband, Joe Wilson.

The national security ramifications for this act have been discussed thoroughly on this floor, in the news media, and I am quite certain behind CIA's closed doors. Today I intend to call my colleagues' attention to the human toll that this "outing" has had on one, often overlooked, individual. That person is Valerie Plame Wilson.

While the media, Congress, and the judiciary have gone to great lengths to discuss the impact of this unfortunate act on politicians, bureaucrats, agents in the field, and the suspected perpetrators of the outing, few have looked at the impact that the outing has had on Mrs. Plame Wilson and her family.

On July 14, 2003, Mrs. Plame Wilson's professional life was forever altered, and her CIA career irrevocably ruined by the syndicated publication of a column, which revealed Mrs. Plame Wilson's identity as a covert CIA officer. Since this time, numerous reports on Mrs. Plame Wilson's personal history have surfaced

in the press, official government documents, and by government officials.

Following the initial outing in the media, Mrs. Plame Wilson's future as a covert CIA operative ceased to exist and her career of two decades was destroyed. On January 9, 2006, Mrs. Plame Wilson resigned from the CIA, recognizing that any future with the Agency would not include any work for which she had been highly trained. For these reasons, and under these distressing conditions, Mrs. Plame Wilson voluntarily resigned from the Agency.

Despite Mrs. Plame Wilson's 20 years of federal service, she does not meet the minimum age requirement to receive her retirement annuity. She has been left without a career.

I am introducing legislation to allow Mrs. Plame Wilson to qualify for her annuity, as one who has served her country for two decades, and waive the age requirement for collecting it. To best demonstrate the annuity for which Mrs. Plame Wilson may qualify if this legislation were to pass, I am submitting for the record a document sent to Mrs. Plame Wilson by the CIA. It outlines her deferred annuity and testifies to 20 years of service. The document bears no indications of classified material as required by CIA procedures, and was sent via regular postal mail after Mrs. Plame Wilson was no longer in the employ of the CIA. Legal experts have assured me that this is not a classified document.

I believe that this is one small measure to help send a message that we must stand up for public service officers, such as Mrs. Plame Wilson, who have been treated wrongly despite their loyalty and sacrifice to country. For those who have been, for all practicable purposes, pushed out of public service for reasons unrelated to performance, but instead seeded in politics, we should not turn our backs.

CENTRAL INTELLIGENCE AGENCY,
*Washington, DC, February 10, 2006.*
Mrs. VALERIE WILSON.

DEAR MRS. WILSON, This letter is in response to your recent telephone conversation with regarding when you would be eligible to receive your deferred annuity. Per federal statute, employees participating under the Federal Employees Retirement System (FERS) Special Category, who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age (MRA). Your MRA is age 56, at which time you'll be eligible to receive a deferred annuity.

Your deferred annuity will be based on the regular FERS computation rate, one percent for every year of service vice the FERS Special rate of 1.7% for every year of service. You will receive 1.7% for each year of overseas service, prorated on a monthly basis, after January 1, 1987 in the calculation of your annuity. Our records show that since January 1, 1987, you have acquired 6 years, 1 month and 29 days of overseas service.

Following is a list of your federal service: Dates of Service: CIA, CIA (LWOP), CIA (P/T 40), from 11/9/1985 to 1/9/2006—total 20 years, 7 days.

Based on the above service and your resignation on January 9, 2006, your estimated deferred annuity is $21,541.00 per year, or $1795 per month, beginning at age 56.

The above figures are estimates for your planning purposes. The Office of Personnel Management, as the final adjudicator of creditable service and annuity computations, determines final annuity amounts.

Please let me know if I can be of any further assistance.

Sincerely,

---

TRIBUTE TO THE REVEREND
JAMES D. PETERS

## HON. DIANA DeGETTE
OF COLORADO
IN THE HOUSE OF REPRESENTATIVES
*Tuesday, January 16, 2007*

Mr. DeGETTE. Madam Speaker, I rise to honor the extraordinary life and exceptional accomplishments of the Reverend James D. Peters, Pastor of New Hope Baptist Church. This remarkable gentleman merits both our recognition and esteem as his spiritual leadership, service and lifelong devotion to civil rights have done much to advance the lives of our people.

While many have made notable contributions to our community, few have left a legacy of progress as has Reverend Peters. He is a powerful champion of social justice and has led with those who fought for civil liberty and whose deeds changed the very fabric of our nation. Reverend Peters has touched countless lives and he has built a ministry that joins faith with equality. He is a dynamic pastor whose teaching and counsel is infused with a spiritual fervor that constantly edifies us and moves us to do what is right.

Reverend Peters' journey began in Washington D.C., the son of a baseball player. He grew up poor but he grew up in church. He was a gifted student and grew to recite Longfellow, Keats and Kipling. He worked full time at the Navy Annex near the Pentagon and struggled to get an education, attending night school for ten years. Reverend Peters recently noted that "I couldn't eat in restaurants, I couldn't sleep at a hotel or go to the movies. I could never go to school with white children. All the way through high school, I never sat in a classroom with white people, not until I went to college." Many of us in this country forget how far we've come. Although civil liberties have deep roots in our republic, there was a time when fundamental decency and equality for all people were not a part of our shared experience. The courage and the work of Reverend Peters during the dark days of the Civil Rights Movement helped make fairness and equal rights part of our shared values. Reverend Peters was at the founding meeting of the Southern Christian Leadership Conference and he worked directly with Dr. Martin Luther King, Jr. He faced guns and dogs during the marches and civil rights demonstrations in Albany, Georgia, in Selma and in Birmingham, Alabama. He was part of the March on Washington that led to the steps of the Lincoln Memorial where Dr. King gave his unparalleled "I Have a Dream" speech.

Reverend Peters' work ethic and his service to the Civil Rights Movement molded a life of enduring accomplishment and a vocation that included ministering to congregations in Connecticut and Virginia. He became pastor of Denver's New Hope Baptist Church in February of 1979 and during his twenty-eight year tenure, he led his congregation through construction of a new church home and the expansion of services for an ever growing congregation. As a spiritual leader, he has burnished a reputation as a powerful advocate for inclusion and expanding opportunity for all people. He served as a volunteer member of the Denver Housing Advisory Board for approximately ten years assisting the twenty-two thousand public housing residents in changing the quality and image of public housing.

He served as a member of the Colorado Civil Rights Commission for nine years, serving as its Chairman from 1987 to 1989, during which time he traveled throughout Colorado and held countless civil rights hearings to secure justice and equality for all citizens.

Reverend Peters has received service recognitions from numerous organizations including the Southern Christian Leadership Conference, Martin Luther King, Jr., the Anti-Defamation League, the Denver Post and the NAACP. He is also the recipient of the Carle Whitehead Award, the highest award given by the American Civil Liberties Union.

Reverend James Peters is an unrelenting advocate for the causes that elevate the human condition and his immeasurable contributions to the spiritual life of our community merit our gratitude. He has led in the struggle for freedom, justice and equality for all people. But Reverend Peters' leadership goes to the heart of what it means to be a leader. "Nathalia Young, a pastor at New Hope Baptist Church. . . remembers how he helped homeless people himself, not delegating it to a deacon. (He) would get into his own car, and use his own money to get someone a hotel room. And then there was a Christmas season one year, when a woman and her children were suddenly homeless. 'He didn't just get her connected with housing but also supplied her with gifts and food.'" Reverend Peters leads by example.

In a recent Denver Post article, Reverend Peters expressed "concern that young people don't understand what it was like before the Civil Rights Act and that some believe King's message is now irrelevant." At some level, I think we all share his concern. But I would submit that Reverend Peters' legacy provides a powerful example that not only affirms Dr. King's undertaking, but inspires all of us to remember the struggle and keep faith with those who have gone before.

Reverend Peters' tenure as pastor of New Hope Baptist Church is quickly drawing to a close. His leadership has been exemplary and his contributions are rich in consequence. On behalf of the citizens of the 1st Congressional District of Colorado, I wish to express our gratitude and look forward to his continued involvement in the life of our community.

Please join me in paying tribute to Reverend James D. Peters, a distinguished spiritual and civic leader. The values, leadership and commitment he exhibits set the mark and compel us to continue the work that distinguishes us as Americans.

---

OPPORTUNITY KNOCKS IN
TURKMENISTAN: IS ANYONE LISTENING?

## HON. JANICE D. SCHAKOWSKY
OF ILLINOIS
IN THE HOUSE OF REPRESENTATIVES
*Tuesday, January 16, 2007*

Ms. SCHAKOWSKY. Madam Speaker, the Administration's crusade to spread democracy

**Letter dated February 9, 2007 from Ginger A. Wright, Esq. to David B. Smallman, Esq.**

# FAX COVER SHEET

Number of Pages
(including cover):          3

To:                  **David Smallman**
Telephone:           (212) 826-5580
Fax Number:          (212) 593-9175

From:                **Ginger A. Wright**
Telephone:           (703) 613-3029
Fax Number:          (703) 613-3003

Date:                9 February 2007

FEB. 9.2007   4:04PM   IP 1J17                                          NO.878   P.2

Central Intelligence Agency



Washington, D.C. 20505

9 February 2007

Mr. David B. Smallman, Esq.
Frankfurt, Kurnit, Klein and Selz
488 Madison Avenue
New York, New York 10022

Dear Mr. Smallman:

I am writing in response to your letter of 31 January 2007.
As an initial matter, we appreciate your recognition of the need
to return the 10 February 2006 letter to Ms. Wilson and any
copies she retains to the Central Intelligence Agency per our
earlier request.  Please have Ms. Wilson contact Ms. Tumolo at
(703) 613-8624 to make arrangements to return the letter.

With regard to Ms. Wilson's manuscript, the Publications
Review Board (PRB) has previously advised Ms. Wilson, the
first 124 pages of her manuscript contain classified
information.  The PRB also advised Ms. Wilson that there is more
than one approach to revising the material in the first
124 pages of her manuscript in order to render it unclassified.
Since a detailed discussion of how certain passages are
classified because of the context in which they appear would
itself be classified, and because the PRB wanted to provide
Ms. Wilson with as much flexibility as possible, the PRB has
previously invited Ms. Wilson to meet with the PRB staff to
discuss these issues and to see if Ms. Wilson had a preference
among the different revision approaches.  However, Ms. Wilson
has declined to meet with the PRB staff to discuss these issues.

In light of the concerns regarding the time associated with
the prepublication review of Ms. Wilson's manuscript that you
raised in your 31 January 2007 letter and in an effort to be as
helpful as possible, the PRB has selected an approach for
revising the manuscript and is currently undertaking a review of
the first 124 pages of Ms. Wilson's manuscript using this

Mr. David B. Smallman, Esq.

approach.  We expect the PRB will complete this review and provide Ms. Wilson with a list of the changes required to make that portion of her manuscript unclassified pursuant to this approach within the next two weeks.

After Ms. Wilson has an opportunity to review the revised unclassified manuscript, the PRB staff will be happy to meet with her to discuss any specific concerns she has.

If you have any questions, please feel free to contact me at (703) 613-3029.

Sincerely,

Ginger A. Wright
Associate General Counsel

2

**Letter dated February 16, 2007 from David B. Smallman, Esq. to Ginger A. Wright, Esq.**

( FRANKFURT KURNIT KLEIN & SELZ PC

488 Madison Avenue
New York, New York 10022
Telephone:  (212) 980-0120
Facsimile:  (212) 593-9175

David B. Smallman
Direct dial:  (212) 826-5580
e-mail:  dsmallman@fkks.com

February 16, 2007

<u>VIA FAX</u>
(703) 613-3003

Ginger A. Wright, Esq.
Assistant General Counsel
Office of General Counsel
Central Intelligence Agency
Washington, D.C.  20505

Dear Ms. Wright:

    I am writing in response to a fax letter from you dated February 9, 2007 ("Agency's February 9 Letter") (copy attached) in response to my letter of January 31, 2007 ("January 31 Letter").  Quite frankly, I was surprised and dismayed to receive official correspondence from the Agency containing such obviously false and self-serving assertions – as described below – which distort unfairly Ms. Wilson's numerous good faith discussions with CIA's Publications Review Board ("PRB") during the past year. While Ms. Wilson looks forward to receiving from the Agency on or before February 24 the promised list of proposed revisions, Ms. Wilson reserves all of her rights and remedies with respect to the Agency's dilatory conduct and any related actions resulting in improper censorship or restraint of publication of her manuscript by the Agency and/or other parts of the Executive Branch, including, for example, the Office of Vice President, in possible violation of the Constitution and the laws of the United States.

    As an initial matter, the Agency's February 9 Letter fails to provide the information requested in connection with Central Intelligence Agency's official acknowledgement and disclosure of Ms. Wilson twenty year employment affiliation with CIA in an unclassified letter dated February 10, 2006, which was published in the Congressional Record on January 16, 2007 ("Published February 10, 2006 Letter") (copy attached).  In order to respond properly to the letter Ms. Wilson received from Ms. Tumolo on January 19, 2007 ("Tumolo January 19 Letter") (copy attached), I am reiterating my request that the Agency send to me as soon as possible a revised and remarked version of the February 10, 2006 letter (with any ostensibly classified information redacted) that complies in good faith with the applicable provisions of Executive Order 12958, as amended ("E.O"), § 1.6.  If the Office of General Counsel

FRANKFURT KURNIT KLEIN & SELZ PC

Ginger A. Wright, Esq.
February 16, 2007
Page 2 of 2

CIA is unable or unwilling to provide a redacted version of the letter indicating the information that it believes to be classified, please provide to me at your earliest convenience the Agency's legal basis for seeking reclassification of the Published February 10, 2006 Letter and confirmation that all required actions have been undertaken by the Agency in connection with seeking reclassification. Ms. Davis and I also are available to meet with you and the Agency's Acting General Counsel, Mr. Rizzo, to discuss these matters.

In order to ensure an accurate record, I must also note that the Agency's February 7 Letter incorrectly describes the actual history of Ms. Wilson's meetings with PRB staff to discuss her manuscript. Contrary to the flatly wrong assertion that "Ms. Wilson has declined to meet with PRB staff," the opposite is true: Ms. Wilson met with PRB staff *three times* at the Agency's headquarters, on November 6, 2006, December 1, 2006, and December 13, 2006, and also had numerous email exchanges and telephone conversations with them. Furthermore, the Agency's February 9 Letter fails to explain adequately the now six month delay in completing a review that should have, as a general matter, been completed within thirty days of submission by Ms. Wilson of her manuscript to PRB in September 2006.

Finally, the Agency's February 9 Letter mischaracterizes our response to the Tumolo January 19 Letter set forth in my January 31 Letter. In order to correct that mischaracterization, I am again advising you of the following: please be assured that Ms. Wilson and her counsel intend to comply fully with all applicable obligations regarding "Classified National Security Information" pursuant to E.O. 12958, and any other applicable law, and, while fully reserving her rights and without prejudice to or otherwise waiving any rights she may have, Ms. Wilson will provide a copy of the February 10, 2006 letter to Ms. Tumolo.

I will look forward to hearing back from you regarding the above matters at your earliest convenience, and will expect the Agency to provide Ms. Wilson with a list of any proposed revisions to the first 124 pages of her manuscript no later than February 24, 2007.

Sincerely,

David B. Smallman

Attachments
cc:  Lisa E. Davis, Esq.
     Elisa Rivlin, Esq.

04/27/2007 22:13 FAX 212 382 3300        WOLLMUTH MAHER DEUTSCH                    ☑001

```
                        *********************
                        ***   TX REPORT   ***
                        *********************

        TRANSMISSION OK

        TX/RX NO              1772
        CONNECTION TEL                    12022011124
        CONNECTION ID
        ST. TIME             04/27 21:51
        USAGE T              21'18
        PGS. SENT              81
        RESULT               OK
```

# WOLLMUTH MAHER & DEUTSCH LLP

---

500 FIFTH AVENUE

12TH FLOOR

NEW YORK, NEW YORK 10110

TELEPHONE: (212) 382-3300

FACSIMILE: (212) 382-0050

FAX TRANSMISSION COVER SHEET

---

| | | | |
|---|---|---|---|
| **Date:** | April 27, 2007 | | |
| **To:** | J. Michael McConnell | **Fax:** | 202-201-1124 |
| | Director of National Intelligence | | |
| **Company:** | Office of the Director of National Intelligence | **Phone:** | 703-733-8600 |
| **Subject:** | | **Direct Dial:** | |
| **From:** | David B. Smallman, Esq. | | |

---

YOU SHOULD RECEIVE **81** PAGE(S), INCLUDING THIS COVER SHEET. IF YOU
DO NOT RECEIVE ALL PAGES, PLEASE CALL (212) 382-3300

---

NOTE: THIS CONFIDENTIAL TRANSMISSION IS INTENDED SOLELY FOR ITS ADDRESSEES AND
THEIR AUTHORIZED DISTRIBUTEES. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR,
PLEASE INFORM US IMMEDIATELY BY TELEPHONE AT (212) 382-3300

---

Message:    Please see attached.