# Exhibit L

Case 1:07-cv-04595-BSJ   Document 11-16   Filed 06/29/2007   Page 1 of 19

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CR. NO. 05-394 (RBW) |
| v. ) | |
| ) | |
| I. LEWIS LIBBY, ) | |
|     also known as Scooter Libby ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, Special Counsel, respectfully submits the following sentencing memorandum:

### I.  Introduction

On March 6, 2007, following a month long trial, a jury convicted defendant I. Lewis Libby of one count of obstruction of justice in violation of 18 U.S.C. §1503, one count of making false statements in violation of 18 U.S.C. § 1001, and two counts of perjury in violation of 18 U.S.C. § 1623. This memorandum addresses the seriousness of defendant's offense conduct and responds to certain possible mitigating arguments identified in the Presentence Investigation Report.

### II.  Seriousness of Defendant's Offense Conduct

In October 2003, the Department of Justice opened an investigation into the unauthorized disclosure of classified information concerning the employment of Valerie Plame Wilson by the Central Intelligence Agency. The allegations underlying this investigation were serious: that high-ranking government officials, in the course of responding to political criticisms of the present administration by Ms. Wilson's husband, had

deliberately, recklessly or negligently compromised her identity as an intelligence agent, posing risks to intelligence assets and operations. As President Bush stated on October 6, 2003: "[t]his is a very serious matter, and our administration takes it seriously. . . . We're talking about a criminal action, but also hopefully will set a clear signal we expect other leaks to stop, as well. And so I look forward to finding the truth." Remarks by President Bush at Press Availability with President Kibaki of Kenya, Oct. 6, 2003, at http://whitehouse.gov/news/releases/2003/10/20031006-3.html. The President and his spokesman made it clear on repeated occasions that the President expected everyone in his administration to cooperate and provide information to the investigators.

It was apparent from early in the investigation that classified information relating to a covert intelligence agent had been disclosed without authorization. Also early in the investigation, investigators learned the identities of three officials – Deputy Secretary of State Richard Armitage, Senior Adviser to the President Karl Rove, and Mr. Libby, the Vice-President's Chief of Staff – who had disclosed information regarding Ms. Wilson's CIA employment to reporters. What was not apparent, however, were the answers to a series of questions central to whether criminal charges arising from the unauthorized disclosure of Ms. Wilson's identity as an intelligence agent were both viable and appropriate. These questions included the following:

- Were Mr. Armitage, Mr. Rove, and Mr. Libby the only government officials to disclose information about Ms. Plame's CIA employment to reporters?

2

- Was each particular disclosure by the government officials to journalists deliberate, reckless or inadvertent?

- How did those government officials learn about Ms. Wilson's CIA employment?

- What did those government officials know about the classified nature of Ms. Wilson's employment?

- Precisely what information regarding Ms. Wilson's CIA employment did government officials disclose to reporters, and to how many reporters?

- Were the disclosures made as part of a concerted effort to disclose this information? and

- Did other government officials direct or approve these disclosures?

Consistent with the seriousness of the allegations, the criminal investigation that followed sought both documentary and testimonial evidence from a wide range of sources. The unusual nature and context of this investigation required witnesses to divulge extraordinarily sensitive information to investigators. The President, Vice President, and many of their closest advisers met with investigators and disclosed communications and deliberations that occurred at the highest level of our government. Multiple government agencies, including the Central Intelligence Agency, disclosed classified information to investigators. Journalists disclosed sources. Witnesses disclosed sensitive personal information relevant to the investigation. The need to balance the important and varied interests affected by this investigation at times led to difficult negotiations resulting in

compromises by both witnesses and investigators, and in the case of certain journalist witnesses, to litigation over the journalists' claims of privilege to protect their sources.

In many respects, the manner in which witnesses from the President to ordinary citizens participated in this criminal investigation, disclosing to investigators information that few of them were eager to share, with the guidance of the courts when disputes arose, is a testament to the strength of a fundamental principle of our nation's justice system: that the law is entitled to every man's evidence. Inherent in this principle is the obligation of a witness to tell the truth, particularly under oath. As the Supreme Court said in *United States v. Mandujano*, 425 U.S. 564, 576 (1975):

> In this constitutional process of securing a witness' testimony, perjury simply has no place whatsoever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative. The power of subpoena, broad as it is, and the power of contempt for refusing to answer, drastic as that is -- and even the solemnity of the oath -- cannot insure truthful answers. Hence, Congress has made the giving of false answers a criminal act punishable by severe penalties; in no other way can criminal conduct be flushed into the open where the law can deal with it.

*See also Nix v. Whiteside*, 457 U.S. 157, 185 (1986) ("[t]his Court long ago noted: 'All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. . . .'") (quoting *In re Michael*, 326 U.S. 224, 227 (1945)). Despite the many competing public and private interests implicated by this investigation, and the high stakes for many of those asked to provide information, witnesses from all stations in life were required to accept and comply with their legal obligations.

4

It is against this background that Mr. Libby's conduct must be judged. As an experienced attorney, Mr. Libby knew well both the seriousness of this investigation and the range of options available to him as the investigation progressed. He, of course, could have told the truth, even if, as was the case for many other witnesses, doing so risked the possibility of criminal prosecution, or personal or political embarrassment. He also could have declined to speak to the FBI agents, invoked his Fifth Amendment rights before the grand jury, or challenged any lines of inquiry he believed improper. And the evidence at trial showed that Mr. Libby had access to counsel and had adequate time to review relevant documents and contemplate his conduct before he testified.

Regrettably, Mr. Libby chose the one option that the law prohibited: he lied. He lied repeatedly to FBI agents and in sworn grand jury testimony, and he lied about multiple facts central to an assessment of his role in the disclosure of Ms. Wilson's CIA employment. He lied about when he learned of Ms. Wilson's CIA employment, about how he learned of her CIA employment, about who he told of her CIA employment, and about what he said when he disclosed it. In short, Mr. Libby lied about nearly everything that mattered.

These lies had two direct results. First, they made impossible an accurate evaluation of the role that Mr. Libby and those with whom he worked played in the disclosure of information regarding Ms. Wilson's CIA employment and about the motivations for their actions. Second, the lies required the government to expend substantial time and resources

5

attempting to determine what – if any – of the information that Mr. Libby provided could be believed.

More fundamentally, however, Mr. Libby's lies corrupted a truth-seeking process with respect to an important investigation, and on behalf of which many others subordinated important public, professional, and personal interests. To minimize the seriousness of Mr. Libby's conduct would deprecate the value that the judicial system places on the truthfulness of witnesses, and tempt future witnesses who face similar obligations to tell the truth to question the wisdom and necessity of doing so. Our criminal justice system rests on the premise that all witnesses have an equal and solemn obligation of candor. We cannot take this candor for granted because the daily work of the criminal justice system depends on the willingness of every witness – whether an eyewitness to a violent crime or drug transaction, or a police officer who witnessed a partner shake down a drug dealer, or a corporate executive aware of fraud by his or her colleagues – to tell the truth under circumstances where there often are strong motives to do otherwise. Particularly in a case such as this, where Mr. Libby was a high-ranking government official whose falsehoods were central to issues in a significant criminal investigation, it is important that this Court impose a sentence that accurately reflects the value the judicial system places on truth-telling in criminal investigations.

### III. Response to Certain Arguments in Mitigation

In this case, as is his right, Mr. Libby maintains that despite his conviction, he is totally innocent. He has expressed no remorse, no acceptance of responsibility, and no recognition that there is anything he should have done differently – either with respect to his false statements and testimony, or his role in providing reporters with classified information about Ms. Wilson's affiliation with the CIA.

Instead, on Mr. Libby's behalf his supporters have submitted to the probation office and the Court a variety of arguments challenging the propriety of his prosecution. These arguments for leniency paint Mr. Libby as the victim of an improper, unnecessary, and politically motivated investigation, an unfair indictment, and a wrongful conviction. These arguments mirror comments made by the defense's public relations team and posted on the defense website, www.scooterlibby.com, before, during and after the trial. The submission of these arguments on Mr. Libby's behalf is well known to Mr. Libby and his attorneys, and while they have not to date explicitly embraced these arguments, neither have they disavowed them. The government submits that these arguments are completely at odds with the kind of contrition that normally is a pre-condition to leniency. We address the lack of merit of these arguments in the event the defense presses such arguments as supporting a lenient sentence.

#### A. Mr. Libby's Public Service

In the Offender Characteristics Section of the Presentence Investigation Report, a number of Mr. Libby's supporters cite Mr. Libby's public service on behalf of our national

7

security during the war against terrorism, and note the fact that Mr. Libby worked long hours for the government under great stress, when he could have earned a more lucrative salary in the private practice of law. We take no issue with Mr. Libby's service to the government and recognize that it did indeed involve long hours, great stress and foregone income. While some may fervently support particular policy positions Mr. Libby advocated, and others strenuously object to those same positions, what is relevant for sentencing is not any effort at assessing the correctness of those policies, but recognition of a positive aspect of Mr. Libby's character: namely that Mr. Libby worked long and hard to advance policies that he believed were in the best interests of the United States. We have never challenged that aspect of Mr. Libby's background and do not do so now.

However, some of those who spoke to the Probation Office on Mr. Libby's behalf advocate that his service in the public sector should excuse him from imposition of any punishment for his crimes. **[Sentence redacted and filed under seal.]**

It is worth placing such suggestions in context by noting that there are many others who have served the nation at great personal hardship, the overwhelming majority of whom are of considerably less means than Mr. Libby. Yet we would not be prepared to excuse those who served in the FBI, the CIA, the military or the Peace Corps if they were found to have perjured themselves and committed

obstruction of justice during a criminal investigation of a national security matter. We should not apply a different set of rules to Mr. Libby because he served in the White House.

### B.    Propriety of Mr. Libby's Prosecution

Others of Mr. Libby's friends and associates interviewed for the Presentence Investigation Report assert that his prosecution was unwarranted, unjust, and motivated by politics. **[Remainder of paragraph redacted and filed under seal.]**

The argument that Mr. Libby is an innocent wrongly charged because it was known early in the investigation that others had leaked the identity of Valerie Wilson overlooks critical facts as well as the jury's carefully reasoned verdict. First, the evidence at trial proved that Mr. Libby was guilty, not innocent. Mr. Libby learned about Ms. Wilson's CIA employment in June 2003 directly from the Vice President, as well as from senior government officials from both the State Department (Marc Grossman) and the CIA (Bob Grenier) and Cathie Martin, who handled public affairs for the Vice President. The evidence showed that Mr. Libby was aggravated about Ambassador Wilson and paid exceptionally close attention in June and July 2003 to media stories about Mr. Wilson. Mr. Libby disclosed information about Ms. Wilson's employment to Judith Miller on June 23.

Following Ambassador Wilson's Op Ed in the *New York Times* on July 6, 2003, Mr. Libby inserted himself even more in the press response to Mr. Wilson. On July 7, he disclosed the information about Ms. Wilson's CIA employment to Ari Fleischer, then the White House press secretary, in what Mr. Fleischer described as a "weird lunch." The next morning, Mr. Libby disclosed the information about Ms. Wilson's CIA employment again to reporter Miller. Mr. Libby provided information about Mr. Wilson and Ms. Wilson on the condition that any attribution disguise him as a "former Hill staffer." Later that week, Mr.

Libby confirmed the information about Ms. Wilson's CIA employment to reporter Matt Cooper, who had first learned the information from Karl Rove.

The evidence at trial further established that when the investigation began, Mr. Libby kept the Vice President apprised of his shifting accounts of how he claimed to have learned about Ms. Wilson's CIA employment. The evidence proved that Mr. Libby invented a conversation about Ms. Wilson's employment with Mr. Russert, lied about other conversations with other officials and reporters and claimed not to have known the information he was spreading to reporters about Ms. Wilson's CIA employment was true. Mr. Libby even went so far as to claim that he was "surprised" and "taken aback" by what Mr. Russert had told him about Ms. Wilson and the CIA on July 10, and to claim that Mr. Libby did not even know at the time of his conversations with reporters that Mr. Wilson had a wife. Mr. Libby also claimed to have a clear memory that the only topic he did not discuss with the Vice President in the aftermath of the Wilson Op Ed was Ms. Wilson's CIA employment.

Second, it is undisputed but of no moment that it was known early in the investigation that two other persons (Richard Armitage and Karl Rove) in addition to Mr. Libby had disclosed Ms. Wilson's identity to reporters, and that Messrs. Armitage and Rove were the sources for columnist Robert Novak's July 14, 2003 column, which first publicly disclosed Ms. Wilson's CIA affiliation. The investigation was never limited to disclosure of Ms. Wilson's CIA affiliation to Mr. Novak; rather, from the outset the investigation sought to

11

determine who disclosed information about Ms. Wilson to various reporters, including – but not limited to – Mr. Novak.

From these facts, it is argued either that the entire investigation should have been quickly terminated or that it was inappropriate that at the end of the investigation only Mr. Libby was charged. We address both arguments below.

### 1. Termination of the Investigation

The assertion that the collective facts known at an early point in the investigation warranted a summary termination of the investigation does not stand up to close scrutiny. First, it was clear from very early in the investigation that Ms. Wilson qualified under the relevant statute (Title 50, United States Code, Section 421) as a covert agent whose identity had been disclosed by public officials, including Mr. Libby, to the press. Early in the investigation, however, the critical issue remained as to precisely what the particular officials knew about Ms. Wilson's status and what the officials intended when they disclosed her identity to the media. Moreover, in assessing the intent of these individuals, it was necessary to determine whether there was concerted action by any combination of the officials known to have disclosed the information about Ms. Plame to the media as anonymous sources, and also whether any of those who were involved acted at the direction of others. This was particularly important in light of Mr. Libby's statement to the FBI that he may have discussed Ms. Wilson's employment with reporters at the specific direction of the Vice President.

Finally, it remained to be determined whether the accounts of various persons who disclosed the information to the media were truthful, and, if not, whether any false statement made could be proven to be intentionally false. In that vein, it became apparent at an early stage of the investigation that Mr. Libby's account was sharply contradicted by the accounts of other witnesses, most notably Tim Russert. The investigation thus appropriately continued for several months after the October 2003 disclosures by Messrs. Armitage, Rove and Libby, under the direction of then Attorney General Ashcroft, until late December 2003 when Special Counsel was appointed. The investigation then continued for the same reasons. It also bears note that although certain of Mr. Libby's supporters have suggested that it was improper for the investigation to continue without publicly disclosing what Mr. Armitage, Mr. Rove, and Mr. Libby admitted in interviews or before the grand jury, maintaining the confidentiality of witness statements and testimony was not only required by law, but was an appropriate and routine investigative practice that protected witnesses' privacy, reduced the risk that witnesses would influence each others' recollections and testimony, and protected the reputations of uncharged persons.

To accept the argument that Mr. Libby's prosecution is the inappropriate product of an investigation that should have been closed at an early stage, one must accept the proposition that the investigation should have been closed after at least three high-ranking government officials were identified as having disclosed to reporters classified information about covert agent Valerie Wilson, where the account of one of them was directly

13

contradicted by other witnesses, where there was reason to believe that some of the relevant activity may have been coordinated, and where there was an indication from Mr. Libby himself that his disclosures to the press may have been personally sanctioned by the Vice President. To state this claim is to refute it. Peremptorily closing this investigation in the face of the information available at its early stages would have been a dereliction of duty, and would have afforded Mr. Libby and others preferential treatment not accorded to ordinary persons implicated in criminal investigations.

### 2. Prosecution of Mr. Libby for Obstruction of Justice and Perjury in the Absence of a Prosecution of Any Person for the Underlying Disclosure of Classified Information

Nor is it of any consequence to Mr. Libby's conduct -- perjury and obstruction of justice -- that others may have engaged in similar disclosures of classified information for which neither Mr. Libby nor they were charged. At the end of the investigation, after all the information was gathered -- including testimony of the reporters and relevant documents -- a decision was made not to pursue substantive charges for the disclosure of classified information about Ms. Wilson's CIA employment. This fact does not support the logical leap that investigators knew at the beginning of the investigation that no such charges would be brought, nor does it have any bearing on the propriety of Mr. Libby's prosecution for perjury.

While not commenting on the reasons for the charging decisions as to any other persons, we can say that the reasons why Mr. Libby was not charged with an offense directly relating to his unauthorized disclosures of classified information regarding Ms. Wilson

14

included, but were not limited to, the fact that Mr. Libby's false testimony obscured a confident determination of what in fact occurred, particularly where the accounts of the reporters with whom Mr. Libby spoke (and their notes) did not include any explicit evidence specifically proving that Mr. Libby knew that Ms. Wilson was a covert agent. On the other hand, there was clear proof of perjury and obstruction of justice which could be prosecuted in a relatively straightforward trial. As Judge Tatel noted in his concurring opinion in *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1182 (D.C. Cir. 2006), "insofar as false testimony may have impaired the special counsel's identification of culprits, perjury in this context is itself a crime with national security implications. What's more, because the charges contemplated here relate to false denials of responsibility for Plame's exposure, prosecuting perjury or false statements would be tantamount to punishing the leak."

Finally, the suggestion that there is something unusual or inappropriate about pursuing a prosecution for a crime of obstruction where the underlying crime is not prosecuted is a red herring (and oddly suggests that Mr. Libby's prosecution would not have been "wrongful" if only the government had brought more charges against him or others). Such perjury prosecutions are hardly unusual; indeed, as the Supreme Court noted in *Mandujano*, our system of justice would break down if witnesses were allowed to lie with impunity. This is especially true where the lies at issue succeeded in preventing the investigators from determining with confidence what had occurred.

15

In light of the foregoing, the assertions offered in mitigation are consistent with an effort by Mr. Libby's supporters to shift blame away from Mr. Libby for his illegal conduct and onto those who investigated and prosecuted Mr. Libby for unexplained "political" reasons. The assertions provide no basis for Mr. Libby to receive a reduced sentence. The record should be clear that the grand jury investigation was conducted fairly and in appropriate secrecy; Mr. Libby had ample legal resources and talent available to him to raise all appropriate legal challenges and mount a legal defense; the Court provided Mr. Libby substantial opportunity to follow through on the defense he proffered; and the jury carefully and dispassionately weighed the evidence over the course of many days and convicted on four counts and acquitted on another. While the disappointment of Mr. Libby's friends and supporters is understandable, it is inappropriate to deride the judicial process as "politics at its worst" on behalf of a defendant who, the evidence has established beyond a reasonable doubt, showed contempt for the judicial process when he obstructed justice by repeatedly lying under oath about material matters in a serious criminal investigation.

## IV.   Conclusion

Mr. Libby, a high-ranking public official and experienced lawyer, lied repeatedly and blatantly about matters at the heart of a criminal investigation concerning the disclosure of a covert intelligence officer's identity. He has shown no regret for his actions, which significantly impeded the investigation. Mr. Libby's prosecution was based not upon politics but upon his own conduct, as well as upon a principle fundamental to preserving our judicial

system's independence from politics: that any witness, whatever his political affiliation, whatever his views on any policy or national issue, whether he works in the White House or drives a truck to earn a living, must tell the truth when he raises his hand and takes an oath in a judicial proceeding, or gives a statement to federal law enforcement officers. The judicial system has not corruptly mistreated Mr. Libby; Mr. Libby has been found by a jury of his peers to have corrupted the judicial system.

In light of the foregoing, it is respectfully submitted that Mr. Libby should be sentenced to a term of imprisonment within the applicable range of 30 to 37 months as set forth in a separate memorandum being filed today addressing the sentencing guidelines calculations. It is respectfully submitted that the sentencing range is reasonable and appropriate and that the Court should determine the precise sentence within that range in light of all the factors set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

/s/
PATRICK J. FITZGERALD
Special Counsel
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Dated: May 25, 2007

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 25th day of May 2007, I caused true and correct copies of the foregoing to be served on the following parties:

William Jeffress, Esq.
Baker Botts
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Facsimile: 202-585-1087

Theodore V. Wells, Esq.
Paul Weiss
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile: 212-373-2217

John D. Cline, Esq.
Jones Day
555 California Street
San Francisco, CA 94104
Facsimile: 415-875-5700

                                     Patrick J. Fitzgerald
                                     Special Counsel
                                     U.S. Department of Justice
                                     10th & Constitution Ave., NW
                                     Washington, D.C. 20530
                                     202-514-1187

By:       /s/
               Kathleen M. Kedian
               Deputy Special Counsel