# Exhibit M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CR. NO. 05-394 (RBW) |
| v. | ) | |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as "Scooter Libby" | ) | |

**FILED**

MAY 2 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
PROPOSED SENTENCING GUIDELINES CALCULATIONS**

The government respectfully submits the following Memorandum of Law in support of its

proposed Sentencing Guidelines calculations, and its objections to the calculations proposed by the

Probation Office.

**INTRODUCTION**

The Sentencing Guidelines recognize that any effort to obstruct a criminal investigation is

a serious crime but, as the seriousness of the offense being investigated increases, so does the risk

of potential harm and the need for significant penalties. Therefore, the Sentencing Guidelines that

determine the punishment for perjury and obstructing criminal investigations operate on this

principle: the penalty for obstructing an investigation should be proportional to the seriousness of

the crime that was the subject of the investigation that the defendant endeavored to obstruct. Under

the Guidelines, enhanced penalties based on the nature of the investigation apply without regard to

the investigation's ultimate result -- that is, without regard to whether the defendant's efforts to

obstruct failed or succeeded, or to whether or not anyone was ultimately charged or convicted. In

this way, the Guidelines gauge the punishment for obstruction according to the harm to the

administration of justice intended by the defendant, and prevent a defendant from being rewarded

with a lower sentence for successful efforts to obstruct justice.

### GOVERNMENT'S PROPOSED SENTENCING GUIDELINES CALCULATIONS

Each of the sentencing guidelines applicable to the offenses of which defendant was convicted, Obstruction of Justice (Count 1), Perjury (Counts 4 and 5), and False Statements (Count 2), contain provisions cross-referencing other guidelines. We address the application of the cross-reference provisions to each offense of conviction below.

### I.    APPLICATION OF CROSS REFERENCE PROVISIONS

#### A.    Applicable Guidelines

##### *Obstruction of Justice*

The guideline applicable to the offense of which defendant was convicted in Count 1 (Obstruction of Justice) is USSG § 2J1.2. Pursuant to USSG § 2J1.2(c)(1), if the offense "involved obstructing the investigation or prosecution of a criminal offense," the Court is directed to apply the greater of:

> (a)    the offense level under USSG § 2J1.2(a), adjusted by any relevant specific offense characteristics; and
>
> (b)    the offense level determined by applying USSG § 2X3.1 ("Accessory After the Fact") to the offense that was the subject of the investigation or prosecution defendant endeavored to obstruct.

See USSG § 2J1.2, comment. (Background). USSG §§ 2J1.2 requires the Court to calculate the base offense level under *both* provisions, and then "apply the greater of the two sentences." *United States v. Kimble*, 305 F.3d 480, 485 (6th Cir. 2002)(quoting *United States v. Miller*, 161 F.3d 977, 899 (6th Cir. 1997)) (adding emphasis). If the sentence is greater under § 2X3.1, then application of that guideline is mandatory. *Id. See also United States v. Arias*, 253 F.3d 453 (9th Cir. 2001) ("The language of the cross-referencing provision is mandatory when the offense involves 'obstructing the

2

investigation or prosecution of a criminal offense.'")

### Perjury

The guideline applicable to the offenses of which defendant was convicted in Counts 4 and 5 (Perjury) is USSG § 2J1.3. Pursuant to § 2J1.3(c)(1), if the offense involved perjury "in respect to" a criminal offense, the Court is directed to apply the greater of:

(a)    the offense level under USSG § 2J1.3(a), adjusted by any relevant specific offense characteristics; and

(b)    the offense level determined by applying USSG § 2X3.1 ("Accessory After the Fact") in respect to the criminal offense to which defendant's perjury related. See USSG § 2J1.3, comment. (Background).

### False Statements

USSG § 2B1.1 is the guideline applicable to the offense of which defendant was convicted in Count 2 (false statements). Pursuant to USSG § 2B1.1(c)(3), if: (a) the offense did not involve drugs, guns or explosives, (b) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally, and (c) "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct)," the Court is directed to apply that guideline.

### The Accessory-After-the-Fact Guideline

The Accessory-After-the-Fact guideline provides for a base offense level "6 levels lower than the offense level for the underlying offense" (USSG § 2X3.1(a)(1)), but in no event "less than level 4 " (USSG § 2X3.1(2)), or more than 30 (USSG § 2X3.1(3)(a)).

In the context of both obstruction of justice and perjury, the application of § 2X1.3 requires that defendant be *treated* as having been convicted as an accessory after the fact, although he has not been so convicted. It is *not* necessary to establish that the defendant was guilty of the underlying

3

crime, or that the defendant was an "accessory after the fact" to that crime. *See, e.g., Kimble*, 305 F.3d at 485-86; *United States v. LeMoure*, 474 F.3d 37, 45 (1st Cir. 2007); *United States v. Suleiman*, 208 F.3d 32, 38-39 (2d Cir. 2000)(stressing that it is not necessary that defendant have been charged with the underlying offense); *Arias*, 253 F.3d 453, 459 (9th Cir. 2001)(holding that cross-reference is to be applied without "regard to whether the defendant or anybody else was convicted of the underlying offense, or whether an offense could be shown to have been committed at all"); *United States v. McQueen*, 86 F.3d 180, 182-83 (11th Cir. 1996)(holding defendant's acquittal on underlying offense no impediment to application of cross reference).   Under this provision, the defendant's offense level is not the same as if he had *committed* the offense under investigation but, rather, six levels lower.

### B.    The Nature of the Investigation Being Conducted By the FBI and Grand Jury in this Case

It is undisputed that defendant was convicted of endeavoring to obstruct, and making false statements and committing perjury in connection with, FBI and grand jury investigations into leaks by government employees of then-classified information regarding the affiliation of Valerie Plame Wilson with the Central Intelligence Agency ("CIA"). As established at trial, the focus of that investigation, as well as the parallel FBI investigation, was to determine whether, by disclosing to reporters information regarding Ms. Wilson's employment at the CIA, any government official had violated the Intelligence Identities Protection Act ("IIPA"), 50 U.S.C. § 421, which prohibits disclosures of the identity of covert intelligence agency personnel, or the Espionage Act, 18 U.S.C. § 793, which prohibits the willful, reckless and negligent disclosure of national defense information.[1]

---

[1]   In addition, the grand jury investigated violations of 18 U.S.C. § 1001, 18 U.S.C. § 1503, and 18 U.S.C. § 1623, the offenses of which defendant was convicted.

At the time of the leaks, Ms. Wilson in fact[2] qualified as a "covert agent" within the meaning of the IIPA.[3] *See*, e.g., the "Unclassified Summary of Valerie Wilson's CIA Employment and Cover History" (a copy of which is annexed as Exhibit A), which makes plain, among other things, that "Ms. Wilson was a covert CIA employee for whom the CIA was taking affirmative measures to conceal her intelligence relationship to the United States."[4] In addition, on March 16, 2007, Ms.

---

[2] The investigators were given access to Ms. Wilson's classified file; information about Ms. Wilson's duties and status that has since been declassified is discussed herein. *See In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 114, 1181 (D.C. Cir. 2006)(reissued opinion lifting seal from some previously redacted portions of court's December 8, 2004 opinion) (discussing information provided to court regarding Ms. Wilson's covert status in context of reporter litigation).

[3] The PSR notes that the Probation Office "could not locate a reference in these proceedings establishing Ms. Plame as a 'covert' agent." PSR at 32. As this Court is aware, evidence establishing Ms. Wilson's *actual* status as a covert agent whose employment at the CIA was classified at the time of the leaks was excluded from the trial on the ground that it was not relevant to the question of whether the defendant made false statements or endeavored to obstruct justice. Defendant sought the exclusion of such evidence on the ground that it would be unfairly prejudicial. As the Court ruled in a number of contexts, defendant's knowledge and belief regarding Ms. Wilson's status, rather than Ms. Wilson's actual status, was what was relevant to the question of defendant's guilt or innocence. Of course, the Court is not limited at sentencing to considering evidence that was presented at trial. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). *See also* USSG § 1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."); *United States v. McCrory*, 930 F.2d 63, 68 (D.C. Cir. 1991) (evidence inadmissible at trial may be admissible at sentencing); *United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006)(court may consider at sentencing conduct of which defendant was acquitted). Thus, neither this Court's exclusion from trial of evidence concerning Ms. Wilson's actual classified and covert status at the time of the leaks, nor its denial of defendant's pretrial motions for discovery of highly sensitive, classified details regarding Ms. Wilson's prior job duties, provide any basis for the Court to ignore the fact that Ms. Wilson was a covert agent whose affiliation with the CIA was classified at the time defendant disclosed her employment to reporters.

[4] A copy of this document was disclosed to the defense in discovery on June 9, 2006.

5

Wilson testified, under oath, before a Congressional Oversight Committee that, at the time of the leaks, she "worked in the Counterproliferation Division of the CIA, still as a covert officer whose affiliation with the CIA was classified." (A copy of her testimony is annexed as Exhibit B). By its very nature, the classified information regarding the identity of a covert intelligence agent may constitute "national defense information" the disclosure of which could be used to the injury of the United States, or to the advantage of a foreign nation, as that term is used in 18 U.S.C. § 793. *See generally Gorin v. United States*, 312 U.S. 19, 28, *reh'g denied*, 312 U.S. 713 (1941)(holding that the term "national defense" is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness"). This is of course particularly true where, as here, the agent's area of responsibility involves weapons of mass destruction.

During its investigation, the grand jury obtained substantial evidence indicating that one or both of the foregoing statutes may have been violated. The evidence obtained by the grand jury, and later presented at trial, established that information concerning Ms. Wilson's CIA-employment was disclosed to multiple members of the news media, including Robert Novak, Judith Miller, Matt Cooper, Walter Pincus and Bob Woodward, none of whom were authorized to receive that information.[5] The disclosures were made by multiple high-level government officials, including defendant. The evidence demonstrated that defendant, in particular, made the disclosures deliberately and for the purpose of influencing media coverage of the public debate concerning intelligence leading to the war in Iraq. According to defendant's grand jury testimony, defendant's

---

[5] The trial evidence also established that, in addition to his disclosures directly to reporters, defendant disclosed information regarding Ms. Wilson's CIA-employment to then-White House Press Secretary Ari Fleischer who, in turn, disclosed the information to reporters.

disclosures of information regarding Ms. Wilson's employment may have been sanctioned by the Vice President. Although in the grand jury defendant denied knowing that Ms. Wilson was a covert agent or that her employment with the CIA was classified, other evidence obtained by the grand jury indicated that defendant learned that Ms. Wilson worked at the CIA from multiple government officials under circumstances that, at a bare minimum, warranted inquiry before the information was publicly disseminated.

The grand jury transcript introduced in evidence at trial conclusively established that, prior to testifying before the grand jury, defendant was not only informed of the general nature of the grand jury's inquiry, but was explicitly informed that the grand jury was investigating possible violations of the Intelligence Identities Protection Act, 50 U.S.C. § 421 (disclosure of the identity of covert intelligence personnel); or the Espionage Act, 18 U.S.C. § 793 (improper disclosure of national defense information),[6] among other statutes. At trial, the defense conceded that the grand jury was investigating the IIPA, and offered in evidence information regarding the statute. There can be no doubt that all of this evidence is more than sufficient to establish by a preponderance of the evidence that the FBI and the grand jury were investigating violations of the IIPA and the Espionage Act, and that defendant knew it when he spoke with investigators and testified before the grand jury.

---

[6] Other evidence presented at trial bolsters the conclusion that defendant had the IIPA firmly in mind when he committed the offenses of conviction. After the publication of the Novak column, defendant was informed by Craig Schmall of the serious potential consequences of disclosing the identity of a CIA employee such as Ms. Wilson. At about the time the investigation began (and prior to his FBI interviews), defendant asked the Vice President's legal counsel how he would know if a CIA agent was covert, and was given a copy of the IIPA. In addition, newspaper articles recovered from defendant's office indicated that Ms. Wilson was, or may have been, a covert agent at the time of the leaks, a matter of obvious relevance to whether the IIPA had been violated.

7

C.    **Application of the Cross Reference Provision with Respect to Count 1**

Because the investigation defendant was convicted of endeavoring to obstruct focused on violations of the IIPA and the Espionage Act, pursuant to USSG § 2J1.2(c)(1), the Court must calculate defendant's offense level by reference to the guidelines applicable to such violations.

1.    **The Intelligence Identities Protection Act**

The guideline applicable to violations of the IIPA is USSG § 2M3.9.  USSG § 2M3.9 provides:

(a) Base Offense Level:

(1)    30, if the information was disclosed by a person with, or who had authorized access to, classified information identifying a covert agent; or

(2)    25, if the information was disclosed by a person with authorized access only to other classified information.

Although Ms. Wilson was a covert agent, the investigation focused on disclosures made by persons who had been given authorized access to classified information generally, rather than by persons who had been specifically authorized to receive access to classified information that expressly identified Ms. Wilson as a covert agent.[7]  Therefore, in the government's view, under § 2M3.9, the applicable

---

[7] To be clear, the government favors application of USSG § 2M3.9(a)(2) based on the form of the information regarding Ms. Wilson's CIA-employment that defendant and the other leakers *received*, rather than on the substance of the information defendant and the others *leaked*. See PSR at 32-33.  The evidence obtained by the grand jury and presented at trial indicated that defendant learned  Ms. Wilson's identity in an oral conversation in which classified information regarding Ms. Wilson's CIA-employment was conveyed, but in which Ms. Wilson was not expressly identified as a covert agent.  Therefore, the government recommends the application of USSG § 2M3.9(a)(2) because the information to which defendant was given access did not expressly identify Ms. Wilson as a covert agent, not because there is or ever was any question regarding whether Ms. Wilson actually was a covert agent, or whether the leaks actually conveyed classified information revealing the identity of a covert agent.  See USSG § 2M3.9, comment.,(Background)("The alternative base offense levels reflect a statutory distinction by providing a greater base offense level for a violation of 50 U.S.C. §§ 421 by an official who has

8

base offense level is 25. Reducing the offense level by six as required under § USSG § 2X3.1, the applicable offense level calculated by cross-referencing the IIPA is 19.

### 2. The Espionage Act

The guideline applicable to violations of the Espionage Act, 18 U.S.C. § 793(d),[8] is USSG § 2M3.3. USSG § 2M3.3 carries an offense level of 24 if, as in this case, the information transmitted (Ms. Wilson's CIA employment) was classified, but not at the "top secret" level.

The commentary to USSG § 2M3.3 indicates that, if the defendant is convicted under 18 U.S.C. § 793(d) or (e) for the willful transmission of intangible information, the Court should apply § 2M3.2, which carries a significantly higher offense level. The investigation in this case focused on the transmittal of "intangible information." However, it is not clear, given the circumstances of the case, that a significantly higher offense level could be justified based solely on the fact that "intangible information," rather than documents, was transmitted. Accordingly, in the government's view, it is more appropriate to apply § 2M3.3 than § 2M3.2. Reducing the offense level by six as required under USSG § 2X3.1, the applicable offense level calculated by cross-referencing the

---

or had authorized access to classified information identifying a covert agent than for a violation by an official with authorized access only to other classified information. This guideline does not apply to violations of 50 U.S.C. §§ 421 by defendants who disclosed such information without having, or having had, authorized access to classified information.")

[8] 18 U.S.C. § 793(d) prohibits, among other things, the willful communication of national defense information by a person who has reason to believe the information could be used to the injury of the United States or to the advantage of any foreign nation, to a person not entitled to receive it. While § 793(f) could have been applicable to disclosures that could be characterized as "grossly negligent," a cross reference to the guideline applicable to that provision of the statute (USSG § 2M3.4) would result in an offense level of 13, which would not be applied, as it is lower than the lowest possible offense level provided by USSG § 2J1.2(a). *See* USSG § 2J1.2(c)(1).

9

Espionage Act is 18.

The Sentencing Guidelines provide that where there is more than one offense that may be cross-referenced, the most serious offense is to be used. USSG § 1B1.5, comment. (n.3). Therefore, the offense level calculated pursuant to the cross reference provided in § 2J1.2(c)(3) is 19 (the offense level calculated by cross-referencing the guideline applicable to the IIPA), rather than 18 (the offense level calculated by cross-referencing the Espionage Act). Because this offense level is greater than the offense level determined pursuant to § 2J1.2(a) and (b), defendant's offense level for Count 1 is 19.

### D.    Objections to the Probation Office's Calculations

The PSR states, without reference to legal authority, that in order to apply the cross-reference provision of USSG § 2J1.2(c)(1), "the *criminal* offense would have to be established by a preponderance of the evidence[,]" and suggests that such a finding cannot be made because "[t]he defendant was neither charged nor convicted of any crime involving the leaking of Ms. Plame's 'covert' status." However, neither the plain language of § 2J1.2(c)(1), nor the applicable commentary, nor the relevant case law, supports this interpretation of this guideline.

First, § 2J1.2(c)(1) requires only that defendant's offense "involved obstructing the investigation or prosecution of a criminal offense." Neither the language of the guideline nor the commentary contain any requirement of proof that the underlying offense was committed, much less, that it was committed by defendant. Nor do they contain any requirement of proof that the defendant was charged or convicted of the criminal offense under investigation. To the contrary, the guideline's use of the term "investigation *or* prosecution of a criminal offense" indicates that the Commission specifically contemplated that the cross reference would be applied where an offense

10

was investigated, but never charged or proven. What must be proven by a preponderance of the evidence is that the grand jury was investigating violations of the IIPA and the Espionage Act.

The statement in the commentary that conduct covered by these guidelines frequently is part of an effort to avoid punishment for "an offense that the defendant has committed" or to assist another person to escape punishment for "an offense," was added in order to make clear that the cross reference should be applied in cases in which the defendant committed obstruction to escape punishment for his own criminal conduct, as well to assist another person to escape punishment. *See* USSG Amendment 401. Thus, this language cannot, as defendant has suggested, reasonably be interpreted as implying an additional prerequisite to the application of the cross reference. If the Commission intended to require proof that the underlying offense was committed by defendant or by another person it could have, and would have, said so. It did not.

Cases construing USSG § 2J1.2(c)(1) and 2J1.3(c)(1) flatly reject the contention that application of the cross reference requires that the underlying offense was charged, much less proven. *See, e.g., United States v. Arias*, 253 F.3d 453, 459-60 (9th Cir. 2001) (holding that cross-reference must be applied without regard to whether underlying crime "was or is provable.") "The language of the cross-referencing provision is mandatory when the offense involves 'obstructing the investigation or prosecution of a criminal offense' without any qualification and without regard to whether the defendant or anybody else was convicted of the underlying offense, or whether an offense could be shown to have been committed at all." *Id. See also United States v. Quam*, 367 F.3d 1006, 1009 (8th Cir. 2004)(upholding application of the cross reference "notwithstanding the fact no one [was] indicted or convicted of an underlying drug offense"). Far from requiring proof of the underlying offense, the cases indicate that the cross reference is properly applied even where

11

the defendant or another person has been *acquitted* of the underlying offense. *See, e.g., United States v. Gay*, 44 F.3d 93, 95 (2d Cir. 1994)(affirming application of cross-reference although defendant acquitted of underlying offense; where "the district court found that the crime of conspiracy to rob the Credit Union had unquestionably been committed, regardless whether Gay was involved in it [and that] Gay's perjuries unquestionably related to that crime."); *United States v. McQueen*, 86 F.3d 180, 182-83 (11th Cir. 1996)(holding defendant's acquittal on underlying offense no impediment to use of cross reference in obstruction case).

The cross reference provision's focus on what the grand jury was investigating, rather than what indictment was returned or what crime actually occurred is no accident. If proof of the underlying crime were required, "obstructors of justice would benefit from . . . obstruction that successfully persuaded a grand jury not to return an indictment." *United States v. LeMoure*, 474 F.3d 37, 45 (1st Cir. 2007)(quotations and citations omitted). *See also United States v. Kimble*, 305 F.3d 480, 485 (6th Cir. 2002)(noting that the purpose of the cross-reference is to punish the obstruction of prosecutions involving more serious crimes more severely); *Arias*, 253 F.3d at 459 (noting that "the point of the cross reference is to punish more severely (and to provide a greater disincentive for) perjury in, and obstruction of, prosecutions with respect to more serious crimes"); *United States v. Russell*, 234 F.3d 404, 410 (8th Cir. 2000)(same); *United States v. Brenson*, 104 F.3d 1267, 1285 (11th Cir. 1997)(same). Requiring proof of the commission of the offense under investigation, even by a preponderance of the evidence, would have the perverse effect of rewarding successful efforts to hide the truth from the investigators.

The cross reference in 2J1.2(c)(1) is designed to match the offense level to the conduct and result *intended* by the defendant, and thus the offense level is determined under this guideline as it

12

would be in the case of an attempt, solicitation, or conspiracy pursuant to USSG § 2X1.1. In light of the overwhelming evidence indicating that the FBI and grand jury were investigating violations of the IIPA and the Espionage Act, that defendant was well aware that such offenses were being investigated, and that defendant tailored his false statements to the FBI and grand jury so as to avoid being found to have *knowingly* disclosed classified information regarding a covert agent, application of the cross reference in this case properly takes into account the seriousness of defendant's conduct and creates no unfairness.[9]

E.    **Application of the Cross Reference Provision with Respect to Counts 4 and 5**

Because the perjury of which defendant was convicted in Counts 4 and 5 was "in respect to" violations of the IIPA and the Espionage Act, pursuant to USSG § 2J1.3(c)(1), the Court must calculate defendant's offense level by reference to the guidelines applicable to such violations.

As this Court is aware, defendant was convicted of perjury in connection with false testimony before the grand jury in which he (a) described in elaborate detail a conversation with reporter Tim Russert on July 10 or 11, 2003 in which Mr. Russert purportedly told him that Ms. Wilson worked at the CIA, and that "all the reporters" knew it; (b) claimed that he was surprised by the information

---

[9] In the hypothetical case posited by defendant in his submission to the Probation Office – in which a defendant is convicted of intentionally obstructing a murder investigation, but it turns out that the homicide in question was, in fact, a suicide – the Court would not be relieved from applying the cross reference, as assumed by defendant, as long as defendant intended to obstruct a *murder* investigation. Should the Court in such a case reasons consider the resulting offense level too harsh in light of the particular circumstances of the case and the sentencing goals set forth in 18 U.S.C. § 3553(a), then the proper procedure would be to depart or deviate from the advisory Sentencing Guidelines range, rather than to ignore the mandate of the guidelines in calculating the defendant's offense level. No such departure or deviation would be appropriate in this case, given the jury's determination that defendant intended to obstruct the grand jury's investigation, which he knew focused on violations of the IIPA and the Espionage Act, and given that he was well aware of evidence indicating that such violations may have occurred.

13

concerning Ms. Wilson when he heard it from Mr. Russert; and (c) described in elaborate detail a conversation in which he purportedly told reporter Matt Cooper that the administration had heard from other reporters that Ms. Wilson worked for the CIA, but that he did not know whether this was true or even whether Mr. Wilson had a wife. The jury determined, beyond a reasonable doubt, that these statements were material to the grand jury's investigation, and that defendant made them deliberately, knowing that they were false, and for the purpose of obstructing the grand jury's investigation.

As discussed above, the grand jury's investigation focused on whether the leaks of information regarding Ms. Wilson's employment constituted violations of the IIPA and the Espionage Act, and defendant was expressly advised of that fact.

Moreover, defendant's false testimony bore directly on the elements of the IIPA and the Espionage Act, and the evidence presented at trial established that defendant was well aware of that fact. Evidence suggesting that defendant believed he was merely passing along to reporters information he had received from another reporter, Mr. Russert, tended to suggest that defendant did not, and could not have, deliberately disclosed the information, knowing or having reason to believe that Ms. Wilson was a "covert agent," that information regarding her employment was classified, or that the information could be used to the injury of the United States or the advantage of a foreign nation. Thus, the nature of defendant's false testimony constitutes circumstantial evidence of defendant's awareness of the elements the offenses under investigation.

Other evidence presented at trial provided further proof that defendant was well aware of the potential impact of this testimony, and that he fully intended it to convince the grand jury that he had no reason for him to believe or even suspect that information regarding Ms. Wilson's CIA-

14

employment could not legally be publicly disclosed.  For example, underlined news articles that defendant kept in his files established defendant's awareness at the time he testified before the grand jury that Ms. Wilson was, or may have been, a covert agent at the time of the leaks.  David Addington's testified that defendant inquired about how he would know that a CIA agent was covert, and that he personally provided defendant with a copy of the IIPA at about the time the investigation began.  In light of all this evidence, and the fact that defendant was a highly skilled and experienced lawyer, it is clear that defendant was aware of the elements of the IIPA, and therefore was aware that his prospects for criminal prosecution under that statute would likely depend on proof that he made the disclosures to reporters with actual knowledge that Ms. Wilson was a covert agent.[10]  As the jury determined beyond a reasonable doubt, the evidence precluded a finding that defendant's testimony was the product of memory failure and that it was, instead, a deliberate lie made in an effort to obstruct the grand jury's investigation.  Accordingly, the evidence presented at trial clearly established that defendant's false testimony was "in respect to" violations of the IIPA and Espionage Act, and the defendant well knew it at the time.  *See United States v. Leon-Reyes,* 177 F.3d 816, 824 (9th Cir. 1999)(holding that a perjurious statement "is in respect to a criminal offense where the defendant knew or had reason to know, at the time of his perjury, that his testimony concerned such a criminal offense.")

Contrary to the suggestion in defendant's submission to the Probation Office, it is not necessary that the defendant's false testimony specifically refer to the crimes under investigation. As the court in *United States v. Suleiman*, 208 F.3d 32,  40 (2d Cir. 2000) stated:

_____

[10]  In addition, letters submitted to the Court on behalf of Mr. Libby indicate that on at least two prior occasions while he was in private practice, Mr. Libby represented government officials suspected of mishandling or leaking classified information.

15

> To perform its broad investigative function, the grand jury must be able to ask questions intended to probe witnesses for information about knowledge or conduct relevant to the criminal offense being investigated. Such questions need not always specifically refer to the underlying offense and would sometimes be ineffective if they did. A witness, punishable for any false answer, deserves enhanced punishment for a false answer that obstructs an inquiry concerning a criminal offense, and a witness, informed of the subject of such an inquiry, may not avoid the enhancement just because the question to which he gave a false answer did not alert him to the precise link between the question and the offense under inquiry.

*Id.* (internal quotation marks omitted).  As long as the questions are relevant and material to the offenses under investigation, and the defendant is aware of the offenses under investigation, the cross reference must be applied.[11]

As in the case of USSG § 2J1.2(c)(1), the cross reference provided by 2J1.3(c)(1) is designed to ensure that the offense level is commensurate with the conduct and result *intended* by the defendant (*i.e.* perjury intended to obstruct and impede the grand jury's leak investigation).  Thus, it is irrelevant whether charges or convictions actually resulted from the investigation as long as defendant understood that the grand jury was investigating a criminal offense.  Indeed, as noted by the court in *United States v. Suleiman*, 208 F.3d 32, 39-40 (2d Cir. 2000):

> Perjuries committed before grand juries investigating crimes will usually risk [an incomplete or an inaccurate investigation or trial of a criminal offense and that], as long as the witness has been alerted to the fact that the grand jury is investigating a criminal offense, false answers to material questions will almost always merit enhanced punishment.

Nor would it matter even if the grand jury had resolved issues and made charging decisions regarding some individuals, but not others, at the time of defendant's offenses.  *See Suleiman*, 208

---

[11]  The court in *Suleiman* specifically noted that typically "the issues before the grand jury are not predetermined" and the grand jury's function "is to investigate possible crimes against the sovereign so that it can make a judgment whether a trial on specific charges is necessary." *Suleiman*, 208 F.3d at 39 (internal quotation marks and citations omitted).

16

F.3d at 40 (upholding application of cross reference despite the fact that convictions had been obtained prior to the perjurious testimony, and stating that "[t]he grand jury's investigation of a criminal conspiracy does not cease where, as here, the Government has already convicted some persons for participating in that conspiracy. The grand jury can still call witnesses to achieve a 'complete' investigation where its inquiry 'is directed at persons suspected of no misconduct but who may be able to provide links in a chain of evidence relating to criminal conduct of others.'")(quoting *United States v. Mandujano*, 425 U.S. 564, 573 (1976) (plurality opinion)).

Accordingly, the offense level for Counts 4 and 5 is 19, pursuant to USSG § 2J1.3(c)(1).

### F.    Application of the Cross Reference Provision with Respect to Count 2

USSG § 2B1.1 is the offense level applicable to the offense of which defendant was convicted in Count 2. Pursuant to USSG § 2B1.1(c)(3), if: (a) the offense did not involve drugs, guns or explosives, (b) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally, and (c) "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct)," the Court is directed to apply that guideline.

Here, the conduct charged in Count 2 (which incorporates by reference paragraphs 1-26 of Count 1) appears to establish a violation of 18 U.S.C. § 1505 (obstruction of proceedings before federal departments or agencies). The allegations of Count 2 provide background to defendant's false statements to the FBI from which it may be inferred that defendant made the false statements as part of an effort to obstruct the investigation of the leak of classified information regarding the CIA-employment of Valerie Wilson. On the other hand, Count 2 does not specifically allege that defendant made the charged false statements "corruptly," with intent to obstruct the FBI's

17

investigation. Therefore, the propriety of applying the cross reference to Count 2 is debatable. If the cross reference is applied, pursuant to USSG § 2B1.1(c)(3), the offense level for Count 2 should be determined under USSG § 2J1.2, the guideline applicable to violations of 18 U.S.C. § 1505 and, tracking the analysis set forth above, the offense level for Count 2 would be 19. If the cross reference is not applied, then the offense level defaults to level 6. USSG § 2B1.1(a)(2). Under the Sentencing Guidelines' grouping rules, the offense level for Count 2 would then be disregarded, and the offense level would be determined based on the adjusted offense level applicable to Counts 1, 4 and 5. *See* Revised PSR at 17.

## II.    SUBSTANTIAL INTERFERENCE WITH THE ADMINISTRATION OF JUSTICE

As discussed above, the government's view is that the application of the cross references contained in USSG §§ 2J1.2(c)(1) and 2J1.3 (c)(1) are mandatory given the circumstances of this case. In the event that this Court determines, contrary to the government's view, that the default offense level provided by §§ 2J1.2(a) and 2J1.3 (a) should be used, the government sets forth its position here that defendant's offense level should be increased by three levels under USSG § 2J1.2(b)(2) and § 2J1.3 (b)(2), because his offenses resulted in substantial interference with the administration of justice.

Under USSG § 2J1.2, the base offense level for Count 1 is 14. USSG § 2J1.2(a). USSG § 2J1.2(b)(2) provides that the offense level must be increased by three levels if the Court finds that the offense "resulted in substantial interference with the administration of justice." As defined by the Guidelines, "substantial interference" includes "the unnecessary expenditure of substantial governmental or court resources." USSG § 2J1.2, comment., n. 1.; § 2J1.3, comment., n. 1.

There can be no real doubt concerning the fact that substantial expenditures were incurred

18

as a result of defendant's perjury and obstruction of justice, best illustrated by the expenditures incurred in obtaining and checking the accuracy of the testimony of reporter Tim Russert. These efforts included four months of negotiations and litigation concerning the grand jury subpoena, as well as the deposition and presentation of Mr. Russert's testimony to the grand jury. None of this effort would have been necessary had defendant not fabricated his story about learning information regarding Ms. Wilson's employment from Mr. Russert. Obviously, efforts related to determining the truth or falsity of defendant's descriptions of his communications with Mr. Russert and the other reporters were necessary in order to determine both whether defendant had violated the IIPA or Espionage Act, as well as whether he had perjured himself or obstructed justice.

The expenditures associated with Mr. Russert, even standing alone, fall well within the type and amount of expenditures previously held to qualify as "substantial" under USSG §§ 2J1.2(b)(2) and 2J1.3(b)(2). *See, e.g., United States v. Tackett*, 193 F.3d 880, 888 (6th Cir. 1999)(holding that fraud investigation lasting several days constituted substantial expenditure); *United States v. Tankersley*, 296 F.3d 620, 623 (7th Cir. 2002) (the cost associated with weeks of investigating to find proceeds from the sale of a yacht and to uncover other assets caused by defendant's failure to comply with preliminary injunction was substantial); *United States v. O'Neill*, 116 F.3d 245, 250 (7th Cir. 1997)(determining that false statements to grand jury that caused authorities to spend additional resources to confirm witness's story constituted substantial expenditure); *United States v. Sinclair*, 109 F.3d 1527, 1540 (10th Cir. 1997) (the interference with administration of justice caused by forcing the re-interviewing and recalling of two witnesses was substantial); *United States v. Dudley*, 463 F.3d 1221, 1226 (11th Cir. 2006)(threatening letter resulted in substantial interference in that it resulted in diverting two judges and multiple law enforcement agents from their duties for several

19

hours).

However, additional expenditures even beyond those associated with Mr. Russert should also be taken into account. The government was forced to interview or reinterview numerous witnesses, and/or seek their grand jury testimony, as a result of Mr. Libby's offenses. This was no small effort. These witnesses included, but were not limited to, the Vice President, Cathie Martin, Craig Schmall, Robert Grenier, Marc Grossman, Eric Edelman, and Jenny Mayfield. Mr. Libby's version of events involved all of these individuals, and his account of events had to be cross-checked against theirs for a determination both as to whether charges of obstruction, perjury, and false statements should be filed, and as to whether charges under the IIPA and the Espionage Act would be appropriate. In addition, the government had to issue and review the results of several subpoenas for telephone records and other documents, including White House emails and notes and CIA documents, as a result of Mr. Libby's offenses.

Because expenditures incurred for purposes of investigating or prosecuting both the underlying offense and possible obstruction or perjury charges support an enhancement under USSG §§ 2J1.2(b)(2) and 2J1.3(b)(2), it is no defense to argue that the testimony of the reporters and other witnesses, as well as the documents that were subpoenaed, were also relevant to possible charges of perjury and obstruction of justice. *See United States v. Harrington*, 82 F.3d 83, 86-87 (5th Cir. 1996) (noting, "[a]s a practical matter, it would seem that in most cases the investigation of the underlying offense and the obstruction charge would be almost inextricably related."); *United States v. Tackett*, 193 F.3d 880, 886 (6th Cir. 1999)(holding that "substantial expense made necessary in the prosecution of a separate charge-whether or not such expense also aids in the eventual prosecution for obstruction-is exactly what the enhancement was designed to punish.") *See also United States*

20

*v. Sinclair*, 109 F.3d 1527, 1539 (10th Cir. 1997)(enhancement warranted where expense associated with investigating and disproving testimony of witnesses whom defendant had improperly influenced aided in both the prosecution of defendant's obstruction offense and the underlying drug trial).

The Probation Office has argued that the enhancement should not be applied because: (a) the defendant signed a waiver of his right to confidentiality with respect to his communications with journalists regarding Ms. Wilson; and (b) the journalists litigated the motions to quash "to protect their interests and rights as journalists protecting their sources of information." PSR at 33.

Even if the additional expenditures incurred by the government were limited to obtaining the testimony of journalists, the defendant's waiver of confidentiality would not, and could not, preclude the application of the enhancement. First, the waiver was not signed until *after* defendant had already told the FBI that he had learned about Ms. Wilson's employment from Tim Russert and repeated that story in a second interview. At the time of these interviews, defendant was well aware of reporter's practices with regard to the protection of their sources, a point reflected by the fact that his testimony regarding Mr. Russert included the false assertion that he had explicitly requested that Mr. Russert treat their conversation regarding Ms. Wilson as "off the record," and thus anticipated the possibility of litigation over any subpoenas the government might issue. Moreover, when defendant was made aware that reporter Miller and her counsel would not rely upon his waiver because they did not consider it voluntary, defendant made no effort to set the record "straight" until after Ms. Miller had sat in jail for nearly 90 days. Even then, defendant included in a letter authorizing her to testify comments that suggested that he expected or hoped that she would testify that he did not disclose information regarding Ms. Wilson's employment to her prior to the publication of Bob Novak's column. In sum, the evidence showed that defendant fully anticipated

21

that, in order to check out his story, the government would need to expend substantial resources litigating with Mr. Russert and the other reporters, and thus his waiver does not absolve him of responsibility for the government's need to expend such resources.

Nor is application of the enhancement rendered inappropriate based on the fact that the reporters chose to litigate the subpoenas to vindicate their perceived rights under the First Amendment. The enhancement applies if the offense "resulted in" the unnecessary expenditure of substantial governmental or court resources. This language clearly includes situations, such as this one, in which the defendant sets in motion a chain of actions that led to substantial expenditures that otherwise would have been unnecessary. Moreover, even if the government had been able to obtain interviews and grand jury testimony from the reporters without litigation, expenditures necessary to conduct those interviews and obtain that testimony would be sufficient to qualify as the expenditure of substantial government resources. *See, e.g., Sinclair,* 109 F.3d 1527 at 1540 (holding that necessity of re-interviewing and recalling of two witnesses was substantial).

Accordingly, an enhancement pursuant to USSG §§ 2J1.2(b)(2) or 2J1.3(b)(2) is warranted.

## III. NONE OF THE POSSIBLE GROUNDS FOR DEPARTURE IDENTIFIED BY THE PROBATION OFFICE SUPPORT A DEPARTURE OR DEVIATION FROM THE ADVISORY GUIDELINES RANGE

As demonstrated below, none of the potential bases for departure identified by the Probation Office, singly or in combination, supports a departure or deviation from the advisory Sentencing Guidelines range in this case. Therefore, and based on a consideration of the factors set forth in 18 U.S.C. § 3553(a), a sentence within the advisory range is reasonable and appropriate.

22

A.    **Defendant's Record of Government Service**

As discussed in the government's Sentencing Memorandum, also filed today, while defendant has a substantial record of government service, that record does not distinguish him from countless other federal employees who make innumerable sacrifices for the public good, and it in no way exonerates him from the conduct of which he was convicted.  Unless we are prepared to provide sentencing discounts to all those who are privileged to serve their country but nevertheless break its laws, a downward departure on this basis is unwarranted.[12]

B.    **Anticipated Loss of Law License**

Nor should a departure be granted based on the anticipated loss of defendant's law license. The government does not dispute that, should defendant ultimately lose his law license and be unable to obtain its reinstatement, this loss would be a serious collateral consequence of his conviction.  If anything, however, the fact that defendant is a highly-trained and experienced lawyer, sworn to uphold the Constitution and laws of the United States as a condition to holding a license to practice law, would support an upward, rather than a downward, departure.  Who, if not a licensed lawyer, may be expected to fully appreciate and respect the need for truth in our system of justice?  It is not uncommon or "outside the heartland" of crimes involving dishonesty for defendants to suffer collateral consequences related to their professions, and downward departures are not routinely given to police officers, bankers, accountants, and insurance agents, simply because they are forced to find other lines of work after being convicted of making false statements or fraud.

---

[12] Any suggestion that defendant is entitled to leniency based on the loss of income he suffered as a result of his decision to work in government rather than in the private sector should be rejected out of hand, particularly in light of the fact that, despite this financial sacrifice, defendant remains a man of considerable financial means.

23

### C.    Financial Impact of Prosecution

A downward departure based in whole or in part on the substantial legal expenses the defendant may incur would be completely unjustified. First, there is no evidence that defendant has suffered or will suffer substantial financial impact as a result of the trial in this case. While the Probation Office reports that "this case has resulted in estimated legal fees in excess of $5 million, exclusive of sentencing," it is also reported that "a legal defense fund [of an undisclosed amount] has been established to assist Mr. Libby with his legal expenses." In order for the Court to assess whether defendant has incurred, or may incur in the future, substantial legal expenses in connection with this case, the Court would have to know the amount of money that is, or may become, available from the legal defense fund to pay defendant's legal expenses.[13]

But more importantly, even if defendant were faced with paying the total amount of his legal expenses, that would be a matter of his own choice and economic wherewithal, not a "collateral consequence" of the prosecution. Like all defendants, defendant Libby was and is free to retain the counsel of his choice, subject to the limits of his economic means. It would be grossly unfair to offer sentence reductions to those defendants who are able to afford, and who decide to retain, expensive counsel, while denying such reductions to those defendants whose economic circumstances prevent them from even considering such options.

### D.    Likelihood of Recidivism

Remorse, acceptance of responsibility, and the prospects for rehabilitation are matters that tend to indicate that it is unlikely that the defendant will engage in future criminal conduct, and that

---

[13] The PSR cites no legal basis, and the government cannot conceive of any, upon which the Court could appropriately consider the costs of a civil lawsuit brought by a private party.

24

therefore leniency may be warranted.  These factors are entirely absent in this case.  In fact, defendant maintains, despite his conviction, that he is totally innocent.  Thus, he demonstrates no recognition that he has done anything wrong, and provides the Court with no basis for concluding that, if presented with similar circumstances, he would make choices any different from the ones that led to his conviction in this case.  It is of course defendant's right to maintain his innocence, but without evidence indicating that he recognizes the wrongfulness of his conduct, there is no basis for the Court to conclude that defendant is unlikely to engage in similar criminal conduct in the future.

E.    **Aberrant Behavior**

The Probation Office suggests that the Court could consider a downward departure based on "aberrant behavior," pursuant to USSG § 5K2.20, which provides:  "The Court may depart downward under this policy statement only if defendant committed a single criminal occurrence or single criminal transaction that was committed without significant planning, was of limited duration, and represents a marked deviation by the defendant from an otherwise law-abiding life."

Defendant's conduct falls far short of meeting the prerequisites for granting a downward departure based on aberrant behavior under the Guidelines.  First, the offenses of conviction represent a series of four separate offenses – four separate decisions to lie – rather than a single occurrence or transaction.  The offenses were committed over a period of five months, a period that cannot by any stretch be considered a "limited duration."  *See, e.g., United States v. Bueno*, 443 F.3d 1017, 1023 (8th Cir. 2006)(reversing grant of departure based on aberrant behavior where crime committed "over a number of days").

Indeed, the evidence showed that defendant's offenses were committed following significant deliberation.  Defendant's calendars indicate that, prior to defendant's first FBI interview, defendant

25

cleared his schedule for a full day, and that on each of the days pre-dating his grand jury appearances, defendant set aside large blocks of time reserved for "office time" and "private meetings" in his office.[14] This provided defendant ample time to review documents with his lawyer and prepare for and plan the statements and testimony he would give. As discussed above, the evidence further indicated that defendant was well aware of the elements of the offenses under investigation, and his statements to investigators and his grand jury testimony were carefully tailored to avoid being seen as having known, or having had reason to suspect, Ms. Wilson's covert or classified status at the CIA.

Defendant testified in the grand jury that, despite his general observance of the admonition to refrain from checking his recollections with others in the Vice President's office, he nevertheless advised the Vice President that he recalled learning of Ms. Wilson's employment from Tim Russert, and later advised him that he located a document among his notes indicating that he had actually learned about Ms. Wilson's employment from the Vice President. This testimony demonstrated not only that defendant's testimony was prepared, and altered, over time but, also, that defendant considered it important for the Vice President to know what he (defendant) recalled (and thus what he would say) about his receipt of information regarding Ms. Wilson. All of this evidence, apparently credited by the jury, strongly negates any suggestion that defendant's false statements were in any way inadvertent, spontaneous or unplanned. *See United States v. Dyce,* 91 F.3d 1462, 1470 (D.C. Cir.)(amending and superseding on denial of rehearing, 78 F.3d 610 (D.C. Cir.)) (holding that aberrant behavior "generally contemplates a spontaneous and seemingly thoughtless act rather

---

[14] Calendars for the dates immediately preceding the dates of defendant's grand jury appearances were obtained by subpoena, but were not admitted in evidence at trial.

than one which was the result of substantial planning.") (internal quotations and citations omitted), *cert. denied,* 117 S. Ct. 533 (1996).

While it may be inferred from defendant's lack of prior convictions that defendant has led an otherwise law-abiding life, that fact is taken into consideration by the defendant's Criminal History Category of I and is not, standing alone, a basis for departing based on "aberrant behavior." Otherwise, every first-time offender would be entitled to a departure based on aberrant behavior. *See, e.g., Bueno,* 443 F.3d at 1023(stating that, to warrant a departure based on aberrant behavior, "the offense must have been more than something out of the defendant's character; it must have been a spontaneous and thoughtless act"); *United States v. Hillyer,* 457 F.3d 347, 352 (4th Cir. 2006)(holding that, because the guidelines take into account a defendant's criminal history, "aberrant behavior must mean something more than merely a first offense."); *United States v. Pierson,* 121 F.3d 560, 564-65 (9th Cir. 1997) (holding that "an absence of criminal history is not synonymous with aberrant behavior" and "a defendant's exemplary life prior to his criminal involvement does not, by itself, justify a departure for aberrant behavior"); *United States v. McClatchey,* 316 F.3d 1122, 1134-35 (10th Cir. 2003)(reversing grant of departure and noting that an aberrant behavior departure should not be used as a "back door" for taking into account discouraged factors such as education and employment history).

For these reasons, a downward departure or deviation from the advisory Guidelines range based on aberrant behavior is not warranted.

## CONCLUSION

It is respectfully submitted that a consideration of all of the factors set forth in USSG § 3553(a) indicates that the advisory Sentencing Guidelines range, calculated by reference to the

offenses that were the subject of the investigation defendant stands convicted of endeavoring to obstruct, is reasonable and appropriate.  A sentence within the advisory guidelines range would appropriately take into account the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, and the need to afford adequate deterrence to similar criminal conduct.  *See* 18 U.S.C. § 3553(a).  Moreover, given that there are no special circumstances warranting a downward departure or deviation from advisory guidelines range, a sentence within the advisory guidelines range would serve to avoid unwarranted sentencing disparities between defendant and other defendants convicted of the same offenses, and thus would promote respect for the law as being applicable to all persons, regardless of the power or privileges they enjoy.

For all of the foregoing reasons, the government respectfully requests that this Court impose a sentence of imprisonment within the advisory Sentencing Guidelines range of 30 to 37 months.

Respectfully submitted,


_____/s/_____
PATRICK J. FITZGERALD
Special Counsel

DEBRA RIGGS BONAMICI
KATHLEEN M. KEDIAN
PETER R. ZEIDENBERG
Deputy Special Counsels
Office of the United States Attorney
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, D.C.  20530
202-514-1187

Dated:  May 25, 2007

28

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 25th day of May, 2007, I caused true and correct

copies of the foregoing to be served on the following parties by electronic mail:

William Jeffress, Esq.
Baker Botts
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Facsimile: 202-585-1087

Theodore V. Wells, Esq.
Paul Weiss
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile: 212-373-2217

John D. Cline, Esq.
Jones Day
555 California Street
San Francisco, CA 94104
Facsimile: 415-875-5700

Patrick J. Fitzgerald
Special Counsel
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, D.C.  20530
202-514-1187

By: _____/s/_____
Debra Riggs Bonamici
Deputy Special Counsel