# Exhibit M-2

**FILED**

MAY 2 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CR 05-394

**EXHIBIT B**

Case 1:07-cv-04595-BSJ    Document 11-19    Filed 06/29/2007    Page 3 of 27

35

48 of 163 DOCUMENTS

Copyright 2007 Federal News Service, Inc.
All Rights Reserved
Federal News Service

March 16, 2007 Friday

**LENGTH:** 15372 words

**HEADLINE:** PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR SAFE-GUARDING THE IDENTITY OF CIA AGENT VALERIE PLAME WILSON;
CHAIRED BY: REPRESENTATIVE HENRY WAXMAN (D-CA);
WITNESS: VALERIE PLAME WILSON, FORMER CIA EMPLOYEE;
LOCATION: 2154 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C.

**BODY:**

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR SAFEGUARDING THE IDENTITY OF CIA AGENT VALERIE PLAME WILSON CHAIRED BY: REPRESENTA-TIVE HENRY WAXMAN (D-CA) WITNESS: VALERIE PLAME WILSON, FORMER CIA EMPLOYEE LOCA-TION: 2154 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C. TIME: 10:15 A.M. EDT DATE: FRI-DAY, MARCH 16, 2007

REP. WAXMAN:  (Sounds gavel.)  The meeting of the committee will come to order.

Today the committee is holding a hearing to examine how the White House handles highly classified information. In June and July 2003, one of the nation's most carefully guarded secrets -- the identity of a covert CIA agent, Valerie Plame Wilson -- was repeatedly revealed by White House officials to members of the media.  This was an extraordina-rily serious breach of our national security.  President George W. Bush's father, the former President Bush, said, and I quote, "I have nothing but contempt and anger for those who expose the names of our sources.  They are, in my view, the most insidious of traitors,"  end quote.

Today we'll be asking three questions:  One, how did such a serious violation of our national security occur?; two, did the White House take the appropriate investigative and disciplinary steps after the breach occurred?; and three, what changes in White House procedures are necessary to prevent future violations of national security from occurring?

For more than three years, a special prosecutor, Patrick Fitzgerald, has been investigating the leak for its criminal implications.  By definition, Mr. Fitzgerald's investigation had an extremely narrow, criminal focus.  It did not answer the broader policy questions raised by the release of Ms. Wilson's identity, nor did it seek to ascribe responsibility out-side of the narrow confines of the criminal law.

As the chief investigative committee of the House of Representatives, our role is fundamentally different than Mr. Fitzgerald's.  It's not our job to determine criminal culpability, but it is our job to understand what went wrong and to insist on accountability and to make recommendations for future -- to avoid future abuses.  And we begin that process today.

This hearing is being conducted in open session.  This is appropriate, but it is also challenging.  Ms. Wilson was a covert employee of the CIA.  We cannot discuss all of the details of her CIA employment in open session.  I have met with -- personally with General Hayden, the head of the CIA, to discuss what I can and cannot say about Ms. Wilson's service.  And I want to thank him for his cooperation and help in guiding us along these lines.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

My staff has also worked with the agency to assure these remarks do not contain classified information.  I have been advised by the CIA, and that even now -- after all that has happened -- I cannot disclose the full nature, scope and character of Ms. Wilson's service to our nation without causing serious damage to our national security interests.  But General Hayden and the CIA have cleared these following comments for today's hearing.

During her employment at the CIA, Ms. Wilson was undercover.  Her employment status with the CIA was classified information, prohibited from disclosure under Executive Order 12958.  At the time of the publication of Robert Novak's column on July 14, 2003, Ms. Wilson's CIA employment status was covert.  This was classified information.  Ms. Wilson served in senior management positions at the CIA in which she oversaw the work for other CIA employees and she attained the level of GS-14 -- Step Six under the federal pay scale.  Ms. Wilson worked on some of the most sensitive and highly secretive matters handled by the CIA.  Ms. Wilson served at various times overseas for the CIA.

Without discussing the specifics of Ms. Wilson's classified work, it is accurate to say that she worked on the prevention of the development and use of weapons of mass destruction against the United States.  In her various positions at the CIA, Ms. Wilson faced significant risks to her personal safety and her life.  She took on serious risks on behalf of our country.  Ms. Wilson's work in many situations had consequence for the security of her colleagues, and maintaining her cover was critical to protecting the safety of both colleagues and others.

The disclosure of Ms. Wilson's employment with the CIA had several serious affects.  First, it terminated her covert job opportunities with the CIA.  Second, it placed her professional contacts at greater risk.  And third, it undermined the trust and confidence with which future CIA employees and sources hold the United States.  This disclosure of Ms. Wilson's classified employment status with the CIA was so detrimental that the CIA filed a crimes report with the Department of Justice.

As I mentioned, Ms. Wilson's work was so sensitive that even now she is still prohibited from discussing many details of her work in public because of the continuing risks to CIA officials and assets in the field, and to the CIA's ongoing work.  Some have suggested that Ms. Wilson did not have a sensitive position with the CIA or a position of unusual risk.  As a CIA employee, Ms. Wilson has taken a lifelong oath to protect classified information, even after her CIA employment has ended.  As a result, she cannot respond to most of the statements made about her.

I want to make clear, however, that any characterization that minimizes the personal risk of Ms. Wilson that she accepted in her assignments is flatly wrong.  There should be no confusion on this point.  Ms. Wilson has provided great service to our nation and has fulfilled her obligation to protect classified information admirably and we're confident she will uphold it again today.

Well, that concludes the characterizations that the CIA is permitting us to make today.  But to these comments, I want to add a personal note.  For many in politics, praising the troops and those who defend our freedom is second nature.  Sometimes it's done in sincerity and sometimes it's done with cynicism, but almost always we don't really know who the people are.  We don't know they're out -- we don't know who those people are that are out there.  They are our abstract heroes whether they're serving in the armed services or whether they're serving in the CIA.

Two weeks ago this committee met some real heroes face to face when we went to visit Walter Reed.  Every member was appalled at what we learned.  Our treatment of the troops didn't match our rhetoric. Thankfully, Mrs. Wilson hasn't suffered physical harm and faces much more favorable circumstances now than some of the troops -- some of the soldiers that we met last week.  But she too has been one of those people fighting to protect our freedom. And she, like thousands of others, were serving our country bravely and anonymously.  She didn't ask that her identity be revealed, but it was, repeatedly, and that was an inexcusable breach of the responsibilities our country owes to her. Once again, our actions did not match our rhetoric.

I want to thank Mrs. Wilson for the tremendous service she gave to our country and recognize the remarkable personal sacrifices she and countless others have made to protect our national security.  You and your colleagues perform truly heroic work and what happened to you not only should never have happened, but we should all work to make sure it never happens again.  Thank you very much.

I want to yield to Mr. Davis, the ranking member of our committee.  And in doing so, I want to thank him for his cooperation in this hearing.  This has been a complicated hearing.

It's much more complicated than most of our hearings.  We've had to decide what we could and what we couldn't say, what we could and couldn't ask, whether we're going to be an open session of closed session, et cetera and I want to thank Mr. Davis for the tremendous cooperation he's given us, and to recognize him at this time.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

REP. TOM DAVIS (R-VA):   Thank you, Chairman Waxman.  I want to first start by congratulating you on the
passage of important reform legislation this week.  We adopted bipartisan bills crafted in this committee to strengthen
the Freedom of Information Act, disclose donors to presidential libraries, expand access to presidential records and to
fortify whistle-blower protections.

Given those accomplishments, it's ironic that we, on Sunshine Week -- the annual observance of open government
-- with a more partisan hearing on how to best keep secrets.  Let me state at the outset that the outing of Mrs. Wilson's
identity was wrong, and we have every right to look at this and investigate it.  But I have to confess I'm not sure what
we're trying to accomplish today, given all the limitations that the chairman has just described that have put on us by the
CIA.  Ostensibly called to examine White House procedures for handling and protecting classified information, the
hearing's lead witness never worked at the White House.  If she knows about security practices there, she can't say
much about them in a public forum.  We do know that she worked at the CIA.  That now-well-known fact raises some
very different questions about how critical but difficult it is to protect the identity of individuals with covert status.  But
again, those are questions we probably can't say much about in a public forum without violating the very security safe-
guards the majority claims to be worried about at the White House.

Under these circumstances, perhaps, a hypothetical case is the best way to describe the futility of trying to enforce
the Intelligence Identity Protection Act in this decidedly non-judicial venue.  Let's say, for example, a member of a
committee staff is told to identify a CIA witness for a hearing on security practices.  He or she calls the agency and
asks to speak with Official A.  Official A's not in, so the call's routed to Official B, who identifies him or herself by
name and title and answers the staffer's question. Thinking Official B would be a fine witness, the staff member then
calls the Congressional Research Service or a friend at another committee to find out more about Official B.  But Offi-
cial B happens to be a covert agent.  In passing the name, title and CIA affiliation around, has the staff member vi-
olated the law against disclosure? Probably not, but you'd have to be looking through a pretty thick political prism to see
an unintentional unauthorized disclosure in that context.

And that happened.  In the case of Mrs. Wilson, the majority stresses the fact the disclosure of her status triggered
a crimes report by the CIA and the Justice Department.  Allegations against White House officials and reporters were
thoroughly vetted.  But after spending six months and millions of dollars, the Special Council charged no one with the
violations of the Intelligence Identities Protection Act.  The lack of prosecution under the act shows those disclosures
probably occurred in a similarly non-intentional context, lacking the requisite knowledge of covert status or the inten-
tion to disclose that status without authorization.  No process can be adopted to protect classified information that no
one knows is classified, just as no one can be prosecuted for unauthorized disclosure of information that no one ever
said was protected.

So this looks to me more like a CIA problem than a White House problem.  If the agency doesn't take sufficient
precautions to protect the identity of those who engaged in covert work, no one else can do it for them.  The same law
meant to protect secret identities also requires an annual report to Congress on the steps taken to protect the highly sen-
sitive information.  But we're told few, if any, such reports exist from the CIA.  Who knows what information needs to
be protected and how they are told?  Is there a list officials can check against?  Do CIA briefers know when material
given to executive branch officials references a covert agent, or are they cautioned not to repeat the name?  How is it
made known and to whom when the five-year protection period for a formerly covert agent has elapsed?  Those are the
questions that need to be asked about the safeguards on classified information.  But we won't hear from the CIA today
because this is an open forum.

Given all of that, I suspect we're going to probably waste some time talking about things we can't talk about, and
that's unfortunate. Unfortunate an individual, possibly still under covert status, was publicly identified.  Unfortunate
executive branch officials got anywhere near this media maelstrom rather than focus on more serious problems.  That's
a disappointment to me.  And unfortunate that this has become so politicized.  On this side, we're not here to defend or
attack anyone.  In an open session, we hope to shed some sunshine on the workings of government.  I have to say
again I'm not sure that's going to happen today, but I thank our witnesses for trying.

Thank you.

REP. WAXMAN:  Thank you very much, Mr. Davis.

Our first witness is Ms. Valerie Plame Wilson.  She's a former covert CIA employee whose service to this country
included work involving the prevention of the development and use of weapons of mass destruction against our nation.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

Her employment status was publicly disclosed in July 2003, effectively terminating her covert job opportunities within the CIA.

(The witness is sworn in.)

Before we begin the questioning period, I want to underscore to members of the committee that while it is important that Ms. Wilson have the opportunity to provide testimony that will help us understand the significance of the disclosure of her CIA employment status, we should not be seeking classified information from Ms. Wilson in this forum and we need to respect that she may, in some cases, have to decline to respond on the grounds that doing so would risk disclosure of sensitive information.

Ms. Wilson, we're pleased to have you here. Thank you very much for coming to our committee today, and I want to recognize you for an opening statement. There's a button on the base of the mike. Be sure to press it in and pull it closely enough to you so you can be heard.

MS. PLAME WILSON: Here we go.

REP. WAXMAN: Pull it a little closer.

MS. PLAME WILSON: Good morning, Mr. Chairman and members of the committee.

My name is Valerie Plame Wilson, and I am honored to have been invited to testify under oath before the Committee on Oversight and Government Reform on the critical issue of safeguarding classified information. I'm grateful for this opportunity to set the record straight.

I served the United States loyally and to the best of my ability as a covert operations officer for the Central Intelligence Agency. I worked on behalf of the national security of our country, on behalf of the people of the United States until my name and true affiliation were exposed in the national media on July 14th, 2003, after a leak by administration officials. Today I can tell this committee even more.

In the run-up to the war with Iraq, I worked in the Counterproliferation Division of the CIA, still as a covert officer whose affiliation with the CIA was classified. I raced to discover solid intelligence for senior policy makers on Iraq's presumed weapons of mass destruction program. While I helped to manage and run secret worldwide operations against this WMD target from CIA headquarters in Washington, I also traveled to foreign countries on secret missions to find vital intelligence. I loved my career because I love my country. I was proud of the serious responsibilities entrusted to me as a CIA covert operations officer, and I was dedicated to this work.

It was not common knowledge on the Georgetown cocktail circuit that everyone knew where I worked. But all of my efforts on behalf of the national security of the United States, all of my training, all of the value of my years of service were abruptly ended when my name and identity were exposed irresponsibly. In the course of the trial of Vice President Cheney's former chief of staff, Scooter Libby, I was shocked by the evidence that emerged. My name and identity were carelessly and recklessly abused by senior government officials in both the White House and the State Department. All of them understood that I worked for the CIA, and having signed oaths to protect national security secrets, they should have been diligent in protecting me and every CIA officer.

The CIA goes to great lengths to protect all of its employees, providing at significant taxpayers' expense painstakingly devised and creative covers for its most sensitive staffers. The harm that is done when a CIA cover is blown is grave, but I can't provide details beyond that in this public hearing. But the concept is obvious.

Not only have breaches of national security endangered CIA officers, it has jeopardized and even destroyed entire networks of foreign agents, who in turn risk their own lives and those of their families to provide the United States with needed intelligence. Lives are literally at stake.

Every single one of my former CIA colleagues -- from my fellow covert officers, to analysts, to technology operations officers, to even the secretaries -- understand the vulnerabilities of our officers, and recognize that the travesty of what happened to me could happen to them.

We in the CIA always know that we might be exposed and threatened by foreign enemies. It was a terrible irony that administration officials were the ones who destroyed my cover. Furthermore, testimony in the criminal trial of Vice President Cheney's former chief of staff, who has now been convicted of serious crimes, indicates that my exposure arose from purely political motives.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

Within the CIA, it is essential that all intelligence be evaluated on the basis of its merits and actual credibility. National security depends upon it. The tradecraft of intelligence is not a product of speculation. I feel passionately, as an intelligence professional, about the creeping, insidious politicizing of our intelligence process. All intelligence professionals are dedicated to the idea that they would rather be fired on the spot than distort the facts to fit a political view -- any political view or any ideology.

As our intelligence agencies go through reorganizations and experience the painful aspects of change, and our country faces profound challenges, injecting partisanship or ideology into the equation makes effective and accurate intelligence that much more difficult to develop. Politics and ideology must be stripped completely from our intelligence services or the consequences will be even more severe than they have been, and our country placed in even greater danger.

It is imperative for any president to be able to make decisions based on intelligence that is unbiased. The Libby trial and the events leading to the Iraq war highlight the urgent need to restore the highest professional standards of intelligence collection and analysis, and the protection of our officers and operations. The Congress has a constitutional duty to defend our national security, and that includes safeguarding our intelligence.

That is why I'm grateful for this opportunity to appear before this committee today and to assist in its important work. Thank you. And I welcome any questions.

REP. WAXMAN: Thank you very much Ms. Wilson. We'll now proceed with 10 minutes on each side, managed by the chair and the ranking member of the committee. For our first round, I want to yield five minutes to the gentleman from Kentucky, Mr. Yarmuth, to begin the questioning.

REP. JOHN YARMUTH (D-KY): Thank you, Mr. Chairman. Thank you for being here today, Mrs. Wilson. Our country owes you a great debt of gratitude for your service, and I think you're continuing that service today by appearing.

I'd like to start by asking you about July 14, 2003, the day that Robert Novak wrote the column in the Chicago Sun Times identifying you as an agency operative on weapons of mass destruction. Quote -- but before I get to that, I want to ask you about the day before, July 13th, my understanding is that on that date, you were covert. Is that correct?

MS. PLAME WILSON: I was a covert officer, correct.

REP. YARMUTH: Without destroying - or disclosing classified information, what does covert mean?

MS. PLAME WILSON: I'm not a lawyer, but my understanding is that the CIA is taking affirmative steps to ensure that there is no links between the operations officer and the Central Intelligence Agency -- I mean, that's simple.

REP. YARMUTH: And you -- as you said -- and my understanding is that your work was classified for purposes of many of the regulations of the laws that we're talking about, your work was classified on that day, July 13th?

MS. PLAME WILSON: That's correct.

REP. YARMUTH: Did the July 14th column destroy your covert position and your classified status?

MS. PLAME WILSON: Yes it did. I could no longer perform the work for which I had been highly trained. I could no longer travel overseas or do the work for which -- my career, which I loved. It was done.

REP. YARMUTH: And my -- this may be a simplistic question, but the information that was disclosed in Robert Novak's column -- is it correct to say that that is information that you would not have disclosed yourself?

MS. PLAME WILSON: That is correct.

REP. YARMUTH: How did you react when you learned that your identity had been disclosed?

MS. PLAME WILSON: I found out very early in the morning when my husband came in and dropped the newspaper on the bed and said, "He did it." And I quickly turned and read the article and I felt like I had been hit in the gut. I -- it was over in an instant, and I immediately thought of my family's safety, the agents, the networks that I had worked with -- and everything goes through your mind in an instant.

REP. YARMUTH: What effect did the leak have on you professionally?

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

MS. PLAME WILSON:  Professionally?  Well, I could no longer do the work which I had been trained to do.
There was -- after that, there was no way that you can serve overseas in a covert capacity, and so that career path was
terminated.

REP. YARMUTH:  Did the leak make you feel that your entire career had been thrown out the window, essentially
-- to have been wasted at all?

MS. PLAME WILSON:  Not wasted, but certainly terminated prematurely.

REP. YARMUTH:  You've talked a little bit about your concern about the effect of the leak on your professional
contacts.  Did you have any contact with those people who were -- expressed their concern about the effect on their
professional career?

MS. PLAME WILSON:  No, I did not.  But I do know the Agency did a damage assessment.  They did not share
it with me, but I know that certainly puts the people and the contacts I had all in jeopardy, even if they were completely
innocent in nature.

REP. YARMUTH:  And what effect do you think it had at the broadest level -- I'm talking about, you know, for
future CIA employees and future sources?

MS. PLAME WILSON:  I think it was -- it had a very negative effect.  If our government cannot even protect my
identity, future foreign agents who might consider working with the Central Intelligence Agency in providing needed
intelligence would think twice, "Well, they can't even protect one of their own, how are they going to protect me?"  As
well as, the Agency is working very hard to attract highly talented young people into its ranks because we do have pro-
found challenges facing our country today.  And I can't think that that helped those efforts.

REP. YARMUTH:  I can't see the clock, Mr. Chairman, I don't know whether my time is expired or not.

REP. WAXMAN:  You have nine seconds.

REP. YARMUTH:  Nine seconds.  (Laughter.)  Well, I'll yield back the balance of my seconds, Mr. Chairman,
thank you.  Thank you, Mrs. Wilson.

REP. WAXMAN:  Thank you, Mr. Yarmuth.  The chair would now like to yield time to Mr. Hodes, the gentle-
man from New Hampshire.

REP. PAUL HODES (D-N.H.):  Thank you, Mr. Chairman.  Mrs. Wilson, thank you for coming today.

What happened to you is deadly serious.  You were the victim of a national security breach.  If this was a law en-
forcement context, something I'm familiar with, it would be equivalent to disclosing the identity of an undercover police
officer who has put his life on the line, and the lives of all those who help that officer.

Our job on this committee is to find out how the breach happened.  Now, I'd like to show you a chart that we pre-
pared on the committee -- you'll see it up on the screens, and we're putting it up here on paper.  That chart is a graphic
depiction of all the ways that your classified CIA employment was disclosed to White House officials and then to the
press.

Every colored block on that chart is an individual, and every arrow shows a disclosure of classified information.
That classified information was your CIA employment status.  And the arrows are based on the testimony in Mr. Lib-
by's criminal case and press reports.  This chart shows over 20 different disclosures about your employment.  Let me
ask you, looking at this chart, are you surprised that so many people had access to the classified information about your
CIA employment?

MS. PLAME WILSON:  Yes, I am, Congressman.  And I'm also surprised at how carelessly they used it.

REP. HODES:  What was your expectation about how the government would handle the classified information
about your work and status?

MS. PLAME WILSON:  My expectation, Congressman, was that as of all CIA operations officers -- every officer
serving undercover -- that senior government officials would protect our identity.  We all take oaths to protect classi-
fied information and national security. So --

REP. HODES:  Prior to the time that you learned that your status had been disclosed, you never authorized anyone
to disclose your status, did you?

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

MS. PLAME WILSON:  Absolutely not.

REP. HODES:  And no one ever approached you and asked for permission to disclose any classified information about you.

MS. PLAME WILSON:  No.

REP. HODES:  Vice President Cheney never approached you and asked if he had your permission to disclose your status, did he?

MS. PLAME WILSON:  No.

REP. HODES:  Karl Rove never approached you and asked whether he had your permission to disclose your status, did he?

MS. PLAME WILSON:  No.

REP. HODES:  Now, this isn't even a complete picture because, as you can see on this chart, we don't know, for example, who told Karl Rove your status.  There's a black box up there, and it says unknown. And there are two arrows from that, one pointing to Vice President Cheney and one pointing to Karl Rove.  So, that's an unanswered question right now.

Now, I can imagine that you followed the proceedings in the press pretty closely over the past few years, have you not?

MS. PLAME WILSON:  Yes.

REP. HODES:  Do you have any theories about who told Karl Rove about your status?

MS. PLAME WILSON:  No, I do not.    There was much evidence introduced in the Libby trial that provides quite a bit, but I have no -- it would just be guesses.

REP. HODES:  Well, that's what this committee's investigation is all about, following all the links in the chain from their sources to their destination.   And it's been reported that Mr. Rove had a discussion with Chris Matthews about you, and the report was that Mr. Rove told Mr. Matthews, "Valerie Plame is fair game."  Do you recall that?

MS. PLAME WILSON:  Yes, I do.

REP. HODES:  I'd like to ask you to forget for a moment that he was talking about you.  Imagine that he was talking about another undercover agent working on sensitive issues.   And that undercover agent's life was on the line. Do you have a reaction to that?

MS. PLAME WILSON:  Absolutely.   This happened to me, but I like to think I would feel just as passionately had it happened to any of my former colleagues of the CIA.

REP. HODES:  One final question -- is there any circumstance that you can think of that would justify leaking the name of an undercover agent?

MS. PLAME WILSON:  No, Congressman.

REP. HODES:  Thank you very much.   I yield back.

REP. WAXMAN:  Thank you, Mr. Hodes.

Before we yield our time, we have a long list of people that seem to have either intentionally or inadvertently passed on your status and your name as a CIA agent, and that included the president, vice president, Scooter Libby, Karl Rove, Ari Fleischer just to name a few. Did any of those people -- the president, the vice president, Karl Rove, Scooter Libby, Ari Fleischer -- did any of them ever call you and apologize to you?

MS. PLAME WILSON:  No, Chairman.

REP. WAXMAN:  None of them ever called you to express regrets.

MS. PLAME WILSON:  No.

REP. WAXMAN:  Thank you.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

Mr. Davis.

REP. DAVIS:   Thank you.

Thank you, Mrs. Plame.

It's clear that the administration officials knew you worked for the CIA, but did they know that your status was that of a covert agent?

MS. PLAME WILSON:   I have no way of knowing, but I can say I worked for the Counterproliferation Division of the Directorate of Operations.   And while not all, many of the employees of that division are, in fact, in covert status.

REP. DAVIS:   But you don't -- I mean, I think one of the issues here was not that you worked for the CIA, because that was obviously why they'd know you in the administration, but for the crime to have been committed, I understand they had to have known that you were covert.   And you don't have any direct linkage that they knew that you were covert at that point.

MS. PLAME WILSON:   Again, Congressman, I'm not a lawyer, but as I said at my --

REP. DAVIS:   You don't have any direct knowledge that --

MS. PLAME WILSON:   No.

REP. DAVIS:   Okay.

MS. PLAME WILSON:   But as I said in my opening comments, the fact that they knew that I worked for the CIA, that alone should have increased their level of diligence.

REP. DAVIS:   I think -- look, we all agree that everybody needs to protect national security and protect the identities of undercover and covert agents.   But should the CIA have done more to adequately protect people as well and say these are covert agents, shouldn't be outed?   Does the CIA have a responsibility here as well?

MS. PLAME WILSON:   I think that Congress might think about reviewing the Intelligence Identities Protection Act and seeing what went wrong and where it needs to be perhaps rewritten.

REP. DAVIS:   I mean, it looked -- they're supposed to -- the CIA is supposed to report to Congress each year on the steps taken to protect this highly sensitive information.   And I'm told few, if any, reports are even filed.   So, I think there's a responsibility from the CIA.   And I think what's missing, and I think -- at least from a criminal perspective -- not from a policy, but from a criminal perspective -- that the special prosecutor in this case looked at that and found that the people who may have been saying this didn't know that you were covert.   And you don't have any evidence to the contrary.

MS. PLAME WILSON:   That, I think, is a question better put to the special prosecutor, Congressman.

REP. DAVIS:   Shouldn't the CIA have made sure that anyone who knew your name and your work be told of your status?   Would that have been helpful in this case?   That would have made it very clear if anybody leaked it at that point they were violating the law, at least.

MS. PLAME WILSON:   The CIA does go to great lengths to create and protect all kinds of covers for its officers. There's a lot of money and a lot of time and a lot of energy that goes into that.   And the onus also, the burden, falls on the officer himself or herself to live that cover, but it's not a perfect world.

REP. DAVIS:   The Intelligence Identities Protection Act makes it a crime to knowingly disclose the identity of a covert agent, which has a specific definition under the act.   Did anyone ever tell you that you were so designated?

MS. PLAME WILSON:   I'm not a lawyer.

REP. DAVIS:   That's why I asked if they told you.   I'm not asking for your interpretation.

MS. PLAME WILSON:   No, no.   But I was covert.   I did travel overseas on secret missions within the last five years.

REP. DAVIS:   I'm not arguing with that.   What I'm asking is, for purposes of the act -- and maybe this just never occurred to you or anybody else at the time -- but did anybody say that you were so designated under the act?   Or was this just after it came to fact?

Document 386

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

MS. PLAME WILSON:   No, no one told me that.   And that --

REP. DAVIS:   How about after the disclosure?

MS. PLAME WILSON:   Pardon me?

REP. DAVIS:   How about after the disclosure, did anyone then say gee, you were designated under the act, this should not have happened? Did anybody in the CIA tell you at that point?

MS. PLAME WILSON:   No.

REP. DAVIS:   Okay.   Since the disclosure of your identity, have you been offered other positions within the CIA?

MS. PLAME WILSON:   Yes.   I went on to other jobs with commensurate responsibility.

REP. DAVIS:   No demotion or anything.

MS. PLAME WILSON:   Pardon me?

REP. DAVIS:   No, you didn't experience any demotion.

MS. PLAME WILSON:   No.

REP. DAVIS:   Did anyone at the CIA tell you your career path was damaged by the disclosure?

MS. PLAME WILSON:   Yes.

REP. DAVIS:   Now, you were a senior manager, GS-14 Step 6, eligible for GS-15 at the time.   Did anyone ever tell you that you could not advance in a normal career path after this exposure?

MS. PLAME WILSON:   It was very clear that I could not advance as a covert operations officer.

REP. DAVIS:   And would that then -- your upward career path in terms of getting a GS-15 and then was impaired in your opinion?

MS. PLAME WILSON:   No, but that was the career for which I had been trained, which I wanted to do.

My husband and I, after our children were born, discussed going overseas again when they were a little bit older. And all of that came to abrupt end, obviously.

REP. DAVIS:   Do you know if any of the CIA colleagues -- like Robert Grenier, who testified at the Libby trial that he told administration officials that you were involved in sending your husband to Niger -- do you know if he ever told any of these officials you were undercover?

MS. PLAME WILSON:   I have no idea, other than what he testified.

REP. DAVIS:   Okay.

When you introduced yourself and your husband to the group of IC analysts at a February 19th, 2002 meeting at CIA headquarters, did you tell anybody present then you were undercover?

MS. PLAME WILSON:   No, I did not.   I was in CIA headquarters; I introduced them and left the meeting, Congressman.

REP. DAVIS:   Okay.

Would they have known that you were -- would they have had any reason to know you were undercover, or --

MS. PLAME WILSON:   I believe that they would have assumed as such.

REP. DAVIS:   We're limited in what we can ask, so we're trying to stay within the confines that the CIA has --

MS. PLAME WILSON:   I understand.

(Pause.)

REP. DAVIS:   Let me just ask, try to put some -- some of the press speculation to rest and give you an opportunity to answer.   In January 2004, Vanity Fair published an article -- not always known for great accuracy -- touching on your role in the Niger uranium affair. It said -- this was what they said -- "In early May, Wilson and Plame attended a

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

conference sponsored by the Senate Democratic Policy Committee at which Wilson spoke about Iraq. One of the other panelists was New York Times journalist Nicholas Kristof. Over breakfast the next morning with Kristof and his wife, Wilson told about his trip to Niger and said Kristof could write about it but not name him." Is that account accurate?

MS. PLAME WILSON: I think it is. I had nothing -- I was not speaking to Mr. Kristof. And I think my husband did say that he had undertaken this trip, but not to be named as a source.

REP. DAVIS: Okay.

Just to be clear, when your -- the article says that -- says your husband "met for breakfast with Kristof and his wife." Just to be clear, were you at the breakfast?

MS. PLAME WILSON: Briefly, yes, Congressman.

REP. DAVIS: Okay.

On June 13th, Kristof wrote a column about the Niger uranium matter. He wrote that he was piecing the story together from two people directly involved and three others who were briefed on it. Do you know if you were one of those people he was referring to?

MS. PLAME WILSON: I can't imagine that I would be. I did not speak to him about it.

REP. DAVIS: Okay.

What about your husband? Would he have been one of the sources, probably?

MS. PLAME WILSON: I think he was speaking to Mr. Kristof at that point.

REP. DAVIS: Okay.

Was any of that information classified, to your knowledge?

MS. PLAME WILSON: Not that I'm aware of.

REP. DAVIS: I yield back at this point.

REP. WAXMAN: Thank you very much.

Mr. Cummings, for five minutes.

REP. ELIJAH E. CUMMINGS (D-MD): Thank you very much.

Ms. Wilson, first of all, thank you for your service.

Ms. Wilson, even today your work for the CIA is so highly classified that we're not permitted to discuss the details, but we can clarify one crucial point: whether you worked undercover for the CIA. You said that your position was covert, but I've heard others say that you were not covert. In fact, one of the witnesses who will testify a little bit later, Victoria Toensing, is making that same argument. In an op-ed that appeared in The Washington Post on February 18th, she says it quite bluntly. She says, quote, "Plame was not covert. She worked at CIA headquarters and had not been stationed abroad within five years." End of quote. I know there are restrictions on what you can say today, but is Ms. Toensing's statement correct?

MS. PLAME WILSON: Congressman, thank you for the opportunity. I know I'm here under oath and I'm here to say that I was a covert officer of the Central Intelligence Agency. Just like a general is a general whether he is in the field in Iraq or Afghanistan, when he comes back to the Pentagon, he's still a general. In the same way, covert operations officers who are serving in the field, when they rotate back for a temporary assignment in Washington, they, too, are still covert.

REP. CUMMINGS: Is it possible that Ms. Toensing had more information than you do about your work or had access to secret documents that you don't?

MS. PLAME WILSON: I would find that highly unlikely, Congressman, because much of that information about my career is still classified.

REP. CUMMINGS: On Wednesday night, I know that Mr. Waxman, our chair, and Congressman Reyes, the chairman of the House Intelligence Committee, spoke personally with General Hayden, the head of the CIA. And

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

Chairman Waxman told me that General Hayden said clearly and directly, quote, "Ms. Wilson was covert," end of quote. There was no doubt about it. And by the way, the CIA has authorized us to be able to say that.

In addition, I understand that Chairman Waxman sent his opening statement over to the CIA to be cleared and to make sure that it was accurate. In it he said, quote, "Ms. Wilson was a covert employee of the CIA," end of quote. Quote, "Ms. Wilson was undercover," end of quote. The CIA cleared these statements. I emphasize all of this because I know that there are people who are still trying to suggest that -- that what seems absolutely clear isn't really true, and that you weren't covert. And I think one of the things we need to do in this hearing is make sure there isn't any ambiguity on this point.

Just three more questions. Do you hold this covert status at the time of the leak -- did you -- the covert status at the time of the leak?

MS. PLAME WILSON: Yes, I did, Congressman. Yes.

REP. CUMMINGS: Number two, the Identities Protection Act refers to travel outside the United States within the last five years. Let me ask you this question -- again, we don't want classified information, dates, locations or any other details -- during the past five years, Ms. Plame, from today, did you conduct secret missions overseas?

MS. PLAME WILSON: Yes, I did, Congressman.

REP. CUMMINGS: Finally, so as to be clear for the record, you were a covert CIA employee and within the past five years from today you went on secret missions outside the United States, is that correct?

MS. PLAME WILSON: That is correct, Congressman.

REP. CUMMINGS: I want to thank you, and I hope this committee now has cleared up the issue of covert -- of whether Ms. Plame was a covert agent, and I yield back.

REP. WAXMAN: Thank you very much, Mr. Cummings.

Dr. Westmoreland.

REP. LYNN A. WESTMORELAND (R-GA): Thank you, Mr. Chairman.

And I'm glad Mr. Cummings asked those questions because I was going to ask them too.

I've -- Ms. Wilson, I want to thank you for your service to our country. If I seem a little nervous, I've never questioned a spy before, and so I was going to ask you --

MS. PLAME WILSON: I've never testified -- (laughter) -- before.

REP. WESTMORELAND: I'm sorry?

MS. PLAME WILSON: I've never testified under oath before.

REP. WESTMORELAND: And I was here during the steroid hearings, too, and I don't think any of those baseball stars got this kind of media attention that you're getting today.

But when the chairman had his opening statements, he used three different terms -- "covert," "undercover" and "classified." Were you one of those in particular, or all of them? Or -- three different terms to categorize, I guess, your service to the country.

MS. PLAME WILSON: For those of us that were undercover in the CIA, we tended to use "covert" or "undercover" interchangeably. I'm not -- we typically would not say of ourselves we were in a "classified" position. You're kind of undercover or overt employees.

REP. WESTMORELAND: Now, did you just discuss this among yourself, if you were classified or covert? Because I'm assuming that you couldn't discuss it with anybody outside the agency, so was it kind of like you all sat around in a back room and said, "I'm covert," or "I'm classified," or if I was going to tell somebody what I would tell somebody?

MS. PLAME WILSON: Yes, within your colleagues, either in the field or at headquarters here in Washington, if you were working on a project, sometimes you did need to know, "Are you undercover or are you overt? Let me know

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

so I --" and then you know how to treat them accordingly in the sense of how careful to be in your association and so forth.

REP. WESTMORELAND:   Right.   So your fellow CIA employees would have known that you were covert or classified or whatever?

MS. PLAME WILSON:   Oh, absolutely.   Absolutely.

REP. WESTMORELAND:   Did you ever tell anyone that you worked for the CIA?   Or was that commonly known that you worked for the CIA and -- or did you tell them that you were something else, or --

MS. PLAME WILSON:   No.

Congressman, I could count on one hand the number of people who knew where my true employer was the day that I was -- my name was -- and true affiliation was exposed in July 2003.

REP. WESTMORELAND:   Okay.   And I'm assuming one of those was your husband.

MS. PLAME WILSON:   That's -- yes.   (Laughter.)   He did know.

REP. WESTMORELAND:   Did he know if you were covert or classified or --

MS. PLAME WILSON:   He did understand.   As a former ambassador and having held security clearances and worked with many agency employees, he understood that world to a certain point.   And he certainly understood that I was undercover, and he protected that diligently.

REP. WESTMORELAND:   Okay.   If -- and this is the -- one last -- we're going to have another round of questions, Mr. Waxman, you think, or --

REP. WAXMAN:   We do have some other panels.   I guess if members wish them, we'll accommodate them.

REP. WESTMORELAND:   Okay.   I mean, do we have --

REP. WAXMAN:   You have a minute and 48 seconds.

REP. WESTMORELAND:   Okay.   Ms. Plame, on October the 5th, 2003, while being interviewed on "Meet the Press," your husband stated that, "my wife will not allow ourselves to be photographed."   In response to the picture you took for Vanity Fair, your husband was quoted in The Washington Post, "the pictures should not be able to identify her and are not supposed to. She is still employed by the CIA and has obligations to her employer.   Was -- so I guess this was after the incident where everybody knew that you worked for the CIA that this was done?

MS. PLAME WILSON:   Yes, Congressman.   At the time that picture came out, I was -- my covert status was long gone.   And I will say this:   having lived most of my life very much under the radar, my learning curve was steep, and it was more trouble than it was worth.

REP. WESTMORELAND:   But when the photograph was actually taken in Vanity Fair, nobody -- that was not -- that was not public knowledge? I mean, all of this was not out then?   Or --

MS. PLAME WILSON:   Oh -- Congressman, the picture came out in late 2003.   My covert status was blown.

REP. WESTMORELAND:   Okay.   If your status was either covert or classified, and if you, in fact, meet with Senate Democratic Policy Committee, Mr. Kristoff, did you view it as part of your covert or classified work to meet with political groups and a columnist for The New York Times to discuss matters within your purview at the CIA?   My -- you know, I don't know if you saw the list of things that we could or could not ask you.   Did this Democratic Policy Committee and the columnist for The New York Times have these same rules that they could or could not ask you?   Or did you volunteer other information?

MS. PLAME WILSON:   Congressman, I attended that conference simply as a spouse of my husband who was invited to speak.   He had been invited to speak because he had quite a bit of experience on Iraq, having served the first President Bush as the charge d'affair at our embassy in Baghdad during the first Gulf War, and negotiated the release of the hostages with Saddam Hussein and so forth.

And he was asked to attend in that capacity.   I had no discussions other than purely social in nature.

REP. WAXMAN:   Thank you, Mr. Westmoreland.   Time has expired. Mr. Kucinich.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

REP. DENNIS KUCINICH (D-OH):   Thank you very much, Ms. Wilson, and thank you for your service to our country.   Briefly, I want to pick up on my colleague, Mr. Hodes' questions.   When you look at this chart, and you see the extraordinary efforts that were made to disclose your identity, when -- and most of this information came out of the Libby trial.   What were you thinking when you saw the effort, this wasn't just a leak, was it?   I mean, in your estimation.   Was this just a simple leak of an ID?

MS. PLAME WILSON:   Quite a bit of evidence came out in the course of the Libby trial, and I really was deeply dismayed.   Because it just showed a recklessness and a political path that is very, very unfortunate.

REP. KUCINICH:   In your judgment, when you look at the chart, does it show a fairly organized approach to disclose your identity?

MS. PLAME WILSON:   Well, it's certainly wide-reaching.

REP. KUCINICH:   Because Mr. Chairman, it's -- do leaks occur of agents' identity -- does it -- it does happen?

MS. PLAME WILSON:   I'm sorry, Congressman.

REP. KUCINICH:   Is it -- have there been in the past leaks of an agent's identity?

MS. PLAME WILSON:   None that I'm aware of by their very own government.

REP. KUCINICH:   And you have never, in your experience as an agent, seen this kind of a coordinated effort by one's own government, in this case our government, to disclose the identity of an agent.

MS. PLAME WILSON:   No, Congressman, I'm not aware of any.

REP. KUCINICH:   What -- to what extent does the agency go to, to protect the identities of its agents?

MS. PLAME WILSON:   It's significant effort.   And again, taxpayers' money, particularly in this day and age of Google and Internet, the efforts have to be even more vigilant and evermore creative, because it is extremely easy to find out a lot of information about someone if you really want to.

So, we are -- the CIA constantly needs to be one step ahead to protect their operations officers.

REP. KUCINICH:   So, when there's an extraordinary effort made to disclose the identity of an agent, it is a -- it's destructive of the agency and it's destructive of the taxpayers' investment in the Central Intelligence Agency, is that not correct?

MS. PLAME WILSON:   Absolutely.

REP. KUCINICH:   And, one of the things that keeps running through my mind is why.   Why did this happen to you?   Was it an unintentional mistake?   Or is it part of a larger pattern?   In recent weeks, we've learned that U.S. attorneys in all parts of the country were fired, despite exemplary service.   And several of these attorneys testified to Congress that they were being pressured to pursue cases against Democratic officials.   Others believe that they were fired because they were pursuing cases against Republican officials.

Have you followed this issue?

MS. PLAME WILSON:   Yes I have, Congressman.

REP. KUCINICH:   And when I think about what happened to these attorneys, I can't help but think of your case, because these could be isolated instances, but they seem to be part of a larger pattern.   Do you know what happened, for example, to the former Treasury Secretary, Mr. O'Neill, when he wrote his book, "The Price of Loyalty?"

MS. PLAME WILSON:   Yes, I'm aware of that.

REP. KUCINICH:   And after Secretary O'Neill that the Bush administration was planning to overthrow Saddam Hussein in a much earlier timeframe than anyone knew, Secretary O'Neill was falsely accused of leaking classified information.   Did you know that Secretary O'Neill was investigated by the Treasury Department for a groundless accusation?

MS. PLAME WILSON:   I believe I've read that, yes, sir.

REP. KUCINICH:   Now, in another instance, General Shinseki warned that the United States would need several hundred thousand troops in Iraq.   Ms. Wilson, do you remember what happened to General Shinseki?

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

MS. PLAME WILSON:   Yes, I do, Congressman.

REP. KUCINICH:   Well, he was dismissed.

MS. PLAME WILSON:   He was asked --

REP. KUCINICH:   I'm also reminded of the case of Richard Foster, the government's chief Medicare actuary.   He was actually told he'd be fired if he told Congress the truth about how much the administration's proposed drug benefit would cost.   Were you aware of that, Ms. Wilson?

MS. PLAME WILSON:   Yes, I was.

REP. KUCINICH:   Now, again, these could all be isolated instances, but they seem to be part of a larger pattern. And I'm struck by what your husband, Joe Wilson, was quoted as saying in the book, "Hubris."   Now according to the book, here's a quote, "Joe Wilson was upset, and said he regarded the leak as a warning to others.   Stories like this are not intended to intimate me, since I've already told my story.   But it's pretty clearly intended to intimidate others who might come forward.   You need only look at the stories of intelligent analysts who say they've been pressured.   They may have kids in college.   They may be vulnerable to these types of smears."

Is this what you think was going on here?

MS. PLAME WILSON:   When you look at -- and I will speak only to the realm of intelligence and you have the politicizing of that. Certainly Vice President Cheney's unprecedented number of visits to CIA headquarters in the run up to the war might be one example.

REP. KUCINICH:   That's exactly the point.   What happens when someone's working at the agency level that people are working at when the vice president visits?   The vice president of the United States comes over and starts looking over their shoulder.   Is that intimidating?

MS. PLAME WILSON:   Yes, it is.

REP. WAXMAN:   Thank you, Mr. Kucinich.   Your time has expired.

REP. KUCINICH:   Thank you very much.

REP. WAXMAN:   Ms. Watson.

REP. DIANE WATSON (D-CA):   Mr. Chairman, I want to thank you for this hearing.   It shows our determina-tion to bring out in the open the malfeasance in office.

I am an ambassador.   I've gone through the training.   I've been blindfolded, put on a C-130, taken to a site, taken into a room with my colleagues -- just like "Galactica 3000" -- handed a red folder highly classified with a general standing over my shoulder.   "Read it and give it back to me."   Any information that came out of that folder and was made public had to come from two sources:   The general or myself.   I was the only woman in the room.   The men, if their wives asked them, said, "I can tell you, but I have to kill you."   So I'm very sensitive to how it works and I am furious that your classified information was -- and Robert Novak of all people!

Now, I'm going to ask you some questions.   They might appear repetitive, but you're sworn and I want this for the record.   Special Prosecutor Patrick Fitzgerald found that at the time of Robert Novak's July 14th, 2003 column, your employment status was classified and that your affiliation with the CIA was not common knowledge outside the intelli-gence community.   The CIA has confirmed to this committee that at the time of Mr. Novak's article, your employment status was covert and that information was classified.   But some people are still trying to minimize your service by suggesting you really weren't at risk and that your position was not classified because you worked at a desk job at the CIA headquarters at Langley, Virginia.

Let me give you an actual example:   Representative Roy Blunt said on the television program "Face the Nation," "You know, this was a job that the ambassador's wife had that she went to every day.   It was a desk job.   I think many people in Washington understood that her employment was at the CIA and she went to that office every day."

Mrs. Wilson, is it fair to say that, based on your service for our government, you are well versed in the rules go-verning the handling of classified information?

MS. PLAME WILSON:   Absolutely, Congresswoman.   And I'd just like to add that when an operations officer -- whether they are posted in the field or back at headquarters -- we are given training to understand surveillance detection

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

training so that we understand very carefully that we are not being followed and that we feel very comfortable that our status can be protected.

REP. WATSON:   That is the reason why I started off with my own scenario.

Is it your understanding that the executive order governing the safeguarding of classified information prohibits the disclosure of classified information to persons who are not authorized to receive this information?

MS. PLAME WILSON:   Yes.

REP. WATSON:   Yes is the answer?

MS. PLAME WILSON:   Yes.  Yes, Congresswoman.

REP. WATSON:   And is it your understanding that when an employee at the CIA is undercover, that individual's employment status at the CIA is considered classified information?

MS. PLAME WILSON:   Yes, it is.

REP. WATSON:   Are you aware of any "desk job" exception to the rules prohibiting the release of classified information on the employment status of a CIA employee?

MS. PLAME WILSON:   No, Congresswoman.

REP. WATSON:   All right.  So I think your testimony underscores that efforts to minimize the significance of the disclosure of your employment status are in effect minimizing the importance of the classified information -- rules designed to protect our national security.  And I am infuriated to continue to hear, "well, she just had a desk job," because I understand.  I've been there, I've been -- I've had the training.  And I want to thank you sincerely for the work that you have done in regards to the protection, homeland security and showing the love for this country.

Thank you very much.

MS. PLAME WILSON: Thank you, Congresswoman.

REP. WAXMAN:   Thank you, Ms. Watson.

Mr. Lynch.

REP. STEPHEN LYNCH (D-MA):   Thank you.

First of all, I want to thank you, Ms. Plame, for coming before this committee and helping us with our work and for your service to our country.

I have to say this hearing has been a long time in coming.   The chairman and I and the members of this committee have signed five or six requests over the last four years to try to get you before us and to get to the bottom of this.

What has happened to you needs to be taken in a wider context, however.   The two issues -- two of the major issues here:  One, the process by which Congress receives information relative to national security.   And as you know, your outing, if you will -- or the disclosure of your covert status -- was, I think, a deliberate attempt to discount the statements of your husband with respect to the supposed attempts by Saddam Hussein to purchase uranium or plutonium through Niger.   And evidently from this chart, there were 20 occasions in which people deliberately, I think, attempted to destroy your credibility and also to destroy your effectiveness within the organization, within the CIA.

And I know you've been very careful with your words.   Once or twice might be a careless disclosure.   Five or six times might be reckless, but 20 times -- I'll say it -- 20 times is a deliberate attempt to destroy your status as a covert agent.   And the only other major case in which we've had the outing of CIA agents -- the Supreme Court in Hague versus Agee said, "It is obvious and inarguable that no governmental interest is more compelling that the security of the nation."

And going to those couple of issues.   First of all, the integrity of the process by which we get our information was affected greatly, I think, in terms of other agents may have been very disheartened and troubled by what happened to you.   And in an effort to discount your husband's credibility, the question was raised -- and it's been continually raised -- of whether you were involved in the decision by the CIA to actually send your husband, Ambassador Joseph Wilson, to Niger in February of 2002 to obtain information on the allegations that Iraq sought uranium from Niger.   They sort

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

of said, "Oh, his wife sent him," like my wife sends me out to put out the trash.    You know, try to discount the import of that -- at least I admit it.

Now, I want to ask you, the suggestion that you were involved in sending your husband seemed to drive the leaks in an effort to discount his credibility.    I want to ask you now under oath:  Did you make the decision to send Ambassador Wilson to Niger?

MS. PLAME WILSON:    No.   I did not recommend him, I did not suggest him, there was no nepotism involved -- I didn't have the authority.  And Congressman, if you'll allow me briefly to just lay of the sequence of events --  (cross talk) --

REP. LYNCH:    That was my next question, if you would.   You know, I sort of doubted this.   If I was going to send my wife somewhere, it wouldn't be Niger, but -- (laughter) -- nothing against Niger, but -- you know.

Please, if you could lay out -- walk us through everything you did that may have been related around the time of the decision to send Ambassador Wilson to Niger.

MS. PLAME WILSON:    Thank you, Congressman. I'm delighted as well that I am under oath as I reply to you.

In February of 2002, a young junior officer who worked for me -- came to me very upset.   She had just received a telephone call on her desk from someone -- I don't know who -- in the office of the vice- president asking about this report of this alleged sale of yellow cake uranium from Niger to Iraq.   She came to me, and as she was telling me this -- what had just happened, someone passed by -- another officer heard this.   He knew that Joe had already -- my husband -- had already gone on some CIA mission previously do deal with other nuclear matters.   And he suggested, "Well why don't we send Joe?"   He knew that Joe had many years of experience on the African continent.   He also knew that he had served -- and served well and heroically in the Baghdad Embassy -- our embassy in Baghdad during the first Gulf War. And I will be honest.   I had -- was somewhat ambivalent at the time. We had 2-year-old twins as home, and all I could envision was me by myself at bedtime with a couple of 2-year-olds.   So I wasn't overjoyed with this idea.   Nevertheless --

REP. LYNCH:    I get it

MS. PLAME WILSON:    We went to my branch chief, or supervisor.   My colleague suggested this idea, and my supervisor turned to me and said, "Well, when you go home this evening, would you be willing to speak to your husband, ask him to come into headquarters next week and we'll discuss the options?   See if this -- what we could do"   Of course.   And as I was leaving, he asked me to draft a quick e-mail to the chief of our Counterproliferation Division, letting him know that this was -- might happen.   I said, "Of course," and it was that e- mail, Congressman, that was taken out of context and -- a portion of which you see in the Senate Select Committee on Intelligence Report of July 2004 that makes it seem as though I had suggested or recommended him.

REP. WAXMAN:    Thank you, Mr. --

REP. LYNCH:    Mr. Chairman, if I could just follow up, because -- it'll just -- 30 seconds.

REP. WAXMAN:    Without objection.

REP. LYNCH:    Thank you.   And I want to go back to that Senate Intelligence Committee hearing.   There were three Republican senators who included a more definitive statement which -- now this is a quote. It said, "The plan to send the former ambassador to Niger was suggested by the former ambassador's wife, a CIA employee."   What is your reaction to that statement in the Senate report about the genesis of your husband's trip to Niger in 2002?

MS. PLAME WILSON:    Congressman, it's incorrect.   It's been borne out in the testimony during the Libby trial, and I can tell you that it just doesn't square with the facts.

REP. LYNCH:    Okay.

MS. PLAME WILSON:    Those additional views were written exclusively by three Republican senators.

REP. LYNCH:    Thank you, Mr. Chairman.   I yield back.

REP. WAXMAN:    Thank you, Mr. Lynch.

Mr. Yarmuth.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

REP. YARMUTH:  Thank you. Mr. Chairman.  I'm going to yield my time to Mr. Van Hollen.

REP. WAXMAN:  Mr. Van Hollen's recognized for five minutes.

REP. CHRIS VAN HOLLEN (D-MD):  Thank you very much, Mr. Yarmuth and Mr. Chairman.

Ms. Plame, thank you for your service to our country and for your testimony here today, and just to remind us all of the larger context in which this happened.  In the lead-up to the war, we remember many statements from the president of the United States, the vice-president of the United States, Secretary of State Condoleezza Rice, others, about mushroom clouds, invoking the image that Saddam Hussein was going to be attaining nuclear weapons and using them in terrorist attacks.  And so when Ambassador Wilson wrote his article in the New York Times that began with this statement, did the Bush administration manipulate intelligence about Saddam Hussein weapons programs to justify an invasion of Iraq and answered that question in the following sentence, "Based on my experience with the administration, the months leading up to the war, I have little choice but to conclude that some of the intelligence related to Iraq's nuclear weapons program was twisted to exaggerate the Iraqi threat."

That posed a direct threat to the administration's credibility, and clearly they understood the danger of that because it undercut one of the main underpinnings and justifications the administration gave for the war.    And we see from the chart here that the White House did spring into action and begin to try and discredit your husband, and that is how you were drawn into this web.  Mr. McClellan, the then- White House spokesman,  said on behalf of the administration, behalf of the president, "If anyone in this administration was involved in it" -- meaning the leaks and the dissemination of information -- "they would no longer be in this administration."  Do you believe there continue to be people -- individuals in this administration who were involved in leaking the information about you?

MS. PLAME WILSON:  Yes, Congressman.  As we know -- again, from the evidence that was introduced at the trial of the vice-president's former chief of staff -- for one, Karl Rove clearly was involved in the leaking of my name and he still carries a security clearance to this day despite the president's words to the contrary that he would immediately dismiss anyone who had anything to do with this.

REP. VAN HOLLEN:  And the CIA spokesman made a statement -- and other intelligence officers had made the statement you have today that the failure to hold people accountable for leaking this kind of information sends a very terrible message to others in the intelligence field.  Do you think the failure of the president to fire the people in his administration who were involved with this message sends a chilling message to those in our intelligence agency that the White House is not willing to stand up behind those people who are putting their lives at danger every day?

MS. PLAME WILSON:  Yes, I believe it undermines the president's words.

REP. VAN HOLLEN:  Let me ask you this -- and I would just say, on the record, that the statements that were made at trial with respect to Karl Rove's involvement, I would just state the testimony given by Mr. Cooper of Time Magazine, who said that he was told by Karl Rove, quote, "Don't go too far out on Wilson."  That Mr. Wilson's wife worked at the, quote, "agency."  And at the conclusion of the conversation, according to Mr. Cooper, Mr. Rove said, quote, "I have already said too much."  Can you think of any reason that Mr. Rove would make that statement if he did not know that he was engaged in wrongdoing?

MS. PLAME WILSON:  Congressman, I cannot begin to speculate on Mr. Rove's intent.  I just know what his words were and the effects.

REP. VAN HOLLEN:  Thank you.

Let me just follow up briefly on Mr. Lynch's line of questioning regarding the Senate report, and who really had Mr. Wilson -- Ambassador Wilson sent to Niger and who was the instigator of that. The unclassified Senate report asserts that the Counterproliferation Division reports officer told the committee staff that the former ambassador's wife -- you -- offered up his name.  Are you familiar with that statement in the unclassified Senate report?

MS. PLAME WILSON:  Yes, I am.

REP. VAN HOLLEN:  Now we don't want to reveal -- we don't want you to reveal any classified information or anyone's identity, but my question is, have you talked with that CPD reports officer who was interviewed by the Senate committee?

MS. PLAME WILSON:  Yes, Congressman, and I can tell you that he came to me almost with tears in his eyes. He said his words had been twisted and distorted.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

He wrote a memo, and he asked his supervisor to allow him to be re-interviewed by the committee. And the memo went nowhere, and his request to be re-interviewed so that the record could be set straight was denied.

REP. VAN HOLLEN: So, just so I understand, Mr. Chairman, if I could -- so, there was a memo written by the CPD officer, upon whose alleged testimony the Senate wrote its report that contradicts the conclusions --

MS. PLAME WILSON: Absolutely.

REP. VAN HOLLEN: -- contradicts the conclusions from that report.

MS. PLAME WILSON: Yes, sir.

REP. VAN HOLLEN: Mr. Chairman, it seems to me that this committee should ask for that memo. And it bears directly on the credibility of the Senate report on this very, very important issue, which they've attempted to us to discredit Ambassador Wilson's mission.

REP. WAXMAN: I think the gentleman makes an excellent point, and we will insist on getting that memo.

REP. VAN HOLLEN: Thank you.

Thank you for your testimony.

REP. WAXMAN: Mr. Hodes, you're next.

REP. HODES: Thank you, Mr. Chairman. I reserve my time, yield back.

REP. WAXMAN: Okay. The gentleman reserves his time.

Mr. Sarbanes.

REP. JOHN P. SARBANES (D-MD): Thank you, Mr. Chairman.

Ms. Wilson, thanks for being here today. I know this can't be easy for you.

If you put this affair in context -- what's happened with you -- with all the other abuses, frankly, Mr. Chairman, that we've been investigating over the last seven weeks -- and I thank you for the diligence of your inquiry and fairness of your inquiry into a number of things that have occurred -- it paints a picture of an administration of bullies, in my view, that thinks that in order to achieve whatever the ends they're seeking, any means can be justified, and that people can just be pushed around. We saw it when we had testimony of people in the White House who bullied the scientific community by altering testimony on global warming. We've seen it in terms of the investigations you've done, Mr. Chairman, with respect to the treatment of our civil service. And now we see it in the context of our intelligence community. And to me, what you've experienced is really the result of a syndrome that's developed in this administration which reflects the arrogance of power run amuck.

I have just a couple of questions that I wanted to ask you in that vein. First of all, I gather you believe that the outing of your status, that the blowing of your covert status, was as a result of some of the statements that your husband was making and the challenges that he was bringing. Is that right?

MS. PLAME WILSON: Yes, I believe that was one of the consequences.

REP. SARBANES: Okay. But at the point that they were prepared to surrender your covert status to the public, I mean, what was to be gained by that? I mean, can you -- was it to apply further leverage? I mean, really, it was sort of after-the-fact at that point, right?

MS. PLAME WILSON: My thinking, Congressman, is that by continuing to assert falsely that I somehow suggested him or recommended him for this mission, it would undercut the credibility of what he was saying. And that's what I think is what happened. And it just got a little out of hand.

REP. SARBANES: Yeah, it strikes me as petulant behavior on their part.

Secondly, there's this suggestion being made that your status could have been divulged sort of accidentally. But you've described efforts -- structural efforts -- that are designed to make sure that this doesn't happen accidentally. And so, could you comment on that? I mean, it seems to me that in order for your status to have been disclosed, somebody had to want that to happen. I know, because the way things were set up, it's highly unlikely that your status would be

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

disclosed by accident.   It would have to be as the result of an orchestrated effort, that somebody wanted to put it out there.   Can you just talk about sort of structurally whether that is the case?

MS. PLAME WILSON:   I can't speak to intent, but I can speak to simply what the actions that we can observe and that, again, they all knew that I worked in the CIA.   They might not have known what my status was, but that alone -- the fact that I worked at the CIA -- should have put up a red flag that they acted in a much more protective way of my identity and true employer.

REP. SARBANES:   Okay.   And then lastly, again, trying to get -- because this is more than a story about Valerie Plame Wilson and what happened to you, as devastating as it's been to your life over these last period of months.   It's about our intelligence community.   And you've spoken yourself to how this kind of conduct can affect the integrity and effectiveness of our intelligence apparatus.   Can you comment on the chilling effect -- if you will, the message it sends to people -- to those, for example who would be sent on a mission to collect intelligence about a subject that the White House might already have a very strong opinion about?   How would it affect the way that agent, the way that person would collect that information and get that information back up the chain?

MS. PLAME WILSON:   Intelligence collection is certainly more of an art than a science.   But if there is any taint of bias, then it undermines its usefulness.   The primary customer of our intelligence if, of course, the president of the United States.   And if the president of the United States thinks somehow or doesn't believe that his intelligence that he receives on his desk -- he or she receives on his desk every morning -- is free of ideology, politics, a certain viewpoint, how then can that president make the most important decisions of all about the security of our country?   And I do feel passionately about that.   You have to get the politics out of our intelligence process.

REP. SARBANES:   I appreciate that.   I appreciate the passion that you've brought to your job.   And you represent thousands -- hundreds of thousands of people that go to work and try to make a difference for this country and I think are being bullied by this administration. You won't get the apology from them that you deserve.   But I want you to know that everyone here appreciates your service.

Thank you very much.

MS. PLAME WILSON:   Thank you, Congressman.

REP. WAXMAN:   Thank you, Mr. Sarbanes.

We've gone back and forth, and rather than a second round, Mr. Davis and I agree that we'll have five-minutes wrap-up on each side -- five minutes to be controlled by the chairman and the ranking member. And I want to yield five minutes to Mr. Davis at this point.

REP. DAVIS:   Mr. Westmoreland, I'll yield such time as you may consume.

REP. LYNN A. WESTMORELAND (R-GA):   Thank you, Mr. Chairman and Chairman Waxman.   I hate it that we're not going to stay here to get all of our questions answered by Ms. Wilson, because I have so many to ask, because there's so much conflicting reports.   And I think that something of this importance that we should have made a little more time for it.

But Ms. Wilson, the Counterproliferation Division of the CIA, that sounds like a pretty important place where a bunch of smart people would work and keep good records.   Would I be okay in thinking that?

MS. PLAME WILSON:   Yes, Congressman.

REP. WESTMORELAND:   But in the Senate intel report that I've got, it says some CPD officials could not recall how the office decided to contact the former ambassador.   Was this a voluntary lack of memory, or was there no notes kept on it.   Is it -- how could they forget how they came about a name that they were fixing to send to a foreign country to check on the intelligence of Iraq getting material to build nuclear bombs?   That seems a little bit far-fetched to me.

MS. PLAME WILSON:   Congressman, please remember that in this period -- in the runup to the war -- we in the Counterproliferation Division of the CIA were working flat out as hard as we could to try to find good, solid intelligence for our senior policymakers on these presumed programs.   My role in this was to go home that night, without revealing any classified information, of course, and ask my husband would he be willing to come into CIA headquarters the following week and talk to the people there.   At that meeting, I introduced him, and I left, because I did have 101 other things I needed to do.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

REP. WESTMORELAND: Mm-hmm. But -- but what I'm trying to say is, do you think there would not have been a paper trail of how his name came about, who would have mentioned it first, or -- I mean, to me that's a pretty important assignment to give somebody and, you know, maybe somebody would want to say, "Hey, that was my idea. That was my guy that I was sending over there," and want to take credit for it. But it seems like everybody's running from it.

MS. PLAME WILSON: Congressman, I believe one of the pieces of evidence that was introduced in the Libby trial was an INR memo of that meeting, where it states, in fact, my husband was not particularly looking forward to -- he didn't think it was necessary. There had been, I believe, at least two other reports, one by a three- star general and one by the ambassador there on the ground, who said there really wasn't much to this allegation. And the INR folks that attended the meeting also said, "Well, we're not sure that this is really necessary." But it was ultimately decided that he would go, use his contacts, which were extensive in the government, to see if there was anything more to this. It was a serious question, asked by the office of the vice president, and it deserved a serious answer.

REP. WESTMORELAND: Do you -- are you familiar with a Charles (sic) Grenier that was the former Iraq mission manager for the CIA?

MS. PLAME WILSON: I know of him, sir, yes.

REP. WESTMORELAND: He testified at the Libby trial that all he had heard was that you were working for this Counterproliferation Division, and it could have meant a number of things. Different people, I guess, work at this, some covert, some classified, some undercover, some different names. Is that true, that there are different classifications of people that work at this Counterproliferation Division?

MS. PLAME WILSON: What I would say is most accurate is that most of the employees of the Counterproliferation Division are under cover of some sort.

REP. WESTMORELAND: Okay, but he -- he did work for the CIA, so he should have known all of that, is that true? Are you saying he should have known that you were undercover, or classified, or --

MS. PLAME WILSON: I'm saying that the fact was that most people in the Counterproliferation Division were undercover. I can't speak to what he should have or should have not known, but as an employee, he was probably cognizant of that, yes, sir.

REP. WESTMORELAND: Okay. And you mentioned taking politics out of intelligence. And your husband -- would you say he was a Democrat or a Republican?

MS. PLAME WILSON: Although my husband comes from a Republican family with deep roots in California, I would say he's a Democrat now, Congressman.

REP. WESTMORELAND: Okay. And just to kind of keep score, not that you would put yourself in any political category, would you say you're a Democrat or a Republican?

MS. PLAME WILSON: Congressman, I'm not sure that that is part of these --

REP. WESTMORELAND: I'm -- I -- well, I know, but I mean, I gave a list of questions I couldn't ask you and that wasn't one of them, so I didn't know if you'd be willing to -- (laughter) --

MS. PLAME WILSON: Yes, Congressman, I am a Democrat.

REP. WESTMORELAND: You're a Democrat? Okay.

MS. PLAME WILSON: Yes, I am.

REP. WESTMORELAND: Okay, so -- so by, you know, the vice president, who's a Republican, who evidently thought from his CIA briefing that he had gotten one day, felt like that this needed to be looked at further. The report that Niger was selling this yellowcake uranium to Iraq, that he would get some further intel on it. They called the Counterproliferation, or at least somebody in the CIA, and then we had a Democrat -- or at least, supposedly, someone who may be affiliated on the Democratic side -- represent or present or supposedly present or at least vouch for her husband, who was -- come from a good Republican family, that had lost his way and became a Democrat.

But my point is in his piece titled, "What I Didn't Find in Africa," he disputes the Bush administration's claims of -- there was no evidence that Niger was selling it. But you coming from a(n) intelligence background, you don't just de-

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

pend on one report from one country or one source to base all your intelligence on, do you? Wouldn't you gather it from a bunch of different sources and then kind of put it together and look at it, and not just one -- from one particular instance?

MS. PLAME WILSON:    That's correct, Congressman.

REP. WAXMAN:    The gentleman's time has expired.

REP. WESTMORELAND:    Okay.

REP. WAXMAN:    Do you have a last question you want to ask?

REP. WESTMORELAND:    Well, no.    I guess, Mr. Chairman, my last comment would be to you is that, you know, I still think it's a shame that we've brought Ms. Wilson here, and all the press came and all these good people came to witness all of this, and it's been quite a spectacle that we wouldn't get to ask all the questions that we had.

REP. WAXMAN:    Thank you.

REP. T. DAVIS:    Mr. Chairman, let me just say --

REP. WAXMAN:    Mr. Davis.

REP. T. DAVIS:    Excuse me.    I think what's clear here   -- it's -- first of all, it's a terrible thing that any CIA operative would be outed.    But what's difficult, I think, and what we haven't been able to establish here is who knew who was undercover and who was in a covert status, and I think we're going to have to look at that.    But if there's no evidence here that the people that were outing this and pursuing this had knowledge of the covert status, and -- so I just want to make that point.    Thank you very much.

Ms. Plame, thank you very much for being here.

MS. PLAME WILSON:    Thank you, Congressman.

REP. WAXMAN:    Thank you, Mr. Davis.

I want to yield to Ms. Norton for five minutes.

DEL. ELEANOR HOLMES NORTON (D-DC):    Thank you very much.    Thank you, Ms. Wilson, as others have thanked you for your extraordinary service to our country.

I am trying to understand the effect of the executive order. Because there is an executive order -- it's Executive Order 12958. It's an executive order, a presidential executive order that indicates what authorized what the requirements are to prevent unauthorized disclosures.

And in summary, they are -- background checks, official need to know.    I'm particularly interested in the official need to know and ask you to look at the little thought -- little chart -- the little part of the chart on where the White House and other officials -- State Department officials -- are listed.

Can you think of any reason that any of those officials would have had a reason to know your identity in particular as a covert agent?

MS. PLAME WILSON:    Congresswoman, there was no need to know my specific identity other than that I was a CIA officer, according to that chart.    None whatsoever.

DEL. NORTON:    Could I ask you whether there is any difference in your view between disclosing the identity of a covert agent and disclosing classified information?    What, if any, difference would there be?

MS. PLAME WILSON:    I think damage in either case could be equally devastating.    It would simply depend on what the classified information was, but certainly revealing operatives true identity is devastating.    In my case, I was working on trying to find the Iraq weapons of mass destruction programs and what they were up to.

DEL. NORTON:    Well, I suppose we could all think of classified information involving our country that would have a devastating effect on all of us.

Disclosing the name of a classified agent might have a devastating effect on more than that agent's career, is that not the case?

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

MS. PLAME WILSON:  Oh, absolutely, Congresswoman.  The ripple effects go outward in quite wide circles; all the contacts through the year, as a(n) innocent or in a professional manner, the agents, the networks, much is taken out.

DEL. HOLMES NORTON:  Are there circumstances under which disclosing the identity of a covert agent could result in the death of that agent?  And hasn't that occurred before in our country's history?

MS. PLAME WILSON:  Yes, it has.

DEL. HOLMES NORTON:  If in fact a(n) official of any kind did not have an official reason to know your status, in your view, would that be a violation of the executive order, which lists need to know, official need to know, as a reason for having classified information?

MS. PLAME WILSON:  Yes, Congresswoman, I would think so.

DEL. HOLMES NORTON:  So you believe that would be --

MS. PLAME WILSON:  It would be a violation.

DEL. HOLMES NORTON:  One of my colleagues questioned you regarding the accusation that over and over again was repeated in the press and, for that matter, by a number of public officials that it was you who was responsible for your husband's being selected to go on the controversial trip at issue.  As I understand it, that person has indeed said that he was not the person who indicated that you had been responsible for the selection of your husband to go to Niger. If that is the case, would you say that it would be inappropriate for us or others to rely on the information that a CIA official had said that you were responsible for the selection of your husband to go to Niger?

MS. PLAME WILSON:  That's incorrect.  A senior agency officer said she had nothing to do with his trip.  And I would just like to add that certainly I had no political agenda at the time of my husband's trip.  Joe had no political agenda.  We were both looking to serve our country.

DEL. HOLMES NORTON:  Mr. Chairman, I understand that that the CIA official to which I refer has in fact said that in writing, and I ask that you try to get the memorandum of that official.

That would make it clear that he or she was not responsible for this information.

REP. WAXMAN:  We'll try to get that information and hold it for the record.

DEL. HOLMES NORTON:  Thanks very much, Mr. Chairman.

REP. WAXMAN:  Mr. Davis.

REP. T. DAVIS:  Ms. Plame, let me just clarify one thing.  You've noted that when you learned about this, your husband picked up the paper and said, he did it.  Do you remember your testimony today?  He did it.  He read -- was he referring to Novak?  Was he referring to the administration at -- and did you know that this was percolating?

MS. PLAME WILSON:  Yes, sir.  He was referring to Mr. Novak.  We had indications in the week prior that Mr. Novak knew my identity and my true employer.  And I of course alerted my superiors at the agency, and I was told, don't worry; we'll take care of it.  And it was much to our surprise that we read about this July 14th.

REP. T. DAVIS:  Do you know if your superiors at the agency did anything at that point to stop the outing of a CIA agent?  It would have seemed to me they would have picked up the phone and said, this is a serious matter; this is a crime.  Do you have any idea --

MS. PLAME WILSON:  Absolutely.  I believe, and this is what I've read, that the then-spokesman, Mr. Harlow, spoke directly with Mr. Novak and said something along the lines of, don't go with this; don't do this.  I don't know exactly what he said, but he clearly communicated the message that Mr. Novak should not publish my name.

REP. T. DAVIS:  And did he -- you don't know if he said, this could be a violation of law; she is covert operator, or anything like that.

MS. PLAME WILSON:  I have no idea what --

REP. T. DAVIS:  Yeah, I think -- one of the long-term concerns, outside of your -- I mean, the outing of an agent is a very, very serious business, which I think has been underscored by both sides. But if no one knows that you're a covert, it's hard at that point to show any violation of law and the like.  But if you have notice, that's a different issue.

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

And so you did the appropriate thing in notifying your superiors that this was percolating, and they were not able to stop it. Is that your testimony?

MS. PLAME WILSON:   That's correct.

REP. T. DAVIS:   Thank you.

REP. WAXMAN:   Mrs. Wilson, you can be a Democrat; you can be a Republican -- no one asks our servicemen or CIA operatives what they believe in in terms of their politics.   They go out and serve our country.   They're not acting as Democrats or Republicans.   They and you were acting as an American.

Facts are not Republican or Democratic.   Your husband revealed the falsehood of the reason the president gave to go to war against Saddam Hussein in Iraq.

And the reason he gave even in his State of the Union address was that the weapon of mass destruction that Saddam Hussein had or would soon have was a nuclear bomb.   That was very sobering, but it was false. And when your husband wrote the article, that went right to the heart of this claim.   So one could see why they wouldn't like what your husband wrote, but they made you collateral damage.   Your career was ended, your life may have been in jeopardy, and they didn't seem to care even to this point because you said they haven't even called to apologize.

Now, whether they knew it and intentionally gave out this information about your status is the reason for this investigation. If they knew it, that you were a covert undercover agent, and they disclosed that fact, that is a big deal.   That's a serious jeopardizing of our national security.   If they didn't know you were a(n) undercover covert agent, then I have to wonder in my mind what was their thinking, that this guy couldn't be right because his wife has something to do with the mission?   Boy is that sort of silly.

Either way I don't think it speaks well for all those people in the White House to have gone out of their way to let the press know this information, which was the only -- I guess, the only thing they had to say.   The president has finally acknowledged the statement that your husband pointed out was factually incorrect.   The president has acknowledged it was factually incorrect.   The secretary of State said CIA didn't tell her, but it turned out that her chief deputy did get informed -- Mr. Hadley -- that the statement was not correct that they were putting into the State of the Union address, the most vetted speech a president ever makes.

They have acknowledged the validity of your husband's statement, and what do we have for you?   Well, just collateral damage.   I find that troubling; that in the zeal for their political positioning, that there are a lot of collateral damage around, including a war that didn't have to be fought.

I want to thank you very much for your presence here.   I think it's been helpful, and we are going to continue this investigation.

REP. WATSON:   Mr. Chairman, a question to the chair.

REP. WAXMAN:   Yes.

REP. WATSON:   The first, I think, most of us knew about Valerie Plame as being an undercover agent was through Robert Novak's July 14th, 2003 column.   Is it possible as we continue our oversight function to have Mr. Novak, under oath, come in and testify to that -- the fact that he did print that information?

REP. WAXMAN:   Well, I think we know that he did print that information and that -- and we know now that she was a covert agent. I'll give it some thought and will talk to you further about where this investigation goes.

REP. WATSON:   All right.   Thank you very much.

REP. WAXMAN:   But I just want to underscore that we need an investigation.   This is not about Scooter Libby, and it's not just about Valerie Plame Wilson.   It's about the integrity of our national security and whether it's being jeopardized.

Yeah?

REP. T. DAVIS:   Well, Mr. Waxman, I think if we do that, you need to involve the CIA, because there's no evidence here that anyone out there had any idea that it was an undercover agent and that she was a covert agent at this point.

REP. WAXMAN:   Well, you may well be right, but the CIA did --

PANEL I OF A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: WHETHER WHITE HOUSE OFFICIALS FOLLOWED APPROPRIATE PROCEDURES FOR
SAFEGUARDING THE IDENTITY OF CIA AGENT VALERI

REP. T. DAVIS:   (Off mike) -- that, and in fact she did the appropriate thing in going to her superiors when she found out that she was about to be outed.   I would have thought at that point, if the CIA felt that one of their operatives were going to be outed, it would have gone to great lengths to try to kill the story and let them know what the law was.

I just also note that --

REP. WAXMAN:   Well, that's a very good point, and I think we need to get that information.

REP.T. DAVIS:   -- that in the president's speech -- I just have to say this and -- well, in the president's speech when he mentioned the uranium, those words were cleared by the CIA.   It may not have been in accords with what Mr. Wilson found, but Ms. Plame's boss approved that, and I think the record should reflect that.

REP. HODES:   Mr. Chairman --

REP. WAXMAN:   Before I call on anybody else, I -- yeah, Mr. Hodes.

REP. HODES:   Just very briefly, the suggestion about what we don't know cannot be finally determined until we pursue the investigation that we need to pursue and find out what the people on this chart knew and when they knew it, who the unknown person or persons are, and we need the investigation --

REP. T. DAVIS:   We had a special prosecutor who did this, Mr. Hodes.   A special prosecutor's looked at this and spent two years on it.

REP. WAXMAN:   Let me suggest that this is a hearing to get information from witnesses and not to debate -- although it's inevitable -- but let's, I think, move on with our hearing.

I thank all the members for their participation.   I wish that we had all the members here to participate, but all those members were invited and had adequate notice.   But this is a Friday.

Thank you so much for being here.

MS. PLAME WILSON:   Thank you, Mr. Chairman.

REP. WAXMAN:   We're going to recess for four or five minutes, just so we can settle down and get the next witnesses up and take care of whatever pressing matters maybe need to be attended to.   (Strikes gavel.)

**LOAD-DATE:** March 17, 2007

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 25th day of May, 2007, I caused true and correct

copies of the foregoing to be served on the following parties by electronic mail:

William Jeffress, Esq.
Baker Botts
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Facsimile: 202-585-1087

Theodore V. Wells, Esq.
Paul Weiss
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile: 212-373-2217

John D. Cline, Esq.
Jones Day
555 California Street
San Francisco, CA 94104
Facsimile: 415-875-5700

Patrick J. Fitzgerald
Special Counsel
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, D.C.  20530
202-514-1187

By: _____/s/_____
Debra Riggs Bonamici
Deputy Special Counsel