UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

VALERIE PLAME WILSON et al.,

                Plaintiffs,

                v.

J. MICHAEL MCCONNELL et al.,

                Defendants.

------------------------------------------------------------- x

07 Civ. 4595 (BSJ)


MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendants

BENJAMIN H. TORRANCE
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Telephone: 212.637.2703
Fax: 212.637.2702

      – Of Counsel –

# Table of Contents

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

POINT I—CLASSIFIED INFORMATION REGARDING WHETHER WILSON WAS EMPLOYED BY
THE CIA PRIOR TO 2002 MAY NOT BE PUBLISHED . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    The CIA May Prevent the Publication of Classified National Security
            Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    The CIA Properly Classified the Information at Issue . . . . . . . . . . . . . . . . . 8

          1.    The Executive Order's Classification Standards Were Met . . . . . . . . 9

          2.    Unauthorized Disclosure Could Harm National Security . . . . . . . . . 10

    C.    The CIA's Classification Decision Is Entitled to a High Level of Deference
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.    The Information at Issue Was Never Declassified and Has Remained
            Classified Since Its Inception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    E.    The Presumption of Regularity of Official Actions Applies to All Agency
            Actions Absent Clear Evidence to the Contrary . . . . . . . . . . . . . . . . . . . . . 19

POINT II—THE CIA HAS NEVER WAIVED ITS ABILITY TO PROTECT THE CLASSIFIED
INFORMATION AT ISSUE BY OFFICIAL DISCLOSURE . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A.    The Information Sought Is Not as Specific, Nor Does it Match, the
            Information Disclosed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    B.    The CIA Has Not Made the Information Public Through an Official
            Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

          1.    No Information Here Has Been Made Public Through a CIA
               Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

          2.    The CIA's Inadvertent Disclosure Was Not "Official" . . . . . . . . . . . 26

               a.    An Inadvertent Disclosure Cannot Be "Official" . . . . . . . . . 26

               b.    Waiver by Inadvertent Disclosure Is Inconsistent with
                   Executive Order 13,292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

c.     The CIA's Benefits Manager Is Not a High-Level Official
       with Authority to Declassify, Inadvertently or Otherwise  . . 31

POINT III—PUBLICATION BY CONGRESS DOES NOT WAIVE THE CIA'S ABILITY TO PROTECT
       CLASSIFIED INFORMATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Cases*:

*ACLU v. Department of Defense*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) . . . . . . . . . . . . 13, 15

*Afshar v. Department of State*, 702 F.2d 1125 (D.C. Cir. 1983) . . . . . . . . . . . . 13, 22, 26, 28

*Aftergood v. CIA*, 355 F. Supp. 2d 557 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Al-Haramain Islamic Foundation, Inc. v. Bush*, 451 F. Supp. 2d 1215 (D. Or. 2006) . . . . 31

*Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362 (4th Cir. 1975) . . . . . . . . . . . . . . . . . . *passim*

*CIA v. Sims*, 471 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 14

*Camp v. Pitts*, 411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Center for National Security Studies v. U.S. Department of Justice*,
    331 F.3d 918 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Department of the Navy v. Egan*, 484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 14

*Diamond v. FBI*, 707 F.2d 75 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Dipace v. Goord*, 218 F.R.D. 399 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Earth Pledge Foundation v. CIA*, 128 F.3d 788 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . 11, 33

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Frugone v. CIA*, 169 F.3d 772 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Haig v. Agee*, 453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Halperin v. CIA*, 629 F.2d 144 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21

*Harman v. City of New York*, 140 F.3d 111 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hudson River Sloop Clearwater, Inc. v. Department of the Navy*,
    891 F.2d 414 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*King v. Simpson*, 189 F.3d 284 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Krikorian v. Department of State*, 984 F.2d 461 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . 15

*Lincoln v. Vigil*, 508 U.S. 182 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*McCoy v. Holland*, 364 F.3d 166 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . *passim*

*National Audubon Social v. Hoffman*, 132 F.3d 7 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 2

*National Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) . . . . . . . . . . . . . 19, 20

*North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002) . . . . . . . . . . . . . 15

*Overby v. U.S. Fidelity & Guaranty Co.*, 224 F.2d 158 (5th Cir. 1955) . . . . . . . . . . . . . . . 29

*Phillippi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 29

*Public Citizen v. Department of State*, 11 F.3d 198 (D.C. Cir. 2003) . . . . . . . . . . . . . . . 22, 28

*Redland Soccer Club, Inc. v. Department of Army*, 55 F.3d 827 (3d Cir. 1995) . . . . . . . . 29

*Rodriguez-Roman v. INS*, 98 F.3d 416 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rubin v. CIA*, No. 01 Civ. 2274, 2001 WL. 1537706 (S.D.N.Y. Dec. 3, 2001) . . . . . . . . . . 28

*Salisbury v. United States*, 690 F.2d 966 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . 14, 34

*Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Snepp v. United States*, 444 U.S. 507 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 7, 15

*Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Armstrong*, 517 U.S. 456 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Chemical Foundation*, 272 U.S. 1 (1926) . . . . . . . . . . . . . . . . . . . . . . . 20–21

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) . . . . . . . . . . . . . . . . . 14

*United States v. Libby*, Crim. No. 05-394, Dkt. No. 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Nixon*, 418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Yunis*, 867 F.2d 617 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 24

*Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . 6

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Yale-New Haven Hospital v. Leavitt*, 470 F.3d 71 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . 2

*Zadvydas v. Davis*, 533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


*Statutes and Regulations*:

5 U.S.C. § 701 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

50 U.S.C. § 403-1(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

32 C.F.R. § 2001.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

32 C.F.R. § 2001.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

32 C.F.R. § 2001.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

32 C.F.R. § 2001.33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

32 C.F.R. § 2001.45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exec. Order 12,065, 43 Fed. Reg. 28,949 (Jun 28, 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Exec. Order 12,356, 47 Fed. Reg. 14,874 (Apr. 2, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 31

Exec. Order 12,958, 60 Fed. Reg. 19,825 (Apr. 17, 1995) . . . . . . . . . . . . . . . . . . . . . . . . 8, 31

Exec. Order 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003) . . . . . . . . . . . . . . . . . . . . . . *passim*

Defendants J. Michael McConnell, Director of National Intelligence; the Central Intelligence Agency ("CIA" or the "Agency"); and Michael V. Hayden, Director of the CIA (collectively, the "government"), respectfully submit this memorandum of law in opposition to plaintiffs' motion for summary judgment and in support of the government's cross-motion for summary judgment.

At the time she resigned from the CIA, plaintiff Valerie Plame Wilson requested information from the Agency's personnel office about her eligibility for a retirement annuity. The CIA responded by letter dated February 10, 2006. That letter, sent only to Wilson, contained classified information about her employment status, but—by administrative error—was not marked as classified and was sent by non-secure means. Later, a member of Congress introduced a bill for Wilson's benefit, and in the process made statements in the Congressional Record about her employment at the CIA. Based on these two disclosures, Wilson now claims that she is entitled to publish the classified information at issue in her forthcoming memoir.

Plaintiffs' position contradicts well-settled law. The personnel office's mistake and the congressional statements notwithstanding, the CIA has never officially acknowledged employing Wilson prior to 2002. That information, if true, was classified from the outset, was never declassified, and remains classified to this day. The government thus has a compelling interest in preventing its publication, as it has a compelling interest in preventing the publication of any classified information. Neither the mistaken, mismarked private letter to Wilson, the result of a one-time administrative error, nor a congressman's remarks are sufficient to waive the CIA's statutory right and duty to protect national security information. As the record in this case establishes that the CIA acted in

accordance with the law and the Constitution, the government is entitled to summary judgment.

## Background

Wilson brings this action under the Administrative Procedure Act ("APA"), seeking to overturn a decision by the CIA refusing to permit her to publish classified information.[1] In particular, the CIA's Publications Review Board determined that information regarding whether Wilson was employed by the Agency before 2002 was properly classified and therefore, in accordance with Wilson's contract with and fiduciary duty to the CIA, could not be disclosed to the public.

As the Agency has acknowledged in another case, Wilson was a covert CIA employee in the counterproliferation division as of January 1, 2002. Unclassified Summary of Valerie Wilson's CIA Employment and Cover History ("Employment Summary") at 1–3, filed in *United States v. Libby*, Crim. No. 05-394, Dkt. No. 351, Attach. 1 (D.D.C. May 25, 2007) (also attached as Ex. M-1 to Decl. of David B. Smallman dated June 28, 2007).

---

[1]   In all but exceptional circumstances, the APA, 5 U.S.C. § 701 *et seq.*, confines judicial review to the administrative record before the agency at the time the challenged decision was made. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997). However, both parties here have submitted extra-record evidence, which is appropriate to the extent it "illuminate[s] the original record" and "explain[s] administrative action." *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 82 (2d Cir. 2006). Such evidence may be considered by the Court as long as "the focal point for judicial review [remains] the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The government notes that while many of plaintiffs' submissions are duplicative of the agency's administrative record, many of the rest of them (e.g., Smallman Exs. B, N, O) do not meet this standard.

Though plaintiffs expressly rely on the APA only for their claims that documents were improperly classified, their other claims, under the First Amendment or otherwise, are necessarily brought under the APA as well. "The APA contemplates . . . that judicial review will be available for colorable constitutional claims," *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993); *accord* 5 U.S.C. § 706(2)(B); otherwise, "Congress has not waived the government's sovereign immunity . . . from lawsuits based on constitutional claims," *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999).

Because Wilson was a covert employee, information identifying her as such was classified pursuant to the Agency's Classification Guide. *Id.* at 2–3; Administrative Record (Classified) ("AR (Cl.)") Tab 9. In 2003, her employment with the Agency was disclosed in the media, resulting in her cover being lifted by the CIA. Employment Summary at 2. The subsequent investigation by the Department of Justice into that disclosure resulted in the indictment in *Libby*, and in October 2005, the CIA determined that the public interest in allowing that criminal prosecution to proceed outweighed the damage to national security that might reasonably be expected to result from the official disclosure of Wilson's employment and cover status. *Id.* Accordingly, the CIA officially disclosed Wilson's employment and cover from January 1, 2002, forward. *Id.* The Agency, however, has never officially disclosed any information relating to whether or not Wilson was employed by the CIA prior to that date. *Id.* at 1–3.

Wilson resigned from the CIA effective January 9, 2006. *Id.* at 3;[2] Administrative Record (Unclassified) ("AR (Uncl.)") Tab 1. Around that time, she requested information about her eligibility for a deferred annuity from the CIA's personnel office. AR (Uncl.) Tab 1. By letter dated February 10, 2006, Karen Tumolo of that office, whose title was Chief, Retirement & Insurance Services, responded. *Id.*; Declaration of Karen F. Tumolo dated July 13, 2007 ("Tumolo Decl.") ¶¶ 7–10. That letter was addressed and sent only to Wilson. AR (Uncl.) Tab 1. The letter was not marked as classified, and was sent by first-class mail.[3] AR (Cl.) Tab 1. Despite its lack of classification markings, the letter did in fact contain classified information: a statement of the dates Wilson was employed by the

---

[2]    The Employment Summary erroneously states that her resignation took effect December 9, 2005. The parties here agree that the true date is January 9, 2006.

[3]    Information classified as "secret," as here, may be sent by express or registered mail or certain commercial carriers, but not by first-class mail. 32 C.F.R. § 2001.45(c)(2).

CIA. *Id.*; AR (Cl.) Tab 9; Employment Summary at 2–3. The failure to mark the letter as classified as required was the result of an administrative error. Tumolo Decl. ¶¶ 9–11.

Wilson—who, as a CIA employee, was subject to prepublication review of any public disclosures she wished to make mentioning intelligence data or activities, AR (Uncl.) Tab 41; *Snepp v. United States*, 444 U.S. 507 (1980)—submitted a partial first draft of a manuscript to the CIA's Publications Review Board on July 7, 2006, and a full first draft on September 7, 2006. AR (Uncl.) Tabs 5, 8. After several meetings and correspondence regarding the manuscript, *id.* Tabs 5–10, the Board formally responded on November 21, 2006. *Id.* Tab 11.[4] That response included a list of changes to make the manuscript unclassified; it also noted that the first half of the manuscript "would reveal classified information because of the context in which it appears, [or] the timeframes associated with the material . . . ." *Id.* A follow-up letter from the CIA dated December 22, 2006, stated that the first half of the manuscript was "replete with statements that may be unclassified standing alone, but they become classified when they are linked with a specific time, such as an event in your personal life, or are included in another context that would reveal classified information." *Id.* Tab 13. The same letter described means by which material could be made unclassified, including "separat[ing] certain statements and vignettes from the timeframes in which they currently appear [or] remov[ing] the references to the times and events in [Wilson's] personal life." *Id.*; *accord id.* Tab 21.

After further discussion among Wilson, the CIA, and their attorneys, *id.* Tabs 14–17, 20–23, the Publications Review Board again wrote Wilson on February 23, 2007. *Id.* Tab 24. The letter noted that Wilson had declined to meet with the Board to discuss ways

---

[4]    The manuscript portion of Tabs 11 and 24 have been filed under seal, pursuant to an order of the Court.

of revising the manuscript so that classified information would not be revealed. *Id.* In light of that, the Board proceeded to delete text from the first half of the manuscript because "[i]n some instances, . . . it is linked with a specific time or is included in a particular context that reveals classified information." *Id.* The Board again offered to "work with [Wilson] to discuss ways in which this deleted text could be modified in order to render it unclassified or could be used in other contexts so as to not reveal classified information." *Id.*

By letter dated April 19, 2007, the CIA advised Wilson that it had withdrawn certain objections, and "[w]ith limited exceptions, the classified information the PRB identified in your manuscript relates to a single issue . . . and reflects the classification determination made by the Director of the Agency." *Id.* Tab 28. As to that, the Board reiterated that "certain writing techniques (e.g., changing or obscuring the chronological timing of an event, placing text in another part of the manuscript, etc.)" could render the material unclassified. *Id.* However, the letter noted that Wilson had declined to "rewrite or change the chronology" of the manuscript. *Id.* The CIA informed Wilson that she had "exhausted her administrative remedies with respect to *this* classification determination." *Id.*[5]

---

[5] With respect to the Board, plaintiffs state that Joseph Wilson's book "was subject to review prior to its publication." Pls.' Br. at 4 n.2. This artfully phrased sentence implies that the CIA approved the statement plaintiffs quote from Joseph Wilson's book, which is false. Joseph Wilson, who was never a CIA employee, did not submit his book to the CIA. It was reviewed by the National Security Council, his former employer; the NSC referred parts of the book to the CIA, which requested changes, only some of which were accepted. Relevant here, the chapter of Joseph Wilson's book containing the quoted language was not submitted to or reviewed by the CIA; therefore, the CIA never had the opportunity to either approve that statement or request its deletion. Declaration of Richard J. Puhl dated July 12, 2007, ¶¶ 6–8.

During these discussions, on January 16, 2007, Representative Jay Inslee introduced a bill in Congress entitled the Valerie Plame Wilson Compensation Act.  AR (Cl.) Tab 8.  In the course of doing so, Representative Inslee submitted into the Congressional Record a partial version of the February 10, 2006, letter from Tumolo.  *Id.*  Three days later, on January 19, 2007, shortly after she learned that her February 2006 letter contained classified information, Tumolo wrote Wilson to inform her of that fact; that the letter was not properly marked to indicate its national security classification; and that the absence of markings was the result of an administrative error.  AR (Uncl.) Tab 18; Tumolo Decl. ¶ 12.  Four days after that, on January 23, 2007, the CIA wrote the clerk of the House of Representatives to inform her that the letter included in the Congressional Record contained classified information and was not properly marked to reflect its classification.  AR (Uncl.) Tab 19.

## ARGUMENT

### Point I

#### Classified Information Regarding Whether Wilson Was Employed by the CIA Prior to 2002 May Not Be Published

A.  The CIA May Prevent the Publication of Classified National Security Information

Indisputably, the government has a compelling interest in preventing the publication or dissemination of classified information.  *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988); *Snepp*, 444 U.S. at 509 n. 3; *Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1441 (D.C. Cir. 1996); *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983).  Those who are entrusted with access to classified information as CIA employees, like Wilson, are required to sign a secrecy agreement, by which they agree to "never disclose" classified or classifiable information "in any form or any manner."  AR (Uncl.) Tab 41 (Wilson's secrecy

agreement) ¶ 3.  Agency employees agree to assume the burden of learning whether

information is disclosable, and further agree to submit for prepublication review "all

information or materials including works of fiction which contain any mention of

intelligence data or activities" that they intend to publicly disclose.  *Id.* ¶¶ 4–5.  These

agreements are an "express condition of . . . employment with the CIA," and have been

upheld by the Supreme Court as consistent with the First Amendment, necessary to

prevent irreparable harm to national security and to the CIA's ability to perform its

functions, and fully enforceable.  *Snepp*, 444 U.S. at 510–13; *Harman v. City of New York*,

140 F.3d 111, 122–23 (2d Cir. 1998); *McGehee*, 718 F.2d at 1146.

Thus, the question before the Court is straightforward: "If the Government

classified the information properly, then [plaintiff] simply has no first amendment right to

publish it.  If, on the other hand, the information was not classified properly, then

[plaintiff] may publish the manuscript."  *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir.

2003); *accord Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975) ("[w]ith

respect to [classifiable] information" a CIA employee has "effectively relinquished his First

Amendment rights").  That rule is embodied in the CIA's regulation governing

prepublication review of material former employees seek to disclose: "The [CIA

Publications Review Board] will review material proposed for publication or public

dissemination [by former employees] *solely* to determine whether it contains any classified

information."  AR (Uncl.) Tab 39, ¶ 2.f(2) (emphasis added).[6]  Thus, whether plaintiffs

challenge the CIA's actions under the First Amendment or as contrary to regulations, the

---

[6]    Different criteria govern the review of proposed publications by current
employees and are specified in ¶ 2.g.  As those criteria are not before the Court, they are
not included in the copy of the regulation in the administrative record.

only question the Court need address is whether the information plaintiffs seek to publish is classified.

B.       The CIA Properly Classified the Information at Issue

National security information is classified pursuant to an Executive Order, the latest iteration of which is Executive Order 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003) (amending Executive Order 12,958).[7]  The order sets forth both procedural and substantive standards for classifying information.  *Id.* § 1.1(a).  Information may be originally classified if it is done by an original classification authority (i.e., someone authorized to classify information); the information is owned by, produced by or for, or is under the control of the government; the information falls within one of the specified classification categories; and the classification authority determines that unauthorized disclosure of the information reasonably could be expected to result in damage to the national security and is able to identify or describe that damage.  *Id.* §§ 1.1(a), 6.1(cc).  Documents that reproduce, extract, or summarize classified information are said to be "derivative classifications"; those classifications may be performed without original classification authority pursuant to a classification guide prepared by the agency.  *Id.* §§ 2.1–2.2, 6.1(n).

In this case, the CIA complied with all of those standards and, therefore, information regarding whether or not Wilson was employed by the Agency before 2002 is— and has been since its inception—properly classified.  That determination is due great deference by this Court.

_____

[7]       Although classification criteria and procedures change from order to order, the provisions relevant to this case are substantially similar in prior orders except where otherwise noted.  *See* Exec. Order 12,958, 60 Fed. Reg. 19,825 (Apr. 17, 1995); Exec. Order 12,356, 47 Fed. Reg. 14,874 (Apr. 2, 1982); Exec. Order 12,065, 43 Fed. Reg. 28,949 (Jun 28, 1978).

1.    The Executive Order's Classification Standards Were Met

In this case, information relating to Wilson's employment, if any, with the CIA before January 1, 2002, was properly classified under these criteria.  Pursuant to the Executive Order, the CIA has created a Classification Guide, under the authority of a CIA official with original classification authority.  Exec. Order 13,292, § 1.1(a)(1); AR (Cl.) Tab 9; Declaration of Ralph S. DiMaio dated July 13, 2007 ("DeMaio Decl.") ¶ 8.  That Guide sets forth certain categories of information that, if disclosed, would cause harm to the national security and therefore must be classified for the reasons, and at the classification levels, provided in the Executive Order.  AR (Cl.) Tab 9; *see* Exec. Order 13,292, §§ 1.2, 1.4.  According to the Guide, Wilson's employment, if any, prior to 2002 was classified.  AR (Cl.) Tab 9.  In addition, after the February 10, 2006, letter, the information was reviewed by the Director of the CIA, who has original classification authority and who determined that acknowledgment of any employment by Wilson before 2002 was and is still classified.  Exec. Order 13,292, § 1.1(a)(1); AR (Uncl.) Tab 28; DiMaio Decl. ¶¶ 7, 9.

The other classification standards have been met as well.  Information concerning whether or not a person is a United States Government employee indisputably "is owned by, produced by or for, or is under the control of the United States Government."  Exec. Order 13,292, § 1.1(a)(2).  As this requirement is phrased disjunctively, only one of those three criteria need be satisfied, but in this case all three are.  Information about whom it has hired is plainly "produced by or for" the government.  Equally plainly, it is under the government's "control," where "control" means "the authority of the agency that originates information . . . to regulate access to the information."  *Id.* § 6.1(s).[8]  And, plaintiffs'

---

[8]    If that authority to regulate access could be doubted, it is established by the case law: "the protection of classified information must be committed to the broad discretion of
(continued...)

unsupported and illogical contentions to the contrary, Pls.' Br. at 36, 38, the information is still "owned by" the government, no matter whether it is public or not. Wilson and Simon & Schuster, presumably, will not concede that they no longer "own" the rights to her book once it has been released to the public; by the same token, the government owns the information about its employees regardless of who else knows it.[9]

## 2. Unauthorized Disclosure Could Harm National Security

The CIA has also established that the information at issue here falls within classification categories specified in the Executive Order, and its unauthorized release—even after its release to the public—"reasonably could be expected to result in damage to the national security." Exec. Order 13,292, § 1.1(a)(3) & (4); *see* DiMaio Decl. ¶ 9. Although a discussion of its contents is not possible in this publicly filed memorandum, a classified declaration will provide further facts related to this case and describe specific harms to national security that could result from unauthorized disclosure. *See* DiMaio Decl. ¶ 9.

Even after an unauthorized disclosure of classified information occurs, the CIA typically does not acknowledge the classified information that was disclosed, as to do so would exacerbate the harm of the initial disclosure. That can occur in several ways.

---

[8]  (...continued)
the agency responsible." *Egan*, 484 U.S. at 529; *see infra* Point I.C. In addition, the authority to protect intelligence sources and methods is vested in the Director of National Intelligence, 50 U.S.C. § 403-1(i), to whom the CIA Director reports, *id.* §§ 403-1(f)(4), 403-4a(b).

[9]  Plaintiffs' argument also rests on the baseless misconception that the information was not classified until after the personnel office's letter. Pls.' Br. at 36. As explained in this section, the information was classified from the outset of Wilson's employment and never declassified thereafter.

The CIA's relationships with intelligence sources could be severely damaged. Maintaining relations with existing human sources—that is, individual people providing information to the CIA, who are at risk of reprisals against themselves, their associates, and their families—and recruiting new ones both depend on the CIA's credibility and its commitment to the absolute secrecy upon which the ability to gather information depends. Similarly, foreign governments, including their intelligence and security services, place their trust in the CIA to maintain the secrecy of their information-sharing arrangements, and face political consequences if that trust is broken. Breaching the confidentiality between the CIA and a source could lead sources—both current and potential—to conclude that the CIA is unwilling to keep its promises, and therefore to stop cooperating with the CIA and cease providing it with information vital to the national security. With foreign governments, a breach of trust could also lead to more formal consequences, such as expulsion of CIA agents or diplomatic action, that would also harm intelligence gathering.

As the court put it in *Earth Pledge Foundation v. CIA*—affirmed by a published, precedential decision adopting the district court's opinion unchanged—"[w]hatever disclosures may have been made in [public], the CIA has an *ongoing interest* in assuring its sources of its *continued adherence* to its *strict policy* of not revealing sources." 988 F. Supp. 623 (S.D.N.Y. 1996) (emphasis added), *aff'd*, 128 F.3d 788 (2d Cir. 1997). The CIA has "broad discretion to safeguard the Agency's sources and methods of operation," and to do so must "provid[e] intelligence sources with an assurance of confidentiality that is *as absolute as possible*." *CIA v. Sims*, 471 U.S. 159, 175 (1985) (emphasis added); *accord id.* (CIA "must tender as absolute an assurance of confidentiality as it possibly can"). To that end, the government has a "'compelling interest in protecting both the secrecy of information important to our national security *and the appearance of confidentiality* so essential to the

effective operation of our foreign intelligence service.' " *Id.* (quoting *Snepp*, 444 U.S. at 509 n. 3 (emphasis added)); *accord Fitzgibbon v. CIA*, 911 F.2d 755, 763–64 (D.C. Cir. 1990). That appearance of confidentiality would be damaged were it subject to judicial oversight, leading sources to question its viability. *Fitzgibbon*, 911 F.2d at 764. Thus, the Supreme Court has expressly recognized the threat to national security stated by the CIA in this case: "If potentially valuable intelligence sources come to think that the Agency will be unable to maintain the confidentiality of its relationship to them, many could well refuse to supply information to the Agency in the first place." *Sims*, 471 U.S. at 175; *accord Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("human resources abroad often refuse to aid the CIA absent assurances of confidentiality because *official confirmation* of a source's cooperation with the Agency could cause . . . retaliatory action" (internal quotation marks and alterations omitted; emphasis added)); *Fitzgibbon*, 911 F.2d at 766 ("executive branch confirmation or denial of information contained in [public] could under some circumstances pose a danger to intelligence sources and methods").

All these harms to intelligence sources could occur if the CIA were to acknowledge the identity of a covert employee and his or her association with the CIA. *Military Audit Project v. Casey*, 656 F.2d 724, 748–49 (D.C. Cir. 1981) ("to reveal the names of those government officials, not associated with the CIA . . . would signal to the world that these persons were and/or are engaged in highly sensitive intelligence activities and could lead to exposure of their cover and the cover used by a classified government entity"). In short, for the CIA to officially acknowledge the identity of a covert employee reveals not just that employee's association with the CIA, but the Agency associations of all the employee's sources and methods as well, implicating the harms described above.

Additionally, foreign governments may also have other concerns not directly related to the intelligence relationship.  As the courts have recognized, "official acknowledgment may force a government to retaliate."  *Afshar v. Dep't of State*, 702 F.2d 1125, 1131 (D.C. Cir. 1983).  "In the world of international diplomacy, where face-saving may often be as important as substance, official confirmation . . . could have an adverse effect on our relations [with other countries]."  *Phillippi v. CIA*, 655 F.2d 1325, 1332–33 (D.C. Cir. 1981); *accord ACLU v. Dep't of Defense*, 389 F. Supp. 2d 547, 561 (S.D.N.Y. 2005) ("the niceties of international diplomacy sometimes make it important not to embarrass a foreign country or its leaders").[10]

With respect to all of the types of harm described here, the damage that comes from disclosure of information to the public would be exacerbated by official acknowledgment of that disclosure by the Agency.  For that reason, the CIA has declined to officially acknowledge the information at issue here, and properly concluded that further disclosure could harm national security.

C.    The CIA's Classification Decision Is Entitled to a High Level of Deference

That classification decision is entitled to the highest level of deference by the Court. "[I]t is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process."  *Sims*, 471 U.S. at 180.  The courts thus cannot "perform[ ] [their] own calculus as to whether or not harm to the national security or to intelligence

---

[10]    *Phillippi* cited a concrete example: former Soviet premier Nikita Khrushchev stated in his memoirs "that what led him to cancel the Paris Summit meeting with President Eisenhower after the U-2 incident was not the fact that American U-2's had overflown the Soviet Union—that was not news to Khrushchev—but rather that President Eisenhower had publicly admitted that he had approved the mission."  655 F.2d at 1332.

sources and methods would result from disclosure," as that assessment "is entrusted to the Director of Central Intelligence, not to the courts." *Fitzgibbon,* 911 F.2d at 766.  Thus, "[f]or 'reasons . . . too obvious to call for enlarged discussion,' the protection of classified information must be committed to the broad discretion of the agency responsible." *Egan*, 484 U.S. at 529 (quoting *Sims*, 471 U.S. at 170); *accord Salisbury v. United States*, 690 F.2d 966, 973 (D.C. Cir. 1982).  Accordingly, the courts "must pay substantial deference to the affidavit submitted by the agency in the 'national security' context." *Diamond v. FBI*, 707 F.2d 75, 79 (2d Cir. 1983).  Once the CIA has provided "facially reasonable" explanations for its national security decisions, no further judicial inquiry is warranted. *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999).

The high level of deference to the CIA's classification decisions is rooted in three well-established principles.  First, the Constitution places responsibility for matters of national security and foreign relations, including the determination of whether secrecy is required, in the executive branch; the courts have therefore shown "the utmost deference to Presidential responsibilities" in those areas.  *Egan*, 484 U.S. at 527, 529–30 (internal quotation marks omitted); *accord United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–20 (1936); *see United States v. Nixon*, 418 U.S. 683, 706, 710 (1974).

Second, "the judiciary is in an extremely poor position to second-guess the executive's judgment" in matters of national security.  *Center for Nat'l Security Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003).  The "mosaic-like nature of intelligence gathering," *Salisbury*, 690 F.2d at 971, means that "[w]hat may seem trivial to the uninformed . . . may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in context," *United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir. 1972); *accord Sims*, 471 U.S. at 178; *McGehee*, 718 F.2d at 1149.

Without expertise in intelligence or foreign relations, courts "are in no position to dismiss the CIA's facially reasonable concerns" about the harms that disclosure could cause to national security. *Frugone*, 169 F.3d at 775; *accord Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993); *McGehee*, 718 F.2d at 1149.

Third, deference is warranted because "no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981). Accordingly, the consequences of disclosure of classified information may be especially severe, as "the benefit of dependable foreign intelligence" is essential to "critical decisions about foreign policy and national defense" and, thus, "to the security of the United States and—in a sense—the free world." *Snepp*, 444 U.S. at 512 n.7.[11]

For all those reasons, courts "have found it unwise to undertake searching judicial review" of executive assertions of harm to national security. *Center for Nat'l Security Studies*, 331 F.3d at 927; *accord North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198, 219 (3d Cir. 2002) (court is "quite hesitant to conduct a judicial inquiry into the credibility of th[e government's] security concerns, as national security is an area where courts have traditionally extended great deference to Executive expertise"); *Military Audit Project v. Casey*, 656 F.2d 724, 753 (D.C. Cir. 1981) ("for us to insist that the Agency's rationale here is implausible would be to overstep the proper limits of the judicial role" (internal quotation marks omitted)); *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980) (court "not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions"); *ACLU v. Dep't of Defense*, 389 F. Supp. 2d at 565 ("small scope for judicial evaluation in

---

[11] Similarly, Congress has also expressed concern that "'adverse affects [*sic*] might occur as a result of public disclosure of a particular classified record,'" and therefore "'Federal courts . . . [should] accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Halpern v. FBI*, 181 F.3d 279, 292 (2d Cir. 1999) (quoting S. Conf. Rep. No. 93-1200, at 12 (1974)).

this area"); *see Zadvydas v. Davis*, 533 U.S. 678, 696 (2001) ("heightened deference to the judgments of the political branches with respect to matters of national security"). The CIA need only provide "facially reasonable" explanations for its national security decisions, and further judicial inquiry is unwarranted. *Frugone*, 169 F.3d at 775; *accord McGehee*, 718 F.2d at 1149 (even in First Amendment context, courts need only be assured that "reasons for classification are rational and plausible ones").[12]

D.   The Information at Issue Was Never Declassified and Has Remained Classified Since Its Inception

As explained above, the CIA properly exercised its authority to classify information that would acknowledge whether or not Wilson was employed before 2002. *Supra* Point I.B. Plaintiffs do not even attempt to point to an actual declassification action by the CIA, yet somehow contend that information regarding Wilson's dates of employment was "indisputably not classified." Pls.' Br. at 26. To the contrary, it indisputably *was* classified—as plaintiffs admit when it suits their purposes: "information about Valerie Wilson's employment affiliation with the CIA . . . was *highly classified*." Pls.' Br. at 4 (emphasis added) (explaining Wilson's victimization by leaks and media exposure). That admission is unassailably correct, then and now. Plaintiffs argue that the CIA has waived its right to protect classified information (which it has not, as shown *infra* Point II); or that the information admittedly classified when leaked to the media later became inexplicably

---

[12]   Plaintiffs argue, almost in passing, that the CIA's decisions "are not entitled to any deference," because the Agency did not provide an explanation for its classification decisions—citing no authority, but presumably referring to the requirement of Exec. Order 13,292, § 1.6(a)(5). Pls.' Br. at 37. Their argument is wrong as a matter of fact—the CIA did provide its reasons, both on the face of the properly marked document, AR (Cl.) Tab 2, and in the Classification Guide, *id.* Tab 9, with the specificity required by § 1.6(a)(5) and 32 C.F.R. § 2001.21(a)(3), i.e., a citation to the relevant category of § 1.4 of the Executive Order. Their argument is also wrong as a matter of law, because nowhere does the case they cite, *McGehee*, 718 F.2d at 1148, or any other case say that deference is lost by an agency's failure to state a reason.

unclassified, even though the CIA never took action to do so.  The latter argument is based on a confused and confusing misuse of the terminology of classification, but does not dispel the basic fact that the information at issue was classified at its inception, was classified when the personnel office sent its letter, and is classified now.

First, plaintiffs repeatedly refer to the February 2006 letter as an "unclassified document."  E.g., Pls.' Br. at 1, 18.  But they never explain how a supposedly unclassified document can contain concededly classified information.  To the contrary, government regulations provide that a document is classified at the highest level of the information contained therein.  32 C.F.R. §§ 2001.21(b), 2001.22(e), 2001.23(e).  Moreover, the February 2006 letter was a derivative classification—meaning that it was a summary of already-classified information—and therefore was classified at the level of the classified information that it included.  Exec. Order 13,292, §§ 2.1(a), 6.1(n).  Plaintiffs' contention that a letter containing classified information is unclassified is thus patently wrong.

Second, plaintiffs characterize the government's actions after the February 2006 letter was issued as attempts to "classify or reclassify" the information it contained.  E.g., Pls.' Br. at 3, 15, 16.  But there was no need to "classify" information already classified— though the CIA did review the information after the letter had been made public and reaffirm that it was properly classified.  DiMaio Decl. ¶ 9; AR (Uncl.) Tab 28.  And it was impossible to "reclassify" the information, because the CIA never declassified it, DiMaio Decl. ¶¶ 9, and plaintiffs can point to nothing to show that the Agency did.  *See* Exec. Order 13,292, § 1.7(c) ("Information may be reclassified *after* declassification and release to the public under proper authority" (emphasis added)); 32 C.F.R. § 2001.13(a)(2) ("declassification and release under proper authority means that the agency originating the information *authorized* the declassification and release of the information" (emphasis

added)).  Plaintiffs' arguments regarding whether the information could be "reasonably recovered," Pls.' Br. at 38–39—a phrase quoted from § 1.7(c)(2) of the Executive Order, which applies only to reclassification—are therefore wholly inapposite.

Third, plaintiffs imply that the failure to mark the letter properly necessarily means that the information in that document was not classified.  Classification does not occur as a result of marking the document; rather, a document is marked once it is classified.  A document becomes classified when the conditions of Executive Order 13,292, § 1.1(a), detailed above, are met, and marking is not one of those conditions.  Instead, markings are added to identify the document as having been classified.  *Id.* § 1.6(a).  But no authority says that a failure to mark a document strips it of its classification—in fact, the Executive Order specifies that "[i]nformation assigned a level of classification . . . shall be considered as classified at that level of classification despite the omission of other required markings."  *Id.* § 1.6(f).  Government regulations further provide that agencies must take action to "restore markings" if information is released without authority.[13] 32 C.F.R. § 2001.10(d).  Thus, the lack of markings, while a mistake in this case, did not deprive otherwise classified information of its national-security importance or its protection from disclosure.

Finally, no matter how much plaintiffs "presume" about what the CIA's benefits manager knew or understood, or conclusorily describe her as "an authorized, high level

---

[13]   As the Agency did here.  AR (Cl.) Tab 2, AR (Uncl.) Tab 1.  Plaintiffs criticize this straightforward and legally required action as an effort to "create the appearance or pretext" that the document had always been marked.  Pls.' Br. at 13–14, 26 n.13.  That accusation is simply false, as the CIA has never denied that the original letter was unmarked.  AR (Cl.) Tab 1; Tumolo Decl. ¶¶ 9–10; AR (Uncl.) Tab 18.  Similarly, plaintiffs charge the CIA with trying to "conceal" their administrative error, Pls.' Br. at 16—an odd allegation, considering that within days after learning of the mistake Tumolo wrote Wilson expressly to inform her that the error had occurred, AR (Uncl.) Tab 18; Tumolo Decl. ¶ 12.

manager," or indulge in speculation about what she must have been thinking, Pls.' Br. at 25–26, they cannot escape a truth almost too obvious to mention: "agencies are run by people and people make mistakes." *Rodriguez-Roman v. INS*, 98 F.3d 416, 433 (9th Cir. 1996) (Kozinski, J., concurring).[14] The evidence that the CIA's personnel office made such a mistake is uncontroverted; plaintiffs can offer nothing but conjecture to rebut Tumolo's admission of inadvertent error. Tumolo Decl. ¶¶ 9–11; *see Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny" the motion (internal quotation marks omitted)). Plaintiffs seek to take that honest mistake and use it to pry loose properly classified national security information. But the rules governing classification are more realistic, and recognize the importance of their subject matter: a mistaken disclosure of national security information does not declassify that information. Exec. Order 13,292, § 1.1(b).

The uncontradicted evidence, therefore, demonstrates that information regarding whether or not Wilson was employed by the CIA before 2002 was and remains classified.

E.     The Presumption of Regularity of Official Actions Applies to All Agency Actions Absent Clear Evidence to the Contrary

Plaintiffs rely on the presumption of regularity of official actions—a well-established presumption that applies to *all* of the CIA's actions in this case, including the review of Wilson's manuscript, unless there is clear evidence to the contrary. *Alfred A. Knopf*, 509 F.2d at 1369 (applying presumption of regularity to CIA's prepublication review of manuscript); *see National Archives & Records Admin. v. Favish*, 541 U.S. 157, 174

---

[14]   Even federal judges, who are also people, have been known to inadvertently release classified information. *United States v. Yunis*, 867 F.2d 617, 621 n.8 (D.C. Cir. 1989).

(2004); *United States v. Armstrong*, 517 U.S. 456, 464 (1996). However, the presumption of regularity is not an assumption of infallibility: it cannot establish, as plaintiffs would have it, that no matter what the CIA's benefits manager did it must be correct. Pls.' Br. at 26–27. In this case, clear evidence establishes that the CIA's benefits manager was mistaken in issuing the February 2006 letter without markings or other protections required for classified information. AR (Uncl.) Tabs 18, 19; Tumolo Decl. ¶¶ 9–11. On the other hand, there is no evidence whatsoever that the Agency's attempts to ameliorate that mistake—by informing Wilson of her obligation to return the letter; telling the clerk of the House of Representatives that classified material had been published in the Congressional Record; and acting to prevent further dissemination of that classified material through, among other things, prepublication review and redaction of Wilson's manuscript—were anything other than a proper and good faith discharge of its official duties to protect intelligence sources and methods and classified information.[15] The presumption of regularity, therefore, applies to those actions.

Plaintiffs offer nothing to controvert the presumption—and the evidence—that the CIA acted properly except unsupported conjecture about the Agency's motives. Pls.' Br. at 13–14, 16, 26 n.13. That is the very type of accusation of government misconduct that, because it is "easy to allege and hard to disprove," cannot overcome the presumption of agency regularity without a "meaningful evidentiary showing." *Favish*, 541 U.S. at 175 (internal quotation marks omitted). Indeed, in *United States v. Chemical Foundation*, the Supreme Court upheld an agency's action against a later government charge that it had

---

[15] Plaintiffs attempt to imply otherwise by stating that the CIA's claim of administrative error is "late" and the Agency "took no steps whatsoever for nearly a year" after the February 2006 letter. However, as Tumolo states, she did not learn of the error until early 2007, at which point she and the CIA promptly began acting to remedy it. Tumolo Decl. ¶ 12; AR (Uncl.) Tabs 18, 19.

been fraudulently induced, not (as plaintiffs describe it) because agencies never make mistakes or that the "validity [of their actions] should not be reviewed by the courts," Pls.' Br. at 27, but simply because the government "failed to establish any conspiracy, fraud or deception alleged." 272 U.S. 1, 14 (1926). In this case, by contrast, the evidence of a mistake by the CIA's benefits manager is clear and uncontradicted; the evidence of any other mistake or bad faith by the Agency is nonexistent.[16]

Point II

The CIA Has Never Waived Its Ability to Protect the Classified Information at Issue by Official Disclosure

Plaintiffs contend that the Court may compel the release of the classified information at issue in this case because it has been publicly disclosed. That alone is insufficient: an agency's refusal to release classified information "is generally unaffected by whether the information has entered the realm of public knowledge." *Halpern v. FBI*, 181

---

[16] The deference and presumptions of regularity to which the Agency is entitled do not leave Wilson without a remedy. As the Fourth Circuit recognized in *Alfred A. Knopf*, the administrative procedure for declassification review provided by the Executive Order is a "remedy which is far more effective than any the judiciary may provide, which can function without threat to the national security and which can act within the Executive's traditional sphere of autonomy." 509 F.2d at 1369–70. Even "in situations in which *information has been so widely circulated* and is so generally believed to be true, that confirmation by one in a position to know would add nothing to its weight . . . appraisals of such situations by the judiciary would present a host of problems and obstacles." *Id.* at 1370–71 (emphasis added). Instead, the review body established by the Order—whose members, "far more than any judge, have the background for making classification and declassification decisions"—is best placed to assess whether declassification is appropriate. *Id.* at 1369–70.

Wilson has apparently never availed herself of this expert classification review, now available under § 3.5 of the Executive Order. Even if the CIA were to deny declassification initially, an appeal is available to the Interagency Security Classification Appeals Panel—a body with far more power than the review committee described in *Alfred A. Knopf*, and which, because of its interagency nature, "would not be expected to serve any parochial interest of particular agency unless it coincided with the national interest," 509 F.2d at 1370—and then to the President. Exec. Order 13,292, § 5.3; 32 C.F.R. § 2001.33; *id.* Part 2001 App. A. As the *Alfred A. Knopf* court did, this Court should leave national security declassification decisions to the expert panel established expressly for that purpose.

F.3d 279, 294 (2d Cir. 1999). There is only a "limited exception" to this rule, "where the government has officially disclosed the specific information the requester seeks." *Id.*; *accord Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 421 (2d Cir. 1989). But this waiver of secrecy by official disclosure is narrowly defined, as the courts have "unequivocally recognized that the fact that information resides in the public domain does not eliminate the possibility that *further disclosures can cause harm* to intelligence sources, methods and operations." *Fitzgibbon*, 911 F.2d at 766 (emphasis added); *accord Wolf*, 473 F.3d at 378 ("the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm"). Because of this possibility of additional harm from official acknowledgment, even of already-known information, the courts are "bar[red] . . . from prying loose from the government even the smallest bit of information that is properly classified." *Afshar*, 702 F.2d at 1130; *accord Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 2003).

Thus, the test for waiver by official disclosure is a "stringen[t]" one. *Public Citizen*, 11 F.3d at 202. To establish an official disclosure, plaintiffs must show the following: "First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed. . . . Third, the information requested must already have been made public through an official and documented disclosure." *Fitzgibbon*, 911 F.2d at 765; *accord Afshar*, 702 F.2d at 1133 (plaintiffs bear burden of showing specific public information that duplicates information withheld); *Hudson River Sloop*, 891 F.2d at 421 (same). This test is applied with "exactitude" out of deference to "'the Government's vital interest in information relating to national security and foreign affairs.'" *Wolf*, 473 F.3d at 378 (quoting *Public Citizen*, 11 F.3d at 203 (test presents a "high hurdle" due to government

interest in national security)).  In fact, the test is applied with such exactitude that nearly every decision on this subject denies a waiver based on official disclosure.[17]

A.    The Information Sought Is Not as Specific, Nor Does it Match, the Information Disclosed

If plaintiffs simply sought to publish the same information that is contained in the February 2006 letter, i.e., the dates of Wilson's employment, then the first two prongs of the *Fitzgibbon* test would be satisfied.  But they demand much more than that: plaintiffs seek a declaration from the Court that they may publish "information in the [m]anuscript that *references or is consistent with* the same information" in that letter.  Pls.' Br. at 17 (emphasis added).  That open-ended and undefined request encompasses far more than simply dates of employment.  As the CIA explained to Wilson on several occasions during prepublication review, even "statements that may be unclassified standing alone . . . [may] become classified when they are linked with a specific time . . . or are included in another context that would reveal classified information."  AR (Uncl.) Tab 24, at 1; *accord* AR (Uncl.) Tab 23, at 3.  It is precisely for that reason that the courts have insisted on "exactitude" in applying the "stringen[t]" *Fitzgibbon* test.  *Wolf*, 473 F.3d at 378.  The public availability of "similar" or "overlapping" information does not suffice to waive the CIA's classification; "instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure."  *Id.* (citing *Public Citizen*, 11 F.3d at 201, 203; *Military Audit,* 656 F.2d at 752–53); *Hudson River Sloop*, 891 F.2d at 421.

---

[17]    Of the cases cited in plaintiffs' nearly page-long string cite, Pls.'s Br. at 21, only one—*Wolf*—actually ordered information released based on the official disclosure doctrine. In that case, the CIA's Director disclosed in congressional testimony precisely the information at issue.  Even then, the waiver was limited strictly to the information revealed in that testimony.  473 F.3d at 379–80.

Thus, an injunction requiring the release of any information that "references or is consistent with" Wilson's employment dates is far broader than the law allows. Though the plaintiffs' failure to meet the terms of the *Fitzgibbon* test is alone fatal to their claims and the government need not show any harm to national security, that harm is readily apparent. A foreign intelligence service, for example, attempting to track the activities of the CIA would be immensely aided by knowing not just where an agent was stationed and the unclassified descriptions of activities she undertook, but *when* that occurred and what other facts are associated with that time frame. "[E]ach individual piece of intelligence information, much like a piece of a jigsaw puzzle, may aid in piecing together other bits of information," or may give foreign intelligence agencies—whom "[t]he CIA has the right to assume . . . are zealous ferrets"—a "starting point" for countermeasures that would compromise the CIA's national security mission. *Wolf*, 473 F.3d at 377 (internal quotation marks omitted).

In addition, the injunction plaintiffs seek is overbroad and entirely unworkable in practice. *See Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) ("Injunctive relief should be narrowly tailored to fit specific legal violations."). Besides going beyond the limits of what is allowed by the substantive law, the proposed injunction's bounds will be impossible for the Publications Review Board to discern and apply. As the Board stated in its letters and electronic mail to Wilson, determining classified status is a matter involving both the narrow context of how particular information is linked to certain times and events, and the broad context of considering the information as it appears in the publication as a whole. AR (Uncl.) Tabs 6 (Aug. 4, 2006, e-mail), 11, 13, 21, 24, 28. A vague injunction to permit anything that "references or is consistent with" Wilson's dates of employment is impossible to apply in that context.

For that reason, and also because the terms of the *Fitzgibbon* standard are not satisfied, the injunction should be denied.

B.     The CIA Has Not Made the Information Public Through an Official Disclosure

The third prong of the *Fitzgibbon* test for official disclosure actually contains four elements: the information must "already have been [1] made public [2] through [3] an official and [4] documented disclosure." *Fitzgibbon*, 911 F.2d at 765 (bracketed numbers added).  In other words, plaintiffs must show that the Agency made information public, that it did so "through" (i.e., by means of) an Agency disclosure, and that that disclosure was "official."[18]  Plaintiffs have failed on all counts.

1.     No Information Here Has Been Made Public Through a CIA Disclosure

First, the CIA has never "made public" any information about Wilson's employment *vel non* prior to 2002.  It is undisputed that the February 2006 letter from the CIA personnel office was sent to Wilson and Wilson alone.  AR (Uncl.) Tab 1; AR (Cl.) Tabs 1–3. This private correspondence was not a public disclosure, and there is no reason to believe that anyone at the CIA—either the personnel office employee who signed it or a more senior official—ever imagined, much less intended, that a mundane letter about retirement benefits would ever go beyond Wilson herself.  "[O]fficial statements *by definition* would . . . have to have been matters of *public record*," *Hudson River Sloop*, 891 F.2d at 422 (emphasis added); private correspondence simply does not qualify.  There is no case or other authority that holds that a letter addressed to a single person constitutes a public disclosure, much less that it serves to waive an agency's obligation to protect the classified information in that letter.  To the contrary, the examples of allegedly official disclosures in

_____

[18]   The requirement that the disclosure was "documented" is not at issue in this case.

the case law are all indisputably public releases by the responsible agency. *Wolf*, 473 F.3d at 379 (CIA director's testimony to Congress); *Hudson River Sloop*, 891 F.2d at 421 ("testimony of various high-ranking Navy officials before Congress"); *Afshar*, 702 F.2d at 1129 (information "released to the public"); *Military Audit*, 656 F.2d at 732 (public and intentional acknowledgment of ownership of Glomar Explorer).

Plaintiffs argue that information regarding Wilson's employment is now in the "public domain," as Wilson transmitted that information to a member of Congress who then published it in the Congressional Record. Pls.' Br. at 26. This is irrelevant. Wilson's communication with a congressman was, like the CIA personnel office's letter to her, a private disclosure and therefore did not "ma[k]e public" any information; and, as explained *infra* Point III, the publication by Congress is immaterial under Second Circuit law. More to the present point, neither communication can be attributed to the CIA, and thus no matter how the disclosure is described it cannot be said that the Agency "made [information] public," or did so "through" that disclosure. For those reasons, plaintiffs have not shown that the first two elements of an official disclosure have occurred.

2.    The CIA's Inadvertent Disclosure Was Not "Official"

a.    An Inadvertent Disclosure Cannot Be "Official"

Additionally, the February 2006 letter was not "official" in the sense used in the case law, because its release was an inadvertent mistake by the benefits manager. To be "official," an action must be "authorized or approved by a proper authority." BLACK'S LAW DICTIONARY (8th ed. 2004); *accord* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000) ("authorized by a proper authority"); *see Military Audit*, 656 F.2d at 744 ("*authoritative*, official disclosure[ ]" (emphasis added)). A mistake, by definition, is

not "authorized," "approved," or "official," and therefore is not sufficient to waive the CIA's duty to protect national security information.[19]

Plaintiffs' argument to the contrary rests on a fundamental misunderstanding of the doctrine of official disclosures: in their view, apparently, an "official disclosure" means any disclosure, in any context, by any agency "official"—an argument that then requires plaintiffs to repeatedly label the CIA's benefits manager a "senior official" (which, as explained below, is unfounded). However, the cases governing waiver by official disclosure are to the contrary: an official disclosure is not a "disclosure by an official," but an "officially *authorized* disclosure."

As the Fourth Circuit has held, "declassification by official public disclosure" is the "result of *high level executive decisions* that *disclosure was in the public interest.*" *Alfred A. Knopf*, 509 F.2d at 1369 (emphasis added). Absent such an informed and conscious decision to release specific information—either expressly stated, as in *Military Audit*, 656 F.2d at 732 (government "determined . . . that it had become necessary for the United States to acknowledge ownership" of Glomar Explorer), or *Alfred A. Knopf*, 509 F.2d at 1369 (disclosure made "to counter popular and congressional pressure . . . and . . . to bolster

_____

[19] Plaintiffs' brief states that "the Agency informed Ms. Wilson that she would receive an 'official' memorandum verifying her annuity"—the quotation marks apparently attributing the word "official" to the CIA. Pls.' Br. at 6. This is one of several instances where the brief makes misleading citations. Plaintiffs cite 11 exhibits in support of the above statement that the letter was "official," but the only one of those documents that describes the annuity letter as "official" is an email from Wilson herself to a congressional staffer—plaintiff's own description, not the CIA's. Smallman Decl. Exhibit B (email dated Nov. 28, 2005). In another example, plaintiffs describe the February 2006 letter as being "made by a senior manager of the CIA presumed to be knowledgeable about handling of classified information." Pls.'s Br. at 25. Plaintiffs cite 15 documents for that proposition (including their own complaint), not one of which describes the CIA employee in question as a "senior manager" or details her knowledge, presumed or otherwise, of classified information handling. Finally, on several occasions, plaintiffs circularly cite only letters written by their own lawyer. *E.g., id.* at 16, 26 n.13, 28.

domestic support"), or implied by an unquestionably official public disclosure such as a top-level official's testimony before Congress, *e.g.*, *Wolf*, 473 F.3d at 379; *Public Citizen*, 11 F.3d at 200; *Hudson River Sloop*, 891 F.2d at 421—no official disclosure has occurred. *Alfred A. Knopf*, 509 F.2d at 1369.

The Second Circuit's leading case on official disclosures confirms that official disclosures must be officially authorized and approved, not merely a statement by an agency official. In *Hudson River Sloop*, the court stated that to defeat the Navy's refusal to confirm or deny classified information, the requesters "would have had to produce information confirming that the Navy had *officially* stated" the information in question. 891 F.2d at 422. The court explicitly said that even a statement by the Navy itself would not necessarily be "official": "Any *unofficial* statements . . . made *by the Navy* to third parties which were not a matter of public record" would not qualify to waive the Navy's right to withhold classified material. *Id.* (emphasis added).

Other cases have consistently drawn "an important distinction between official and unofficial disclosures. . . . An unofficial disclosure . . . does not constitute a waiver by the Agency of confidentiality." *Rubin v. CIA*, No. 01 Civ. 2274, 2001 WL 1537706, at *5 (S.D.N.Y. Dec. 3, 2001); *accord Fitzgibbon*, 911 F.2d at 765 ("critical difference"). But while statements by non-employees are always held to be unofficial, *Frugone*, 169 F.3d at 774 (citing cases), statements by current government employees may also be unofficial—as is clear from the *Hudson River Sloop* language quoted above. For instance, leaks by current employees are distinguishable from official disclosures and do not waive a government agency's ability to protect classified information. *Hudson River Sloop*, 891 F.2d at 422; *Afshar*, 702 F.2d at 1130–31; *see Military Audit*, 656 F.2d at 740. Even authorized disclosures may be unofficial: in *Military Audit*, the court quoted an affidavit from Brent

Scowcroft, then a White House national security official, stating that while the conduct of secret intelligence is "known and accepted" and governments themselves "may even *unofficially* acknowledge this fact," those same governments "do not *officially* acknowledge" such activities.[20] 656 F.2d at 732 (emphasis added); *accord Phillippi v. CIA*, 655 F.2d 1325, 1330 (D.C. Cir. 1981) (information "disseminated . . . by the CIA itself" for its own purposes does not require further disclosure of the same information).[21]

No authority supports the contrary view, that an inadvertent disclosure can constitute an official disclosure. Plaintiffs rely on a single district court opinion, *Aftergood v. CIA*, 355 F. Supp. 2d 557 (D.D.C. 2005), but there the information at issue was officially declassified by the CIA's Historical Review Program.[22] *Id.* at 563–64. The case, therefore, did not involve a "declassification by official public disclosure," *Alfred A. Knopf*, 509 F.2d at 1369, but an actual, express declassification and release that the Agency later asserted was inadvertent. It is thus inapplicable here. To the extent it is actually an application of the official disclosure rule, it is dicta—as the court acknowledged, the requester in that case already had the released document and was actually seeking other information, a request

---

[20] The affidavit went on to explain that this is because "[n]o government . . . could tolerate the official acknowledgment by another government that such an operation has been conducted against it. When such an official acknowledgment occurs, the nation that has been the object of such an operation must take some action in response."

[21] The focus on intent—fatal to plaintiffs' claims in this case—is consistent with the general principle that a governmental privilege cannot be waived by inadvertence. *Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 856 (3d Cir. 1995) (no inadvertent waiver of deliberative process privilege); *Dipace v. Goord*, 218 F.R.D. 399, 406–07 (S.D.N.Y. 2003) (agency must "actually authorize[]" document's release). That is because—like here—the "privilege belongs to the Government and . . . can neither be claimed nor waived by a private party." *Overby v. U.S. Fid. & Guar. Co.*, 224 F.2d 158, 163 (5th Cir. 1955).

[22] That CIA program exists for the purpose of declassifying and releasing historical documents. *See* CIA Special Collections, http://www.foia.cia.gov/special_collections.asp.

that was denied—and contains no reasoning to justify its deviation from the cases cited above.

Just as the CIA unquestionably cannot be required to officially acknowledge classified information disclosed by another executive-branch agency, *Frugone*, 169 F.3d at 774–75, or by another branch of government, *infra* Point III, so too it cannot be made to officially acknowledge a mistaken disclosure by its personnel office. *Frugone* presents nearly identical facts to those here: the plaintiff requested that the CIA confirm that he had been a covert employee, which the Agency refused to acknowledge due to its national security classification. 169 F.3d at 773. The plaintiff argued that written acknowledgment of his employment by the government's Office of Personnel Management ("OPM"), as well as written confirmation by the CIA's Office of Independent Contractor Programs that he had paid Social Security taxes, constituted an official disclosure that waived the CIA's right to protect classified information. *Id.* at 773–74. The Court held that it would "not deem 'official' a disclosure made by someone [OPM] other than the agency from which the information is being sought," and noted the "untoward consequences that could ensue were [the CIA] required either to confirm or to deny" that disclosure. *Id.* at 774–75. Official acknowledgment of an inadvertent disclosure by the CIA's personnel office would have the same "untoward consequences" as acknowledgment of another agency's release of information: in both cases, the CIA would be forced to confirm a disclosure that it did not approve and did not endorse, thus causing greater potential harm to national security than did the "informal, and possibly erroneous, statements already made." *Id.* at 775; *supra* Point I.B.2. The law does not require the CIA to make such an acknowledgment.

b.     Waiver by Inadvertent Disclosure Is Inconsistent with Executive Order 13,292

Plaintiffs' contention that an inadvertent disclosure can waive the CIA's ability to protect classified national security information is barred by the very Executive Order that permits agencies to classify documents in the first place.  Executive Order 13,292 provides: "Classified information shall not be declassified automatically as a result of any unauthorized disclosure of identical or similar information."  Exec. Order 13,292, § 1.1(b). Under that provision, "inadvertent disclosure of [classified information] does not declassify it."  *Al-Haramain Islamic Found., Inc. v. Bush*, 451 F. Supp. 2d 1215, 1228 (D. Or. 2006). That is precisely the opposite of plaintiffs' argument here, that an inadvertent disclosure does in fact automatically declassify information.  If accepted, then, plaintiffs' rule would completely swallow the express provision of the Executive Order.[23]

c.     The CIA's Benefits Manager Is Not a High-Level Official with Authority to Declassify, Inadvertently or Otherwise

Finally, even if plaintiffs are correct that an inadvertent disclosure can be an official disclosure, a letter from an agency's benefits manager does not qualify.  As described above, the cases in which an official disclosure was alleged all involved a high-level official or deliberative agency body.  *Alfred A. Knopf*, 509 F.2d at 1369 (official disclosure results from "high level executive decisions that disclosure was in the public interest").  The only case in which an official disclosure was actually found by a federal court of appeals involved the congressional testimony of the CIA's highest officer.  *Wolf*, 473 F.3d at 379. Though plaintiffs refer to her numerous times as a "senior official," the CIA's benefits

---

[23]   Similar provisions have appeared in the two previous Executive Orders governing the classification of national security information.  Exec. Order 12,958, § 1.2(c), 60 Fed. Reg. 19,825 (Apr. 17, 1995); Exec. Order 12,356, § 1.3(d), 47 Fed. Reg. 14,874 (Apr. 2, 1982).

manager simply is not a high official, one who can waive its crucial duty to protect

classified national security information.  In fact, plaintiffs make no attempt whatsoever to

justify the characterization of a personnel officer as a "senior official" by citing either the

record or the law—neither of which supports that label.[24]  It appears that they rely simply

on the presence of the word "chief" in her title—begging the question, chief of what?  The

responsibilities of the benefits chief are confined to administering benefits, Tumolo Decl.

¶ 5; her title suggests no authority beyond that, certainly not the power to declassify any

information she can access within the Agency simply by mistakenly disclosing it.

While the government maintains that a waiver by official disclosure must be

authorized and intentional, if that is not correct then the disclosure must certainly be

effected by a top official.  Only certain CIA officials have the authority to declassify

information, and the benefits manager is not one of them.  Tumolo Decl. ¶¶ 6, 10; *see* AR

(Uncl.) Tab 40.  She cannot acquire that authority by making a mistaken disclosure.

For all of the above reasons, then, the CIA has not officially disclosed the

information plaintiffs seek to publish.

### Point III

#### Publication by Congress Does Not Waive the CIA's Ability to Protect Classified Information

Plaintiffs also point to the appearance of information related to Wilson's

employment in the Congressional Record.  The courts have unanimously rejected claims

---

[24]  "Senior agency official" is defined in Executive Order 13,292 as "the official
designated by the agency head . . . to direct and administer the agency's program under
which information is classified, safeguarded, and declassified."  Exec. Order 13,292,
§ 6.1(ii).  The benefits manager had no such authority.  Tumolo Decl. ¶¶ 6, 10.

that congressional publication of classified CIA information constitutes declassification or official disclosure by the Agency, or otherwise waives the Agency's right to withhold it.[25]

The Second Circuit reached that conclusion in *Earth Pledge Foundation v. CIA*, 128 F.3d 788 (2d Cir. 1997), *aff'g* 988 F. Supp. 623 (S.D.N.Y. 1996), adopting in a published (and therefore precedential) opinion the decision of the district court.[26]  In that case, the government declined to confirm or deny the existence of a CIA station in Ciudad Trujillo, Dominican Republic, despite the publication of a Senate Report that referred to such a station.  988 F. Supp. at 625.  The court noted the deference required to the CIA's classification decisions, especially regarding intelligence sources and methods.  *Id.* at 626. It then held that "public disclosure in the Senate Report of some of the information requested by plaintiffs does not undermine [the CIA's] justifications for refusing to confirm or deny the existence of this information."  *Id.* at 628.  As in this case, "[w]hatever disclosures may have been made in a Congressional Report, the CIA's ongoing interest in assuring its sources of its continued adherence to its strict policy of not revealing sources," and in honoring to the extent possible the "pledge of confidentiality" it had given those sources, was sufficient to exempt the already-disclosed information from disclosure by the Agency.  *Id.* at 627–28.

---

[25]  Apparently recognizing that the law is well settled, plaintiffs do not actually argue that the congressional publication itself waives the CIA's right to withhold classified information; such argument is therefore waived.  Instead, they cite that publication as evidence that the information in question is now in the public domain.  As explained *supra* Point II.B.1, that standing alone is irrelevant, as plaintiffs cannot show that the CIA was responsible for any public dissemination.

[26]  A district court opinion becomes binding circuit precedent when it is "adopted by or incorporated into one of [the circuit's] published opinions."  *McCoy v. Holland*, 364 F.3d 166, 172 n.8 (4th Cir. 2004).

Similarly, in *Fitzgibbon*, the circuit court found it "doubtless correct" that "executive branch confirmation or denial of information contained in congressional reports could under some circumstances pose a danger to intelligence sources and methods." 911 F.2d at 766. And in *Salisbury*, the court ruled that disclosure of intelligence methods in a Senate report "cannot be equated with disclosure by the agency itself" and accordingly did not waive the government's classification. 690 F.2d at 971.

No case holds to the contrary. The publication of information in the Congressional Record, therefore, has no effect on the CIA's ability to continue to deem it classified.

CONCLUSION

For all of the above reasons, plaintiffs' motion for summary judgment and for injunctive relief should be denied, and the government motion for summary judgment should be granted.

Dated:      New York, New York          Respectfully submitted,
                July 13, 2007

                                      MICHAEL J. GARCIA
                                      United States Attorney for the
                                      Southern District of New York
                                      Attorney for Defendant

                      By:      /s/ Benjamin H. Torrance
                                      BENJAMIN H. TORRANCE
                                      Assistant United States Attorney
                                      Telephone: 212.637.2703
                                      Fax: 212.637.2702