**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Valerie Plame Wilson, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 07 CV 4595 (BSJ) |
| ) | |
| J. Michael McConnell, et al., ) | |
| ) | |
| Defendants. ) | |
| ———————————————) | |

**DECLARATION OF STEPHEN R. KAPPES
DEPUTY DIRECTOR, CENTRAL INTELLIGENCE AGENCY**

I, STEPHEN R. KAPPES, pursuant to 28 U.S.C. § 1746, hereby declare and state:

1.  I am the Deputy Director of the Central Intelligence Agency (CIA) and have held this position since 24 July 2006.  I have held numerous senior operational and administrative positions since joining the CIA in 1981.  As an example, I have served more than 12 years overseas with assignments as an Operations Officer.  I have served as Deputy Chief of CIA's Counter-Intelligence Center (CIC) and concurrently as the Chief of CIC and Associate Deputy Director for Operations for Counterintelligence.  I was named the Associate Deputy Director for Operations of the CIA in 2002 and Deputy Director for Operations of the CIA in 2004.

## I. **Background**

2. Through the exercise of my official duties, I am familiar with this civil action, including the 10 February 2006 letter from CIA's Chief, Retirement and Insurance Services, to Valerie Wilson ("10 February 2006 letter"). I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

## II. **Purpose of this Declaration**

3. The purpose of this declaration is to describe, to the greatest extent possible on the public record, the serious damage to the national security that reasonably could be expected to result if certain information in the 10 February 2006 letter is officially acknowledged by the CIA. This declaration is accompanied by my classified in camera, ex parte declaration filed this date.

4. Section III of this declaration describes the CIA's official disclosures relating to Ms. Wilson's employment with the CIA. Section IV describes the CIA's classification authority and the legal basis for my determination that serious damage to the national security reasonably could be expected to result if certain information in the 10 February 2006 letter is officially acknowledged by the CIA. Section V describes that damage to the national security that reasonably could be

expected to result from the unauthorized disclosure of classified information.  Section VI explains why this classification determination is unaffected by media reports of the same or similar information.  Section VII describes the CIA's declassification authorities.

### III.  <u>Valerie Wilson Employment Summary</u>

5.  On 1 January 2002, Valerie Wilson was working for the CIA as an operations officer in the Directorate of Operations (DO).  She was assigned to the Counterproliferation Division (CPD) at CIA Headquarters, where she served as the chief of a CPD component with responsibility for weapons proliferation issues related to Iraq.

6.  While assigned to CPD, Ms. Wilson engaged in temporary duty (TDY) travel overseas on official business.  She traveled at least seven times to more than ten countries.  When traveling overseas, Ms. Wilson always traveled under a cover identity-- sometimes in true name and sometimes in alias--but always using cover--whether official or non-official cover (NOC)--with no ostensible relationship to the CIA.

7.  At the time of the initial unauthorized disclosure in the media of Ms. Wilson's employment relationship with the CIA on 14 July 2003, Ms. Wilson was a covert CIA employee for whom

the CIA was taking affirmative measures to conceal her intelligence relationship to the United States.

8. In August 2003, Ms. Wilson was assigned to a senior personnel position in CPD, where she supervised staffing, recruiting, and training for CPD. She had been selected for this position prior to the leak.

9. As a result of the leak and subsequent media reporting of Ms. Wilson's relationship with the CIA, in December 2003 the CIA lifted Ms. Wilson's cover effective 14 December 2003, and then in February 2004 the CIA rolled back her cover effective 14 July 2003, the date of the leak.

10. In September 2004, Ms. Wilson requested and received permission to be placed on leave without pay for personal reasons. She returned to duty in August 2005, when she became the chief of operations of a CPD component with responsibility for proliferation issues.

11. In October 2005, the CIA, exercising its discretion under section 3.1(b) of the Executive Order, determined that the public interest in the disclosure of Ms. Wilson's employment and cover status for a specified period of time outweighed the damage to national security that might reasonably be expected from disclosure. Accordingly, the CIA lifted and rolled back Ms. Wilson's cover effective 1 January 2002 and declassified the

fact of her CIA employment and cover status from that date forward.

12.   This determination means that the CIA declassified and now publicly acknowledges the previously classified fact that Ms. Wilson was a CIA employee from 1 January 2002 forward and the previously classified fact that she was a covert CIA employee during this period.  This determination does not mean that the CIA acknowledges any other period of employment, if any, nor does it declassify the nature and details of Ms. Wilson's cover, the cover methods employed by the CIA to protect Ms. Wilson or other covert CIA employees, or the fact, nature, and details of Ms. Wilson's classified intelligence activities as a CIA employee at any time during her employment.

13.   Valerie Wilson resigned from the CIA on 9 January 2006.

## IV.  Classification Authority

14.   As the Deputy Director of the CIA and under a written delegation of authority pursuant to Section 1.3(c)(2) of Executive Order 12958, as amended,[1] I hold original classification authority at the TOP SECRET level.  Section 6.1 of Executive Order 12958 defines "national security" as "the

---

[1] Executive Order 12958 was amended by Executive Order 13292.  See Exec. Order No. 13292, 68 Fed. Reg. 15,315 (Mar. 28, 2003).  All citations to Executive Order No. 12958 are to the Order as amended by Executive Order No. 13292. See Exec. Order No. 12958, 3 C.F.R. 333 (1995), *reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

national defense or foreign relations of the United States;" and defines "information" as "any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of the United States Government." I am, therefore, authorized to make original classification and declassification decisions regarding national security information.

15.    Section 1.1(a) of the Executive Order provides that information may be originally classified under the terms of this order only if the following conditions are met:

>    (1) an original classification authority is classifying the information;

>    (2) the information is owned by, produced by or for, or is under the control of the United States Government;

>    (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

>    (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order 12958, § 1.1(a).

16.    *Original classification authority* – Section 1.3(a) of the Executive Order provides that the authority to classify information originally may be exercised only by the President

6

and, in the performance of executive duties, the Vice President; agency heads and officials designated by the President in the Federal Register; and United States Government officials delegated this authority pursuant to section 1.3(c) of the Order. Section 1.3(c)(2) provides that TOP SECRET original classification authority may be delegated only by the President; in the performance of executive duties, the Vice President; or an agency head or official designated pursuant to section 1.3(a)(2) of the Executive Order.

17. In accordance with section 1.3(a)(2), the President designated the Director of the CIA as an official who may classify information originally as TOP SECRET.[2] Under the authority of section 1.3(c)(2), the Director of the CIA has delegated original TOP SECRET classification authority to, among other officials, the Deputy Director of the CIA and the Director, Information Management Services (IMS), Chief Information Officer (CIO). Section 1.3(b) of the Executive Order provides that original TOP SECRET classification authority includes the authority to classify information originally as SECRET and CONFIDENTIAL.

---

[2] Order of President, Designation under Executive Order 12958, 70 Fed. Reg. 21,609 (Apr. 21, 2005), *reprinted in* U.S.C.A. § 435 note at 192 (West Supp. 2006). This order succeeded the prior Order of President, Officials Designated to Classify National Security Information, 60 Fed. Reg. 53,845 (Oct. 13, 1995), *reprinted in* U.S.C.A. § 435 note at 486 (West 2006), in which the President similarly designated the Director of Central Intelligence as an official who may classify information originally as TOP SECRET.

18.    Pursuant to section 2.2 of the Executive Order, the CIA prepared a classification guide to facilitate the proper and uniform derivative classification of information.  The CIA's Director, Information Management Services, to whom original classification authority has been delegated, approved the CIA's classification guide.

19.    The CIA's National Security Classification Guide describes the categories of information that are classified and the classification level of each such category.  With respect to cover and covert employees, the guide states that the following category of information is classified at the SECRET level:

- information that identifies or describes CIA cover methods or organizations, including information that associates current or former CIA officers or facilities with specific covers.

The CIA has not acknowledged certain information in the 10 February 2006 letter.  Therefore, any acknowledgement of such information in the 10 February 2006 letter would disclose classified information.

20.    Following the CIA's transmission of the 10 February 2006, the Director of the CIA reviewed the 10 February 2006 letter and, pursuant to his original classification authority under section 1.3(a)(2) of the Executive Order, confirmed that the letter contains information that is currently and properly classified SECRET.

21. *U.S. Government information* - Information may be originally classified only if the information is owned by, produced by or for, or is under the control of the United States Government. I have reviewed the 10 February 2006 letter and have determined that the letter contains information that is owned by the U.S. Government, produced by the U.S. Government, and under the control of the U.S. Government.

22. *Categories of classified information* - Information may be classified only if it concerns one of the categories of information set forth in section 1.4 of the Executive Order. I have reviewed the 10 February 2006 letter and have determined that it contains information that concerns one or more of the following classification categories in the Executive Order:

   (a)  Information concerning intelligence activities (including special activities), or intelligence sources or methods [§ 1.4(c)]; and

   (b)  Information concerning foreign relations or foreign activities of the United States, including confidential sources [§ 1.4(d)].

23. *Damage to the national security* - Section 1.2(a) of the Executive Order provides that information shall be classified at one of three levels if the unauthorized disclosure of the information reasonably could be expected to cause damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Information shall be classified TOP SECRET if its unauthorized disclosure reasonably could be expected to result in extremely grave damage to the national security; SECRET if its unauthorized disclosure reasonably could be expected to result in serious damage to the national security; and CONFIDENTIAL if its unauthorized disclosure reasonably could be expected to result in damage to the national security.

24.    I have reviewed the 10 February 2006 letter and have determined that it is currently and properly classified SECRET because it contains information the disclosure of which reasonably could be expected to cause serious damage to the national security.

25.    First, I have determined that unauthorized disclosure of this information reasonably could be expected to damage intelligence sources, methods, and activities.    Second, I have determined that unauthorized disclosure of this information reasonably could be expected to damage foreign relations and foreign activities of the United States.

26.    In addition to the protection of classified information provided by Executive Order 12958, the letter contains information that also is protected from disclosure under the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.    Specifically, the letter contains information that would tend to reveal intelligence

activities, sources, and methods that are statutorily protected from disclosure by section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-1(i)(1) (West 2006), and section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C.A. § 403g (West 2006). Although the CIA relies exclusively on the legal authority of Executive 12958 to protect the classified information in the letter, and explicitly disclaims reliance on the National Security Act and the CIA Act, I include citations and descriptions of the Acts below because they are illustrative of the legislative and judicial recognition through statute and case law, respectively, of the vital need to protect certain categories of information from disclosure.

27. *National Security Act of 1947* – Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-1(i)(1) (West Supp. 2006), provides that the Director of National Intelligence (DNI) shall protect intelligence sources and methods from unauthorized disclosure. I have determined that the letter contains information that would tend to reveal intelligence sources and methods. For this reason, the DNI has authorized the CIA to take all necessary and appropriate measures in this case to ensure that intelligence sources and methods are protected from disclosure. The CIA, therefore, relies on the National Security Act of 1947 to withhold any

11

information that would tend to reveal intelligence sources and methods.

28.   In contrast to Executive Order 12958, the National Security Act's statutory requirement to protect intelligence sources and methods does not require the CIA to identify or describe the damage to national security that reasonably could be expected to result from their unauthorized disclosure.  In any event, the damage to the national security that reasonably could be expected to result from disclosure of intelligence sources and methods protected by the National Security Act is the same as the damage that reasonably could be expected to result from disclosure of intelligence sources and methods protected by the Executive Order for classified information. Therefore, the damage to national security that reasonably could be expected to result from the disclosure of such information relating to intelligence sources and methods is co-extensive with the damage that reasonably could be expected to result from the disclosure of classified information.

29.   *Central Intelligence Agency Act of 1949* - Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C.A. § 403g (West Supp. 2006), provides that in the interests of the security of the foreign intelligence activities of the United States and in order to further implement section 403-1(i) of Title 50, which provides that the DNI shall be

responsible for the protection of intelligence sources and methods from unauthorized disclosure, the CIA shall be exempted from the provisions of any law which requires the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the CIA. In accordance with section 104A(d) of the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-4a(d) (West. Supp. 2006), foremost among the functions of the CIA is the collection of intelligence through human sources and by other appropriate means.

30.  In the interests of the security of the foreign intelligence activities of the United States and in order to further implement the DNI's responsibility to protect intelligence sources and methods from unauthorized disclosure, the CIA relies on the Central Intelligence Agency Act of 1949 to withhold any information that would reveal the organizations and functions of the CIA, including the collection of foreign intelligence through intelligence sources and methods.

31.  Again, in contrast to Executive Order 12958, the CIA Act's statutory requirement to protect the CIA's organization and functions does not require the CIA to identify or describe the damage to national security that reasonably could be expected to result from their unauthorized disclosure. In any event, the damage to the national security that reasonably could

be expected to result from disclosure of the CIA's organization and functions protected by the CIA Act is the same as the damage that reasonably could be expected to result from disclosure of intelligence sources and methods protected by the Executive Order for classified information. Therefore, the damage to national security that reasonably could be expected to result from the disclosure of such information relating to the CIA's organization and functions is co-extensive with the damage that reasonably could be expected to result from the disclosure of classified information.

## V.  Damage To The National Security If Certain Information In the 10 February 2006 Letter Is Officially Acknowledged By The CIA

32.  I am necessarily limited in my description of the damage to the national security that reasonably could be expected to result from the disclosure or official acknowledgement of certain information in the 10 February 2006 by the practical need to avoid disclosing the very classified information sought to be protected. In this unclassified declaration, therefore, I describe the general considerations that influence the CIA whenever it considers whether the disclosure of certain information reasonably could be expected to damage the national security and foreign relations of the United States.

## A.  Intelligence Sources

33.  One of the CIA's primary functions is to gather intelligence for the President and other government officials who make policy decisions.  To do this, the CIA must often depend upon information that can only be gathered from knowledgeable sources under an arrangement of absolute secrecy. This secrecy extends both to the existence of the source's clandestine relationship with the CIA and to the kind of information or type of operational assistance the source is providing.

34.  Intelligence sources include individual human sources and foreign intelligence and security services.  I will explain each of these sources and the need to protect them in more detail below.

### 1.  Human Sources

35.  Human intelligence sources can be expected to furnish information to the CIA only when they are confident that the CIA can and will do everything in its power to ensure that their cooperation will forever remain secret.  In the case of a foreign national who has been cooperating with CIA, acknowledgement of that cooperation could cause a foreign government to take retaliatory action against that individual, his family, or his associates.  Moreover, such acknowledgement places in jeopardy every individual with whom the foreign

national has had contact.  Thus, acknowledgement of one
intelligence source can ravage an entire spectrum of sources:
the damage occasioned by one can be incalculable for many.

36.  Acknowledgement of an individual's cooperation or
relationship with the CIA also could be expected to seriously
damage this nation's credibility with other current intelligence
sources, and undermine CIA's ability to attract potential
intelligence sources in the future.  The CIA has an ongoing
interest in assuring its current and future intelligence sources
of its continued adherence to a strict policy of not revealing
intelligence sources.  The CIA must show its intelligence
sources that, even if information that may or may not be true
has been disclosed, the CIA will stand by a policy to not
acknowledge intelligence information, if any, in order to
preserve commitments that the CIA has made to its sources, and
to try to preserve those sources' trust in the CIA.

37.  If the CIA were to breach this confidentiality,
current and potential sources throughout the world could be
expected to conclude that the CIA is unable or unwilling to
maintain such confidentiality.  These sources also could
conclude that cooperation with the United States entails a risk
that the United States will later make an official
acknowledgment of such clandestine activity.  Therefore, CIA's
betrayal of an intelligence source's confidentiality could be

expected to seriously damage this nation's ability to retain current sources and recruit new sources.

38. The CIA takes great care in protecting human sources for another noteworthy reason: they deserve our protection. Clandestine cooperation with U.S. intelligence is an inherently dangerous venture. In many areas of the world, sources put not only themselves, but also their families and associates at risk of death, imprisonment, injury, or harassment. They deserve our most vigilant protection for placing themselves in peril for the United States' benefit.

39. Some human sources are officials of a foreign government. Regardless of the type of human intelligence source, should the CIA undertake any action that might compromise a source's identity, the safety and welfare of the source and his or her family, most of whom reside in places where justice is swift and punishment harsh, could be placed in jeopardy.

## 2. **Foreign Liaison Sources**

40. A "liaison relationship" is a cooperative and secret relationship between the CIA and an entity of a foreign government. Most CIA liaison relationships are with another country's intelligence or security services. A liaison relationship is an information-sharing agreement. Liaison relationships between the CIA and other foreign intelligence or

security services are initiated and continued only on the basis of a mutual understanding that the fact, nature, and details of the liaison arrangements will be kept in the utmost secrecy.

41.    A liaison relationship is extremely sensitive and the CIA must protect it from harmful disclosures that could damage and possibly destroy that relationship.  Some services with which the CIA maintains a liaison relationship are hostile towards, and maintain political agendas at odds with, other services with which CIA has a liaison relationship.  Maintaining these relationships is a politically risky endeavor for the CIA. The CIA is relying upon such sensitive relationships for intelligence collection against several threats to U.S. national security, including the war on terrorism.

42.    The CIA has limited resources to conduct its intelligence missions, including a limited amount of case officers, stations, and money.  Liaison relationships with foreign intelligence services constitute a force-multiplier for U.S. intelligence collection activities, especially necessary in times of war.  Intelligence services with which the CIA has a close liaison relationship provide the CIA with the intelligence reported by many of that services' own intelligence sources. Such services may even task their own sources to collect information at the request of the CIA.

43.  Therefore, through liaison relationships, the CIA can gather and provide intelligence information to U.S. national security and foreign policy decision makers that is critical to informed decision making, but which the CIA would be unable to obtain through its own resources.  The closer and more trusting the liaison relationship, the greater the information sharing.  The more hesitant or untrusting the liaison relationship, the more reluctant and miserly the sharing.  For intelligence collection, it is of the utmost importance that liaison relationships be maintained and, if possible, strengthened.

44.  As discussed above with respect to human sources, foreign liaison sources can be expected to cooperate with the CIA only as long as they remain assured that the CIA will do everything within its power to protect the fact, nature, and details of the clandestine intelligence relationship.

45.  If the CIA breaches that confidence and trust, the foreign liaison service can terminate the intelligence relationship, or retaliate in any number of ways, all of which damage our national security.  The foreign government can send a demarche to the United States protesting the acknowledgement, declare CIA officers *persona non grata* and expel them from the country, restrict or terminate the liaison relationship, or demand that the CIA diminish or terminate its presence in the country.  Any of these measures can result in the loss of

liaison or unilateral sources of significant foreign intelligence to the United States, adversely affecting the larger CIA counterterrorism mission as well as the CIA's ability to collect intelligence on the entire spectrum of political, military, and economic developments in the country.

46.  More broadly, if the CIA appears unable or unwilling to keep its foreign liaison relationships secret, other relationships or understandings with foreign intelligence or security services could be jeopardized as well.  These outcomes would present substantially increased burdens (and therefore increase the threat to national security) for U.S. intelligence gathering.  Thus, the CIA must maintain strict control of any information that would, in any way, reveal the information's source.  Indeed, if our liaison sources were affected or limited, the U.S. Government's ability to track international terrorist groups, like al Qaeda, and our ability to respond to a multitude of national security threats, would be severely hampered.

**B.   Intelligence Methods**

47.  Generally, intelligence methods are the means by which an intelligence agency accomplishes its mission.  Most organized professions or businesses employ methods to accomplish their goals and objectives that are common to and, in some cases, unique to that business or profession.  Certain intelligence

methods are of a special character necessitating the protection of their use, as well as the details of their use.

48.    Intelligence methods must be protected in situations where a certain capability or technique, or the application thereof, is unknown to those individuals or entities--such as hostile intelligence services or international terrorist groups--that would take countermeasures to frustrate U.S. intelligence collection.  Secret information-collection techniques, capabilities, or technological devices are valuable (from an intelligence-gathering perspective) only so long as they remain unknown and unsuspected.  Once the nature of an intelligence method or its use is discovered, its continued successful use will be in serious jeopardy.  Indeed, acknowledgement of intelligence methods and practices would be of material assistance to those who would seek to penetrate, detect, prevent, or damage U.S. intelligence operations.  Thus, acknowledgement of a particular intelligence method can lead to the neutralization of that method--whether the method is used for information collection, the conduct of clandestine activities, or information analysis and evaluation.

49.    Foreign intelligence services view discovery of CIA methodology as one of their primary defensive missions.  Indeed, the cost ratio between developing and employing an intelligence method and negating that method via public acknowledgement is

hugely disproportionate. Intelligence methods can cost many millions of dollars to develop, and a single newspaper story generated by a single acknowledgement will often end the utility of that method. In fact, CIA may lose intelligence during the time it takes to fund and field a replacement method.

50. In exercising and fulfilling its mission, CIA must do more than prevent explicit references to an intelligence method; it must also prevent indirect references to such a method. A primary vehicle for gathering intelligence methods information is by reviewing officially-released information. We know that foreign intelligence services have the capacity to gather information from myriad sources, analyze it, and deduce means and methods (from disparate and even seemingly unimportant details) to defeat CIA collection efforts. What may seem trivial to the uninformed could be of great significance to one who has a broader view of the issue and can place the item of information in its proper context. Thus, even seemingly innocuous, indirect references to an intelligence method could have significant adverse effects when juxtaposed with other publicly-available data.

51. Accordingly, the CIA must protect information concerning particular intelligence methods if CIA determines that such information reasonably could be expected to assist foreign intelligence services and terrorist organizations to the

detriment of the United States. Without such protection, the CIA would quickly become impotent.

52. Intelligence methods include foreign liaison relationships, cover methods, and CIA field installations. I will explain each of these methods and the need to protect them in more detail below.

### 1. **Foreign Liaison Relationships**

53. As discussed above, foreign liaison relationships provide valuable intelligence information and are thus essential intelligence sources that must be protected. In addition, because foreign liaison relationships provide essential intelligence and are the means by which an intelligence agency accomplishes its mission, they are also intelligence methods that must be protected from unauthorized disclosure.

54. Each relationship constitutes a specific method for the collection of intelligence, and the fact of the use of each relationship in a given circumstance must be protected. As previously discussed under the category of intelligence sources, acknowledging information concerning a particular liaison relationship could compromise the relationship and thereby destroy this specific intelligence method. Accordingly, these sources are also classified intelligence methods.

## 2.  Cover

55.  One specific intelligence method used by the CIA is cover.  In order to carry out its mission of gathering and disseminating intelligence information, the CIA places individual CIA employees under cover to protect the fact, nature, and details of CIA's interest in foreign activities and the intelligence sources and methods employed to assist those activities.  CIA considers the cover identities of individual employees and cover mechanisms both to be intelligence methods.

56.  The purpose of cover is to provide a believable, non-threatening reason for a CIA officer to move around and meet individuals of intelligence interest to the United States, and to do so without attracting undue attention.

57.  Acknowledging the identity of a covert employee could expose the intelligence activities with which the employee has been involved, the sources with whom the employee has had contact, and other intelligence methods used by the CIA. Compromise of an officer's cover not only reveals his intelligence officer status, but also allows hostile intelligence services and terrorist organizations to find out precisely the location in which that person works.  In fact, disclosing the identity of a covert employee could jeopardize the life of the employee, his family, his sources, and even innocent individuals with whom he has had contact.

58. Acknowledging cover mechanisms used by the CIA would expose and officially confirm those mechanisms, hindering the effectiveness of the cover for current and future covert employees, as well as current and future intelligence operations.

### 3. Field Installations

59. Another intelligence method used by the CIA is to operate covert installations abroad. Official acknowledgement that the CIA maintains an installation in a particular location abroad would likely cause the government of the country in which the installation is located to take countermeasures, either on its own initiative or in response to public pressure in order to eliminate the CIA presence within its borders, or otherwise to retaliate against the United States Government, its employees, or agents. Revelation of this information also would likely result in terrorists and foreign intelligence services targeting that installation, and persons associated with it.

60. Additionally, in some cases, the acknowledgement of information concerning a covert CIA installation would, in and of itself, reveal another specific intelligence method for which the CIA uses the installation.

### C. Intelligence Activities

61. Intelligence Activities refer to the actual

implementation of intelligence sources and methods in the operational context. Intelligence activities are highly sensitive because their disclosure often would reveal details regarding specific intelligence collection activities. The CIA is charged with both foreign intelligence and counterintelligence collection and analysis responsibilities. Although it is obviously widely acknowledged that CIA is responsible for performing activities in support of this mission for the United States, the CIA cannot confirm or deny the existence of any specific intelligence collection or disclose the target of such intelligence gathering activities.

62. To acknowledge the existence of a particular intelligence collection operation would reveal U.S. intelligence needs, priorities, and capabilities to a foreign intelligence service or hostile organization seeking to take advantage of any national security weakness. The damage that would be caused by such an admission is clear. Foreign government services and hostile organizations would be advised that their activities and information had been targeted by the CIA; future intelligence collection operations would be made more difficult by such a revelation; and, as a result, the conduct of such operations would become even more dangerous.

### D. Foreign Relations and Foreign Activities of the United States

63.  CIA's presence in any country is likely to be condoned only so long as CIA's presence is viewed as compatible with the interests of that foreign country, and does not have to be officially acknowledged or publicly detailed.  While all nations are aware that they may be the target of clandestine intelligence operations, they will not condone hostile activities, official acknowledgment of an intelligence presence, or secret intelligence operations conducted in their country without their knowledge or consent.  If, even though information has previously been reported in the media, the CIA acknowledges intelligence information, the nation that has been the target or location of such intelligence operations will take measures on its own initiative or in response to public pressure, including eliminating the CIA's presence in its country, or reducing its official cooperation with the CIA or with the U.S. Government at large.  Such countermeasures would have an obvious adverse effect upon our foreign relationships and national security.

64.  Even though the United States' relations with certain countries may be friendly, organizations or individuals of those countries may be decidedly, and violently, anti-U.S. or anti-CIA.  Therefore, a friendly government confronted with a CIA acknowledgement that the CIA existed and operated on its soil

could be compelled by public opinion to order all CIA personnel out of the country.  This reaction could damage our security by reducing the CIA's intelligence collection capability in that country.  Also, such an acknowledgement of information previously disclosed could cause diplomatic tension between that country and the United States.

65.  Mere acknowledgement of covert CIA activities and installations on foreign soil also would be of value to a hostile intelligence service, which could use this information as propaganda to embarrass the United States or pressure the foreign government to retaliate against the CIA.  Finally, personnel identified as working for such a covert installation, and thus for the CIA, would be subject to threats, reprisal, and physical injuries from terrorist forces or from other persons hostile to the CIA.

## VI.  Damage To The National Security If The CIA Officially Acknowledges Information Reported In The Media

66.  Section V of this declaration provides a general description of the damage to the national security that reasonably could be expected to result from the disclosure or official acknowledgement of classified information.  In this case, I understand that a significant amount of information about Ms. Wilson has been reported in the media.  This section describes the serious damage to national security that

reasonably could be expected to result if the CIA acknowledges classified information reported in the media.

67.  Unauthorized disclosures of classified information, whether intentional or inadvertent, are an unfortunate reality for the CIA that complicates, and sometimes completely defeats, U.S. intelligence collection activities.  After such a disclosure occurs, however, the CIA typically does not acknowledge the classified information that was disclosed.  To do so would merely exacerbate the harm caused by the initial disclosure.  Any CIA acknowledgement of the publicly-reported information could reveal the specific information that the CIA seeks to protect, provide a valuable advantage to foreign intelligence services, and unduly jeopardize the CIA's intelligence activities.  Official acknowledgement of publicly-reported information could confirm CIA intelligence sources, methods, and activities, and harm U.S. foreign relations and foreign activities.

68.  For example, if an unauthorized disclosure of classified CIA information regarding a human intelligence source were made, that disclosure could jeopardize the source.  If the CIA were to officially acknowledge the information, however, that additional step could further jeopardize the source and could deter other clandestine human intelligence sources from cooperating with the CIA.  Existing and future human

intelligence sources would note that the CIA was willing to confirm publicly a clandestine human intelligence source's involvement with the CIA. These human sources would factor that additional risk into their own decision on whether to provide information to the CIA and could decide that the risks are too great to cooperate with the CIA.

69. Similar damage also could result to intelligence methods that are compromised through unauthorized disclosures. If an alleged intelligence method were reported in the press, for example, its effectiveness could be diminished. For the CIA to officially acknowledge that intelligence method, however, would certainly diminish its usefulness for the CIA.

70. The same can be said for unauthorized disclosures related to foreign liaison relationships, foreign relations, and foreign activities of the United States. As described in Section V, the CIA relies on foreign liaison relationships as a valuable source and method for foreign intelligence collection and activities. Countries with which the CIA has liaison relationships may be less willing to cooperate if the CIA were to officially acknowledge information that has been reported in the media. Foreign governments would learn of the official acknowledgement and conclude that the CIA is not trustworthy enough to prevent acknowledgement of sensitive information that is reported in the media. A foreign liaison partner could view

the acknowledgement as a direct violation of their agreement with the CIA to keep their liaison activities secret.  Countries could be expected to respond based on their perception of the CIA's inability to honor its commitments.  A foreign country might respond through diplomatic channels, or by limiting intelligence sharing with the United States.  An official CIA acknowledgement of an unofficial disclosure also could arouse public opinion in a foreign country.  Public pressure to respond to the CIA's official acknowledgement may force a foreign country to retaliate against the United States.

71.   In addition, foreign governments that might be faced with a decision in the future of whether to cooperate with the CIA and become liaison partners would note if the CIA had ever officially acknowledged its relationship with another foreign government.  As with human sources, these foreign governments could conclude on the basis of a CIA acknowledgement of information reported in the media that the CIA does not adequately protect foreign government relationships.

72.   The damage from official acknowledgement of unauthorized disclosures may be swift and obvious:  foreign partners may terminate their relationship with the CIA; sources may be identified and arrested; foreign countries may expel CIA officers from the country; or clandestine activities may be discovered and abandoned.  The damage also may be more subtle:

foreign partners may not provide their most sensitive and useful information to the United States; possible sources may choose not to be recruited by the CIA; or hostile intelligence services or terrorist groups may thwart CIA's collection efforts or provide misinformation, unbeknownst to the CIA. Often, the CIA does not know, and will never know, the intelligence and opportunities that were lost due to unauthorized disclosures. Thus, the CIA must do everything within its power to prevent unauthorized disclosures and, when they do occur, to mitigate the potential damage by refusing to officially acknowledge such information.

## VII.  CIA's Declassification Authorities

73.  I have reviewed the CIA regulation entitled, "Declassification Authorities," under Tab 40 in the Unclassified Administrative Record, including the information redacted from the original regulation.  The regulation contains a list of position titles of officials to whom declassification authority has been delegated by the Director of the CIA.

74.  After reviewing the list of declassification officials, I have determined that Ms. Karen Tumolo, who at the time of the 10 February 2006 letter was CIA's Chief, Retirement and Insurance Services, did not possess declassification authority when she signed the letter to Ms. Wilson.  Since this

regulation was promulgated in 1997, declassification authority has been delegated to certain other positions, but the regulation has not yet been updated. Ms. Tumolo's position is not among those additional officials to whom declassification authority has been delegated.

75.    The 10 February 2006 letter was issued by Chief, Retirement and Insurance Services, which is a component of the Directorate of Support. Pages 2 to 3 of the regulation list the positions in the Directorate of Support to whom declassification authority has been delegated by the Director of the CIA. Chief, Retirement and Insurance Services, is not among the listed positions. Therefore, Chief, Retirement and Insurance Services, did not and does not have the authority to declassify information or release classified information.

76.    The information redacted on pages 1 through 3 of the document is a CIA phone number, position numbers, and organizational information. The CIA phone number, position numbers, and organizational information are properly redacted pursuant to Section 6 of the CIA Act of 1949. The Director of the CIA has statutory authority under the CIA Act of 1949 to withhold this information in an effort to protect CIA intelligence methods.[3]

---

[3]    See *supra*, ¶¶ 29-31.

77.  The information redacted from pages 4 through 8 are lists of position titles, position numbers and declassification levels for four CIA Directorates not relevant to this case. These four directorates are:  the National Clandestine Service (NCS); the Directorate of Science & Technology (DS&T); the Directorate of Intelligence (DI); and the Director of Central Intelligence Area (DCIA).

78.  Because I am not able to further describe the damage to national security that reasonably could be expected to result from disclosure of certain information in the 10 February 2006 letter without disclosing classified information, this declaration is accompanied by a classified in camera, ex parte declaration filed this date.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __18TH__ day of July, 2007.

Stephen R. Kappes
Deputy Director
Central Intelligence Agency