UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
VALERIE PLAME WILSON; SIMON     :
& SCHUSTER, INC.,            :
                               :
            Plaintiffs,   :
     v.                  :
                               :
J. MICHAEL McCONNELL, in his   :
official capacity as Director of :
National Intelligence Agency;   :
CENTRAL INTELLIGENCE AGENCY;    :
GEN. MICHAEL V. HAYDEN, in his  :
official capacity as Director of :
Central Intelligence Agency,    :
                               :
           Defendants.   :
------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/3/07 AL_

07 Cv. 4595

**Opinion & Order**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

## INTRODUCTION

Valerie Plame Wilson ("Wilson") and her publisher, Simon &
Shuster, seek declaratory and injunctive relief against the
government defendants under the First Amendment of the United
States Constitution, the Declaratory Judgment Act, and the
Administrative Procedure Act. This dispute arises from the
government's decision to preclude plaintiffs from publishing
information in Wilson's forthcoming memoir concerning her dates
of employment for the Central Intelligence Agency (the "CIA" or
"Agency"). The parties have cross-moved for summary judgment
without discovery. For the reasons below, the Court DENIES
plaintiffs' motion and GRANTS defendants' motion.

## BACKGROUND

Wilson is a former CIA agent who was "outed" on July 14, 2003, when she was identified in Robert Novack's syndicated newspaper column as an Agency operative. This leak was later traced to certain senior government officials, none of whom are defendants here.[1] Wilson's outing ultimately caused her to resign from the CIA in January 2006.

After she resigned, Wilson wrote a memoir covering her tenure with the CIA and the events surrounding her outing. (See Tab-Cl. 5.)[2] She submitted a draft of her manuscript to the CIA's Publication Review Board ("PRB") in September 2006. (See id.; Tab 8.) The PRB is charged with reviewing putative publications by current and former CIA employees for the dual purpose of assisting individuals in meeting their secrecy obligations and to ensure that information damaging to national security is not disclosed. (See Declaration of Richard Puhl ("Puhl Decl.") ¶ 3; Tab 39.)[3]

---

[1] See Wilson v. Libby, -- F. Supp. 2d --, 2007 WL 2059094 (D.D.C. July 19, 2007) (recounting the events and sources of the leak; dismissing Wilson's damages claims against Dick Cheney, I. Lewis Libby, Karl Rove, and Richard Armitage); see also United States v. Libby, 05 Cr. 394, Dkt. No. 351 (D.D.C. May 25, 2007) (Government's sentencing memorandum).

[2] Citations to "Tab-Cl. __" are to the classified administrative record, submitted by the government ex parte. Citations to "Tab __" are to the unclassified administrative record publicly filed in this case.

[3] See McGehee v. Casey, 718 F.2d 1137, 1148 (D.C. Cir. 1983) ("[T]he entire scheme of prepublication review is designed for the purpose of preventing publication of classified information."). Wilson was obligated to submit her manuscript to PRB screening pursuant to CIA regulations and the secrecy agreement she entered into with the government when she began working for the

On November 21, 2006, the PRB sent a letter to Wilson itemizing a number of edits she would have to make in order to render her memoir unclassified. (Tab 11.) The letter also stated that the first half of Wilson's manuscript "would reveal classified information because of the context in which it appears, [or] the time frames associated with the material." (Id.)[4] A follow-up letter from the PRB, dated December 22, 2006, stated that the first part of the memoir was "replete with statements that . . . become classified when they are linked with a specific time frame," and suggested means by which the material could be made unclassified, including "separat[ing] certain statements or vignettes from the timeframes in which they currently appear [or] remov[ing] the references to the times and events in [Wilson's] personal life." (Tab 13.) On February 23, 2007, the PRB sent a redacted version of the memoir to Wilson, and explained in an accompanying letter that "[i]n some instances, the deleted text is classified because it is

---

CIA. (See Puhl Decl. ¶ 3; Tab 41.) The CIA's secrecy agreement is an "express condition of . . . employment with the CIA." See Snepp v. United States, 444 U.S. 507, 507-08 (1980). To the extent the agreement has the effect of censoring classified information, it does not violate the First Amendment. Id. at 509 n.3. In this action, Wilson is not challenging the PRB process, the PRB regulations, or her contractual secrecy obligation to the government. As explained further below, she only challenges the government's refusal to allow her to publish certain information concerning her dates of CIA employment, which she claims are not classified or classifiable under the circumstances presented here.

[4] Wilson alleges that approximately two weeks earlier, on November 8, 2006, she was informed by a PRB member that senior CIA management would not permit Wilson to disclose any Agency affiliation prior to 2002. (Tab 15.)

3

linked with a specific time frame or is included in a particular context that reveals classified information." (*See* Tab 24.)

Then, on April 19, 2007, the CIA advised Wilson that it had withdrawn certain objections, and that "[w]ith limited exceptions, the classified information the PRB identified in [the memoir] relates to a *single issue*." (Tab 28 (emphasis added)). Although the reference is vague, the parties agree that the "single issue" either is, or encompasses, the CIA's determination that Wilson cannot disclose her dates of CIA service prior to 2002, if any.[5] This litigation springs from that determination.[6]

As discussed further below, plaintiffs assert that the government may not lawfully censor information about Wilson's pre-2002 service dates because that information was already "declassified" or was otherwise "officially acknowledged" publicly. Although the government disputes these legal conclusions, it does not contest that the information is, in

---

[5] In connection with the federal prosecution stemming from Wilson's outing, the CIA officially declassified Wilson's employment and cover from January 2002 forward. (*See* Declaration of Stephen Kappes ("Kappes Decl.") ¶ 11.) In doing so, however, the CIA did not acknowledge any other period of Wilson's employment, if any. (*See id.* ¶ 12); *see also infra*. Nor did the CIA declassify the nature and details of Wilson's cover, the cover methods employed by the CIA, or the fact, nature, and details of Wilson's classified intelligence activities as a CIA employee at any time during her employment. (*See* Kappes Decl. ¶ 12.)

[6] The Court has not been asked to rule on any particular redaction, but rather to rule on whether, or to what extent, the CIA may use Wilson's dates of service as a basis for censor on national security grounds.

fact, in the public domain.  Nor is there any material factual dispute about how the information got there.

Namely, prior to resigning, Wilson had requested that the CIA waive the minimum age requirement to receive her deferred annuity.  (*See* Declaration of Karen Tumolo (Tumolo Decl.") ¶ 7; *see also* Declaration of David Smallman, dated June 28, 2007 ("Smallman Decl."), Ex. B.)  On February 10, 2006, the Chief of the CIA's Retirement and Insurance Services, Karen Tumolo ("Tumolo"), sent a letter to Wilson explaining that the minimum age requirement could not be waived because it was statutory (the "February 10th Letter" or "Letter").  (*See* Tab-Cl. 1; *see also* Tumolo Decl. ¶ 10.)  As relevant here, the Letter also purports to set forth Wilson's dates in service and the date she would become eligible to receive her annuity.  (Tab-Cl. 1.)  The letter was sent on CIA letterhead, by first class mail, and without any indicia that the information contained therein was classified.  (*Id.; see also* Tumolo Decl., ¶¶ 9-11.)[7]

On January 16, 2007, House Representative Jay Inslee ("Representative Inslee") introduced a private bill to make Wilson's annuity available to her earlier than under the extant

---

First class mail is an impermissible method of delivery for "secret" information.  *See* 32 C.F.R. § 2001.45(c) (providing means by which classified information may be sent).

statutory scheme.[8]  (*See* Compl., Ex. A.)  Sometime prior to the

bill's introduction -- although it is not clear when in relation

to the PRB process -- Wilson provided a copy of the February

10th Letter to Representative Inslee.[9]  In support of the bill,

he introduced a materially identical version of the February

10th Letter into the Congressional Record.  (*See id.*)[10]  He

purportedly did so only after receiving "assur[ance]" from

"legal experts" that the information in the Letter was not

confidential.  (*See id.*)  As part of the legislative process,

the material contents of the February 10th Letter entered the

Congressional Record (*see id.*), and has since been publicly

accessible on the Internet through the Library of Congress's

website.

Three days after the bill was introduced, Tumolo wrote a

letter to Wilson stating that the February 10th Letter contained

---

[8] *See* The Valerie Plame Wilson Act, H.R. 501, 110th Cong. (2007).  Absent a private bill, Wilson would not become eligible to receive retirement benefits until approximately 10 years from the date of her resignation. (Compl., Ex. A.)

[9] Wilson offered to forward the February 10th Letter to Representative Inslee's office on February 26, 2006 (Smallman Decl., Ex. B); however, there is no indication in the record whether she sent the Letter at that time.  On January 12, 2007, Wilson stated in a letter to Representative Inslee that the "[February 10th] letter does not contain any designation that its entire contents or any portion sets forth or references classified information." (*Id.*, Ex. D.)  She also noted that the February 10th Letter had been sent to her by first class mail.  (*Id.*)

[10] The version of the February 10th Letter introduced into the Congressional Record redacted the dates that Wilson was on leave without pay from the CIA and redacted Tumolo's name and title from the letter.  Otherwise, and as relevant here, the version of the letter in the Congressional Record purports to contain Wilson's dates in service for the CIA and the amount of time she served overseas.

6

classified information, that the absence of a security stamp on
the Letter was the product of "administrative error," and that
Wilson must return the Letter to the CIA so that it may be
"properly marked and secured." (Tab 18.)[11] On January 23, 2007,
the CIA also wrote a letter to the Clerk of the House of
Representatives stating that the February 10th Letter contained
"classified information" but had not been properly marked. (Tab
19.) The CIA's letter to the Clerk did not specify what
information in the February 10th Letter was classified, and did
not request any action from the Clerk.

On January 31, 2007, Wilson agreed to return a copy of the
February 10th Letter to the CIA, and requested that the Agency
provide her with a remarked version of the Letter with any
ostensibly classified information redacted. (Tab 20.) On April
24, 2007, the CIA sent Wilson a newly redacted copy of the
February 10th Letter (Tab 1), which the CIA stated "reflects the
proper classification markings" and was "approved for
release . . . as a result of a declassification review." (Tab
29.)[12] The redacted letter is largely blank, except for the
CIA's letterhead, date of the letter, Wilson's name and address,

---

[11] Government regulations provide that agencies must take action to "restore
markings" if information is released without authority. 32 C.F.R.
§ 2001.10(d).

[12] As of April 24, 2007, Wilson had not returned the original February 10th
Letter and all copies in her possession. (Tab 29.) It is not apparent to
the Court whether she has since complied with the CIA's requests in this
regard.

her service dates from January 2002 to January 2006, and the title (but not the name) of the sender. (Tab 1.) The redacted letter also contains the marking "Secret//20320110," with a diagonal line through it, at the top and bottom margins of the page. (*Id.*)[13]

Plaintiffs commenced this action on May 31, 2007.[14] The parties have since cross-moved for summary judgment on an expedited basis, without discovery. Plaintiffs seek to permanently enjoin defendants from censoring information that is consistent with information contained in the February 10th Letter and published in the Congressional Record. Plaintiffs also seek declarations that the First Amendment protects their right to publish the information at issue, and that defendants have violated the Administrative Procedure Act, the CIA internal regulations governing prepublication review, and the Executive Order governing classified information. Defendants oppose plaintiffs' motion in its entirety, and seek summary judgment in their own favor on all of the claims asserted.

---

[13] Plaintiffs suggest that the diagonal line through the word "secret" may be the CIA's attempt to "create the appearance" that the original Letter contained the stamp. While the government has not explained why the marking was crossed out in the redacted letter, it has never taken the position that the word "secret" appeared anywhere in the original Letter. As noted above, government regulations provide that agencies must take action to "restore markings" if information is released without authority. 32 C.F.R. § 2001.10(d). The government maintains that that is precisely what occurred here.

[14] There is no dispute that plaintiffs exhausted their administrative remedies with respect to the issues raised in this litigation. (*See* Tab 28.)

## DISCUSSION

This case tests the boundary between plaintiffs' First
Amendment right to freedom of speech and the government's
interests in curbing that speech on national security grounds.
As a general matter, government restraints on speech are
permissible where the government's interest in promoting the
"public services it performs . . . outweighs the interests of
prospective speakers and their audiences in free dissemination
of the speakers' views." *Weaver v. U.S. Information Agency*, 87
F.3d 1429, 1439 (D.C. Cir. 1996) (internal quotation marks and
citations omitted).

"[N]o governmental interest is more compelling than the
security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307
(1981). Thus, it is well settled that a person's First
Amendment right to freedom of speech yields to the government's
"compelling interest" in preventing the publication or
dissemination of classified information. *See Snepp v. United
States*, 444 U.S. 507, 509 n.3 (1980); *see also Alfred A. Knopf,
Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975) (explaining
that CIA employees who enter secrecy agreements "effectively
relinquish[]" First Amendment rights with respect to
classifiable information); *United States v. Marchetti*, 466 F.2d
1309, 1315-16 (4th Cir. 1972) ("Although the First Amendment

protects criticism of the government, nothing in the
Constitution requires the government to divulge information.").

     It is equally well settled, however, that the pendulum
swings to protect free expression where the information targeted
for censor is not properly classified or has otherwise been
"officially acknowledged" by the appropriate governmental
agency. *See, e.g., McGehee v. Casey*, 718 F.2d 1137, 1141 (D.C.
Cir. 1983) ("[The] government has no legitimate interest in
censoring unclassified material."); *Marchetti*, 466 F.2d at 1313
(explaining that the First Amendment precludes government
restraints on secrecy "with respect to information which is
declassified or officially disclosed"); *cf. Snepp*, 444 U.S. at
520 (Stevens, J., dissenting) ("The public interest lies in a
proper accommodation that will preserve the intelligence mission
of the Agency while not abridging the free flow of unclassified
information."}.

     Within this framework, plaintiffs present alternative
theories as to why they believe the CIA may not preclude them
from publishing information concerning the dates of Wilson's
employment. First, plaintiffs claim that once Wilson's
employment dates became public, the CIA could not properly
classify or reclassify that information pursuant to the
governing executive order. Alternatively, plaintiffs claim that
even if the information was classified or is classifiable, the

CIA "officially acknowledged" information about Wilson's employment dates in the February 10th Letter, and as a result cannot now lawfully preclude further public dissemination of that information.

The Court disagrees. The information at issue was properly classified, was never declassified, and has not been officially acknowledged by the CIA. Because there are no genuine issues of material fact, defendants are entitled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## A. The CIA Properly Classified the Information At Issue

National security information is classified pursuant to executive order, the latest iteration of which is Executive Order 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003) (the "Executive Order") (amending Executive Order 12,958).[15] Pursuant to the Executive Order, information may be originally classified if the information: (1) is classified by someone authorized to classify it; (2) is owned by, produced by or for, or is under the control of the government; (3) falls within one of the specified classification categories;[16] and (4) reasonably could

---

[15] The provisions in the Executive Order relevant to this case are substantially similar to those in the preceding executive orders. *See* Exec. Order 12,958, 60 Fed. Reg. 19,825 (Apr. 17, 1995); Exec. Order 12,356, 47 Fed. Reg. 14,874 (Apr. 2, 1982).

[16] Section 1.4 of the Executive Order provides the following classification categories: (a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including special activities), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential

be expected to result in damage to national security, as articulated by the classifying officer. *Id.* §§ 1.1(a), 6.1(cc). Documents that reproduce, extract, or summarize classified information are defined as "derivative classifications". *Id.* § 6.1(n). Such classifications may be performed without original classification authority pursuant to the CIA's Classification Guide, discussed further *infra. Id.* §§ 2.1-2.2.

Classification decisions by the CIA are entitled to the highest level of judicial deference because "it is the responsibility of the Director of Central Intelligence, not that of the [courts], to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." *CIA v. Sims*, 471 U.S. 159, 180 (1985); *accord Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (explaining that courts cannot perform their own calculus as to whether harm to the national security would result from disclosure). Of course, this deference is not a rubber stamp, *see Stillman v. CIA*, No. 01 Cv. 1342, 2007 WL 1020814, at *6 (D.D.C. Mar. 30, 2007); the CIA must provide a "facially

---

sources; (e) scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism; (f) United States Government programs for safeguarding nuclear materials or facilities; (g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security, which includes defense against transnational terrorism; [and] (h) weapons of mass destruction. Exec. Order 13,292 § 1.4.

reasonable", plausible, explanation for its national security decisions. *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999); *accord McGehee,* 718 F.2d at 1149 (stating that courts should require a "logical connection" between the deleted information and reasons for classification).

The CIA has met its burden of demonstrating that the classification requirements of the Executive Order were met. First, the information at issue was properly classified pursuant to the CIA's Classification Guide (the "Guide"), which is created by an Agency official with original classification authority. (*See* Declaration of Stephen Kappes "Kappes Decl.") ¶ 18.) The Guide sets forth certain categories of information that, if disclosed, would cause harm to national security and therefore must be classified. (*See id.*); Exec. Order 13,292 §§ 1.2, 1.4, 2.2.[17] With respect to cover and covert employees, the Guide states that "information that identifies or describes CIA cover methods or organizations, including information that associates current or former CIA officers or facilities with specific covers" is "secret". (Tab-Cl. 9; *see* Kappes Decl. ¶ 19.) Pursuant to the Guide, Wilson's employment for the CIA

---

[17] The CIA prepared the Classification Guide to facilitate the proper and uniform derivative classification of information, pursuant to section 2.2 of the Executive Order. (*See* Kappes Decl. ¶ 18.)

prior to 2002, if any, was classified. (*See* Kappes Decl.
¶ 19.)[18]

Second, information about whom the CIA has hired and in
what capacity is plainly owned by, produced by or for, or is
under the control of the government. *See* Exec. Order 13,292
§ 1.1(a)(2); *see also id.* § 6.1(s) ("control" means "the
authority of the agency that originates information . . . to
regulate access to the information"); (Kappes Decl. ¶ 21.)
Plaintiffs' suggestion that the government lost control and
ownership of the information when it entered the public domain
is misplaced. The information was not public at the time it was
originally classified. In any event, there is no dispute that
the information was "produced by" the government. Thus, the
disjunctive requirements of Executive Order 13,292 § 1.1(a)(2)
are clearly met.

Third, the CIA has determined that the information at issue
concerns intelligence activities, intelligence sources or
methods, foreign relations, or foreign activities of the United
States, and thus falls squarely within the classifiable
categories specified in the Executive Order. (*See* Kappes Decl.
¶ 22); Exec. Order 13,292 §§ 1.1(a)(3), 1.4(c),(d).

---

[18] In addition, the February 10th Letter was reviewed by the Director of the
CIA, who has original classification authority and who determined that
acknowledgment of any pre-2002 employment by Wilson was, and is, classified.
(*See* Kappes Decl. ¶ 20.) The CIA Director's decision only confirmed what
already had been the case; *i.e.*, that the information was classified. (*See
id.*)

14

Finally, the CIA has determined that unauthorized release

of the information "reasonably could be expected to result in

damage to national security," notwithstanding that the

information is already in the public domain. (*See* Kappes Decl.

¶¶ 24-25.) Deputy CIA Director, Stephen Kappes, provided two

declarations -- one classified and one unclassified -- which

explain the harm to national security which reasonably could be

expected if the CIA were to acknowledge the veracity of the

information at issue. (*See id.* ¶¶ 32-72; *see generally*

Classified Declaration of Stephen Kappes.)[19] His explanation is

reasonable, and the Court sees no reason to disturb his

judgment. *See Sims*, 471 U.S. at 180; *Fitzgibbon*, 911 F.2d at

766; *McGehee*, 718 F.2d at 111-12; *see also Diamond v. FBI*, 707

F.2d 75, 79 (2d Cir. 1983) (courts "must pay substantial

deference to the affidavit submitted by the agency in the

'national security' context").

Accordingly, the information contained in the February 10th

Letter concerning Wilson's purported dates of employment was

properly classified pursuant to Executive Order.

**B. The Information Was Never Declassified**

Plaintiffs nevertheless claim that, even if the information

at issue was originally classified, it was presumptively

_____

[19] Kappes's classified declaration was submitted to the Court *ex parte* and reviewed *in camera*.

15

declassified as a result of the February 10th Letter. This assertion fails as a matter of law.

Previously classified information may be officially declassified pursuant to Executive Order where the agency head or senior agency official "determine[s]" that "the public interest in disclosure outweighs the damage to the national security that might reasonably be expected from disclosure." Exec. Order 13,292 § 3.1(b). Putting aside whether Tumolo undertook the requisite declassification analysis prior to sending the February 10th Letter, she was not legally authorized to declassify the information.

The governing CIA regulation, entitled "Declassification Authorities", contains a list of position titles of officials to whom the CIA Director has delegated declassification authority. (*See* Tab 40; Kappes Decl. ¶ 73.) Tumolo's position at the time the Letter was sent -- Chief, Retirement and Insurance Services -- is not among the titles listed. (See Tab 40; *see also* Kappes Decl. ¶¶ 74-77.) Nor has Tumolo otherwise been granted declassification authority. (*See* Kappes Decl. ¶¶ 73-74.)[20] Thus, contrary to plaintiffs' assertion, Tumolo's act of mailing

---

The Declassification Authority regulation was promulgated in 1997. Although declassification authority has been delegated to certain other positions since then, the position of Chief of Retirement and Insurance Services is not among those additional officials to whom declassification authority was delegated. (*See* Kappes Decl. ¶ 74.)

the February 10th Letter did not -- and could not --amount to or result in an official declassification.

The fact that the Letter was sent without the appropriate classification stamp does not change the result. Classification does not occur as a result of marking a document; rather, a document is marked once it is classified. *See* Exec. Order 13,292 § 1.6(a). In a similar vein, the failure to mark a document does not render the information in it unclassified. *See id.* §§ 1.6(f) ("Information assigned a level of classification . . . shall be considered as classified at that level of classification despite the omissions of other required markings.").

Because the information at issue concerning Wilson's employment dates was never declassified, there was no need or occasion for the CIA to *reclassify* that information. *See* Exec. Order 13,292 § 1.7(c) ("Information may be reclassified *after* declassification and release to the public under proper authority." (emphasis added));[21] *see also* 32 C.F.R.

---

Section 1.7 of the Executive Order provides:

(c)    Information may be reclassified after declassification and release to the public under proper authority only in accordance with the following conditions:

(1) the reclassification action is taken under the personal authority of the agency head or deputy agency head, who determines in writing that the reclassification of the information is necessary in the interest of the national security;

(2) the information may be reasonably recovered; and

17

§ 2001.13(a)(2) ("[D]eclassification and release under proper
authority means that the agency originating the information
authorized the declassification and release of the
information."). Thus, plaintiffs' claim that the information at
issue cannot be "reasonably recovered" from the public domain --
a requirement for reclassification -- is simply irrelevant. *See*
Exec. Order 13,292 § 1.7(c).

## C. The CIA Has Not Officially Acknowledged the Information

Finally, plaintiffs rely on the "official acknowledgment"
doctrine to free the information at issue from censorship. The
government's right to censor information does not extend to
information that it has already officially acknowledged. *See,
e.g., Wolf*, 473 F.3d at 378 ("[W]hen information has been
officially acknowledged, its disclosure may be compelled even
over an agency's otherwise valid exemption claim."); *Knopf*, 509
F.2d at 1367-70. That is because when the government has
officially acknowledged the specific information at issue, its
interest in precluding further dissemination of the identical
information is outweighed by an individual's competing First
Amendment rights. *See Marchetti,* 466 F.2d at 1314 (explaining
that the First Amendment precludes censorship of officially

---

(3) the reclassification action is reported promptly to the
Director of the Information Security Oversight Office.

Exec. Order 13,292 § 1.7(c).

18

disclosed information); *see also Snepp*, 444 U.S. at 513 n.8

("[I]f in fact information is unclassified or in the public

domain, neither the CIA nor foreign agencies would be

concerned."); *Brown v. Glines*, 444 U.S. 348, 355 (1980)

(restrictions on speech must be "no more than is necessary to

protect the substantial government interest").[22]  Contrary to

plaintiffs' claim, however, no official acknowledgment occurred

here.

To establish an official acknowledgment, plaintiffs must

demonstrate that the information requested: (1) is "as specific"

as the information previously released; (2) "matches" the

information previously disclosed; and (3) was previously made

public "through an official and documented disclosure."  *Wolf*,

473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765); *accord*

---

[22] The official acknowledgment doctrine typically arises in Freedom of
Information Act (FOIA) cases. *See, e.g.*, *Wolf*, 473 F.3d at 378; *Afshar v.
Dep't of State*, 702 F.2d 1125, 1129-33 (D.C. Cir. 1983); *Military Audit
Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981).  The doctrine generally
operates in that context as a "waiver" of the government's right to withhold
information on national security grounds. *See, e.g.*, *Wolf*, 473 F.3d at 378.
The official acknowledgment doctrine is also generally thought to apply in
First Amendment cases, *see, e.g.*, *Knopf*, 509 F.2d at 1370, but in a somewhat
different fashion.  Specifically, while the doctrine operates in the FOIA
context to waive the government's right to withhold documents in its
possession, the doctrine in First Amendment cases potentially serves to
negate or override the government's interest in restricting the dissemination
of information already known by the person(s) seeking to disseminate it.  The
relationship between FOIA and First Amendment cases, as it relates to the
official acknowledgment doctrine, was explained by the court in *Knopf* as
follows: "[P]laintiffs should not be denied the right to publish information
which any citizen could compel the CIA to produce and, after production,
could publish." *Knopf*, 509 F.2d at 1367.

19

*Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891
F.2d 414, 421 (2d Cir. 1989).

This Court need not concern itself with the first two
requirements of the official acknowledgment doctrine because the
third has not been met; namely, the information requested was
not "made public through an official . . . disclosure." [23]  *See*
*Fitzgibbon*, 911 F.2d at 765.  As explained in context below,
this standard accounts for two critical distinctions in the law
which are dispositive here.

The first is that the information must be made public
"*through*" an official disclosure; the mere presence of the
information in the public domain is insufficient.  *See, e.g.,*
*Wolf,* 473 F.3d at 378 ("The fact that information exists in some
form in the public domain does not necessarily mean that
official disclosure will not cause harm."); *accord Fitzgibbon*,
911 F.2d at 766.  Requiring that the information be made public
through an official disclosure conjoins the act of an official
disclosure to the means by which the information became public.
*Cf. Hudson River Sloop,* 891 F.2d at 422 ("Official statements *by*

---

[23] Although plaintiffs state in their opening memorandum of law that the only
information they seek to uncensor is the dates of Wilson's employment
contained in the February 10th Letter, elsewhere in their memorandum they
request, *inter alia*, an injunction requiring the release of any information
that is "consistent with" her dates of service.  (Pl. Memo. at 17.)  The
latter request clearly goes too far.  Even if the Court were to find that an
official disclosure occurred, Wilson's location and actions at any particular
time -  while perhaps "consistent with" her dates in service -- is not
contained in the February 10th Letter.

*definition* would . . . have to have been matters of *public record.*" (emphasis added)).[24]

Second, the public disclosure must be "official"; unofficial disclosures cannot bind the government. *See Fitzgibbon*, 911 F.2d at 765 (drawing a "critical" distinction between "official and unofficial disclosures"); *accord Rubin v. CIA*, No. 01 Civ. 2274, 2001 WL 1537706, at *5 (S.D.N.Y. Dec. 3, 2001). Sound policy compels this distinction. When a disclosure is unofficial, the world at large is left to surmise whether the information is accurate. Leaving the public to guess carries some degree of protection to confidentiality, which is lost when the government officially discloses or acknowledges the veracity of the disclosed information. *See Frugone*, 169 F.3d at 774-75 (D.C. Cir. 1999); *Military Audit Project v. Casey*, 656 F.2d 724, 745 (D.C. Cir. 1981) (recognizing that the perpetuation of the public's "lingering doubts" may be an important means of protecting national security); *Marchetti*, 466 F.2d at 1318 ("Rumor and speculation

---

[24] This nexus serves to safeguard classified information. For example, an agency official who directly discloses information to the public is more likely to ensure that the information is not classified, compared to when the same information is delivered in private to someone who either already knows the information or is in a position to know it. Of course, safeguarding classified information against unwitting public disclosure is entirely consistent with the Executive Order, which provides, *inter alia*, that "[c]lassified information shall not be declassified automatically as a result of any unauthorized disclosure of identical or similar information." Exec. Order 13,292 § 1.1(b); *see also Al-Haramain Islamic Found., Inc. v. Bush*, 451 F. Supp. 2d 1215, 1228 (D. Or. 2006) ("inadvertent disclosure . . . does not declassify it").

are not the equivalent of [an official] prior

disclosure . . . .").

In addition, the CIA confirms its commitment to secrecy

when it does not officially disclose or acknowledge public

information. *See, e.g., Sims*, 471 U.S. at 175. That commitment

serves not only to protect former and existing intelligence

sources and methods, but also serves to maintain the confidence

of would-be recruits and co-operators. *See id.* ("If potentially

valuable intelligence sources come to think that the Agency will

be unable to maintain the confidentiality of its relationship

with them, many could well refuse to supply information to the

Agency in the first place."); *Earth Pledge Foundation v. CIA*,

988 F. Supp. 623, 627 (S.D.N.Y. 1996) ("Whatever disclosures

have been made in [public], the CIA has on ongoing interest in

assuring its sources of its continued adherence to its strict

policy of not revealing sources."), *aff'd* 128 F.3d 788 (2d Cir.

1997); *see also Snepp*, 444 U.S. at 509 n.3 (noting the

government's "compelling interest in protecting . . . *the

appearance of* confidentiality so essential to the effective

operation of our foreign intelligence service" (emphasis

added)).

Finally, "[i]n the world of international diplomacy, where

face-saving may often be as important as substance, official

confirmation . . . could have an adverse effect on our

relations" with foreign countries. *Phillippi v. CIA*, 655 F.2d

1325, 1332-33 (D.C. Cir. 1981). For example, "[o]fficial

acknowledgment may force a [foreign] government to retaliate."

*Afshar*, 702 F.2d at 1131.[25] For all these reasons, the law

recognizes that "in the arena of intelligence and foreign

relations there can be a critical difference between official

and unofficial disclosures." *Fitzgibbon*, 911 F.2d at 765.

With these considerations in mind, it is clear to the Court

that the CIA has not officially acknowledged the information at

issue because it was not made public through any official

disclosure.

### 1. The February 10th Letter Was Not a Public Disclosure

To begin, the information at issue was not made public

through the CIA. The February 10th Letter was sent only to

Wilson. This private correspondence was not a public

disclosure.

*Wolf* is the only case cited by plaintiffs in which an

official, public, disclosure was found to exist. *Wolf*, 473 F.3d

at 379-80. There, the CIA Director testified directly before

Congress about the specific information sought by the FOIA

---

[25] The court in *Phillippi* cited a concrete example: former Soviet premier Nikita Khrushchev stated in his memoirs "that what led him to cancel the Paris Summit meeting with President Eisenhower after the U-2 incident was not the fact that American U-2's had overflown the Soviet Union -- that was not news to Khrushchev -- but rather that President Eisenhower had publicly admitted that he had approved the mission." 655 F.2d at 1332.

plaintiff. *See Wolf*, 473 F.3d at 379; *cf. Hudson River Sloop*, 891 F.2d at 421-22 (assuming, without deciding, that acting high-ranking Navy officers' testimony before Congress was an official disclosure).[26] By stark contrast, the CIA's communication at issue in this case was a private letter sent to a former Agency employee who already knew the information and was sworn to secrecy. The Court is unaware of any case holding that a letter sent by the CIA to a former employee is a "public" disclosure, much less that it should serve as the basis for vitiating the CIA's obligation to protect any classified information in the Letter. Nor is the Court aware of any case holding that a "disclosure" occurs where information is provided to someone who already knows it.[27] The Court sees no reason to extend the official acknowledgment doctrine beyond its intended purpose, and declines to do so here. *See Wolf*, 473 F.3d at 378 (explaining that the requirements for official acknowledgment

[26] In *Wolf*, the Director's testimony resulted in a "waiver" of the CIA's claimed FOIA exemptions, but only with respect to the specific information testified to. *Wolf*, 473 F.3d at 379-80. In *Hudson River Sloop*, the Second Circuit found that no official acknowledgment occurred as a result of the naval officers' testimony because the information testified to did not match the information requested by the plaintiffs. 891 F.2d at 412-22. In any event, the congressional testimony of the naval officers is easily distinguished from the circumstances of this case for the reasons discussed herein.

[27] Because the Court finds that the information was not made public "through" Tumolo's act of sending the Letter to Wilson, the Court does not reach the issues of: (1) whether Tumolo held sufficient rank or responsibility at the CIA to make an official disclosure; (2) whether she "intended" to disclose the information; and (3) whether, or to what extent, these considerations are even relevant to an "official acknowledgment" analysis. The parties vigorously disagree on all of these points.

24

must be applied with "exactitude" out of deference to the government's "vital interest in information relating to national security and foreign affairs." (internal marks and citations omitted)); *see also Public Citizen v. Dep't of State*, 11 F.3d 198, 202 (D.C. Cir. 1993) (describing the test for official disclosure as a "stringent" one).

### 2. Wilson's Transmittal of the February 10th Letter to Congress Was Not An Official Disclosure

Wilson's subsequent transmittal of the February 10th Letter to Representative Inslee cannot operate to bind the Agency because *her* disclosure was not official. To be "official", an action must be "authorized or approved by a proper authority." Blacks Law Dictionary (8th ed. 2004); *accord* American Heritage Dictionary of the English Language (4th ed. 2000) (defining "official" as "authorized by a proper authority"); *see also Military Audit*, 656 F.2d at 744 (describing the official disclosure requirement as an "authoritative" disclosure); *Schlesinger v. CIA*, 591 F. Supp. 60, 66 (D.D.C. 1984) (construing "official disclosure" to mean "direct acknowledgments by an authoritative government source").

A disclosure by a former agency employee is *not* official, regardless of his or her former position at the agency. *See Hudson River Sloop*, 891 F.2d at 421-22 (former Navy admiral's testimony before Congress was not official disclosure); *accord*

*Military Audit*, 656 F.3d at 742-43 (former CIA Director's statements in his book was not an official disclosure, even where his statements were corroborated with other unofficial public disclosures); *see also Afshar*, 702 F.2d at 1133 (statements in books by former CIA agents are not official disclosures).[28]  Thus, Wilson's transmittal of the February 10th Letter to Representative Inslee was not an official disclosure that could bind the CIA.

### 3. Representative Inslee's Reproduction of the February 10th Letter In the Congressional Record Is Not An Official Disclosure

Finally, the reproduction of the February 10th Letter in the Congressional Record is not an official disclosure.  That is so whether the congressional disclosure is considered in isolation, or in conjunction with the communications from Tumolo and Wilson that preceded it.

An official disclosure occurs only when the agency responsible for protecting the information discloses it. *Frugone*, 169 F.3d at 774 ("[W]e do not deem 'official' a disclosure made by someone other than the agency from which the

---

[28] It is not clear whether Wilson was required, under her secrecy agreement or otherwise, to ascertain whether the information in the Letter was unclassified before forwarding it to Representative Inslee.  If she was so required, this might provide an independent basis for ruling that she cannot further disseminate the information at issue for her own benefit.  *Cf. Knopf*, 509 F.2d at 1371 ("A public official in a confidential relationship surely may not leak information in violation of the confidence reposed in him and use the resulting publication as legitimating his own subsequent open and public disclosure of the same information.").  However, the Court has not been asked to, and does not, decide this issue.

information is being sought." (citations omitted)); *see also*
*Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) ("[T]he
protection of classified information must be committed to the
broad discretion of the agency responsible."). Thus, a
*congressional* publication of classified CIA information cannot
bind the *CIA*. All of the courts to have addressed the issue are
in agreement. *See Earth Pledge Foundation*, 128 F.3d 788 (2d
Cir. 1997), *aff'g* 988 F. Supp. 623, 628 (S.D.N.Y. 1996)
("[P]ublic disclosure in the Senate Report of some of the
information requested by plaintiffs does not undermine [the
CIA's] justification for refusing to confirm or deny the
existence of this information."); *Fitzgibbon*, 911 F.2d at 766
(holding that the CIA could refuse to disclose classified
information even though the information was already reported in
a congressional committee report); *Salisbury v. United States*,
690 F.2d 966, 971 (D.C. Cir. 1982) (finding that disclosure of
intelligence methods in a Senate Report "cannot be equated with
disclosure by the agency itself"); *see also Military Audit*, 656
F.2d at 743.

Plaintiffs seek to distinguish these cases on the ground
that the congressional statements at issue therein amounted to
unattributed speculation, *see, e.g., Military Audit*, 656 F.2d at
743 (characterizing the Senate Report at issue as "nothing more
than a compilation of speculation from non-government sources"),

27

whereas the information concerning Wilson's employment, as republished in the Congressional Record, is directly traceable to the CIA. Perhaps more to the point, plaintiffs argue that because the CIA cannot "plausibly deny" the truth of the information at issue, it must be deemed officially acknowledged. *Cf. Knopf*, 509 F.2d at 1370 ("It is one thing for a reporter or author to speculate or guess that a thing may be so or even . . . to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so."). But plaintiffs' argument places far too much emphasis on public perception, and ignores the compelling considerations of the CIA's commitment to secrecy and matters of foreign relations, discussed *supra*. *See Earth Pledge*, 988 F. Supp. at 627-28 (holding that Senate Report which referenced written cables between CIA headquarters and a CIA station in the Dominican Republic was not an official disclosure or acknowledgment of the foreign station's existence), *aff'd* 128 F.3d 788 (2d Cir. 1997).

To be sure, the public may draw whatever conclusions it might from the fact that the information at issue was sent on CIA letterhead by the Chief of Retirement and Insurance Services. However, nothing in the law or its policy requires the CIA to officially acknowledge what those in the public may think they know. *See id.; Military Audit,* 656 F.2d at 741-46;

*Afshar*, 702 F.2d at 1130 (rejecting suggestion that public speculation about CIA liaison with Iranian government constituted prior disclosure); *Knopf*, 509 F.2d at 1369-70 (even "in situations in which information . . . is so generally believed to be true, that confirmation by one in a position to know would add nothing to its weight . . . appraisals of such situations by the judiciary would present a host of problems and obstacles").[29]

## CONCLUSION

In sum, information concerning Wilson's pre-2002 employment for the CIA (if any) is properly classified, has never been declassified, and was not otherwise officially acknowledged by the CIA. The CIA itself did not publicly disclose the information at issue; it was Wilson and/or Representative Inslee who did. Their unofficial disclosures, however, cannot bind the CIA. The government has a compelling interest in censoring the dissemination of classified information and has provided a reasonable basis for doing so here.

---

[29] To the extent plaintiffs suggest that the CIA's January 23, 2007 letter to the Clerk of the House of Representatives was an official acknowledgment, they are incorrect. Although that letter states that the Congressional Record contains classified information, the CIA did not specify what information in the record is classified. *See Wolf*, 473 F.3d at 378; *accord Hudson River Sloop*, 891 F.2d at 421 (information disclosed must be as specific as the information requested).

Accordingly, plaintiffs' motion for summary judgment is DENIED; defendants' motion for summary judgment is GRANTED.

**SO ORDERED:**

Dated:  New York, New York
        August 1, 2007

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**